EXHIBIT  2

| | |
|---|---|
| NOVARTIS PHARMA AG, | **Case No. 1:20-cv-00400-GHW-GWG** |
| Plaintiff, | **Judge Gregory H. Woods** |
| v. | **Magistrate Judge Gabriel W. Gorenstein** |
| INCYTE CORPORATION, | |
| Defendant. | |

## LINDA M. PULLAN, Ph.D. REBUTTAL EXPERT REPORT

The following report is provided pursuant to Federal Rule of Civil Procedure 26(a)(2).[1] My opinions are based on my education, training, knowledge, experience, and/or materials I have considered in connection with this litigation, which were listed on **Exhibit A** to my opening report and **Exhibit 1** to this rebuttal report. I reserve the right to supplement those lists and my opinions set forth in this report. I also reserve the right to respond to and rebut all information provided in discovery and any opinions offered by Defendant's experts.

In submitting this report, I stand by all of my opinions set forth in my opening report, which are expressly incorporated by reference. I also annex an updated CV as **Exhibit 2**.

## REBUTTAL TO DEFENDANT'S EXPERT PETER LANKAU

As a general matter, Mr. Lankau's report reads in material respects as highly legalistic contract interpretation. By rebutting his report, I am not endorsing his contract interpretation arguments or purported opinions as appropriate expert opinion. Subject to that caveat, I rebut from my professional experience and understanding of industry custom and practice the content of his report as set forth below.

## I. Notable Omissions and Mischaracterizations in Background Sections

To begin, I note that Mr. Lankau's report lacks factual record support in material respects because it contains several notable omissions and mischaracterizations. A non-exhaustive list of these is set forth below, all of which are important facts that I have considered in formulating my opinions in this case:

- Section IV.B makes no reference to the significant debt and other financial hurdles Incyte had at the time it was looking to partner with and gain the benefit of resources from a more

---

[1] All defined terms used herein and not otherwise defined shall have the same meaning as in my opening report dated May 4, 2022.

established pharmaceutical company like Novartis; the limited experience and infrastructure Incyte had at the time, certainly with respect to commercializing a drug on a global scale; at the time, Incyte did not yet sell a single product and thus had a negative balance sheet; or all the positive attributes that Novartis brought to the table, which ultimately resulted in Incyte reaching agreement with Novartis as its partner for the global commercialization of ruxolitinib, among other things.

- Section IV.D makes no reference to the fact that on June 5, 2009, the parties met in person to discuss, among other things, financial projections, and Novartis presented slides to Incyte reflecting alliance revenue (*i.e.*, incoming reverse royalties) until at least 2024, if not later, and thus well beyond 10 years past launch, as testified by Douglas Hager (who attended this meeting) on pages 201-05, 238, and 310-15 of his deposition transcript. As Doug Hager further testified at pages 201-05, the modeling Incyte was presented by Novartis reflected Novartis' understanding and expectation that it would be paid a reverse royalty on U.S. sales until the loss of market exclusivity in the U.S., consistent with the parties' discussion that there should be "congruency" as to when the parties are paying royalties to one another. In the particular circumstances here, this approach is consistent with industry custom and practice.

- Sections IV.C and IV.D omit reference to the high royalties on ex-U.S. sales and high upfront ($150 million) and milestone payments that Incyte was demanding from Novartis, as reflected in the term sheet exchanges produced by Novartis, as well as Novartis' need to necessarily return value to itself, hence the need to have the reverse royalty as part of this deal. As Todd MacLaughlan testified on pages 368-69 of his deposition transcript, the reverse royalty "going out to the patent expiry date" was necessary to "make the deal make sense"; otherwise, "there wouldn't be enough [value] to offset the amount of money going out of Novartis' treasury."

- Section IV.E (and frankly the whole report) omits reference to the conversation Douglas Hager had with Steven Singer where he asked why "Licensed Patent Rights" had been used in the draft contract in lieu of "Licensed IP," as used in the final term sheet dated July 9, 2009, and he was told that "IP" (as used in "Licensed IP") includes know-how, which does not expire, whereas patents do. Mr. Hager described this conversation on pages 315-18 of his deposition transcript.

- Section IV.E makes no reference to the inclusion of the separate 1% royalty (ultimately set forth in Section 8.3(b)(ii) of the Agreement) in the contract drafting phase of the deal period, and that this 1% royalty being paid by Incyte to Novartis was premised on "Novartis Improvements," if any. This 1% royalty addition was reflected on issues lists and in communications relating to the parties' contract drafting discussions, as one would expect. My opening report discusses my thoughts with respect to the absence of such documentation or discussions as to Section 8.3(b)(i) reverse royalties and my opinions as to what that absence reflects from an industry custom and practice perspective.

- Section IV.F distorts the record by making no reference to the numerous, valuable contributions Novartis made to the commercialization of Jakafi in the U.S. I discussed these contributions in my opening report and discuss them further below.

- Paragraph 76 assumes that Novartis needed to or should have obtained patents in the U.S. to protect Jakafi, when Incyte had already sought that patent protection, as reflected in the Agreement and its Exhibit A-2 listing out all of the Incyte patent applications.

- Section IV.F(2) omits reference to the significant amount of money that Incyte has made over the years selling Jakafi in the U.S. Incyte's annual sales of Jakafi from 2011 (when the product was approved by the U.S. Food and Drug Administration ("FDA")) to 2021, as publicly reported in its annual 10-Ks submitted to the U.S. Securities & Exchange Commission, are as follows:

| 10-K for the Year Ended | Publicly Reported Sales of Jakafi |
|---|---|
| 2011 | $ 2 Million |
| 2012 | $ 136 Million |
| 2013 | $ 235 Million |
| 2014 | $ 357 Million |
| 2015 | $ 601 Million |
| 2016 | $ 853 Million |
| 2017 | $ 1.133 Billion |
| 2018 | $ 1.387 Billion |
| 2019 | $ 1.685 Billion |
| 2020 | $ 1.938 Billion |
| 2021 | $ 2.135 Billion |

These figures are consistent with the royalty reports served by Incyte to Novartis in connection with making reverse royalty payments pursuant to Section 8.4 of the Agreement (save for that from 2021, when Incyte informed Novartis it would no longer be paying any reverse royalties, even at a 50% reduced amount, as of November 17, 2021). Notably, the publicly reported sales of Jakafi are significantly higher, and Incyte was (and still is) getting significantly higher royalties (between 18-24%) from Novartis based on ex-U.S. sales of Jakavi, whereas Incyte was only paying Novartis 2-5% on U.S. sales for about approximately four years (from Q4 2014 to Q4 2018) and then at a unilaterally 50% reduced rate for under three years (from time of step-down invocation through mid-November 2021). To put this in context, notwithstanding Novartis' significant contributions (described in my opening report and elsewhere herein), Novartis got a very small percentage of U.S. sales royalties, whereas Incyte got a much larger percentage of ex-U.S. sales royalties *plus* all of the U.S. sales monies described above.

- Paragraph 80 references Tabrecta, the trade name for the drug containing the c-MET compound, the other compound covered by the Agreement. Tabrecta has no bearing on this reverse royalty dispute pertaining to Jakafi. In fact, I understand that the parties recognized such irrelevance in a stipulation that the Court entered.

- Paragraph 90 ignores that the parties appear to have sought "congruency" in the duration of royalty payments to one another, such that reverse royalty payments would begin from Incyte when Novartis had obtained the required reimbursement and pricing approvals in the E.U. that would allow Novartis to sell the drug in those European countries (and thus make royalty payments to Incyte). Based on my experience and industry custom and practice, as well as my review of the term sheet exchange record in this case, it is my opinion that the purpose of this "reimbursement and pricing approval" language in Section 8.3(b)(i) was to ensure that the parties commence paying each other royalties around the same time (and so the royalty streams were equivalent in duration going both ways).

- Paragraph 94 erroneously suggests that Section 8.3(c) is a provision that provides for 10 years' worth of royalties unless certain things occur that can "extend" the length of the royalty term. To the contrary, and as I described in my opening report, Section 8.3(c) is drafted consistent with industry custom and practice and is reflective of the concept of market exclusivity—*i.e.*, that the royalty payor will pay royalties when they have market exclusivity due to the presence of patent protection, regulatory exclusivities, or both, and that in the absence of market exclusivity, royalties will be paid for a 10-year term. Mr. Lankau does not frame Section 8.3(c) consistent with industry custom and practice with respect to the payment of a royalty.

## II. "Licensed Patent Rights" Relating to Jakafi Are in Existence Today, Protect Jakafi from Market Competition, and Should Be Used to Calculate the Endpoint of Incyte's Reversal Royalty to Novartis: A Rebuttal to Section V.B

I disagree with Mr. Lankau's opinion that there are no "Licensed Patent Rights," as that term is defined in the Agreement, covering and thus protecting Jakafi in the U.S. I incorporate by reference the entirety of my opening report and my opinions with respect to "Licensed Patent Rights" encompassing all patent rights (*i.e.*, the term is defined by the existence of subject patent rights and not by the identity of the holder), irrespective of which party to the Agreement obtained or owns the applicable patent(s). Without repeating my opening report here, I rebut specific arguments made by Mr. Lankau in Section V.B of his report below.

*First*, Mr. Lankau opines at Section V.B(1) that Section 8.3(c) was intended to be "directional" in nature and he relies on the "with respect to" language to support that opinion. I disagree. He points to nothing in the contemporaneous documentary record (and ignores the significance of the term sheets and other contemporaneous documents in the record refuting his position) or even deposition testimony to support that opinion. There is nothing in the definition of "Licensed Patent Rights" that indicates that which patent rights apply depends on whether the drug seller in a given country is the licensor or licensee. In fact, nothing in the term "Licensed Patent Rights" is tied to sales at all; the word "sales" does not even appear in the definition. Based on my industry experience and industry custom and practice, if the parties had intended to exclude Incyte Patent Rights from the definition of "Licensed Patent Rights" or endpoint (i) in Section 8.3(c) for purposes of determining the duration of the reverse royalty's term (*i.e.*, for sales of Jakafi made in the U.S.), that would have been made clear in the Agreement. I also note that "directional" is not a common industry term used in the pharmaceutical licensing context.

Mr. Lankau's "directional" argument also is at odds with the licenses granted under the Agreement. Under Section 2.1(b), Incyte granted Novartis a license "under Incyte IP" and necessarily access to its U.S. patent rights for various reasons (including for research, development, manufacturing, and other activities) with the caveat that Incyte, not Novartis, would be responsible for commercializing and selling the drug in the U.S. Put differently, pursuant to Section 2.1(b), Novartis has been licensed Incyte Patent Rights (among other IP) in the U.S. by Incyte, which makes sense, as Incyte had sought to protect the compounds it had discovered by applying for various patents before it ever partnered with Novartis. Nowhere in the Agreement does it say that this license grant from Incyte to Novartis excludes access to Incyte Patent Rights in the U.S. for the sole purpose of determining the length of the term applicable to the reverse royalties paid by Incyte to Novartis under Section 8.3(b)(i) of the Agreement.

Mr. Lankau's "directional" argument is also misplaced in that the economic logic of a multi-faceted pharmaceutical licensing deal, such as this one, which is not tied exclusively to obtaining patents. All of the deal terms, including the contributions of respective know-how, financial investments, valuable intangibles, experience, infrastructure, and various other items, factor into how a deal is structured and the "direction" in which payments between the parties may flow. Who owns the patent protecting the product from third-party/market competition need not match the "directionality" of payments, as payments are agreed to for a myriad of reasons and for contributions of all kinds. In a complex arrangement such as here, how the parties agree to split financial upside is a matter of risk and timing allocation and perception of contributions along various fronts, without any type of bright-line rule as Mr. Lankau suggests. He has no basis to opine that that the patents rights within a collaboration define royalty term duration only when the patent holder is the party making the sales in the subject country. That is also not supported by any industry custom or practice or commercial rationality.

In addition, Mr. Lankau's "directional" argument is undermined by the fact that Novartis makes payments to Incyte on certain events in ex-U.S. countries in the form of milestones. This suggests that money can flow from one direction to the other irrespective of who has the patents and who is making the sales in that country.

The "directional" argument is further misplaced given that Incyte was the inventor party, at the time of the Agreement was the only party with any Patent Rights at all (and so would be the only side that could take advantage of endpoint (i) in Section 8.3(c)), and pursuant to Section 7.2 controlled all patent activity relating to Jakafi in the U.S. Based on my experience and industry custom and practice, there is no commercially rational basis for Novartis to receive less of a benefit with respect to the reverse royalty (*i.e.*, significantly cutting its overall duration and at a time when the sales for the product are at its highest) against this backdrop and given its many financial and other contributions to the collaboration.

While Mr. Lankau selectively cites sparse testimony from Incyte witnesses to support his opinion regarding the meaning of "Licensed Patent Rights," he omits a significant portion of the record to the contrary—specifically, Novartis witnesses' deposition testimony that the term

"Licensed Patent Rights" was intended to include all patent rights within the collaboration and encompasses any patent right from any party that is licensed to the other under the Agreement.[2]

Mr. Lankau also omits relevant context from his citation of Steven Singer's testimony in footnote 132 on page 35, where he notes that Mr. Singer testified that "Licensed Patent Rights" was intended to bifurcate the parties' patent rights and "not to lump them together." Specifically, Mr. Lankau leaves out that this was Mr. Singer's opinion *at the time of his deposition*, not at the time of drafting the Agreement. Immediately after the deposition transcript testimony quoted by Mr. Lankau in footnote 132, Mr. Singer went on to say, at page 168:14-18 of his deposition transcript: "[t]hat would be the intent and purpose from my perspective, but that's my analysis now. If you ask me what I remember from back then, again, I just don't recall exactly." This concession renders Mr. Singer's testimony on this topic irrelevant as to what the parties understood at the time the Agreement was drafted.

*Second*, Mr. Lankau opines in Section V.B(1) that "Licensed Patent Rights" was a "single-purpose definition" or "specially defined term" that "would not have been needed at all except to achieve the outcome of clarifying whose Patent Rights are relevant for assessing the term of the royalty stream on a given Licensed Product in a specific country in the context of Section 8.3(c)(i)." I disagree. Licensing agreements often include defined terms, including defined terms used in royalty term provisions, that cross or cover multiple circumstances/situations or obligations flowing from both sides to the other. Based on my industry experience and industry custom and practice, if the parties had intended for the other side's patents, which had been licensed to one another, to be excluded from determining the length of the royalty term applicable to a royalty stream, then the parties would have clearly spelled that out. This is particularly so given that Incyte had obtained patent coverage in the U.S. prior to the Agreement's execution. Based on my industry experience and industry custom and practice, if Incyte's patents were being excluded – and Novartis would need to successfully pursue the contingency of obtaining its own U.S. patent to ever be able to satisfy endpoint (i) of Section 8.3(c) – that would have been clearly spelled out in the Agreement (and likely its drafting history). It notably is not.

Moreover, "Licensed Patent Rights" is a term being used in a reciprocal provision that is setting forth durational obligations both sides will have in paying a royalty to the other party. In my experience, using one term to succinctly describe all Patent Rights each side brought to the table at the time of contract execution or may bring into the collaboration following contract execution (whether individually or jointly), and which may be licensed to each other, is consistent with industry custom and practice and with several of Incyte's own other licensing agreements.

---

[2] The opinion that "Licensed Patent Rights" applied equally to each side's patent rights was shared by Novartis witnesses. *See* Brian Goldfus Deposition at 37:23-38:11 ("I understood that this was a collaboration in which the two parties would have access to a pool of - - of patent rights, 'pool' meaning any rights that were contributed by either party."); Nancy Griffin Deposition at 178:21-179:16 ("Q. For financial purposes, do you know that they are identical, for the purposes of how much money flows between the parties? . . . A. My understanding of managing the collaboration with input from a broad team, which includes legal and finance and different parties who work together and each party has individual responsibilities, that the term of the agreement as it pertains here is that little 'i' is for the valid claim of the patent rights. Q. Whose patent rights? A. The - - the joint patent rights. Q. What about patents that are not owned jointly? . . . A. It includes the IP that governs this agreement and Jackavi [sic] and Jakafi."); Doug Hager Deposition at 269:22-25 ("This [definition of licensed patent rights] defines licensed patent rights as being the sum of Incyte rights and Novartis rights. That's how I read this.").

Parties to territorial licensing deals routinely include all patents owned by each party in the license to avoid any blocking of the other party in a given territory.

Mr. Lankau contends in paragraph 110 that the parties "could have used the same phrase that they used in Section 7.3" ("Joint IP, Incyte IP, or Novartis IP") in lieu of "Licensed Patent Rights" as used in Section 8.3(c), and the decision not to do so reflects that the parties did not intend to "pool" patent rights that would apply to calculating the royalty term. This argument is fundamentally flawed for two reasons. To begin, "IP" is different from, and certainly broader than, "Patent Rights" in that "Patent Rights" are part of "IP" but "IP" also includes "Know-How," which does not expire. As the purpose of Section 8.3(c) is to set parameters around the duration of a royalty term, and necessarily its endpoint, using "IP" terms would not clearly capture that intent (and would not have an "endpoint" to the payment of royalties at all since it would then last as long as "Know-How"). This opinion by Mr. Lankau also ignores Douglas Hager's testimony, cited above, with respect to his conversation with Mr. Singer as to why "Licensed Patent Rights" was used in the draft contract in lieu of "Licensed IP." Based on my experience and industry custom and practice, "Licensed Patent Rights" reflects a reasonable structure to separate out the clear endpoint of patent rights versus "IP" in the context of paying royalties, as "Know-How" does not expire. In fact, Mr. Hager testified to this effect at his deposition. In other words, the duration of the royalty term would be longer and may never end if endpoint (i) of Section 8.3(c) was determined by "IP," which includes "Know-How," as opposed to patent rights.

*Third*, Mr. Lankau opines that Novartis needed to "add[] value by obtaining Novartis Patent Rights" in order to get reverse royalty payments for more than 10 years. I reject the suggestion that Novartis needed to undertake such a task in order to "add value," given Novartis' many financial and other contributions to the commercialization of ruxolitinib around the world, including in the U.S. which I discuss in more detail below, and the patent work Incyte had already done before the Agreement was signed. Mr. Lankau's opinion also ignores the construct of the deal and its collaboration, the parties' respective value splits (as set forth in their financial modeling), and the deal's financial parameters, including but not limited to the high upfront license fee paid to Incyte ($150 million), the significant royalties Novartis was paying (and continues to pay) Incyte on ex-U.S. sales of ruxolitinib (18-24%), the high milestone payments Novartis agreed to pay (and did pay) Incyte, and Novartis' development and clinical trial contributions. It also ignores that one of the rationales for royalty streams going both ways was to align incentives, so that each side benefits from the other's success. And as I noted in my opening report, in my experience, if the receipt of a royalty for a particular timeframe was conditioned on undertaking an additional step, like Novartis obtaining a patent that protects Jakafi in the U.S., that would be clearly reflected in the Agreement, just as "Novartis Improvements" was tied to obtaining the separate 1% royalty described in Section 8.3(b)(ii). That is tellingly absent.

*Fourth*, Mr. Lankau opines in Section V.B(2)(a) that Novartis is removing or ignoring language in the definition of "Licensed Patent Rights." I disagree. Based on my experience and industry custom and practice, there simply is no identifiable substantive difference based on the words "with respect to," "in each case," and "as applicable" in the definition of "Licensed Patent Rights." With or without these words, I read this defined term to encompass all patent rights—irrespective of who within the collaboration owns the patent—because that is the only reading of

the term that makes sense in the context of the whole Agreement and that is consistent with the basis and rationale for parties like Incyte and Novartis to collaborate at all.

Moreover, Mr. Lankau seeks to revise the definition of "Licensed Patent Rights" by adding in language that does not appear in the Agreement. The Agreement does not say that "Licensed Patent Rights" must be patents held or owned by the non-selling party (here, Novartis) and licensed to the selling party in a given territory (here, Incyte in the U.S.) or only applies to sales in a particular country. Again, "sales" appears nowhere in this defined term.

*Fifth*, contrary to the record surrounding the relevant negotiations, Mr. Lankau posits that the drafting history in this case suggests that "Licensed IP" in the final July 9, 2009 term sheet did not become "Licensed Patent Rights" in the Agreement, but rather, "Incyte IP," and thus does not have the same meaning.[3] In turn, he further posits that "Licensed Patent Rights" cannot include Incyte's valid U.S. patents that protect Jakafi in the U.S. I disagree based on both my industry experience and my evaluation of the contract terms, the Agreement as a whole and its relevant context, and the negotiating record, and incorporate all of my opening report opinions on this topic here in rebuttal.

To be clear, I disagree with Mr. Lankau's suggestion that "Licensed IP" in the term sheet, as used in the "Royalty Term" section thereof, did not form the basis of "Licensed Patent Rights" in Section 8.3(c) or is somehow a different concept in calculating royalty term duration. The final term sheet was clear on its face as far as how to calculate the duration of the royalty term applicable to either the royalties being paid by Novartis to Incyte or the reverse royalties being paid by Incyte to Novartis; it is consistent with my experience and industry custom and practice with respect to the duration of a royalty stream and that stream being tied to loss of market exclusivity.

While the term "Licensed IP" in the "Royalty Term" section of the final term sheet is revised to the term "Licensed Patent Rights" in Section 8.3(c) of the Agreement, that is not, in my opinion, a substantive change that affects the duration of the royalty term for either side pursuant to Section 8.3(c)(i). "Licensed IP" in the final term sheet included both patents and know-how owned or controlled by Incyte prior to Agreement execution *as well as* patents and know-how that *either party* brought into the collaboration (either separately or jointly). Put differently, it was a grouping of all patents and know-how that may be licensed to one another. This was streamlined to exclude know-how for the royalty term duration endpoint in the contract drafting stage, as know-how does not expire, but otherwise substantively remained the same. This supports my opinion that "Licensed Patent Rights" is a broad and all-encompassing grouping of all patents that either party to the collaboration brings to the table and licenses to the other, not a limiting term as to U.S. sales that will only include Novartis Patent Rights (which did not exist at Agreement execution, unlike Incyte Patent Rights).

---

[3] It merits note that "Incyte IP" and "Novartis IP" are parallels of one another in the final Agreement. "Incyte IP" is defined as "Incyte Know-How and Incyte Patent Rights" in Section 1.45. "Novartis IP" is defined as "Novartis Know-How and Novartis Patent Rights" in Section 1.76. Both definitions thus include the concept of Know-How *in addition to* Patent Rights.

## III.  Jakafi is "Covered" by "Licensed Patent Rights": A Rebuttal to Section V.C

Mr. Lankau opines that pursuant to the definition of "Cover," "Covering," and "Covered" in Section 1.23 of the Agreement, Jakafi is not "Covered" by any "Licensed Patent Rights." It is my opinion, based on my experience and industry custom and practice, that he is misreading the definition of "Covered," which is a commonplace definition in the industry, and ignoring the fact that the drug *is* protected by patents (including a compound/composition of matter patent) in the U.S. that excludes third parties from competing with Incyte in the market. Again, as I described in my opening report, the duration of a royalty stream in a pharmaceutical licensing agreement is typically tied to loss of market exclusivity, including patent protection.

As I explained in my opening report, the definition of "Cover," "Covering," and "Covered" is a commonplace definition used in the industry and would be interpreted by pharmaceutical industry professionals such as myself as meaning that the applicable patent protects the product from market competition by a third party that is not party to the partnership/collaboration/ agreement. Put differently, if a party outside the Agreement was trying to sell ruxolitinib, they would be infringing the patent(s) protecting the product in a given country because they have no license to sell it. The definition does not relay anything beyond saying that but for a patent or a license to a product, you would be infringing, and that if you have a patent or a license, you are protected (and if you are protected, you have market exclusivity). It is my opinion that Mr. Lankau improperly tries to frame Novartis as an outsider to the Agreement and to Incyte's patents that protect Jakafi in the U.S. when in fact Novartis is Incyte's partner/collaborator and obtained a license to those patents in Section 2.1(b) of the Agreement. Mr. Lankau's interpretation is, in my opinion, contrary to industry custom and practice in pharmaceutical licensing partnerships/collaborations.

Relatedly, I disagree with Mr. Lankau's suggestion that the license given to Novartis by Incyte in Section 2.1(b) of the Agreement is "limited" and that this somehow affects the duration of the royalty term applicable to the reverse royalty. Given the territorial split arrangement between Incyte and Novartis in the Agreement, this license provides Novartis with exclusive and appropriate rights and access to all Incyte IP, necessarily including Incyte Patent Rights in the U.S., with the understanding that Novartis cannot sell ruxolitinib in the U.S. I reject Mr. Lankau's attempt to frame this license somehow limits Novartis' access to Incyte's U.S. patents for purposes of calculating the royalty term applicable to the reverse royalty. This framing and interpretation is, in my opinion, contrary to industry custom and practice in territorial split partnerships/collaborations and is inconsistent with the Agreement between Novartis and Incyte whereby the parties agreed to share in the upside in their respective sales territories. By way of example, Novartis had the right to run clinical trials with patients in the U.S. (subject to joint committee approval per the Agreement), including the COMFORT-II that contributed to FDA approval, and for that would have needed a license to the U.S. patents from Incyte.

**IV.** **The Commercial Purpose of the Reverse Royalty Was to Return Value to Novartis and Have the Partners Share in the Upside, Not to Require Novartis to Obtain Patents: A Rebuttal to Section V.D**

In Section V.D of his report, Mr. Lankau opines that "Novartis needed to contribute something," *i.e.*, obtain its own U.S. patent, in order to get paid a reverse royalty for more than 10 years and "improve its financial position." Based on my experience, industry custom and practice, and my review of the factual record, I disagree with this opinion.

As I explained in my opening report, it is custom and practice in the pharmaceutical industry for collaborators who agree to partake in a territorial split to structure their business relationship and cooperate with one another, effectively as a joint team, such that they can share in the upside that results from the product's coordinated commercialization worldwide. In doing so, all parties—in this instance, Novartis and Incyte—benefit and their interests are aligned in ensuring the product's global success. And as part of its collaboration with Incyte, Novartis made material contributions to the commercialization of Jakafi in the U.S. warranting sharing in that upside (and thus getting a royalty for an equivalent amount of time and when Incyte still has market exclusivity). Mr. Lankau's opinion ignores all of these contributions, ranging from the financial (which are set forth in the Agreement and described in my opening report) to the regulatory and day-to-day commercialization activities.

It is abundantly clear from the record that Novartis directly contributed to the commercialization of Jakafi in the U.S. by funding and/or successfully completing clinical trials, the data for which was submitted to FDA to get regulatory approval. Incyte has even conceded this very fact in public press releases. For example, in an August 3, 2011 press release announcing that FDA accepted Incyte's New Drug Application ("NDA") for ruxolitinib as a treatment for myelofibrosis, Incyte acknowledged that the NDA included "results from two Phase III trials," including "COMFORT-II conducted by Novartis." This press release was produced by Incyte at INCY000119808-09. And even as recently as September 22, 2021 (and as this litigation was ongoing), in announcing FDA approval of ruxolitinib for treatment of chronic GVHD, Incyte acknowledged in a press release that the "FDA approval was based on the REACH3 study," which was "co-sponsored" by Novartis. This press release was produced by Incyte at INCY000120396-401. Novartis' contributions were critical for the FDA approvals for ruxolitinib's current indications.

Novartis and Incyte also worked together to strategize with respect to commercialization on a global scale, working together to ensure that activities undertaken would support both sales territories. In this regard, Novartis worked with Incyte on studies (including the recruitment of trial participants for a trial that Novartis did not even buy into), regulatory communications and submissions (*e.g.*, briefing books), conference and symposium materials and messaging, and publications to ensure they were coordinated to ensure mutual success (including success in the U.S.) and incorporated each other's thoughts and comments. In these and other contexts, Novartis shared significant know-how, data and information, and market research with Incyte. And at the outset of the relationship, Novartis shared a significant amount of information and potential strategies for how to commercialize the drug with Incyte (prior to FDA approval), deal with advertising-related issues that would only concern the U.S., and over time took the lead on the

global branding strategy. Notably, Novartis also provided Incyte with the drug's brand name. In other words, absent Novartis' contributions, Incyte would not have been able to sell the JAK compound-containing drug called "Jakafi" in the U.S.

In addition, as I referenced in my opening report, Incyte and its advisors also referred to the reverse royalty in internal documents as a "clawback" or "less" or "net against" the high royalties Novartis was to pay Incyte on ex-U.S. sales. Based on my experience in the industry and familiarity with the language used by pharmaceutical licensing deal negotiators, the use of this language suggests an understanding of the reverse royalty as a mechanism for Novartis to get back some of the significant value it was paying to Incyte, including via double-digit royalties on Novartis' ex-U.S. sales relating to the JAK compound and via high upfront ($150 million) and milestone payments. Commercial logic would suggest that the reverse royalties would continue for approximately the same length of time that Novartis was continuing to pay royalties to Incyte, consistent with that interrelationship. This is also supported by testimony of Novartis' deal negotiator Todd MacLaughlan, among other deponents.[4] Mr. Lankau's opinion also does not take any of this into account.

Turning to Mr. Lankau's opinion that "[o]ther sections of the Agreement . . . reflect this concept that Novartis needed to contribute something in order to improve its financial position," as described on page 54 of his report, I disagree that any of those sections support his opinion that Novartis needed to get its own patent to be able to satisfy endpoint (i) of Section 8.3(c) of the Agreement. I will take each of his arguments in turn:

- ***Section V.D(1)***: With respect to the "reimbursement and pricing approval" language in Section 8.3(b)(i), it must be noted that in the pharmaceutical licensing space it is well known that both of those regulatory steps must be achieved in the E.U. in order to sell the drug. That language clearly indicates to me, as an industry professional working in the pharmaceutical licensing space, that the parties agreed that Incyte would start paying Novartis reverse royalties when Novartis had obtained the requisite regulatory approvals that would allow it to sell the drug in three major E.U. markets and in turn pay royalties from those markets with meaningful sales to Incyte. Put differently, this language was included to ensure that the parties commence paying each other royalties from larger country markets around the same time (and so the royalty streams were as equivalent in duration as possible going both ways); without it, Incyte would be paying reverse royalties to Novartis but not obtaining royalty income from Novartis given that it was projected that ruxolitinib would launch earlier in the U.S. than abroad. This is supported by Doug Hager's deposition testimony, who explained on pages 203-04 that the parties intended for "congruency about the payment of royalties between the two companies, that during the time that we were paying them, we expected to have the payment back" and vice versa.

---

[4] Todd MacLaughlan testified, at pages 368-89 of his deposition transcript, that "the concept" of the reverse royalty "was· that we needed to get value for multiple reasons; one, to make the deal make sense. Otherwise, if you didn't have the royalty rate going out to the patent expiry date, there wouldn't be enough -- there wouldn't be enough to offset the amount of money going out of Novartis' treasury . . . [and Novartis] wanted to feel compensated for the value they were bringing to the table, to the project in general by the expertise that Novartis felt that they had at the time and to . . . align the goals between the companies."

Nothing in this language supports that Novartis needed to "contribute" something, but rather, reflects a sense of equality in the duration of royalty streams going both ways.

- *Section V.D(2)*: With respect to the separate 1% royalty described in Section 8.3(b)(ii) of the Agreement, it is expressly tied to "Novartis Improvements," whereas the reverse royalties described in Section 8.3(b)(i) are tellingly not. It is my opinion, based on my experience and industry custom and practice, that the presence of "Novartis Improvements" in Section 8.3(b)(ii) reflects that the parties clearly indicated where payments were predicated on Novartis improving upon Incyte's IP by developing its own (to the extent it chose to do so). Put differently, if the receipt of a royalty for a particular timeframe was conditioned on undertaking an additional step, like Novartis obtaining a patent, that would be clearly reflected. There is no such contingency reflected in Section 8.3(b)(i) or Section 8.3(c). Moreover, Section 8.3(b)(ii) is describing a separate 1% royalty that is outside the scope of the partnership/collaboration (topical and ophthalmic) and so providing a means for Novartis to get some money for contributions, if any, it was giving Incyte for matters outside the scope of the Agreement. It merits note that this separate 1% royalty was added later in the pre-deal period, added to issues lists, and the subject of active discussion between the parties after the final term sheet. This lends further support to my opinions, as set forth in my opening report, relating to the absence of such communications and discussion between the parties in the contract drafting phase relating to the reverse royalty.

- *Section V.D(3)*: With respect to the "termination" royalties provided for in Section 9.3 of the Agreement, Mr. Lankau mischaracterizes the potential continuation of the licenses provided from Novartis to Incyte at Section 2.2 of the Agreement as being predicated solely on "if Novartis had obtained any Patent Rights." Section 2.2(a) clearly provides a license "under Novartis IP," which includes Novartis Know-How, that Incyte may desire access to even following a termination by Novartis. I disagree with the suggestion in Mr. Lankau's paragraph 137 that if Novartis had not obtained a patent, Incyte would have no reason to continue the license. Indeed, Incyte would have every reason to want access to Novartis Know-How that Novartis had generated and accumulated over time given the success of the product ex-U.S., and the royalty Incyte would have to pay Novartis for access to that is low. It is my opinion, based on my experience and industry custom and practice, that the termination royalties do not support Incyte's interpretation of Section 8.3(c) of the Agreement with respect to the duration of the reverse royalty on U.S. sales. Further, I also note that while Novartis had the option to obtain its own U.S. patent (and generate "Novartis Improvements" potentially providing it with a separate 1% royalty under Section 8.3(b)(ii) of the Agreement), it did not need to in order to get full reverse royalties consistent with the rates provided in Section 8.3(b)(i) and until the expiration of market exclusivity.

## V.     Industry Custom and Practice Supports My Opinions, Not Mr. Lankau's: A Rebuttal to Section V.E

I disagree with Mr. Lankau's opinion that to obtain a reverse royalty, custom and practice (as he mis-frames it) would require Novartis to have "contributed intellectual property that serves to protect that market exclusivity" even when Incyte had already obtained it and Novartis made the significant contributions that it did.  And it is undisputed that the parties *did agree* to Incyte paying a reverse royalty to Novartis, and that Incyte did in fact pay Novartis a reverse royalty for some period of time (at full rates from Q4 2014 until Q4 2018 and then at 50% reduced rates until November 17, 2021).  As such, the argument that it is "unusual" to pay on one's own IP is a red herring because the parties agreed to do so here.[5]

With respect to paragraphs 140 and 141, while it is true that Novartis *could have* obtained an additional patent covering Jakafi in the U.S. (*i.e.*, developed "Novartis Improvements"), it did not *need to* in order to get paid reverse royalties until the expiration of market exclusivity.  Mr. Lankau effectively takes optionality in the Agreement on Novartis' part and posits a contingency with respect to the reverse royalty (that Novartis needed to get its own patent) that appears nowhere in Section 8.3(c).  It remains unclear to me what Incyte is suggesting Novartis could have expected and should have obtained as a patent that Incyte did not already have and thus would have aided Incyte in its commercialization of Jakafi in the U.S.

In disagreeing with Mr. Lankau, I incorporate all of my opinions in my opening report, including with respect to relevant industry customs and practices, the Agreement between Novartis and Incyte as a whole, the commercial rationales underlying BD&L deals and this deal in particular, and the reasonable understanding of the parties at the time of contracting based on industry customs and practices as applied to the factual sequence of events.  I stand by my opinion that industry customs and practices and commercial rationality support the conclusion that the duration of the reverse royalty to be paid by Incyte to Novartis is to continue pursuant to the agreed-upon Incyte Reverse Royalty Rates, without any 50% reduction, until at least the loss of market exclusivity (*i.e.*, the expiration of Incyte's patents protecting Jakafi in the U.S.).

## REBUTTAL TO DEFENDANT'S EXPERT MOHAN RAO, PH.D.

In rebutting Dr. Rao's report, I am not endorsing his contract interpretation arguments or purported opinions as appropriate expert opinion.  Subject again to that caveat, I rebut the content of his report as set forth below.

---

[5] While Mr. Lankau mischaracterizes the substance of Mr. Goldfus' testimony on page 58 of his report, it is also irrelevant because the Agreement, which expressly calls for Incyte paying a reverse royalty to Novartis, governs. Mr. Goldfus was clear in his testimony, at pages 344-47, that he understood the parties agreed to a reverse royalty that would be paid until patent expiration and his model was built with that assumption in mind, so I reject any suggestion to the contrary.

## I.    The Economics of Pharmaceutical Licensing Are Deal and Context Specific: A Rebuttal to Sections A and B

Dr. Rao makes several statements concerning the economics of pharmaceutical licensing agreements, namely amounting to an opinion that royalties are customarily paid *to* the holder of the patent, not *by* the patent holder. Based on my extensive experience negotiating pharmaceutical licensing agreements and exposure to industry custom and practice, I find that his opinions apply inapt concepts, taken out of context, that have little bearing, if any, on the particulars of the Agreement terms in dispute.

### *Deal Payments Are Made for More Than Just Patents*

In my experience, deal payments are made to recognize value in a partnership. In the drug industry, the value of a drug is driven by patents but even more by data and know-how. The value of the drug is ultimately reflected in its label and driven by the data from all the aspects of that drug's development as well as know-how. Deal payments recognize not just patents but also data and know-how. The value of a patent is its ability to exclude others who are not in the partnership/collaboration. That barrier to competition is established when the patent is filed and issued and does not change with drug development. If all the value of a drug was in the patent, however, then the value of a Phase III deal would differ from the value of a preclinical deal by the time value of money only and that is not typically the case at all. We talk of value inflections (jumps in value) with data and know-how that reduce the risk of failure; data and know-how drives value and the data and know-how is often built through collaboration between two partners. In the case of Novartis and Incyte, Novartis brought a myriad of different attributes to the table in terms of developing a successful partnership/collaboration. Dr. Rao largely ignores those contributions in his report, which I discussed in my opening report and above and incorporate that all here.

### *Royalties Can be Interchangeable with Other Forms of Payment*

Royalties are just another form of payment, delayed in time and only paid upon successful approval and sales of a product. Royalties can be exchanged for other forms of payments. I addressed in my opening report the concept of squeezing the balloon of value at one end to expand the balloon at the other end. The interchangeability is reflected in modeling the eNPV, where a bigger payment in the form of royalty is at higher risk and farther out in time and is exchangeable for (equivalent to) a smaller dollar amount in an upfront payment, for example.

### *Royalties Can be Paid on Many Different Contributions*

Pharmaceutical licensing deals can have all types of structures depending on what the parties choose to negotiate. Licensing deals can have no royalties or royalties at different rates, for different reasons. In addition, in complex collaboration deals, royalties are paid on the drug net sales to pay for the value of the many different types of contributions (*e.g.*, data, resources, expertise, know-how, patents) within the partnership/collaboration. And as in the Novartis-Incyte deal, royalties can be intentionally structured to align incentives to make both parties contribute to the other party's success, necessarily sharing in the success. Dr. Rao only focuses on patents as a

basis for royalties, which is not consistent with my experience or with industry custom and practice.

### *Royalties <u>Can</u> be Paid by Patent Holders, As Some of Incyte's Own Deals Reflect*

Dr. Rao identifies the Calithera and MorphoSys agreements where Incyte would pay royalties on jointly developed IP and states in paragraph 35 that "the royalty-bearing party is paying to access the benefit of the IP contribution of the counterparty." I disagree and think the correct interpretation would be that the royalty-bearing party is paying for the contribution of the counterparty, whether know-how, patent, or data or even earlier financials.

In paragraph 35, Dr. Rao also identifies two of fifteen Incyte deals (besides the Novartis-Incyte Agreement subject of this litigation) where there are possible "reverse" royalties being paid, which he describes as "patent royalties may be due upon the last to expire of both parties' patents." In these cases, he concedes that Incyte could pay a royalty where it holds the patent. However, he tries to distinguish these two other deals from the transaction subject of the Novartis-Incyte Agreement, which was substantially more advanced in the development stage (at least with respect to the JAK compound). However, in my experience and pursuant to industry custom and practice, royalties can be paid for diverse kinds of contributions. The distinction of stage of development is irrelevant as contributions (both financial and other) may be different deal-to-deal.

I also note that Dr. Rao did not highlight the case of the Merus-Incyte agreement in his report. This was a collaboration with multiple types of possible products. In section 9.3, that agreement discusses that Incyte would pay royalties on Program 1 (this was an existing preclinical program, presumably where patents were already filed by Merus). Royalties on Program 1 were from Incyte to the holder of the patent. But section 9.3 also says that Merus will pay Incyte 0-2% royalties on dropped bispecific products that were created in the collaboration. These would likely have been either Merus patents or joint patents so that Merus was paying in the "reverse" direction. Incyte would pay Merus on co-development programs where it is likely there would be joint patents. In all of these types of royalties in the Incyte Merus deal, the same royalty duration applies, which includes the last to expire "Valid Claim of Licensed Patent Rights, Patent Rights in Target Pair Arising IP, or Joint Patent Rights Covering such Licensed Product." Thus, Incyte would pay on at least joint patents, where it held the patents jointly. Merus would pay Incyte where Merus held the patent but Incyte had funded the creation of the dropped bispecific asset. Royalties thus could be paid by the patent holder.

In the Syros-Inctye deal referenced in Dr. Rao's report, royalties (section 5.6.1) can be paid on a Validated Target basis of each Royalty Product (the drug developed at the target identified by Syros), where there is no Syros patent on the Royalty Bearing Product. The royalty term (section 5.6.2) is for the longest of patent claims from Syros, 10 years from first commercial sale, or loss of regulatory exclusivity. Royalties can be paid where Incyte owns the composition of matter on the drug if Incyte used it in the Research Plan, or in a program initiated in the Research Plan or relied on Syros Confidential Information or Program Know-how (making it an Associated Compound). The Syros Research Plan activities are not focused on compounds that modulate the target, but rather on validating the targets as involved in the disease, so it is likely that the drugs and their patents come from Incyte. Royalties could thus be paid by the patent holder.

By way of further example, in the Incyte deal with Innovent, in section 3.14, there can be royalties paid to Innovent from Incyte on sales by Incyte of a combination product (two drugs sold as one package) including a Licensed Product (excepting any combination with Ruxolotinib) in China. This means royalties from Incyte on Incyte IP.

The Innovent deal is also relevant to my rebuttal to Dr. Rao's report for another reason, which I discuss further below.

### *Reverse Royalties Are Also Common on Termination*

Another place where royalties are often paid by the patent holder is on product reversion on termination. As in the Novartis-Incyte Agreement, it is quite common for termination by the licensee to result in a return of the drug to the patent holder licensor. In some instances, the agreement provides that if the patent holder chooses to develop the drug, the patent holder will pay the former licensee a royalty. This form of "reverse royalty" recognizes that the licensee contributed to the advancement of the drug, building its data package.

Frequently (as in the Novartis-Incyte Agreement), the royalty duration is the same for this "reverse royalty" as for the original royalty to be paid by the licensee. Again, the duration of royalties often reflects the economic reality that the value of the drug is highest before loss of exclusivity, when a generic entry can cause a rapid reduction in sales price and volume for the royalty paying company.

This is reflected in Incyte's own agreements with companies other than Novartis. By way of example, in the Agenus-Incyte agreement, in section 8.3, Agenus is to pay 0 to 6% on terminated products depending on their stage of development at the time of termination. As Agenus brought some products with patents into the agreement, Agenus could be paying Incyte a royalty where Agenus holds the patent, a reverse royalty on termination. The royalty term (section 7.6(b)) is the same as for the royalty in the other direction.

Similarly, in the MorphoSys-Incyte agreement, section 17.6 says that if Incyte terminates, MorphoSys will pay a reverse royalty to Incyte on MorphoSys Patents, Xencor Patents (held by MorphoSys), and Joint (with Incyte) Patents. The royalty term (section 8.3) is the same as for royalties paid by Incyte to MorphoSys.

In the Merus-Incyte agreement, section 10.6 says that Merus is to pay Incyte a royalty upon Incyte's termination and reversion of the product. For Program 1, this would be a reverse royalty where Merus held the patent. On other programs, there could be joint patents where Merus would pay on their joint ownership. The royalty term (section 9.3) is the same as for the royalty in the other direction.

In the ALK2 license from Novartis to Incyte, if Novartis terminates for cause or Incyte terminates without cause (section 12.2(ix)), the parties are to negotiate payments to Incyte from Novartis (holder of the IP), "taking into account the relative contribution of the Parties to the Development of the Licensed Product and the Licensed Product's potential commercial value given its state of development."

And in the Cellenkos agreement (section 12.5.3(c)), if Incyte has initiated a pivotal study before termination, and Cellenkos opts to include information or patents from Incyte in its license for a reversion, Cellenkos would pay Incyte a royalty on the Cellenkos patented product. The royalty term (section 6.6.1) is the same as defined for the royalty in the other direction.

All this is to say that reverse royalties are not nearly as unusual in pharmaceutical licensing agreements as Dr. Rao suggests.

### *Novartis Did Contribute to the Development and Commercialization of Jakafi*

Like Mr. Lankau, Dr. Rao suggests that Novartis provided limited contributions to the development and commercialization of Jakafi in the U.S., including at paragraphs 35 and 39 of his report. I incorporate by reference my previously articulated opinions with respect to Novartis' many contributions, both in this report and in my opening report, by reference. To be clear, that Jakafi may have been in Phase III does not change the fact that Novartis materially contributed to its development and commercialization, including by (among other things) facilitating the completion of clinical trials that resulted in FDA approval, as noted above.

### *Ultimately, Incyte Agreed to Pay a Reverse Royalty*

Parties to an agreement may decide to negotiate a multiplicity of items in different ways, and in the case of Incyte and Novartis, the parties reasonably agreed that Incyte would pay Novartis a reverse royalty on U.S. sales of Jakafi at the Incyte Reverse Royalty Rates set forth in Section 8.3(b)(i) and for the term described in Section 8.3(c). Accordingly, that other licenses may have royalties flowing only from the licensor to the licensee is irrelevant to the dispute at hand where the terms, structure, and drafting history of the Agreement reflect that the parties *did* agree to reverse royalties flowing from Incyte to Novartis. In this regard I incorporate my opinions in my opening report as well as my opinions above in rebutting Mr. Lankau's report on this topic.

## II.    Incyte's Own Licensing Behavior Supports My Opinions and Novartis' Interpretation of the Agreement: A Rebuttal to Section B

I have considered all of the other agreements referenced by Dr. Rao in Section B of his report. My analysis of these agreements is summarized in the chart at **Exhibit 3** to this report. Based on my experience and industry custom and practice, it is my opinion that Incyte's other licensing agreements only serve as further support for what I described in Section I of my opening report, including with respect to market exclusivity guiding the duration of royalty streams in pharmaceutical licensing agreements.

I also disagree with Dr. Rao's characterization of reverse royalties as being a "deviation from typical practice," as described in paragraph 40. As noted in my opening report and herein, reverse royalties can be agreed to by parties in many different circumstances based on the construct of the deal. What is "typical practice" in the industry, as I described in my opening report, is that royalty stream duration is guided by the concept of market exclusivity.

## III. The Novartis-Incyte Agreement Is Not a Limited, Capped, or "Return on Investment" Deal, and Incyte Is Getting Significant Value from Its Agreement with Novartis: A Rebuttal to Section D

Dr. Rao suggests, including in paragraphs 10 and 47-57, that Incyte's interpretation of Section 8.3(c) of the Agreement is correct because Novartis purportedly earned a higher return on its investment than it had expected when the Agreement was executed. Based on my industry experience and industry custom and practice, if the parties had intended to tie the duration of the reverse royalty term to Novartis' return on investment, to a "cap," or to a similar financial metric, that would have been clearly spelled out in the Agreement. There is no such indication here.

The Innovent agreement that Incyte entered into is illustrative on this point. That agreement, at section 7.5.1(c), explains that Incyte's obligation to pay royalties to Innovent is tied to two financial metrics, stating clearly that (1) the "applicable royalty rate will be reduced by fifty percent" if the cumulative royalties paid by Incyte "is equal to the total upfront and milestone payments" that Innovent paid to Incyte, and (2) the "cumulative royalties paid by" Incyte after this "step down" in royalty rates "shall not exceed twice the total Development Costs incurred by [Innovent] . . . ." Here, by contrast, the Agreement between Novartis and Incyte does not suggest, much less clearly spell out, that the duration of the reverse royalty term is tethered to Novartis' return on investment or to a similar financial metric.

Dr. Rao also goes to great lengths to suggest that Novartis has obtained "significant value" from the Agreement but does not mention the significant value that *Incyte* has obtained from the collaboration/partnership with Novartis. My review of the parties' respective public 10-K and 20-F filings and royalty reports and invoices leads to the inevitable conclusion that it is *Incyte* that has significantly profited, with significantly higher U.S. sales than anticipated (now in the billions) and obtaining significant royalties from Novartis on ex-U.S. sales, which again have been successful. Based on my industry experience and industry custom and practice, it is my opinion that Incyte cannot ignore the significant value it has itself obtained from the collaboration with Novartis and seek to avoid now paying reverse royalties by suggesting that Novartis has somehow already obtained enough monies from Incyte.

## IV. A Commentary on Certain of Dr. Rao's Sources

In preparing my rebuttal report, I reviewed several publications that Dr. Rao selectively cites and found that they contain statements that undercut his opinions and that Dr. Rao makes no mention of in his report. All these statements support the opinions I rendered in my opening report and herein. For example:

1. In his report, at paragraph 30, footnote 64, Dr. Rao cites "Pharmaceutical royalties in licensing deals: No place for the 25 per cent rule of thumb," *Journal of Commercial Biotechnology* (Apr. 2009) for the proposition that it "is common see risk-sharing terms incorporated in pharmaceutical licenses, including royalties set as a percentage of sales, royalties that are triggered upon reaching certain regulatory and commercialization milestones, and tiered royalties that are applied at certain levels of sales." I agree that it is common industry practice for risk-sharing terms to be incorporated in

pharmaceutical licensing transactions. I further agree, based on my industry experience, with the following findings in this publication, that Dr. Rao omits reference to in his report:

    a. "upfront payments or milestone payments" can be significant drivers of value in licensing transactions (pages 14-15);

    b. it is improper to attempt to compare transactions by looking at royalties alone (pages 14-15);

    c. "[e]arly paid out components such as upfront sums carry maximum risk for the licensee" (page 14); and

    d. although all licensing deals carry "risk to varying degrees," each deal is "unique" (page 14).

2. In his report, at paragraph 26, footnote 56, and paragraph 27, footnote 58, Dr. Rao points to "Licensing Biotech Intellectual Property in University-Industry Partnerships," *Cold Spring Harbor Perspectives in Medicine* (2015) as support for his myopic focus on IP and royalties in licensing transactions. Rather than support his report, the publication contains the following findings with which I agree, based on my industry experience, that are contrary to Dr. Rao's and/or Mr. Lankau's opinions:

    a. license agreements are "often ***hybrid structures***, which combine a research and development (R&D) agreement component ***that provides for the transfer of technology such as know-how and materials*** with a license agreement component that governs rights to existing and future developed IP" (page 2);

    b. "[u]se of ***term sheets*** . . . is often ***the best approach to ensure that the parties reach a true consensus***" (page 4);

    c. term sheets essentially "provide a summary of those issues that the parties consider as the ***most important aspects of the deal***" (page 5);

    d. there are certain "important provisions," including with respect to payments, IP, and technology, that are commonly included in term sheets (pages 5-6 & Table 2);

    e. there are several different types of payment structures in licensing agreements and the structure(s) used depends on "many factors" (pages 8-10 & Table 3); and

    f. the royalty payment term is often "***linked to life of the patents***" (page 9, Table 3).

Finally, I note that Dr. Rao cites other publications or sections thereof that concern issues such as calculating patent infringement damages where a licensing agreement does not exist. For

example, in paragraph 27, footnote 57, he cites "Patent Infringement Damages" in LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, Sixth Edition, John Wiley & Sons (2017), and William Choi and Roy Weinstein, "An Analytical Solution to Reasonable Royalty Rate Calculations" (July 2000). Dr. Rao fails to explain how these publications support his opinions in this case where the licensing agreement in dispute exists. Based on my review and industry experience, I find the cited publications to be irrelevant to the issues in this case.

Signature: _____     Date:     May 23, 2022

Linda M. Pullan, Ph.D.

# EXHIBIT 1:
## Documents Considered

| *Novartis Pharma AG v. Incyte Corporation*, Case No. 1:20-cv-00400 |
|---|
| **Materials Considered by Linda Pullan in Rebuttal Report** |
| BATES NUMBER / NAME OF DOCUMENT |
| **Parties' Reports and Materials** |
| Report of Dr. Mohan Rao, dated May 4, 2022, and cited documents/references therein irrespective of whether individually listed below or not |
| Report of Peter Lankau, dated May 4, 2022, and cited documents/references therein irrespective of whether individually listed below or not |
| Expert Report of Larry Tedesco, dated May 4, 2022 |
| All Materials Considered in the Expert Report of Dr. Linda Pullan, dated May 4, 2022 |
| **Incyte Bates-Stamped Documents** |
| INCY000003000-175 |
| INCY000008527-28 |
| INCY000009494-95 |
| INCY000009671-72 |
| INCY000010116-17 |
| INCY000010121-124 |
| INCY000011289-91 |
| INCY000011522-23 |
| INCY000012459-537 |
| INCY000014390-91 |
| INCY000019496-97 |
| INCY000024975-76 |
| INCY000028282-84 |
| INCY000028663-64 |
| INCY000041364-66 |
| INCY000044694-95 |
| INCY000044929-33 |
| INCY000045100-01 |
| INCY000045997-98 |
| INCY000048968-69 |
| INCY000050085-87 |
| INCY000056601-02 |
| INCY000057502-03 |
| INCY000057509-10 |
| INCY000057548-49 |
| INCY000057553-54 |
| INCY000058134-35 |
| INCY000062812-13 |
| INCY000075412-13 |
| INCY000076677-78 |
| INCY000079504-09 |
| INCY000079521 |
| INCY000079586 |
| INCY000079673 |
| INCY000079686 |

| |
|---|
| INCY000080961-77 |
| INCY000081383 |
| INCY000081661 |
| INCY000082264-65 |
| INCY000082278-79 |
| INCY000082290-91 |
| INCY000082478-79 |
| INCY000086489-91 |
| INCY000086958-59 |
| INCY000088446-47 |
| INCY000089811-12 |
| INCY000090591-93 |
| INCY000091691 |
| INCY000091809-11 |
| INCY000115541-44 |
| INCY000119808-09 |
| INCY000120396-401 |
| INCY000124298-405 |
| INCY000134785-901 |
| INCY000150412-503 |
| INCY000150504-632 |
| INCY000150633-703 |
| INCY000150704-872 |
| INCY000150873-1012 |
| INCY000151013-102 |
| INCY000151180 |
| INCY000159264-366 |
| INCY000161180 |
| INCY000161738-874 |
| INCY000189239-382 |
| INCY000189383-528 |
| INCY000189529 |
| INCY0000156692 |
| **Novartis Bates-Stamped Documents** |
| NOVARTISPROD000000534-44 |
| NOVARTISPROD000001458-80 |
| NOVARTISPROD000005580-808 |
| NOVARTISPROD000005943-74 |
| NOVARTISPROD000005982-91 |
| NOVARTISPROD000007322-32 |
| NOVARTISPROD000009442-44 |
| NOVARTISPROD000010384-86 |
| NOVARTISPROD000011010-11 |
| NOVARTISPROD0000110276 |
| NOVARTISPROD0000110277 |
| NOVARTISPROD0000110278 |
| NOVARTISPROD0000110279 |

| |
|---|
| NOVARTISPROD000011128-29 |
| NOVARTISPROD000012170 |
| NOVARTISPROD000012823-44 |
| NOVARTISPROD000015407-15 |
| NOVARTISPROD000016163-87 |
| NOVARTISPROD000016249-50 |
| NOVARTISPROD000016262-65 |
| NOVARTISPROD000016286-92 |
| NOVARTISPROD000016930-53 |
| NOVARTISPROD000017024-46 |
| NOVARTISPROD000017118-42 |
| NOVARTISPROD000017239-40 |
| NOVARTISPROD000017471-72 |
| NOVARTISPROD000017828-29 |
| NOVARTISPROD000025716-18 |
| NOVARTISPROD000031298-424 |
| NOVARTISPROD000031459-61 |
| NOVARTISPROD000031462-63 |
| NOVARTISPROD000031464 |
| NOVARTISPROD000031465 |
| NOVARTISPROD000031466 |
| NOVARTISPROD000031467 |
| NOVARTISPROD000031468 |
| NOVARTISPROD000031469 |
| NOVARTISPROD000031470 |
| NOVARTISPROD000031471-73 |
| NOVARTISPROD000031474-77 |
| NOVARTISPROD000031478-81 |
| NOVARTISPROD000031482 |
| NOVARTISPROD000031483 |
| NOVARTISPROD000031484 |
| NOVARTISPROD000031485 |
| NOVARTISPROD000031486 |
| NOVARTISPROD000031487-89 |
| NOVARTISPROD000031490-93 |
| NOVARTISPROD000031494-97 |
| NOVARTISPROD000031498-00 |
| NOVARTISPROD000031501 |
| NOVARTISPROD000031502 |
| NOVARTISPROD000031503 |
| NOVARTISPROD000031504 |
| NOVARTISPROD000031505-08 |
| NOVARTISPROD000031509-11 |
| NOVARTISPROD000031512-13 |
| NOVARTISPROD000031514-17 |
| NOVARTISPROD000031518 |
| NOVARTISPROD000031519 |

| |
|---|
| NOVARTISPROD000031520 |
| NOVARTISPROD000031521 |
| NOVARTISPROD000031522 |
| NOVARTISPROD000031523 |
| NOVARTISPROD000031524 |
| NOVARTISPROD000031525 |
| NOVARTISPROD000031526 |
| NOVARTISPROD000031527 |
| NOVARTISPROD000031528 |
| NOVARTISPROD000031529-30 |
| NOVARTISPROD000031531 |
| NOVARTISPROD000031532 |
| NOVARTISPROD000031533 |
| NOVARTISPROD000031534 |
| NOVARTISPROD000031535-36 |
| NOVARTISPROD000031537 |
| NOVARTISPROD000031538-39 |
| NOVARTISPROD000031540 -42 |
| NOVARTISPROD000031543 |
| NOVARTISPROD000031544 |
| NOVARTISPROD000031545 |
| NOVARTISPROD000031546 |
| NOVARTISPROD000031547-48 |
| NOVARTISPROD000031549-50 |
| NOVARTISPROD000031551 |
| NOVARTISPROD000031552 |
| NOVARTISPROD000031553 |
| NOVARTISPROD000031554 |
| NOVARTISPROD000031555-56 |
| NOVARTISPROD000031557 |
| NOVARTISPROD000031558-59 |
| NOVARTISPROD000031560 |
| NOVARTISPROD000031561 |
| NOVARTISPROD000031562 |
| NOVARTISPROD000031563-64 |
| NOVARTISPROD000031565 |
| NOVARTISPROD000031566 |
| NOVARTISPROD000031567-68 |
| NOVARTISPROD000031569 |
| NOVARTISPROD000031571 |
| NOVARTISPROD000031572 |
| NOVARTISPROD000031577 |
| NOVARTISPROD000031578-79 |
| NOVARTISPROD000031580 |
| NOVARTISPROD000031581 |
| NOVARTISPROD000031586 |
| NOVARTISPROD000031587 |

| |
|---|
| NOVARTISPROD000031588 |
| NOVARTISPROD000031589 |
| NOVARTISPROD000031594 |
| NOVARTISPROD000031597-98 |
| NOVARTISPROD000031597-99 |
| NOVARTISPROD000031600-02 |
| NOVARTISPROD000031603 |
| NOVARTISPROD000031607-08 |
| NOVARTISPROD000031616 |
| NOVARTISPROD000031619 |
| NOVARTISPROD000031620 |
| NOVARTISPROD000031621 |
| NOVARTISPROD000031626 |
| NOVARTISPROD000031627 |
| NOVARTISPROD000031628 |
| NOVARTISPROD000031629 |
| NOVARTISPROD000031630 |
| NOVARTISPROD000082339-51 |
| NOVARTISPROD000086054-84 |
| NOVARTISPROD000095077-124 |
| NOVARTISPROD000096976-78 |
| NOVARTISPROD000098371-85 |
| NOVARTISPROD000105530-65 |
| NOVARTISPROD000109503-566 |
| NOVARTISPROD000144514-879 |
| NOVARTISPROD000151760-62 |
| NOVARTISPROD000153976-021 |
| NOVARTISPROD000154011 |
| NOVARTISPROD000154012 |
| NOVARTISPROD000154013 |
| NOVARTISPROD000154014 |
| NOVARTISPROD000164839-40 |
| NOVARTISPROD000166677-85 |
| NOVARTISPROD000177473-651 |
| NOVARTISPROD000185139-49 |
| NOVARTISPROD000194624-869 |
| NOVARTISPROD000194870-72 |
| NOVARTISPROD000194873-5118 |
| NOVARTISPROD000225405-422.00001 |
| NOVARTISPROD000225423-26 |
| NOVARTISPROD0000158292-93 |
| NOVARTISPROD000225428 |
| NOVARTISPROD000225429 |
| NOVARTISPROD000225427 |
| NOVARTISPROD000225434 |
| NOVARTISPROD000225430 |
| NOVARTISPROD000225431 |

| |
|---|
| NOVARTISPROD000225432 |
| NOVARTISPROD000225433 |

| Other Bates-Stamped Documents |
|---|
| GS0001581-84 |
| WH0000000921-994 |
| WH000000345-575 |
| WH000001073-1259 |
| WH000002517-18 |
| WH000002529-2850 |
| WH000003173-74 |
| WH000003184-91 |
| WH000003694-99 |
| WH000003726-3967 |
| WH000004214-224 |
| WH000004565-4852 |
| WH000005275-5550 |
| WH000007093-7344 |
| WH00001825-26 |
| WH00001827-2155 |

| Additional Pleadings / Discovery Documents |
|---|
| Amendment Civil Case Management Plan and Scheduling Order (April 14, 2022) |
| Stipulation and Order Limiting Discovery Concerning Certain Licensed Compounds, C-MET and Tabrecta, Dkt. 72, so ordered on 8/16/21 |

| Additional Items |
|---|
| Interview with Nancy Griffin on May 19, 2022 |
| Interview with Jennifer Gallagher on May 18, 2022 |
| Licensing Executive Society - Global "Life Sciences" Royalty Rates & Deal Terms Survey - 2018 - (March 2019) |
| Collaboration and License Agreement between Syndax Pharmaceuticals, Inc. and Incyte Corporation, Ex. 10.1 to Syndax Form 10Q for quarter ending September 30, 2021 |
| Global Collaboration and License Agreement by and Between Macrogenics, Inc. and Incyte Corporation, Ex. 10.23 to Incyte Annual 10K filing for year end 2017 |
| Target Discovery, Research Collaboration and Option Agreement between Syros Pharmaceuticals, Inc. and Incyte Corporation, dated as of January 8, 2018, Ex. 10.22 to Syros Annual 10K for year end 2017 |

# EXHIBIT 2:
# CV of Linda M. Pullan, Ph.D.

# Linda M. Pullan, Ph.D.

**Pullan Consulting**
**www.pullanconsulting.com**
9360 W. Flamingo Road, Suite 110-554, Las Vegas, NV 89147
work and cell 805-558-0361
linda@pullanconsulting.com

Over 25 years of pharmaceutical and biotech experience.  In-depth understanding and proven success in drug development, and evaluation, valuation and negotiation for strategic alliances and licensing deals.

## BUSINESS DEVELOPMENT EXPERIENCE

**Pullan Consulting**                                                                                         April 2006-present
Working for a variety of small and larger biotech as a business development consultant.

- Representing out-licensing efforts, coordinating out-licensing activities
- Seeking and evaluating opportunities for in-licensing
- Providing preliminary valuations, financial models for deals
- Negotiating and advising on negotiations on buy and sell side
  - Many signed deals (licenses as large as $150MM upfront, options, and university licenses) for Preclinical to Phase III
  - Many term sheets always in progress
- Designing partnering presentations
- Advising on strategy and processes
- Leadership recognized:
  - Author of Pullan's Pieces with thousands of confirmed subscriptions
  - Taught negotiations courses, webinars on partnering, presentations on valuations, negotiations, diligence, including EBD Academy master course in negotiations
  - Led panels on oncology licensing, IO, ADCs, Bispecifics, and other science topics
  - Invited Speaker at BIO, BioEurope, BioEurope Spring, BioNetwork etc.
  - Served as interim CEO (Viriome, Inc.)
  - Served on Board of Directors (Aksivi, AUTM Foundation, Viriome, Paloma Pharmaceuticals, IRAD)

**Kosan Biosciences, Inc.**, Hayward, CA                                                        Oct 2004-March 2006
Vice President, Business Development

- Responsible for all business development activities, strategy, market analysis, financial models, messaging, relationship management and negotiations
- 9 negotiations initiated, 1 subsequently signed (**$12.5MM** upfront)
- Chair committee for portfolio analysis, long-range planning
- Member of Operating Committee

**Amgen Inc.,** Thousand Oaks, CA
Director, Oncology and Hematology Licensing                                                              2000-2004
Associate Director, Oncology Licensing                                                                        1998-2000

- Created and led licensing team of 10 (including legal and finance) for Amgen's biggest therapeutic areas, oncology and hematology
- Generated 8 major deals and more than 10 others:
  - first clinical deal at Amgen (Ph 3, Praecis, **$100MM** upfront)
  - Ph 2/3 cancer Ab (Immunomedics, **$65MM**)
  - acquisition of kinase company Kinetix (**$170MM**), now Amgen's Boston site
  - preclinical Ab (Vanderbilt) – milestones triggered since
  - targets and drug development (Tularik, **$125MM**) – two milestones and acquisition since triggered
  - human Ab generation (Abgenix, Medarex, BioSite) – multiple milestones paid
  - drug delivery (Skye Pharma)

- ➢ companion diagnostics (Dako and Ventana)
- ➢ biomarkers (many)
- ➢ IP (many
- Established review process, documents, diligence checklist now in use at Amgen
- Led identification, evaluation, valuation (market forecasts, deal terms and P&L models) and negotiations of technologies & products from targets to market
- Shaped strategy for therapeutic area, licensing, and research
  - ➢ Created monthly Therapeutic Area Leadership forum with heads of R, D, Sales and Marketing to drive strategy for all of oncology and hematology
  - ➢ Chosen to make presentations and contributions to Research reviews and strategy
  - ➢ Created, syndicated and communicated licensing strategy
- Sold value of Amgen for oncology partnering with capabilities pitches, negotiations, mass mailings, oncology licensing brochure, booths at congresses, and numerous speaking invitations

**Zeneca Pharmaceuticals,** Wilmington, DE
Collaborations (Licensing) Manager                                                                 1995-1998
Research Planning Analyst                                                                               1994-1995

- Led identification, evaluation and negotiations of academic and industry research collaborations
  - ➢ 4 Significant Deals
  - ➢ Established cost/value modeling for external alliances
  - ➢ Represented Zeneca at biopartnering conferences (E&Y, H&Q, Connect, Alex Brown)
- Defined neuroscience research, licensing, and hospital business strategies as part of teams
- Wrote Zeneca-wide international bioethics policy and guide
- Represented Zeneca on PhRMA Genomics Key Issues Team
- Continued to drive development strategy for clinical candidates for stroke, pain, other diseases
- Authored position papers on strategic options for senior R&D management

## RESEARCH EXPERIENCE

**ICI/Zeneca Pharmaceuticals** and **Monsanto/Searle**
Principal Pharmacologist                                                                                1992-1994
Project Leader                                                                                              1992-1993
Senior Research Pharmacologist                                                                     1988-1992
Research Biochemist                                                                                      1983-1988

- Contributed to promoting 3 drugs into the clinic; 1 now >$1B sales
- Promoted to lead a team of biologists and chemists (~50 people)
  - ➢ Put a glycine antagonist into clinical development for cerebral ischemia (stroke) and pain
  - ➢ Contributed in vitro biology on Seroquel; now >$1B plus antipsychotic on market
  - ➢ *In vitro* & *in vivo* biochemistry, receptor binding, second messengers, disease models, behavior
- Represented research team as member Development Strategy Team
- Chaired Zeneca U.S. Safety Committee

## PUBLICATIONS

- Produce monthly newsletter (Pullan's Pieces) on science and business for thousands of readers
- Webinars on Deal Prep, Partnering presentations, Valuation, Negotiations, What's Hot and What's Not in Oncology Licensing, Non-IO Oncology, ADCs, bispecifics, etc.
- Presented at many invited seminars and panels
- Authored 66 scientific literature publications
- Coauthor with VP of Research on paper on Zeneca's research strategy

## EDUCATION

**PhD**, in Biochemistry, minor in Chemistry, University of California, Riverside, 3.8 GPA
- Thesis research on enzyme isolation, kinetics, chemical modification, protein chemistry on the newly discovered carbonic anhydrase III and phosphoglucose isomerase

**BS** in Chemistry, University of Utah, 1978, Magna Cum Laude, 3.8 GPA

## HONORS

- Expert witness on licensing in litigation
- Reviewer for Australia's BTB and MRFF program grants
- Strategy review panel for Walter and Eliza Hall Institute
- American University Technology Managers Foundation board member (past)
- Taught master course in negotiation for EBD Academy, diligence course to pharma company
- Webinars and papers chosen by BIO to promote partnering
- Invited speaker for Keck Graduate Institute Advisory Board
- Reviewer for BioCurate incubator proposals
- Reviewer for USC start-up proposals
- Advisor for LARTA for small start-ups
- Lecturer for UCSD, UCSB on entrepreneurship, technology management
- Taught course in Norway for startups
- Taught basics of licensing course for Chinese pharmaceutical company
- Taught due diligence course for public biotech company
- Taught evaluations, valuations and negotiations for Asian company
- UCR College of Sciences Advisory Board
- Special Achievement awards at Amgen for Licensing
- Speaker on impact of new science on drug discovery for Zeneca's annual meeting, as Research Team Leader at SEROQUEL® launch meeting
- Special Achievement Award for coordinating R&D exhibits at Zeneca annual meeting
- Reviewer for Eur. J. Pharmacol.
- Two Zeneca Outstanding Achievement Awards
- Outstanding Teaching Assistant Award and Regents Fellowship from UC system
- Phi Beta Kappa, Phi Kappa Phi, ACS Analytical Chemistry Award

<u>**DEAL SHEET**</u>

## Strategic Alliances (>$20MM upfront)

- Consulting Client – Big Pharma, $48.5 M upfront, partnership resulting in eligibility for development and regulatory milestones and a license option, commercialization and sales-based milestones and tiered royalties.
- Consulting Client- Big Pharma, $40M upfront, $300M total for preclinical small molecule. Advice on terms and negotiations.
- Consulting Client – Biotech, $40M, company acquisition. Advice on terms and negotiations.
- Consulting Client – Chinese pharma, $220M total for Phase 3. Advice on termsheet and contract.
- Consulting Client – Big Pharma, $27.5 upfront for biologic asset starting Phase 1, did outreach, led negotiations
- Consulting Client – Big Pharma, $150M upfront for Phase 3 asset. Advice on terms and contract.
- Consulting Client – Big pharma, $1B in milestones for 3 molecules. Led negotiations.
- Consulting Client – Big Pharma, $56M upfront, $440M in milestones for 1 molecule, additional terms for other 2 molecules. Led negotiations for one of the biggest deals in China.
- Consulting Client – Big pharma, $100MM upfront cash and equity, Phase 3, negotiations, advice on terms and final contract
- Consulting Client – Big Asian Pharma, $25MM upfront, valuation, advice on negotiations (Phase 3)
- Consulting Client – Big pharma, $25MM upfront, negotiations and advice (pseudo auction, pre-completion of Phase II)
- Consulting client – Big Pharma: $30MM upfront, broad chemistry collaboration; advice and deal structure
- Tularik –Amgen: $125MM, targets and drug development, led evaluation team, launched collaboration that led to acquisition
- Praecis – Amgen: $100MM, Ph 3 GnRH antagonist, led evaluation team
- Immunomedics – Amgen: $65MM, Ph 2/3 NHL Ab, led evaluation team and member of negotiation team
- Abgenix – Amgen: multi-antigen Ab creation, supervised evaluator and negotiator
- Medarex – Amgen: multi-antigen Ab creation, supervised evaluator and negotiator
- Kinetix acquisition by Amgen – $170MM, kinases and structural biology, led evaluation and diligence

## Mid-Size Deals (>$10M upfront)

- Consulting Client – Big pharma, $15M upfront, $550M in milestones. Introduction and advice thru out negotiations.
- Consulting Client – Non-profit, negotiation advice (preclinical)
- Consulting Client – US Biotech, negotiations and advice (Phase II)
- Consulting Client – Regional Pharma, negotiations and advice (Phase II)
- Consulting Client – venture firm, sale of Phase I asset
- Consulting Client – US Biotech, negotiations and advice (Phase 1)
- Consulting Client – Mid-size pharma, option; led negotiations
- Consulting Client – Big pharma, discovery collaboration, on negotiation team
- Consulting Client – Major Pharma, advised negotiator (preclinical)
- Vanderbilt – Amgen: preclinical Ab, led negotiation
- Biosite – Amgen: multiple Abs, supervised evaluator and negotiator
- Incyte – Zeneca: genomics database, on negotiation team
- Pharmacopeia – Zeneca: combinatorial chemistry, on negotiation team
- U C Irvine – Zeneca: lead optimization ion channels, led evaluation and negotiations
- U College of London – Zeneca: small molecule lead, led renegotiations

**Smaller Deals**

- Consulting Client – Australian research institute, research collaboration, led negotiations
- Consulting Client – US Biotech, research collaboration, led negotiations
- Consulting Client – Diagnostics company, license, advice on negotiations
- Consulting Client – university, research collaboration, negotiated
- Consulting Client – EU biosimilars co, license, negotiated
- Consulting Client – US biotech, clinical trial collaboration, advice
- Consulting Client – UK biotech, Covid-19 deal, advice
- Consulting Client – US biotech, in-licensing bispecific, negotiated
- Consulting Client – US biotech, Global pharma pilot study, negotiated
- Consulting Client – UK biotech, CRUK clinical trial deal, advised
- Consulting Client – Chinese Ab generation, terms negotiation
- Consulting Client – US biotech, academic in-license, negotiated
- Consulting Client – European biotech, platform deal, advised on value and negotiations
- Consulting Client – China biotech, preclinical Ab, advised negotiator
- Consulting Client – China biotech, preclinical bispecific, advised negotiator
- Consulting Client – China biotech, preclinical vaccine, advised negotiator
- Consulting Client – US biotech, out-licensing Ab, advised negotiator
- Consulting Client – China company, in-licensing from biotech co, led negotiation
- Consulting Client – China company, ww rights for University asset, advised negotiator
- Consulting Client – computational chemistry collaboration, big pharma, advised negotiator
- Consulting Client – chemistry LO and license, $500M milestones, global pharma, advised negotiator
- Consulting Client – small biotech, advised negotiator (preclinical)
- Consulting Client – small biotech, advised negotiator (preclinical)
- Consulting Client – University, advised negotiator (clinical)
- Consulting Client – University, advised negotiator (preclinical)
- Consulting Client – small biotech advised negotiator (preclinical)
- Consulting Client – Japanese pharma, participated in negotiations
- Consulting Client – global pharma, use patent, adviced negotiations
- Consulting Client – University, negotiations
- Consulting Client – University, negotiations
- Consulting Client – Small biotech, JV, participated in negotiations
- Consulting Client – small biotech, territorial deal (preclinical), participated in negotiations
- Consulting Client – University (clinical), valuation, advice throughout negotiations
- Consulting Client – University (platform), led negotiations
- Consulting Client – Mid-sized pharma, led negotiations (preclinical)
- Consulting Client – Mid-sized pharma, advised negotiations (platform)
- Consulting Client – Global pharma, valuations, advised negotiator (preclinical)
- Consulting Client – Small biotech, valuations, advised negotiator (preclinical)
- Consulting Client – Global pharma, part of negotiations (preclinical)
- Consulting Client – Small biotech, led negotiations (preclinical)
- Consulting Client – Small biotech, led negotiations (preclinical)
- Consulting Client – University, led in-licensing negotiations (preclinical)
- Consulting Client – University, led in-licensing negotiations (preclinical)

- Consulting Client – University, led in-licensing negotiations (preclinical)
- Consulting Client – small biotech, led in-licensing negotiations (preclinical)
- Dako – Amgen: companion diagnostic development, supervised evaluator, led negotiations
- Ventana – Amgen: companion diagnostic development, supervised evaluator, led negotiations
- Skye Pharma – Amgen: drug delivery, led evaluation and negotiations
- Many biomarker deals – supervisory roles
- Many IP licenses – negotiator and supervisory roles, some as consultant

**Webinars (incomplete)**

- What's hot and what's not in IO 2021? (organizer and moderator)
- What's hot and what's not in oncology licensing?  (organizer and moderator)
- What's hot and what's not in antibody drug conjugates? (organizer and moderator)
- Adoptive Cell Therapy:  The who, how and when. (organizer and moderator)
- Bispecific antibodies:  are two really better than one? (organizer and moderator)
- Paradigm changing technologies in oncology (organizer and moderator)
- China investments and licensing deals  (speaker)
- LES Pullan's Pieces III:  A business development view of the immunology landscape. (speaker)
- LES  Pullan's Pieces II:  A business development view of the CNS landscape.  (speaker)
- LES Pullan's Pieces I:  A business development view of the oncology landscape. (speaker)
- Getting ready for a biopharma partnering deal (speaker)
- Nuts and bolts of due diligence in biopharma partnering (speaker)
- Winning strategies.  How to create, grow and sustain a successful life science company (panelist).
- Anticipating and planning for deal dynamics (interviewed)
- Trends, challenges and opportunities in bispecific antibodies (moderator) BioEurope 2021.
- Targeting mRNA:  The new frontier of tailored therapeutics (moderator) Demy Colton virtual salon.

**Publications**

Whitepapers:

- Pullan LM.   Successful biotech licensing negotiations
- Pullan, LM.  Valuation of your early drug candidate.  A no formulas tour of valuation.
- Pullan LM.  Getting ready for a biopharma partnering deal.
- Pullan LM.  A business development view of the oncology landscape.
- Pullan LM, et al.,  The nuts & bolts of due diligence in biopharma partnering.
- Pullan LM, et al., What's hot and what's not in oncology licensing in 2020?
- Pullan LM.  How to win at the partnering game.
- Pullan LM, et al., What's hot and what's not in immune-oncology.
- Pullan LM, et al., What's the role of non-IO in an IO world.
- Pullan LM.  Building a better partnering presentation.
- Pullan LM, et al.,  What's hot and what's not in antibody-drug conjugate (ADC) licensing.

**Books and chapters**

- Pullan LM.  "China licensing deals for biologics" in <u>Advances in Biopharmaceutical Technology in China, 2nd ed.</u> 2018, pp945-959. Bioplan.

**Abstracts**

- Huang, C et al., A chemoproteomic platform for identifying small-molecule modulators of protein-protein interactions, discovering new cancer targets, and revealing previously unknown targets for well-known drugs. Molecular Cancer Therapeutics 2021, 20: 12S.

**Newsletters**

- Email Newsletter Archives by Robly – Pullan Consulting

# EXHIBIT 3:
# Analysis of Incyte Licensing Agreements Cited in Dr. Rao's Report

# Analysis of Incyte Licensing Agreements Cited in Dr. Rao's Report

| Agreement at Issue | Licensor in Agreement | Licensee in Agreement | Date of Agreement | Stage of Compound/Product | Territory of the License | Does Royalty Term Include Concept of Market Exclusivity? | Does Royalty Term Include Concept of Patent Protection? | Does Royalty Term Include Concept of Regulatory Exclusivity? | Does Royalty Term Include Concept of Payment of Royalties for Certain # of Years From Launch/First Sale? | Whose Patents Are Referenced in Royalty Term/Definitions Applicable to Royalty Term? | Does Royalty Term Include Concept of a Step Down? | Step Down Triggered in Absence of Patent and/or Regulatory Exclusivity? | Step Down Triggered at Generic Entry or Generic Competition Share of Market? | Bates Range of Agreement |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Collaboration and License Agreement | Incyte | Novartis | 11/24/2009 | Phase 3 (JAK) | ex-U.S. | YES | YES | YES | YES | Incyte, Novartis, and Joint | YES | YES | YES | NOVARTIS PROD000031298-NOVARTIS PROD000031424 |
| License, Development and Commercialization Agreement | Agenus | Incyte | 1/9/2015 | Preclinical and discovery | Worldwide | YES | YES | YES | YES | Agenus Patents, Incyte Patents, and Joint Patents | YES | YES | YES | INCY000150412 - INCY000150503 |
| Research Collaboration and License Agreement | Nimble | Incyte | 9/30/2020 | Discovery | Worldwide | YES | YES | YES | NO | Incyte and Nimble | YES | YES, if loss of composition of matter patent | YES | INCY000161741 - INCY000161874 |
| Collaboration and License Agreement | MorphoSys | Incyte | 1/12/2020 | Submitted to FDA | Worldwide, splitting U.S. | YES | YES | YES | YES | Xencor, MorphoSys, and Joint | YES | YES | NO | INCY000189239 - INCY000189382 |
| Amended and Restated Buy-In License Agreement | ARIAD | Incyte | 6/1/2016 | Marketed drug and EU staff | European 22 other countries (not U.S.) | YES | YES | YES | YES | ARIAD Composition Patent | YES | YES | YES | INCY000124298 - INCY000124405 |
| Collaboration and License Agreement | Merus | Incyte | 12/20/2016 | Preclinical and discovery | Worldwide, ex -U.S., or ex -dev. in U.S. | YES | YES | NO | YES | Merus and Joint | YES | NO | YES | INCY000150873-INCY000151012 |
| Collaboration and License Agreement | Calithera | Incyte: in -licensor, developer, and marketer | 1/27/2017 | Dose escalation clinical trial | Worldwide | YES | YES | YES | YES | Calithera and Joint | NO | YES | YES | INCY000150506-INCY000150632 |
| Target Discovery, Research Collaboration and Option Agreement | Syros | Incyte: in -licensor of targets, developer and marketer of associated drugs | 1/8/2018 | Discovery | Worldwide | YES | YES | YES | YES | Syros (target or method of use) | NO | YES | NO | Syros 10-K (2017), Exhibit 10.22 |
| Global Collaboration and License Agreement | MacroGenics | Incyte | 10/24/2017 | Phase 1 | Worldwide | YES | YES | YES | YES | MacroGenics | YES | YES | YES | Incyte 10-K (2017), Exhibit 10.23 |
| Collaboration and License Agreement | Incyte | Innovent | 12/17/2018 | Phase 2 | Greater China | YES | YES | YES | YES | Incyte | YES, to combination products | NO | NO | INCY000151013 - INCY000151102 |
| Collaboration and License Agreement | Incyte | Zai Lab | 7/1/2019 | Clinical | Greater China | YES | YES | YES | YES | Incyte (MacroGenics) | YES | YES | YES | INCY000159264 - INCY000159366 |
| License Agreement | Novartis | Incyte | 3/8/2019 | Preclinical | Worldwide | YES | YES | YES | YES | Novartis | YES | YES | YES | INCY000134786 - INCY000134901 |
| Development Collaboration, Option and License Agreement | Cellenkos | Incyte | 12/29/2020 | Phase 1b | Worldwide | NO | YES | YES | YES | Cellenkos | YES | NO | YES | INCY000150633 - INCY000150530 |
| License, Development and Commercialization Agreement | Incyte | Eli Lilly | 12/18/2009 | Phase 2 | Worldwide | YES | YES | YES | YES | Incyte Patents | YES | YES | YES | INCY000150704 - INCY000150872 |
| Collaboration and License Agreement | Incyte | InnoCare | 8/16/2021 | Approved by FDA | China | YES | YES | YES | YES | Incyte (MorphoSys) | YES, step-down amount to be negotiated | NO | YES | INCY000189383 - INCY000189528 |
| Collaboration and License Agreement | Syndax | Incyte | 9/24/2021 | Phase 2 | Worldwide | YES | YES | YES | YES | Syndax | YES | YES | NO | Syndax 10-Q (Sept. 30, 2021), Exhibit 10.1 |