EXHIBIT  2

NOVARTIS PHARMA AG,

Plaintiff,

v.

INCYTE CORPORATION,

Defendant.

**Case No. 1:20-cv-00400-GHW-GWG**

**Judge Gregory H. Woods**

**Magistrate Judge Gabriel W. Gorenstein**

## <u>Rebuttal Expert Report of Larry Tedesco</u>

**<u>May 23, 2022</u>**

HIGHLY CONFIDENTIAL

# Table of Contents

| | | |
|---|---|---:|
| 1. | Amended Qualifications | 3 |
| 2. | Background and Assignment | 3 |
| 3. | Rebuttal Opinions and Analysis of Incyte's Expert Report of Dr. Mohan Rao | 4 |
| | A. Rebuttal Opinions and Analysis of Section V.C of Rao Report | 4 |
| | B. Rebuttal Opinions and Analysis of Section V.D of Rao Report | 10 |
| | C. Conclusion | 21 |
| 4. | Appendices | 21 |
| | A. Appendix A: Updated Larry Tedesco Curriculum Vitae | |
| | B. Appendix B: Materials Considered | |
| | C. Rebuttal Appendix C | |

HIGHLY CONFIDENTIAL

1. **ADDITIONAL QUALIFICATIONS**

    1. In addition to the experience I referenced in my opening report ("Opening Report"), I am the President and Chief Intellectual Property Officer at Basis Medical, LLC, a biomedical device company based in Atlanta, Georgia that is focused on developing next generation medical devices and treatment protocols focused on multiple aspects of peripheral vascular disease, such as venous insufficiency, pelvic congestion syndrome, and dialysis access treatment. As Chief Intellectual Property Officer, I am responsible for the development, protection, and monetization of Basis Medical's intellectual property through (i) research and development, (ii) manufacturing and sales, and (iii) licensing. I routinely develop patent license and royalty models and negotiate both outbound and inbound licenses.

    2. Additionally, I am an intellectual property advisor to CorMatrix, Inc., a regenerative biotechnology company based in Atlanta, Georgia which develops regenerative heart valve and tissue products to treat heart failure, valve disease, and other cardiovascular clinical challenges. I advise CorMatrix in areas related to patent monetization and development of its intellectual property program. My advisory work with CorMatrix involves the development and structuring of patent license and royalty models and negotiations with potential licensees and monetization partners.

    3. My updated CV is attached hereto as Rebuttal Appendix A.

2. **BACKGROUND AND ASSIGNMENT**

    4. I have been retained by Greenberg Traurig, LLP, counsel for Novartis ("Counsel"), as an independent expert in economic modeling analysis relating to, in particular, royalty streams. I submitted an opening report on May 4, 2022 (the "Opening Report").[1] I incorporate herein all references and defined terms from that report by reference.

    5. On May 4, 2022, Dr. Mohan Rao submitted a report on behalf of Incyte relating to certain issues pertaining to the November 24, 2009 Collaboration and License Agreement between Novartis and Incyte (the "Rao Report").[2] I have been asked to consider and respond to the opinions and analysis presented by Dr. Rao in the Rao Report, specifically Sections V.C and V.D thereof as well as related Tabs of attachments to the Rao Report.

    6. I incorporate herein by reference my opinions from my Opening Report.

---

[1]   Expert Report of Larry Tedesco, May 4, 2022.
[2]   Report of Mohan Rao, Ph.D., May 4, 2022.

HIGHLY CONFIDENTIAL

3. **REBUTTAL OPINIONS AND ANALYSIS OF INCYTE'S EXPERT REPORT OF DR. MOHAN RAO**

7. I have reviewed the report of Incyte's expert, Dr. Mohan Rao, and considered the additional materials set forth in Rebuttal Appendix B, which includes documents Dr. Rao considered and/or relied upon in rendering his opinions in the Rao Report. As a general matter, I disagree with the substance of Dr. Rao's opinions and reach the following conclusions:

## A. Rebuttal Opinions and Analysis of Section V.C of the Rao Report

### A.1. **Opinion #1**

8. Dr. Rao is incorrect that neither Incyte nor Novartis' financial modeling prior to the execution of the Agreement provides insight into either party's interpretation of Section 8.3 of the Agreement. To the contrary, on review based on my professional experience and customary practice with respect to transactional analysis and financial modeling, both sides' financial modeling reflects Novartis' interpretation of Section 8.3(c) of the Agreement and the expectation that the Reverse Royalty would be paid by Incyte to Novartis at the negotiated Incyte Reverse Royalty Rates described in Section 8.3(b)(i), without a 50% reduction, for well more than ten years. I incorporate by reference all opinions set forth in my Opening Report regarding the pre-Agreement modeling done by Goldman Sachs on Incyte's behalf.

### A.2. **Basis for Opinion #1**

9. My opinion, based on my experience and the materials I have considered prior to the submission of this report, is that Novartis' pre-Agreement financial modeling and internal Committee documents, coupled with deposition testimony from (among other Novartis witnesses) Brian Goldfus, reflects that Novartis expected the Reverse Royalty to be paid by Incyte to Novartis on U.S. sales of Jakafi for well past 10 years and in fact until the expiration of patent protection/market exclusivity in the U.S.

10. In reaching this opinion, I analyzed the purported "seven Novartis financial models" selectively chosen and referenced by Dr. Rao in paragraph 43 of his report. The majority of these documents reflect modeling results from a P&L statement in a slide deck; one of them also appears to be an accounting form, not a model with projections, and another consists of a set of documents prepared in March 2009 (but circulated in May 2009) which is before Novartis had even sent the first term sheet to Incyte with a 7.5% flat rate proposed Reverse Royalty (and thus constitute nothing more than drafts not yet approved by Novartis management at the Pharma Committee level in mid-April 2009, which ultimately did require a Reverse Royalty as a walkaway term).

HIGHLY CONFIDENTIAL

11. The majority of these Novartis documents selected by Dr. Rao only include projections for metrics generally until 2025 or 2026, which is well before compound patent expiration in the U.S., which at the time the Agreement was signed, was to occur in December 2027. Accordingly, these documents appropriately have Reverse Royalty projections at full rates, without any 50% reduction, throughout the length of the document.

12. For those few Rao-cited Novartis modeling documents that extend further in time, they also project <u>Reverse Royalty</u> payments for well more than 10 years—continuing until at ▮▮▮▮▮ (*i.e.,* compound patent expiration). Therefore, these models are contrary to Incyte's interpretation of Section 8.3 of the Agreement.

13. That Novartis did not model a scenario in which the Reverse Royalty was terminated after 10 years, or include a 50% reduction at any time, reflects the expectation that it would be receiving the full Incyte Reverse Royalty Rates set forth in Section 8.3(b)(i) of the Agreement through patent expiration, which at the time was December 2027 for the compound patent.

14. While discussed further herein, based on my review of Incyte's modeling, Incyte's pre-Agreement modeling (including models prepared just prior to execution) also forecast that Incyte would pay Novartis the Reverse Royalty ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

15. Additionally, Dr. Rao's reliance on selective, isolated, and out of context testimony from Mr. Goldfus in paragraph 43 of his report is misleading and does not support his conclusions. Contrary to Rao's assertion, Goldfus was never asked "to explain why no step down or termination in royalties was assumed in [Novartis'] financial model."[3] Rather, Incyte's counsel asked Goldfus if the model was built to reflect "an end of the royalty term in 2027," and Goldfus acknowledged that "the way the model was constructed was to ensure that the royalties are properly reflected at least through 2027."[4] When asked why the Reverse Royalty formula was carried through 2028 and 2029 in Novartis' model, Goldfus clarified that the numbers in those entries, which rounded to zero, were likely inadvertent, and in any event, completely "de minimus" in terms of valuing the "overall value of this deal."[5] Leaving no doubt, Goldfus further stated that the model was "consciously designed

---

[3]  Rao Report at ¶ 43.

[4]  Deposition of Brian Goldfus dated January 28, 2022, at 362:21-365:19.

[5]  Deposition of Brian Goldfus dated January 28, 2022, at 362:21-365:19.

HIGHLY CONFIDENTIAL

to capture royalties that were expected at least through 2027" and that he considered the model to "properly reflect[] the terms of the deal on a material basis."[6]

### A.3. **Opinion #2**

16. Dr. Rao incorrectly states that the record suggests Novartis was not considering the duration of the Reverse Royalty in 2009 prior to execution of the Agreement, and he inaptly cites only testimony from an Incyte witness on this subject in paragraph 44 of his report, excluding from his analysis the testimony of Novartis witnesses that said just the opposite.

### A.4. **Basis of Opinion #2**

17. Novartis' witnesses who were working on the deal team with respect to the Agreement with Incyte in 2009 have consistently testified that they understood the Reverse Royalty's duration to extend until patent expiration. None of these witnesses have had any ambiguity on that point or suggested that Novartis ever considered anything to the contrary as far as the duration of the Reverse Royalty term. And I have seen nothing in the factual record suggesting that anyone at Incyte directly told Novartis, prior to Agreement execution, that Incyte thought that the Reverse Royalty would end prior to existing patent expiration and only last 10 years unless Novartis obtained its own U.S. patent.

18. On February 17, 2022, for example, Todd MacLaughlan, on behalf of Novartis, testified in his deposition as follows:

"Q.  Okay. Going back to the time you were in the negotiations, conceptually, what's called the "reverse royalty," whose ·idea was it to include it in the deal proposal?

A.  I don't recall whose specific idea it was, but the idea, **the concept was that we needed to get value for multiple reasons; one, to make the deal make sense. Otherwise, if you didn't have the royalty rate going out to the patent expiry date, there wouldn't be enough -- there wouldn't be enough to offset the amount of money going out of Novartis' treasury.**

Q.  Novartis wanted to get enough money to justify –

A.  **To justify the deal. Correct. Number two, they wanted to feel compensated for the value they were bringing to the table, to the project in general by the expertise that Novartis felt that they had at the time and to the align Incyte -- to align the goals between the**

---

[6]     Deposition of Brian Goldfus dated January 28, 2022, at 362:21-365:19.

HIGHLY CONFIDENTIAL

**companies,** so that you wouldn't have decisions where, hey, if we did this, we are not going to include -- I'll give you an example -- we are not going to include any U.S. doctors in our clinical trials because we don't want to do anything to help the U.S., to avoid -- and they happen -- those kind of petty things."[7]

And,

"Q.     Okay. So from the DRC's perspective, if they approve a walkaway of zero, how can it be that the existence of a royalty is a necessary ask from Novartis in the negotiation?

A.     So a couple of concepts. One is this is a point in time, right, so this is with the information we knew at the time that we went to the DRC, and as you knew when we went to the pharma committee, more information had come along that changed what we were able to do.

The -- at the DRC, with what we knew, the reverse royalty could be zero assuming the other milestones were reasonable.

**And as we all know, the milestones increased in the later and final deal. So that's why you had to have the reverse royalty all the way through to the end of patent life for this deal to make sense**."[8]

And,

"Q.     But true that you recently learned that it's used in the royalty term in 8.3(c)?

A.     And again, I wasn't there when they wrote that contract. So I don't know what was in either parties' head. **When I was there, into late May, it was clearly understood, both from a modeling purposes when, you know, Incyte communicated to us what we should use for modeling purposes in terms of patent life, and it was always clear and every discussion we had that the term that we were modeling went into 2025 or beyond**."[9]

---

[7]     Deposition of Todd MacLaughlan dated February 17, 2022, at 368:16-369:23 (objection omitted; emphasis added).

[8]     Deposition of Todd MacLaughlan dated February 17, 2022, at 304:24-305:22 (objection omitted; emphasis added).

[9]     Deposition of Todd MacLaughlan dated February 17, 2022, at 405:18-406:11 (objection omitted; emphasis added).

HIGHLY CONFIDENTIAL

19. On March 11, 2022, Douglas Hager testified in his deposition as follows:

> "Q.    I'm trying to think specifically about Incyte's royalty payments to Novartis. **You understood those to continue until Incyte lost exclusivity in the U.S. market**?
>
> A.    Yes.
>
> Q.    And could you just define what you mean by "loss of exclusivity"?
>
> A.    **The preferred loss of exclusivity is that the patent expires. There may be some additional regulatory exclusivity added on to that. It would be at the end of the patent expiry, plus any extensions.**
>
> Q.    Whose patent are you referring to there?
>
> A.    This was Incyte's patent."[10]

And

> "Q.    Do you recall that you were asked questions by Mr. Mach about Novartis' financial modeling of royalties and you testified **that Novartis modeled the reverse royalty until Incyte U.S. patent expiration**?
>
> A.    I did say that, **yes**."[11]

20. On March 9, 2022, Shelly Sun, on behalf of Novartis, testified in her deposition as follows:

> "Q.    When you were performing financial modeling in your role at Novartis oncology after the agreement was signed in 2009, **were you using patent expiration dates in calculating the duration of the reverse royalties for ruxolitinib to Novartis?**
>
> A.    **Correct, yes.**
>
> Q.    And why were you using patent expiration in calculating the duration of reverse royalties for ruxolitinib to Novartis?
>
> A.    Based on the royalty terms, patent expiration date is the longer of the three conditions for the royalty terms.
>
> Q.    And what was the basis for that understanding?

---

[10]    Deposition of Douglas Hager Deposition dated March 11, 2022, at 109:13-110:5 (emphasis added).

[11]    Deposition of Douglas Hager dated March 11, 2022, at 309:2-8 (emphasis added).

HIGHLY CONFIDENTIAL

A.     Based on the contract. And then, you know, the patent expiration date is '27 to '28. And the other dates are shorter than that, so our royalty will extend all the way until at least these two dates by two years."[12]

21. On February 25, 2022, Nancy Griffin, on behalf of Novartis, testified at her deposition as follows:

"Q.     So if that team was not discussing a royalty step-down and this guidance document would not indicate to them that there is a royalty step-down, it would make sense that they were surprised when the step-down occurred?

A.     No, I disagree.

Q.     Why do you disagree?

A.     Because, as I said, anybody for whom that was relevant would have access to the contract sections and would understand the implications of any step-down. **In addition, I believe that the understanding, based on our understanding of those three criteria, was that things were still going on until patent expiry, which was not even here yet. End of, I don't know the dates, but end of '27, '28.**

So that wasn't -- when I was working with this that wasn't our understanding that any of those other criteria would be triggered."[13]

22. Moreover, the fact that Novartis was not modeling a 50% reduction in the Incyte Reverse Royalty Rates—just like Goldman Sachs on behalf of Incyte—merely lends further support that neither side expected the step down provision to be invoked in 2019.

A.5.  **Opinion #3**

23. The absence of post-execution Incyte or Novartis' financial modeling or internal documents in the Rao Report is notable and leads to flawed conclusions. Indeed, the post-Agreement modeling is consistent on both sides, reflecting the payment of the Reverse Royalty until ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and supports Novartis' interpretation of Section 8.3(c) of the Agreement, not Incyte's.

A.6.  **Basis for Opinion #3**

24. My opinion is that Dr. Rao's omission of post-Agreement modeling and documentation leads to significant flaws in his conclusions. To analyze the

---

[12]     Deposition of Shelley Sun dated March 9, at 89:6-25 (emphasis added).

[13]     Deposition of Nancy Griffin dated February 25, 2022 at 200:11-201:8 (objection omitted; emphasis added).

HIGHLY CONFIDENTIAL

expectations and/or intentions of the parties to a negotiation, one must consider not only the pre-Agreement modeling and documentation, but also the post-Agreement modeling and documentation because it reflects the parties' understanding of the application of the agreement and serves to further corroborate the parties' expectations.

25. Generally, based on my experience and custom and practice, in modeling or forecasting economic terms of a transaction—either pre-deal or post-deal—it is common practice to incorporate into financial models or projections all applicable inputs, particularly those involving payments a party receives or outlays. As Incyte's Principal Accounting Officer Paul Trower acknowledged, in modeling one seeks to give management "as accurate information as possible," including in financial forecasts.[14] Thus, my opinion is that Incyte's modeling, which reflects its payment to Novartis of Reverse Royalties ███████████████████ ██████████ without a 50% reduction/step down, demonstrates Incyte's understanding that the step down provision was not expected to be invoked in 2019 and the Reverse Royalty did not terminate in 2021. In my opinion, if the step down was expected to be applied as of late 2018 or early 2019 and the Reverse Royalty concluded in late 2021, Incyte's models should have reflected that. They do not.

26. Notably, both Novartis' and Incyte's post-Agreement modeling supports Novartis' interpretation of the Agreement—not Incyte's. In that regard, I incorporate by reference all of my opinions from my opening report, and should Dr. Rao rebut those opinions in a rebuttal report, I reserve the right to respond to same at my deposition and/or at trial.

## B. Rebuttal Opinions and Analysis of Section V.D of Rao Report

### B.1. Opinion #4

27. I strongly disagree with Dr. Rao's suggestion that because the global sales of ruxolitinib exceeded expectations that Novartis should not continue being paid the agreed-upon Incyte Reverse Royalty rates, which were set forth in the parties' Agreement, until patent protection expires (and market exclusivity expires) for Jakafi in the U.S.

### B.2. Basis for Opinion #4

28. Novartis and Incyte's pre-Agreement modeling forecasted ruxolitinib sales (and necessarily royalties) that were much lower than what ultimately transpired following the product's approval and launch around the world. Both Novartis and

---

[14] Deposition of Paul Trower dated March 11, 2022, at 93:20-94:25.

HIGHLY CONFIDENTIAL

Incyte underestimated the expected success of ruxolitinib in each of their final financial models dated at the time of Agreement execution.[15] However, that the sales of ruxolitinib had exceeded both parties' expectations as seen in Rebuttal Appendix C(11), is irrelevant as to whether Incyte should be required to abide by the terms set forth in the Agreement (and thus pay Novartis the Reverse Royalties as contracted).

29. Additionally, Dr. Rao's omission of Incyte's financial gain from the Agreement with Novartis is misleading. Incyte has financially benefited much more (and disproportionally) than anticipated based on the global success of ruxolitinib, and it is Incyte that has been conferred significant value from entering the Agreement with Novartis, as seen in Rebuttal Appendices C(9), C(10), and C(11).

30. For example, as illustrated in Rebuttal Appendix C(9) and C(10), if one compares Novartis and Incyte's 2009 projections of ex-U.S. and U.S. net sales to actual net sales and the net sales later projected in post-Agreement modeling from 2018 (for Novartis) and from 2021 (for Incyte), it is clear that both parties' actual sales exceeded their 2009 expectations and forecasts. And based on both parties' forecasts,

There is no dispute that both parties have obtained a better-than-expected outcome on sales of ruxolitinib than their original 2009 deal projections and in any event, this is irrelevant as to whether Incyte should be paying full Reverse Royalties at the Incyte Reverse Royalty Rates set forth in Section 8.3(b)(i) of the Agreement until at least 2028. My understanding is that Novartis stands on its position that Incyte should be paying them in full until June 2028.

31. While both parties have benefitted from net sales greater than forecast in 2009, when I compare Novartis' growth and expected growth in net sales for 2011-2027 to Incyte's growth and expected growth in net sales for 2011-2027, as illustrated in Rebuttal Appendix C(11), it is clear that

relating to the sales of ruxolitinib. I have also illustrated this same point in Rebuttal Appendix C(12), which demonstrates that Incyte has received 127% greater than expected adjusted net sales and Novartis has received          greater than expected adjusted net sales.

---

[15] Novartis final model at execution of Agreement (NOVARTISPROD000225411) and Incyte's final Goldman Sachs model at execution of Agreement (GS0003808).

HIGHLY CONFIDENTIAL

### B.3. **Opinion #5**

32. Dr. Rao's opinion that the Reverse Royalty, as calculated based on the forecasted U.S. sales available to Novartis at the time of the negotiations, was a small proportion of the deal value calculation in 2009 is irrelevant.

### B.4. **Basis for Opinion #5**

33. Every component of a deal's financial terms—regardless of the size—can impact its valuation and can affect whether a company like Novartis approves proceeding with the deal or elects to invest those funds and resources into a different deal. Moreover, Novartis calculated the duration of the Reverse Royalty to extend until patent expiration (not just 10 years) and was the party that pushed for the inclusion of the Reverse Royalty in the deal terms, lending further support for how important the Reverse Royalty—in its full duration—was to Novartis.

34. Indeed, without the Reverse Royalty, according to several witnesses, Novartis may not have signed the Agreement. Douglas Hager testified that if Novartis had to obtain a U.S. patent and license it to get Reverse Royalties for longer than 10 years, "there is significant risk that the Novartis side would have chosen not to do the deal under those circumstances."[16] Brian Goldfus testified that without a reverse royalty, "you would have to adjust the other terms to accommodate for that,"[17] which never occurred. And Todd MacLaughlan stated that the Reverse Royalty came from the "concept . . . to participate in the U.S. value" and "to get value from the deal; otherwise the deal wouldn't made sense."[18] MacLaughlan further stated that "the concept was that we needed to get value for multiple reasons; one to make the deal make sense. Otherwise, if you didn't have the royalty rate going out to patent expiry date, there wouldn't be enough -- there wouldn't be enough to offset the amount of money going out of Novartis' treasury."[19]

35. In my review of the pre-Agreement term sheets, Novartis pre-Agreement models, and internal Novartis committee slide decks, it is abundantly clear to me as an experienced professional familiar with negotiating and modeling practices that the Reverse Royalties were of particular importance to Novartis. In its initial April 22, 2009 proposal, Novartis requested a flat Reverse Royalty rate of 7.5% to be paid by Incyte on Incyte net sale of Jakafi in the U.S.[20] Incyte countered with a proposal

---

[16]   Deposition of Douglas Hager dated March 11, 2022, at 309:13-310:16.

[17]   Deposition of Brian Goldfus dated January 28, 2022, at 350:9-23.

[18]   Deposition of Todd MacLaughlan dated February 17, 2022, at 288:14-289.

[19]   Deposition of Todd MacLaughlan dated February 17, 2022, at 368:16-369:23.

[20]   NOVARTISPROD000154913-922.

HIGHLY CONFIDENTIAL

on May 7, 2009, that removed all Reverse Royalty language from the term sheet. [21] Novartis then sent another proposal on June 11, 2009, in which the Reverse Royalty language was added back to the term sheet but at tiered rates.[22] Novartis and Incyte continued to exchange term sheets in which the Reverse Royalty was negotiated until both parties agreed to the tiered Reverse Royalty term as written in the executed Agreement.[23]

36. It is my opinion, based on my experience and the facts and evidence described above and upon which I have relied, the Reverse Royalty was of significant importance to Novartis in the 2009 negotiations between Novartis and Incyte. As described above, the parties negotiated first over whether to include the Reverse Royalty at all, and then the applicable royalty rate and the duration thereof. Had the Reverse Royalty been of little or no importance to Novartis, Novartis would not have put it back into the term sheet after Incyte removed it and required the Reverse Royalty as part of its walkaway terms set in the negotiations with Incyte.

37. Further, as noted above, multiple Novartis witnesses indicated Novartis would not have done the deal without the Reverse Royalty extending beyond ten years. Consistent with this approach, none of the contemporaneous Novartis models examined by Dr. Rao noted in Section V.C of his report modeled termination of the Reverse Royalty at ten years.[24] Given that Novartis did not contemplate such a termination occurring after 10 years (given at least U.S. compound patent expiry in 2027 at the time the Agreement was signed), Novartis did not model that "10 years termination" scenario. As Douglas Hager testified, Novartis would "certainly" have modeled Reverse Royalties for only ten years if that was seen as "a risk or baseline," but Novartis "never modeled that."[25]

38. For these reasons, I conclude that Novartis would likely have also modeled any reduction or elimination of the Reverse Royalty if it had an expectation of a step down or elimination of Reverse Royalty payment. It did not.

---

[21] NOVARTISPROD000158328-337.

[22] NOVARTISPROD00005943-5974.

[23] *See*, NOVARTISPROD000154913-922, NOVARTISPROD000158328-337, NOVARTISPROD00005943-5974, NOVARTISPROD000211167-188, NOVARTISPROD00016163-187, NOVARTISPROD000202304-326.

[24] Rao Report, p. 26-27, ¶ 43.

[25] Deposition of Douglas Hager dated March 11, 2022, at 309:13-310:3.

HIGHLY CONFIDENTIAL

B.5. **Opinion #6**

39. Dr. Rao's suggestion that Novartis achieved "payback" and recovered the amounts it had already spent before Incyte invoked the disputed 50% reduction is irrelevant to the contract application issues in dispute.

B.6. **Basis for Opinion #6**

40. The Agreement at the center of this litigation is a Collaboration and License Agreement. This Agreement was not a contract by which Novartis was only to recoup the money spent (akin to a loan), nor was the Agreement drafted with a cap on the Reverse Royalty payments paid by Incyte. Rather, consistent with the concept of collaboration, the Agreement was drafted so that both parties financially benefitted as evidenced in the multiple negotiated term sheets that were exchanged, as well as the various Novartis and Incyte internal committee Board presentations whereby the value of the Agreement respective to each party was the deciding factor as to whether to enter into the Agreement or walk away.

41. For this reason, both Dr. Rao's statement that Novartis' "actual value recognized on the deal" was higher than projected based on 2009 modeling and his attempt to show that Novartis achieved its "payback period" sooner than modeled in 2009 (Tab 7) is inapt. Indeed, Incyte recognized even more "actual value" on the deal than Novartis did. As demonstrated in Rebuttal Appendix C(12), while Novartis achieved net sales ex-U.S. that were ███ higher than expected in its 2009 modeling, Incyte achieved net sales in the U.S. that were 127% higher than expected in its 2009 model—further demonstrating the significant value Incyte has gleaned from the Agreement.

B.7. **Opinion #7**

42. Dr. Rao's hypothetical modeling described in paragraph 50 and the referenced tabs (Tabs 4, 5, and 6) are inconsistent with both Novartis and Incyte's pre-Agreement modeling. However, because it was never performed by either party, it is not relevant or instructive to inform what the parties expected, understood, or agreed to with respect to the Reverse Royalty. In rebutting this opinion, I do not concede that this exercise by Dr. Rao is appropriate expert testimony.

B.8. **Basis for Opinion #7**

43. In my opinion, based on my review of both the pre-Agreement and post-Agreement Novartis and Incyte modeling, as well as other produced materials in this case such as the Novartis Committee and Incyte Board materials, Dr. Rao's hypothetical modeling in paragraph 50 of his report is irrelevant to determining what the parties expected, understood, and agreed to. Dr. Rao's analysis in paragraph 50, and

Page 14

HIGHLY CONFIDENTIAL

reflected on Tabs 4 and 5 of his report, simply takes Novartis' pre-Agreement modeling from 2009—which projected payment of Reverse Royalties ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ without any 50% reduction/step down provision invocation—and runs the same model under a scenario whereby the step down applied in 2019 and royalties terminated in 2021 (*i.e.*, Incyte's litigation position) in order to illustrate the deal value contributions of the Reverse Royalties between the actual 2009 models and a hypothetical scenario. Dr. Rao's hypothetical modeling by its nature serves no purpose in assisting the fact finder to determine what the parties expected, understood, or agreed to in 2009.

44. That the Reverse Royalties may have been a smaller percentage of the value of the deal than other component parts does not negate the fact that the Reverse Royalty, both in rate and duration, was a heavily negotiated term in the record that contributed to the consideration of the deal value for both Novartis and Incyte as evidenced in the negotiation term sheets, pre-Agreement Committee and Board presentations and related materials, and previously stated deposition testimony. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

45. Additionally, it is important to note that neither Novartis' nor Incyte's pre-Agreement (or post-Agreement) modeling included the assumptions used by Rao or actually modeled Dr. Rao's hypothetical scenario. By modeling a scenario that neither party actually modeled, Dr. Rao artificially creates a scenario wherein the Reverse Royalties would have been lower than those found in Novartis' 2009 forecasts thereby lowering the Reverse Royalties' contribution to the deal value. The actual pre-Agreement and post-Agreement modeling is what should be considered and speaks to what the parties understood and agreed. There is no reason to consider or look to the hypothetical scenario modeled by Dr. Rao in paragraph 50 as it does not reflect what either party actually did or thought.

46. Similarly, Dr. Rao continues his analysis in Tab 8 by comparing the internal rate of return when calculated through application of his hypothetical scenario to Novartis' pre-Agreement modeling. Again, Dr. Rao's analysis is not instructive to the issue of intended application of the Reverse Royalty. The internal rate of return of the Reverse Royalty—regardless of size—is irrelevant, as the Reverse Royalty was a negotiated term that was part of the overall value of the deal. Indeed, negotiations over the term sheets for the deal demonstrate that after Novartis' initial inclusion of the Reverse Royalty in the first draft term sheet, Incyte attempted to remove it entirely, only for Novartis to add it back in and then negotiate with Incyte the exact royalty rate and duration that would apply. Thus, Dr. Rao's analysis is simply irrelevant.

HIGHLY CONFIDENTIAL

B.9. **Opinion #8**

47. Dr. Rao's attempt to reconstruct alleged value, as described in paragraphs 54-57 of his report and the referenced tabs (Tabs 9-12), are fundamentally flawed, including because he uses estimated costs based on 2009 projections, which are more than 13 years old. Further Rao's comparison of his estimated Novartis "actual performance" during 2009-2021 to his estimated Novartis "expected value" (Tabs 5, 6, and 9) is irrelevant to the to the contract application issues in dispute.

B.10. **Basis for Opinion #8**

48. To estimate the "actual performance" of Novartis, Dr. Rao relies upon the Novartis 2009 financial model[26] to estimate costs, which he applies to historical 2009-2021 Novartis Jakavi revenues and both incoming and outgoing Jakafi/Jakavi royalty payments to created "Estimated Profit & Loss Statements."[27] In my opinion, based on my experience and custom and practice with respect to financial modeling, it is not appropriate to use assumptions from a financial projections model to attempt to calculate actual profit & loss figures up to 12 years after the date of the projections. In his report and attached tabs, Dr. Rao does not acknowledge the limitations of using 2009 model assumptions to attempt to calculate 12 years of actual values.

49. Dr. Rao's estimation of the Novartis 2009-2021 profit and loss figures, regardless of his cost assumptions, are not relevant to the contract application issues in dispute. Dr. Rao discounts his estimated "actual" cash flow figures to 2009 to compare them with Novartis' probability-weighted NPV from 2009.[28] In his analysis, Dr. Rao claims that during 2009-2021, Novartis has recognized "$601.7 million"— ███████ ██████████████████████████████████████████████████ Whatever value Novartis has actually realized from the deal does not negate any Reverse Royalties owed by Incyte to Novartis.

50. While I find Dr. Rao's methodology materially flawed for the reasons described above, to the extent the Court finds that Dr. Rao's analysis is admissible, I have applied Dr. Rao's methodology to Incyte's last 2009 model to estimate Incyte's "actual" value realized from the deal from 2009-2021. This analysis demonstrates that Incyte's actual value realized from the transaction is much higher than was expected in 2009.

---

[26] NOVARTISPROD000225411.

[27] Rao Report, pp. 31-32, ¶¶ 55-56, Tab 9. Dr. Rao sources his actual revenues and royalty payments from Novartis' Form 20-F and Incyte's Form 10-K annual reports and produced royalty reports.

[28] Rao Report, pp. 31-32, ¶¶ 54-57, Tabs 5 and 9.

HIGHLY CONFIDENTIAL

51. Rebuttal Appendices C(14) through C(19) illustrate my application of Dr. Rao's methodology to Incyte's latest pre-Agreement 2009 model to compare Incyte's expected value from 2009 to Incyte's actual value realized from for 2009-2021. I have used Incyte's 2009 assumptions to estimate costs for Incyte's actual revenues and royalty payments from 2009-2021.[29] My analysis, using Dr. Rao's methodology, includes "actual" profit & loss figures for Incyte in 2009-2021. *See* Rebuttal Appendices C(14) through C(19). These calculations include two alternatives: one based on the Reverse Royalties Incyte actually paid and one based on the Reverse Royalties I understand Incyte should have paid (but did not) from 2019-2021.

### B.11. Opinion #9

52. Dr. Rao misplaces reliance on Tabrecta forecasts and sales in the last section of his report, as this case has to do with ruxolitinib.

### B.12. Basis for Opinion #9

53. It is my understanding that both parties in this litigation have already formally agreed that Tabrecta and the c-MET compound (also licensed under the Agreement) are irrelevant to the claims and defenses in this case. Nevertheless, that Novartis is now selling Tabrecta or that Novartis' pre-Agreement Tabrecta sales forecasts may have been allegedly more accurate, is irrelevant to determining the amount or extent of Reverse Royalty payments to be paid by Incyte on sales of Jakafi.

### B.13. Opinion #10

54. In my opinion, and as shown in the Rebuttal Appendices C using the available modeling, Incyte is appropriating a significant amount of value of the deal from Novartis

This is in addition to the significant royalties it continues to receive from Novartis on ex-U.S. sales and the billions of dollars it continues to make on U.S. existing sales of Jakafi.

### B.14. Basis for Opinion #10

55. During my analysis of the pre-Agreement and post-Agreement financial models, I created Rebuttal Appendix C, which contains multiple illustrations based on actual (from 2014-2021) and forecasted net sales                          using royalty reports

---

[29] I rely on upon GS0003808.xls assumptions to estimate Incyte costs.

HIGHLY CONFIDENTIAL

and the parties' financial models produced in this litigation. I discuss my analysis and conclusion of each appendix in turn below.

56. Rebuttal Appendices C(1) and C(2) illustrate the financial benefit that Incyte has received and will continue to receive as a result of its (a) unilateral invocation of the 50% reduction/step down provision in 2019 and (b) Incyte's unilateral termination of Reverse Royalty payments to Novartis in 2021. All actual net sales and Reverse Royalty payments are based on net sales as reported in produced royalty reports for 2014-2021. For 2022-2027, I used Incyte's net sales projections from its latest in time financial model dated March 31, 2021. This analysis demonstrates that by invoking the step down provision in 2019, reducing the Reverse Royalty by 50% in 2019, and terminating the Reverse Royalty entirely in 2021, respectively, Incyte will retain

a fact conceded by Incyte's litigation counsel. Dr. Rao never acknowledges that Incyte's interpretation of Section 8.3(c) of the Agreement enriches Incyte so significantly at the expense of Novartis.

57. Rebuttal Appendix C(3) illustrates Incyte's actual net sales (for 2014-2021, based on royalty reports) and Incyte's future forecasted net sales (based on Incyte's March 31, 2021 model), the amount of Reverse Royalties Incyte actually paid to Novartis, and the amount of Reverse Royalties that Incyte owes or will owe to Novartis. My analysis demonstrates that the Reverse Royalty payments as set forth in Section 8.3(b)(i) of the Agreement are                                    that Incyte is projected to make                     and that only Incyte (not Novartis) stands to increase its expected value from the step down or termination of the Reverse Royalty payments. While the Agreement provided value to all parties, Dr. Rao's analysis fails to recognize that Incyte has already realized and stands to realize significantly more value than Novartis from the Agreement at the expense of Novartis under Incyte's interpretation of Section 8.3.

58. Rebuttal Appendix C(4) illustrates Novartis' ex-U.S. sales of ruxolitinib. All actual net sales and ex-U.S. royalty payments are based on net sales as reported in produced royalty reports for 2014-2021. For 2022-2027, I used Novartis' net sales projections from modeling from May 2018 and calculated royalties to Incyte per the Agreement's tiers as set forth in Section 8.3(b)(i) of the Agreement. In my analysis of this data in conjunction with Appendix C(3),

---

[30] Deposition of Douglas Hager, dated March 11, 2022, at 153:22-154:3 (Incyte's counsel acknowledging that "there is potentially                     at stake here.")

Page 18

HIGHLY CONFIDENTIAL

Novartis thus receives less value from the Agreement than Incyte.

59. Additionally, when I consider that Incyte has already reduced the Reverse Royalty payment to Novartis by 50% in 2019, 2020, and 2021 and is refusing to pay Novartis according to the terms as set forth in Section 8.3(b)(i) of the Agreement at all moving forward, Incyte's already upward value split increases even more because of the Reverse Royalty payments Incyte is no longer paying. While the Agreement provided value to all parties, Dr. Rao fails to recognize that Incyte has already received and is projected to receive significantly more value in the Agreement than Novartis and fails to recognize the additional loss of value to Novartis under Incyte's interpretation of Section 8.3(c) of the Agreement.

60. Rebuttal Appendix C(5) contains a side-by-side comparison of the amount of ex-U.S. royalties Novartis has paid and is expected to pay based on net adjusted sales projections as compared to royalties to be paid by Incyte. This appendix does not illustrate the actual payments from 2019-2021 whereby Incyte reduced the Reverse Royalty payments by 50% or the elimination of Reverse Royalties from 2022-2027. I have concluded based on this analysis that Incyte is receiving more value from the Agreement with Novartis than Novartis was expected to receive from Incyte. Furthermore, when I take into consideration that this appendix does not illustrate the reduction and elimination of Reverse Royalty payments from Incyte to Novartis, Incyte's value under the Agreement increases even more. While the Agreement provided value to all parties, Dr. Rao fails to recognize that Incyte has already received and is projected to receive more value in the Agreement than Novartis and fails to recognize the additional loss of value to Novartis under Incyte's interpretation of Section 8.3(c) of the Agreement.

61. Rebuttal Appendix C(6) illustrates Incyte's actual adjusted net sales (from royalty reports) and forecasted net sales from [redacted] based on Incyte's March 31, 2021 projections. My analysis of this data indicates that Incyte experienced significant increases in adjusted net sales from 2014 through 2021, [redacted]

62. Rebuttal Appendix C(7) illustrates ruxolitinib U.S. actual adjusted net sales (from royalty reports) and forecast net sales from 2022-2027 based on Novartis' May 2018 projections as well as projected royalties to be paid. Like Incyte's projections, Novartis' projections demonstrate that Incyte is [redacted]

HIGHLY CONFIDENTIAL

63. Rebuttal Appendix C(8) compares actual and projected adjusted net sales for Novartis' ex-U.S. sales (using Novartis' May 2018 projections for 2022-2027) and Incyte's U.S. sales (using Incyte's March 31, 2021 projections for 2022-2027).

64. Rebuttal Appendix C(9) compares Novartis' Ex-U.S. net sales as reported in Novartis Ex-U.S. royalty reports and its 2022-2027 projections (from May 2018) with Novartis' final model prior to signing the Agreement. Based on this analysis it is apparent that Novartis' ex-U.S. sales have exceeded through 2021 and is expected to

65. Rebuttal Appendix C(10) compares Incyte's U.S. adjusted net sales as reported in Incyte's Reverse Royalty reports and its 2022-2027 projections (from March 31, 2021) with Incyte's final pre-Agreement forecasts from 2009. In comparing Appendix C(9) and C(10)—which is the function of C(11)—I find that the Agreement has been financially mutually beneficial and exceeded the financial expectations of both parties. However, Incyte has experienced the most growth in net sales and value from the Agreement.

66. Rebuttal Appendix C(12) illustrates the expected net sales of both Incyte and Novartis in 2009 just prior to execution of the Agreement compared to each parties actual adjusted net sales between 2009-2021. In my analysis of this data, I found that Incyte experienced 127% growth in net sales (over its original projections) while Novartis only experienced ___ growth (over its original projections).

67. Rebuttal Appendix C(13) illustrates Incyte's and Novartis' projected net sales in their respective territories for 2022-2027 using Incyte's March 31, 2021 projections and Novartis' May 2018 projections. My analysis shows that Incyte's projected sales from 2022-2027

68. Rebuttal Appendices C(14)-(C19), as described more fully above, consist of my application of Dr. Rao's methodology (which I believe is flawed), as employed in Rao Tab 9, to Incyte's 2009 modeling and Incyte's actual results from 2009-2021.

Page 20

HIGHLY CONFIDENTIAL

## C. Conclusion

69. My opinions on this rebuttal are as stated in this report. However, I reserve the right to supplement or amend my opinions and conclusions should any other documentation or testimony be produced or taken pertinent to the assignment for which I was hired, to rebut any of Incyte's experts, or if otherwise requested by Counsel.

4. **APPENDICES**

**A. Appendix A: Updated Larry Tedesco Curriculum Vitae**

**B. Appendix B: Materials Considered**

**C. Rebuttal Appendix C**

HIGHLY CONFIDENTIAL

Signature: _____ Date: __May 23, 2022__

Larry Tedesco

**Appendix A: Updated Larry Tedesco Curriculum Vitae**



LARRY TEDESCO, CVA, CLP, MAFF
**BERKELEY RESEARCH GROUP**
3350 Riverwood Parkway, Suite 1900
Atlanta, GA 30339
Direct: (678) 570-4902
ltedesco@thinkbrg.com

Mr. Tedesco is an intellectual property valuation, licensing, and damages expert. He is acknowledged as one of the World's Leading IP Strategists by Intellectual Asset Management (IAM). Mr. Tedesco has spent a large portion of his career developing, managing, valuing, and licensing intellectual property as both an operator and as a consultant. He has provided multiple levels of damages evaluations for both plaintiffs and defendants in a wide range of intellectual property disputes.  He is a Certified Valuation Analyst (CVA), Certified Licensing Professional (CLP), and a Master Analyst in Financial Forensics (MAFF).

Mr. Tedesco has provided forensic and expert consulting services in litigation matters regarding patent royalty structures and modeling, lost profits, reasonable royalties, unjust enrichment, and other forms of economic damages related to complex commercial litigation, intellectual property licensing, and valuation.  Mr. Tedesco has reviewed and analyzed more than 1,000 license agreements, and he has significant experience with determining FRAND royalty rates for Standard Essential Patents in a variety of technologies including wireless telecommunications, Wi-Fi, and audio/video.

As an operator, Mr. Tedesco has significant experience monetizing intellectual property in a wide variety of industries including telecommunications, medical devices, software development, electronics, manufacturing, and augmented reality. He has held senior level management positions where he obtained extensive experience developing patent assets in addition to designing and implementing IP licensing programs. Mr. Tedesco has negotiated more than 150 IP transactions and managed the licensing program for an industry leading essential Ethernet patent portfolio.

His experience includes:

• More than 20 years of IP development, valuation, monetization, and enforcement

• Negotiating over 150 IP transactions

• Review and analysis of more than 1,000 license agreements

• Damages evaluation including lost profits, reasonable royalty, unjust enrichment, and other forms of economic damages

• Assisting clients with the determination of FRAND/RAND royalty rates for standard essential patents



## EDUCATION

B.A., Political Science and Business Administration          Furman University, 1991

## CERTIFICATIONS

Certified Valuation Analyst (CVA) – National Association of Certified Valuators and Analysts

Certified Licensing Professional (CLP) – Certified Licensing Professionals

Master Analyst in Financial Forensics (MAFF) – National Association of Certified Valuators and Analysts

## PROFESSIONAL AFFILIATIONS

National Association of Certified Valuators (NACVA)

Certified Licensing Professionals (CLP)

Technology Association of Georgia (TAG)

Licensing Executives Society (LES)

## POSITIONS HELD

BERKELEY RESEARCH GROUP, LLC, Atlanta, GA                          2014 - *present*
Managing Director

BASIS MEDICAL, LLC, Atlanta, GA                          2018 - *present*
President & Chief Intellectual Property Officer

U.S. ETHERNET INNOVATIONS, LLC, Tyler, TX                          2009 - 2013
Senior Vice President & Licensing Director

DISPUTE RESOLUTION CONSULTING (DRC), Atlanta, GA                          2008 - 2012
Managing Director

ALSET IP MANAGEMENT L.P., New York, NY                          2008 - 2009
Associate Director

EXCHANGEBLVD.COM / EXCHANGEBLVD IP, Atlanta, GA
President/CEO                          2000 - 2008
Vice President, Business Development                          1998 - 2000

AUGUSTA NATIONAL GOLF CLUB / The MASTERS, Augusta, GA                  1992 - 1998
Golf Professional/Merchandise Manager

## TESTIMONY DELIVERED SINCE 2018

*Netlist, Inc. v. Samsung Electronics*. Case No. 8:20-cv-993-MCS (ADS)
Deposition: September 2021
United States District Court for the Central District of California

*Organic Healing, LLC v. Brandon Slater*. Case No. 18-CA-003860
Expert Report: July 2020
Thirteenth Judicial Circuit Court, Hillsborough County, FL

*Richard Belliveau v. Barco*. Case No. 1:17-cv-00379-SS
Deposition: March 2019
United States District Court for the Western District of Texas

## PUBLICATIONS

"*FRAND royalty rates in SEP licensing: comparable license agreements*", Larry Tedesco, David Kennedy, Intellectual Asset Management Yearbook 2021

"*Formulating or Evaluating a FRAND Offer for LTE*", Larry Tedesco, David A. Kennedy, Intellectual Asset Management Yearbook 2020

"*Myth-Busting Litigation Finance: What Today's Law Departments Need to Know*", Business Vision, Winter 2018/2019, p. 18

"*Litigation Finance 101*", ThinkSet, Issue 6, Larry Tedesco, Daniel Ryan, Bob Craig, October 15, 2018.

"*Legal and Strategic Implications of Litigation Funding in IP Litigation*", Larry Tedesco, Katharine Wolanyk, Michael McLaughlin, IP Law Section of the State Bar or Georgia, September 22, 2018

"*5G SEPs – how can early implementers predict aggregate royalties*?", David A. Kennedy, Larry Tedesco, Intellectual Asset Management Yearbook 2018, p. 120

"*A practical guide to determining FRAND in the telecommunications industry*", David A. Kennedy, Larry Tedesco, Intellectual Asset Management Yearbook 2017, p. 163

## RECENT PRESENTATIONS

Dealmakers Digital Disruption Series
Driving Outcomes with SEP Litigation at the ITC
September 9, 2022

IP Law Section of the State Bar of Georgia – 2018
Legal and Strategic Implications of Litigation Funding



September 18, 2018

Georgia State University College of Law – Corporate IP Institute
Panel: "Money Talks – Making Early and Better – Informed Dispute Resolution Decisions Using Damages and Valuation Models."
October 2, 2015

**Appendix B: Materials Considered**

## *Novartis Pharma AG v. Incyte Corporation* , Case No. 1:20-cv-00400

## Materials Considered by Larry Tedesco in Rebuttal Report

**BATES NUMBER / NAME OF DOCUMENT**

**Parties' Reports and Materials**

Report of Dr. Mohan Rao, dated May 4, 2022, and cited documents/references therein irrespective of whether individually listed below or not

Report of Peter Lankau, dated May 4, 2022, and cited documents/references therein irrespective of whether individually listed below or not

All Materials Considered in the Expert Report of Larry Tedesco, dated May 4, 2022

Expert Report of Dr. Linda Pullan, dated May 4, 2022

**Incyte Bates-Stamped Documents**

| |
|---|
| INCY000003000-175 |
| INCY000007320 |
| INCY000008527-28 |
| INCY000009494-95 |
| INCY000009671-72 |
| INCY000010116-17 |
| INCY000010121-124 |
| INCY000010123 |
| INCY000011289-91 |
| INCY000011522-23 |
| INCY000012459-537 |
| INCY000014390-91 |
| INCY000019496-97 |
| INCY000019497 |
| INCY000024975-76 |
| INCY000024976 |
| INCY000028282-84 |
| INCY000028663-64 |
| INCY000041364-66 |
| INCY000044694-95 |
| INCY000044929-33 |
| INCY000045100-01 |
| INCY000045101 |
| INCY000045997-98 |
| INCY000045998 |
| INCY000048968-69 |
| INCY000048969 |
| INCY000050085-87 |
| INCY000050087 |
| INCY000056601-02 |
| INCY000057502-03 |
| INCY000057503 |
| INCY000057509-10 |
| INCY000057510 |
| INCY000057548-49 |

| |
|---|
| INCY000057549 |
| INCY000057553-54 |
| INCY000057554 |
| INCY000058134-35 |
| INCY000058135 |
| INCY000062812-13 |
| INCY000062813 |
| INCY000075412-13 |
| INCY000075413 |
| INCY000076677-78 |
| INCY000079504-09 |
| INCY000079521 |
| INCY000079586 |
| INCY000079673 |
| INCY000079686 |
| INCY000080961-77 |
| INCY000081383 |
| INCY000081661 |
| INCY000082264-65 |
| INCY000082278-79 |
| INCY000082290-91 |
| INCY000082478-79 |
| INCY000086489-91 |
| INCY000086491 |
| INCY000086958-59 |
| INCY000086959 |
| INCY000088446-47 |
| INCY000088447 |
| INCY000089811-12 |
| INCY000089812 |
| INCY000090591-93 |
| INCY000090593 |
| INCY000091691 |
| INCY000091809-11 |
| INCY000093580 |
| INCY000093581 |
| INCY000094046-47 |
| INCY000115541-44 |
| INCY000124298-405 |
| INCY000134785-901 |
| INCY000150412-503 |
| INCY000150504-632 |
| INCY000150633-703 |
| INCY000150704-872 |
| INCY000150873-1012 |
| INCY000151013-102 |
| INCY000151180 |

| |
|---|
| INCY000159264-366 |
| INCY000161180 |
| INCY000161738-874 |
| INCY000189239-382 |
| INCY000189383-528 |
| INCY000189529 |
| INCY000156692 |
| **Novartis Bates-Stamped Documents** |
| NOVARTISPROD000008946-62 |
| NOVARTISPROD000052897-913 |
| NOVARTISPROD000060210-62 |
| NOVARTISPROD000110142-76 |
| NOVARTISPROD000000534-44 |
| NOVARTISPROD000001458-80 |
| NOVARTISPROD000005580-808 |
| NOVARTISPROD000005943-74 |
| NOVARTISPROD000005982-91 |
| NOVARTISPROD000007322-32 |
| NOVARTISPROD000009442-44 |
| NOVARTISPROD000009444 |
| NOVARTISPROD000010384-86 |
| NOVARTISPROD000010386 |
| NOVARTISPROD000011010-11 |
| NOVARTISPROD000011011 |
| NOVARTISPROD0000110276 |
| NOVARTISPROD0000110277 |
| NOVARTISPROD0000110278 |
| NOVARTISPROD0000110279 |
| NOVARTISPROD000011128-29 |
| NOVARTISPROD000011129 |
| NOVARTISPROD000012170 |
| NOVARTISPROD000012823-44 |
| NOVARTISPROD000015407-15 |
| NOVARTISPROD000016163-87 |
| NOVARTISPROD000016249-50 |
| NOVARTISPROD000016262-65 |
| NOVARTISPROD000016286-92 |
| NOVARTISPROD000016930-53 |
| NOVARTISPROD000017024-46 |
| NOVARTISPROD000017118-42 |
| NOVARTISPROD000017239-40 |
| NOVARTISPROD000017471-72 |
| NOVARTISPROD000017828-29 |
| NOVARTISPROD000018280-81 |
| NOVARTISPROD000018282-85 |
| NOVARTISPROD000018331-36 |
| NOVARTISPROD000018399-400 |

| |
|---|
| NOVARTISPROD000018679 |
| NOVARTISPROD000025716-18 |
| NOVARTISPROD000030966 |
| NOVARTISPROD000031298-424 |
| NOVARTISPROD000031459-61 |
| NOVARTISPROD000031462-63 |
| NOVARTISPROD000031464 |
| NOVARTISPROD000031465 |
| NOVARTISPROD000031466 |
| NOVARTISPROD000031467 |
| NOVARTISPROD000031468 |
| NOVARTISPROD000031469 |
| NOVARTISPROD000031470 |
| NOVARTISPROD000031471-73 |
| NOVARTISPROD000031474-77 |
| NOVARTISPROD000031478-81 |
| NOVARTISPROD000031482 |
| NOVARTISPROD000031483 |
| NOVARTISPROD000031484 |
| NOVARTISPROD000031485 |
| NOVARTISPROD000031486 |
| NOVARTISPROD000031487-89 |
| NOVARTISPROD000031490-93 |
| NOVARTISPROD000031494-97 |
| NOVARTISPROD000031498-00 |
| NOVARTISPROD000031501 |
| NOVARTISPROD000031502 |
| NOVARTISPROD000031503 |
| NOVARTISPROD000031504 |
| NOVARTISPROD000031505-08 |
| NOVARTISPROD000031509-11 |
| NOVARTISPROD000031512-13 |
| NOVARTISPROD000031514-17 |
| NOVARTISPROD000031518 |
| NOVARTISPROD000031519 |
| NOVARTISPROD000031520 |
| NOVARTISPROD000031521 |
| NOVARTISPROD000031522 |
| NOVARTISPROD000031523 |
| NOVARTISPROD000031524 |
| NOVARTISPROD000031525 |
| NOVARTISPROD000031526 |
| NOVARTISPROD000031527 |
| NOVARTISPROD000031528 |
| NOVARTISPROD000031529-30 |
| NOVARTISPROD000031531 |
| NOVARTISPROD000031532 |

| |
|---|
| NOVARTISPROD000031533 |
| NOVARTISPROD000031534 |
| NOVARTISPROD000031535-36 |
| NOVARTISPROD000031537 |
| NOVARTISPROD000031538-39 |
| NOVARTISPROD000031540 -42 |
| NOVARTISPROD000031543 |
| NOVARTISPROD000031544 |
| NOVARTISPROD000031545 |
| NOVARTISPROD000031546 |
| NOVARTISPROD000031547-48 |
| NOVARTISPROD000031549-50 |
| NOVARTISPROD000031551 |
| NOVARTISPROD000031552 |
| NOVARTISPROD000031553 |
| NOVARTISPROD000031554 |
| NOVARTISPROD000031555-56 |
| NOVARTISPROD000031557 |
| NOVARTISPROD000031558-59 |
| NOVARTISPROD000031560 |
| NOVARTISPROD000031561 |
| NOVARTISPROD000031562 |
| NOVARTISPROD000031563-64 |
| NOVARTISPROD000031565 |
| NOVARTISPROD000031566 |
| NOVARTISPROD000031567-68 |
| NOVARTISPROD000031569 |
| NOVARTISPROD000031571 |
| NOVARTISPROD000031572 |
| NOVARTISPROD000031577 |
| NOVARTISPROD000031578-79 |
| NOVARTISPROD000031580 |
| NOVARTISPROD000031581 |
| NOVARTISPROD000031586 |
| NOVARTISPROD000031587 |
| NOVARTISPROD000031588 |
| NOVARTISPROD000031589 |
| NOVARTISPROD000031594 |
| NOVARTISPROD000031597-98 |
| NOVARTISPROD000031597-99 |
| NOVARTISPROD000031600-02 |
| NOVARTISPROD000031603 |
| NOVARTISPROD000031607-08 |
| NOVARTISPROD000031616 |
| NOVARTISPROD000031619 |
| NOVARTISPROD000031620 |
| NOVARTISPROD000031621 |

| |
|---|
| NOVARTISPROD000031626 |
| NOVARTISPROD000031627 |
| NOVARTISPROD000031628 |
| NOVARTISPROD000031629 |
| NOVARTISPROD000031630 |
| NOVARTISPROD000052686-703 |
| NOVARTISPROD000052705 |
| NOVARTISPROD000058209-62 |
| NOVARTISPROD000058663-66 |
| NOVARTISPROD000058678-82 |
| NOVARTISPROD000064093-132 |
| NOVARTISPROD000082339-51 |
| NOVARTISPROD000086054-84 |
| NOVARTISPROD000095077-124 |
| NOVARTISPROD000096976-78 |
| NOVARTISPROD000098308-25 |
| NOVARTISPROD000098371-85 |
| NOVARTISPROD000105530-65 |
| NOVARTISPROD000108918-44 |
| NOVARTISPROD000109052-80 |
| NOVARTISPROD000109503-566 |
| NOVARTISPROD000109606-09 |
| NOVARTISPROD000110196-97 |
| NOVARTISPROD000110201-04 |
| NOVARTISPROD000144514-879 |
| NOVARTISPROD000151760-62 |
| NOVARTISPROD000153976-4021 |
| NOVARTISPROD000164839-40 |
| NOVARTISPROD000166677-85 |
| NOVARTISPROD000177473-651 |
| NOVARTISPROD000185139-49 |
| NOVARTISPROD000194624-869 |
| NOVARTISPROD000194870-72 |
| NOVARTISPROD000194873-5118 |
| NOVARTISPROD000225405-422.00001 |
| NOVARTISPROD000225423-26 |
| NOVARTISPROD0000158292-93 |
| NOVARTISPROD000225428 |
| NOVARTISPROD000225429 |
| NOVARTISPROD000225427 |
| NOVARTISPROD000225434 |
| NOVARTISPROD000225430 |
| NOVARTISPROD000225431 |
| NOVARTISPROD000225432 |
| NOVARTISPROD000225433 |
| **Other Bates-Stamped Documents** |
| GS0001581-84 |

| |
|---|
| WH0000000921-994 |
| WH000000345-575 |
| WH000001073-1259 |
| WH000002517-18 |
| WH000002529-2850 |
| WH000003173-74 |
| WH000003184-91 |
| WH000003694-99 |
| WH000003726-3967 |
| WH000004214-224 |
| WH000004565-4852 |
| WH000005275-5550 |
| WH000007093-7344 |
| WH00001825-26 |
| WH00001827-2155 |

**Additional Deposition Transcripts and Exhibits**

| |
|---|
| Transcript of the deposition of Brian Goldfus and Exhibits 201-231 |
| Transcript of the deposition of Jennifer Gallagher and Exhibits 101-116 |
| Transcript of the deposition of Teresa Jose and Exhibits 901-914 |
| Transcript of the deposition of Manuel Litchman and Exhibits 301-329 |
| Transcript of the deposition of Paul Friedman and Exhibits 1-20 |
| Transcript of the deposition of Nancy Griffin and Exhibits 601-619 |
| Transcript of the deposition of Douglas Hager and Exhibits 801-820 |
| Transcript of the deposition of Todd MacLaughlan and Exhibits 501-523 |
| Transcript of the deposition of Steven Singer and Exhibits 1-22 |

**SEC Filings**

| |
|---|
| Incyte Corp 10-KA (FY 2015) (3/15/2016) |
| Incyte Corp 10-KA (FY 2016) (3/17/2017) |
| Incyte Corp 10-KA (FY 2016) (6/30/2017) |
| Incyte Corp 10-K (FY 2008) |
| Incyte Corp 10-K (FY 2009) |
| Incyte Corp 10-K (FY 2010) |
| Incyte Corp 10-K (FY 2011) |
| Incyte Corp 10-K (FY 2012) |
| Incyte Corp 10-K (FY 2013) |
| Incyte Corp 10-K (FY 2014) |
| Incyte Corp 10-K (FY 2015) |
| Incyte Corp 10-K (FY 2016) |
| Incyte Corp 10-K (FY 2017) |
| Incyte Corp 10-K (FY 2018) |
| Incyte Corp 10-K (FY 2019) |
| Incyte Corp 10-K (FY 2020) |
| Incyte Corp 10-K (FY 2021) |
| Collaboration and License Agreement between Syndax Pharmaceuticals, Inc. and Incyte Corporation, Ex. 10.1 to Syndax Form 10Q for quarter ending September 30, 2021 |
| Global Collaboration and License Agreement by and Between Macrogenics, Inc. and Incyte Corporation, Ex. 10.23 to Incyte Annual 10K filing for year end 2017 |

| |
|---|
| Target Discovery, Research Collaboration and Option Agreement between Syros Pharmaceuticals, Inc. and Incyte Corporation, dated as of January 8, 2018, Ex. 10.22 to Syros Annual 10K for  year end 2017 |
| **Additional Pleadings / Discovery Documents** |
| Defendant Incyte Corporation's Objections and Responses to Plaintiff Novartis Pharma AG's First Set of Amendment Civil Case Management Plan and Scheduling Order (April 14, 2022) |
| Plaintiff Novartis Pharma AG's Responses to Incyte Corporation's Second Set of Interrogatories |
| Stipulation and Order Limiting Discovery Concerning Certain Licensed Compounds, C-MET and TABRECTA; so ordered 8/16/21 |

**Rebuttal Appendix C**



Incyte Reverse Royalty Payments: A Comparison of Payments Incyte Owes to Novartis Versus Actual Payments Incyte Made to Novartis, Per Incyte's Own 2021 Projections

Legend:
- Reverse Royalties Incyte Owes to Novartis on U.S. Sales (calculated using 2/4/5% tiers in the Agreement)
- Reverse Royalty Payments Incyte Actually Made to Novartis

* Calculated reverse royalty payments owed to Novartis using the 2/4/5% tiers set forth in Section 8.3(b)(i) of the Agreement, applied to net sales as reported in produced royalty reports for 2014-2021, and using Inycte's projections from INCY000094047 for 2022-2027.
* Actual reverse royalty payments from produced royalty reports.



Incyte Reverse Royalty Payments: A Timeline

* Calculated reverse royalty payments owed to Novartis using the 2/4/5% tiers set forth in Section 8.3(b)(i) of the Agreement, applied to net sales as reported in produced royalty reports for 2014-2021, and employing Inycte projections from INCY000094047 for 2022 [REDACTED]
* Actual reverse royalty payments from produced royalty rep[REDACTED]

# Incyte's Actual and Future Forecasted Net Sales, Reverse Royalties Incyte Actually Paid, and Reverse Royalties That Remain Owed to Novartis



**2014-2021**
**Based on Actual Reverse Royalty Payments**

Legend: ■ Incyte s Actual and Future Forecasted Net Sales  ■ Incyte s Actual Reverse Royalty Payments  ▦ Disputed U.S. Royalties/Incyte Savings



* Adjusted net sales data from Incyte royalty reports through 2021, then projected using Incyte s March 31, 2021 model (INCY000094047), which does not recognize a 50% reduction.
* Incyte s payments from reverse royalty reports.
* Disputed U.S. royalties calculated as adjusted net sales and employing royalty tiers as specified in Section 8.3(b)(i) in the Agreement (2/4/5% tiers), minus payments Incyte has paid, if any.



## Novartis' Actual and Forecasted Net Sales, Royalties Actually Paid, and Royalties That Are Forecasted to be Paid

2014-2021
Based on Actual Royalty Payments from
Novartis to Incyte

Legend:
- Novartis Actual and Future Forecasted Ex-U.S. Net Sales
- Novartis ex-U.S. Royalties Paid/Forecasted to be Paid to Incyte Using Royalty Tiers

* Actual adjusted net sales data from Novartis royalty reports through 2021, then projected using Novartis May 2018 model (NOVARTISPROD000064093 at 121).
* Novartis royalty payments to Incyte from Novartis royalty reports through 2021, then calculated using adjusted net sales and tiers in Section 8.3(a)(ii) of the Agreement ███████ tiers).



A Comparison of Novartis' and Incyte's Royalty Payments to One Another
(Assuming No Stepdown Invocation in 2019)

2014-2021
Based on Actual Royalty Payments

■ Novartis ex-U.S. Royalties Paid/Forecasted to be Paid to Incyte Using Royalty Tiers   ■ Incyte s U.S. Reverse Royalties Paid to Novartis/Forecasted Using Reverse Royalty Tiers

* Both columns use actual royalty report data from 2012-2021, then are projected by applying royalty tiers in the Agreement to net sales using Novartis May 2018 model (NOVARTISPROD000064093 at 121) and Incyte s March 31, 2021 model (INCY000094047).



Incyte's Actual and Future Forecasted Net Sales and Reverse Royalty Payments
(Per Incyte Modeling)

2014-2021
Based on Actual Reverse
Royalty Reports and Payments

Incyte Stopped Paying
Reverse Royalty Paymen...

— Incyte s Actual and Future Forecasted U.S. Net Sales          — Incyte s Actual Reverse Royalty Payments

* Adjusted net sales and reverse royalty data from Incyte royalty reports through 2021, then projected from Incyte s March 31, 2021 model (INCY000094047).



Incyte's Actual and Future Forecasted Net Sales and Reverse Royalties
(per Novartis Modeling)

2014-2021
Based on Actual Reverse
Royalty Payments

Based on Nov

— Incyte s Actual and Future Forecasted U.S. Net Sales     — Incyte s U.S. Reverse Royalties Paid to Novartis/Forecasted Using Reverse Royalty Tiers

\* Adjusted net sales (2014-2021) from reverse royalty reports, then projected from Novartis May 2018 model (NOVARTISPROD000064093 at 121).
\* Inctye s payments from reverse royalty reports and forecasted from royalty tiers from Section 8.3(b)(i) of the Agreement.



Actual and Projected Adjusted Net Sales by Novartis (ex-U.S.) and Incyte (U.S.) (201█

* Actual adjusted net sales from produced royalty reports; Incyte royalty reports begin Q4 2014.
* Figures for 2022-2027 calculated from Novartis' 2018 projections (NOVARTISPROD000064093 at 122) and from Incyte's 2021 projections (INCY000094047).



**Novartis Ex-U.S. Net Sales: A Comparison Against Novartis' 2009 Projections**

Legend:
- Novartis-Forecasted Novartis Ex-U.S. Net Sales
- Novartis Actual and Future Forecasted Ex-U.S. Net Sales

* Novartis forecasted Novartis ex-U.S. net sales from 2009 Novartis projections (NOVARTISPROD000225411).
* Novartis actual net sales (2009-2021) from royalty reports and future forecasted ex-U.S. net sales forecasted from NOVARTISPROD000064093 at 122.



**Incyte U.S. Net Sales: A Comparison Against Incyte's 2009 Projections**

* Incyte s projected net sales (2009 ▮▮▮▮ from 2009 Goldman Sachs/Incyte projections (GS0003808).
* Incyte s actual net sales (2009-2021) from reverse royalty reports and future forecasted U.S. net sales (2022-2027) are forecasted from INCY000094047.



Incyte and Novartis Net Sales in Respective Territories: A Comparison Against 2009 Projections

Legend:
- Novartis-Forecasted Novartis Ex-U.S. Net Sales
- Novartis Actual and Future Forecasted Ex-U.S. Net Sales
- Incyte-Forecasted Incyte U.S. Net Sales
- Incyte s Actual and Future Forecasted U.S. Net Sales

* Incyte s projected net sales (2009 ▉▉ from 2009 Goldman Sachs/Incyte projections (GS0003808).
* Incyte s actual net sales (2009-2021) from reverse royalty reports and future forecasted U.S. net sales (2022 ▉▉ are forecasted from INCY000094047.
* Novartis forecasted Novartis ex-U.S. net sales from 2009 Novartis projections (NOVARTISPROD0002254111)
* Novartis actual net sales (2009-2021) from royalty reports and future forecasted ex-U.S. net sales (2022 ▉▉ re forecasted from NOVARTISPROD000064093 at 122.



**Expected Net Sales vs. Actual Adjusted Net Sales (2009-2021)**

[A]    127% Higher Net Sales in the U.S. Than Expected    [B]

Incyte

$4,249,755,203    $10,259,129,951

[C]    74% Higher Net Sales ex-U.S. Than Expected    [D]

Novartis

$4,080,581,953    $7,102,250,204

[A] Incyte s projected net sales (2009-2021) from 2009 Goldman Sachs/Incyte projections (GS0003808).
[B] Incyte s actual net sales (2009-2021) from royalty reports.
[C] Novartis projected net sales (2009-2021) from 2009 Novartis projections (NOVARTISPROD000225411).
[D] Novartis actual net sales (2009-2021) from royalty reports.



**Incyte's Estimated JAK and C-MET Value from Deal Based on Dr. Rao's Methodology from Tab 9**
*Comparison of Incyte's Expected Value and Estimated Actual Value Based on Incyte's 2009 Assumptions*

($ millions)                                                                                    **2009 NPV\*\*\***

**Incyte's Probability Weighted Expected Value Based on**
**Incyte's 2009 Model\***
JAK-2 MPD US to INCYTE (2009-2030)                                          [1]                    ███████
JAK-2 MPD EU to INCYTE (2009-2030)\*\*                                      [2]                    ███████
cMET (INCY) (2009-2037)                            ███████                [3]          ███████

**Estimated Value Based on Incyte's Actual Earnings\***
JAK-2 MPD US to INCYTE (2009-2021)                                          [5]                    $1,614.83

JAK-2 MPD EU to INCYTE (2009-2021) - Actual Paid Reverse
Royalties\*\*                                                               [6]                    $665.48

JAK-2 MPD EU to INCYTE (2009-2021) - Actual Paid Reverse Royalties
+ Disputed Reverse Royalties\*\*                                            [7]                    $644.64

cMET (INCY) (2009-2021)                                                     [8]                    ($18.92)

     **Total - Actual Paid Reverse Royalties**            [9]=[5]+[6]+[8]          ████████████
     **Total - Actual Paid Reverse Royalties + Disputed Reverse Royalties**  [10]=[5]+[7]+[8]          **$2,240.55**

**Notes and Sources:**

\*    See GS0003808.XLS, tab "JAK2 MPD DCF." When using GS0003808.XLS, change cell A1 on tab "JAK MPD Cases" in the drop down box to Nereus Final, which will update information on tab "JAK2 MPD DCF." Then change cell B2 in "JAK2 MPD DCF" from 1 to 0. See also, tab "cMET DCF." When using GS0003808.XLS, change cell A1 on tab "cMET Cases" in the drop down box to Nereus Final, which will update information on tab "cMET DCF."

\*\*  Incyte's DCF model for "JAK-2 MPD EU to INCYTE" includes an estimate of the value of Novartis' royalty payments to Incyte less Incyte's reverse royalty payments to Novartis.

\*\*\* NPV values are expressed in 2009 dollars. The NPV figures in the Incyte 2009 model are equivalent to "eNPV" in the Novartis 2009 model.

[1]   GS0003808.XLS, tab "JAK2 MPD DCF," sum of Row 91; cell F96.
[2]   GS0003808.XLS, tab "JAK2 MPD DCF," sum of Row 118; cell F123.
[3]   GS0003808.XLS, tab "cMET DCF," sum of Row 49; cell F57.
[5]   Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions: JAK MPD US to INCYTE, 2009-2021.
[6]   Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions: JAK MPD EU to INCYTE, 2009-2021.
[7]   Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions: JAK MPD EU to INCYTE, 2009-2021.
[8]   Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions: C-MET, 2009-2021.

**Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions**
*JAK MPD US to INCYTE, 2009-2021*

| ($ millions) | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JAK-2 MPD US to INCYTE*** | | | | | | | | | | | | | | |
| **Incyte Net Revenues of Jakafi** | [1] | | | $2.01 | $136.00 | $235.44 | $357.56 | $588.99 | $835.76 | $1,110.72 | $1,359.22 | $1,651.27 | $1,898.82 | $2,097.90 |
| COGS | [2]=[1]*5.00% | | | ($0.10) | ($6.80) | ($11.77) | ($17.88) | ($29.45) | ($41.79) | ($55.54) | ($67.96) | ($82.56) | ($94.94) | ($104.89) |
| R&D | [3] | ($13.35) | ($20.57) | ($24.90) | ($12.35) | ($7.55) | ($5.00) | ($4.50) | ($4.00) | ($2.50) | ($2.50) | $0.00 | $0.00 | $0.00 |
| S&M | [4]=[1]*[5]*-1 | ($4.30) | ($20.10) | ($2.12) | ($36.67) | ($57.54) | ($66.13) | ($102.68) | ($134.21) | ($172.23) | ($203.48) | ($198.15) | ($227.86) | ($251.75) |
| *S&M Margin* | [5] | | | 106% | 27% | 24% | 18% | 17% | 16% | 16% | 15% | 12% | 12% | 12% |
| G&A Expense Allocation | [6]=[1]*2.00%*-1 | | | ($0.04) | ($2.72) | ($4.71) | ($7.15) | ($11.78) | ($16.72) | ($22.21) | ($27.18) | ($33.03) | ($37.98) | ($41.96) |
| **Total Costs** | [7]=[2]+[3]+[4]+[6] | ($17.65) | ($40.67) | ($27.16) | ($58.54) | ($81.57) | ($96.16) | ($148.41) | ($196.71) | ($252.48) | ($301.13) | ($313.74) | ($360.78) | ($398.60) |
| **Operating Income** | [8]=[1]+[7] | ($17.65) | ($40.67) | ($25.15) | $77.46 | $153.88 | $261.40 | $440.59 | $639.05 | $858.24 | $1,058.10 | $1,337.53 | $1,538.05 | $1,699.30 |
| NOL Balance | [9] | ($500.0) | ($517.7) | ($558.3) | ($583.5) | ($506.0) | ($352.1) | ($90.7) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| EBIT | [10]=[8] | ($17.7) | ($40.7) | ($25.2) | $77.5 | $153.9 | $261.4 | $440.6 | $639.0 | $858.2 | $1,058.1 | $1,337.5 | $1,538.0 | $1,699.3 |
| Taxable EBIT | [11]=[9]+[10] | ($517.7) | ($558.3) | ($583.5) | ($506.0) | ($352.1) | ($90.7) | $349.9 | $639.0 | $858.2 | $1,058.1 | $1,337.5 | $1,538.0 | $1,699.3 |
| Taxes (net of NOLs) | [12]=[10]*35.00% | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $122.5 | $223.7 | $300.4 | $370.3 | $468.1 | $538.3 | $594.8 |
| EBIT, after tax | [13]=[8]-[12] | ($17.7) | ($40.7) | ($25.2) | $77.5 | $153.9 | $261.4 | $318.1 | $415.4 | $557.9 | $687.8 | $869.4 | $999.7 | $1,104.5 |
| Discount Period | [14] | 0.00 | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.50 | 6.50 | 7.50 | 8.50 | 9.50 | 10.50 | 11.50 |
| Discount Factor | [15]=1/(1+15.00%)^[14] | 1.00 | 0.93 | 0.81 | 0.71 | 0.61 | 0.53 | 0.46 | 0.40 | 0.35 | 0.30 | 0.27 | 0.23 | 0.20 |
| NPV | [16]=[13]*[15] | ($17.7) | ($37.9) | ($20.4) | $54.6 | $94.3 | $139.4 | $147.5 | $167.5 | $195.6 | $209.7 | $230.5 | $230.4 | $221.4 |
| **Sum Undiscounted EBIT, after tax, INCY US, 2009-2021** | [17]=Sum of [13] | $5,362.1 | | | | | | | | | | | | |
| **Sum NPV, INCY US, 2009-2021** | [18]= Sum of [16] | $1,614.8 | | | | | | | | | | | | |

**Notes and Sources:**

* See GS0003808.XLS, tab "JAK2 MPD DCF." When using GS0003808.XLS, change cell A1 on tab "JAK MPD Cases" in the drop down box to Nereus Final, which will update information on tab "JAK2 MPD DCF." Then change cell B2 in "JAK2 MPD DCF" from 1 to 0.

[1] 2011-2014: Jakafi Net Revenues from Incyte Corporation's 10-Ks for the years ending 2015, 2016, 2017, 2018. 2015-2021: Adjusted net sales data from Incyte royalty reports. I understand the adusted net sales data from Incyte's royalty reports already includes a 2% cost reduction.
[2] Assumption of GS0003808.XLS, tab "JAK2 MPD DCF," row 13.
[3] GS0003808.XLS, tab "JAK2 MPD DCF," row 14. U.S. R&D modeled to reflect 50% of modeled WW R&D expenses.
[4] GS0003808.XLS, tab "JAK2 MPD DCF," row 15. 2009-2010 values directly from GS0003808. 2011-2021: GS0003808 models figures as percent of unadjusted projected revenues. I applied percent to actual revenues.
[5] GS0003808.XLS, tab "JAK2 MPD DCF," row 16.
[6] Assumption of GS0003808.XLS, tab "JAK2 MPD DCF," row 17.
[9] GS0003808.XLS, tab "JAK2 MPD DCF," row 87. 2009 value directly from GS0003808. 2010-2021: If prior year EBIT is <0, use prior year Taxable EBIT. Otherwise, $0.
[10] GS0003808.XLS, tab "JAK2 MPD DCF," row 88.
[11] GS0003808.XLS, tab "JAK2 MPD DCF," row 89.
[12] GS0003808.XLS, tab "JAK2 MPD DCF," rows 90, 98. If Taxable EBIT is <0, 0.
[13] GS0003808.XLS, tab "JAK2 MPD DCF," row 91.
[14] GS0003808.XLS, tab "JAK2 MPD DCF," row 61. Discounted to 2009.
[15] Assumption of GS0003808.XLS, tab "JAK2 MPD DCF," rows 93, 99.

**Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions**
**JAK MPD EU to INCYTE, 2009-2021**

| ($ millions) | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JAK-2 MPD EU to INCYTE*** | | | | | | | | | | | | | | |
| Novartis Ex-US Royalties to Incyte | [1] | | | | | | | | | | | | | |
| Upfront Payment | [2] | | | | | | | | | | | | | |
| Total Milestones | [3] | | | | | | | | | | | | | |
| US Royalties Paid to Novartis (Actual) | [4] | | | | | | | | | | | | | |
| US Royalties Paid to Novartis (Disputed) | [5] | | | | | | | | | | | | | |
| **Total Upfront, Milestones and Royalties (Actual)** | [6] Sum [1] [4] | | | | | | | | | | | | | |
| **Total Upfront, Milestones and Royalties (Actual + Disputed)** | [7] Sum [1] [5] | | | | | | | | | | | | | |
| **Total Costs** | [8] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| **Operating Income (w Actual Paid Royalties)** | [9] [6]+[8] | | | | | | | | | | | | | |
| **Operating Income (w Actual Paid+Disputed Royalties)** | [10] [7]+[8] | | | | | | | | | | | | | |
| **NOL Balance** | [11] | ($500.0) | ($350.0) | ($240.0) | ($215.0) | ($171.6) | ($118.4) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| EBIT (w Actual Paid Royalties) | [12] [9] | | | | | | | | | | | | | |
| Taxable EBIT (w Actual Paid Royalties) | [13] [11]+[12] | | | | | | | | | | | | | |
| Taxes (net of NOLs) | [14] [13]*35.00% | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $7.1 | $40.5 | $41.6 | $58.1 | $67.1 | $65.5 | $109.3 | $103.3 |
| EBIT, after tax (w Actual Paid Royalties) | [15] [9]-[14] | $150.0 | $110.0 | $25.0 | $43.4 | $53.2 | $131.6 | $75.1 | $77.2 | $107.9 | $124.6 | $121.6 | $203.0 | $191.8 |
| **NOL Balance** | [16] | ($500.0) | ($350.0) | ($240.0) | ($215.0) | ($171.6) | ($118.4) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| EBIT (w Actual Paid + Disputed Royalties) | [17] [10] | | | | | | | | | | | | | |
| Taxable EBIT (w Actual Paid + Disputed Royalties) | [18] [16]+[17] | | | | | | | | | | | | | |
| Taxes (net of NOLs) | [19] [18]*35.00% | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $7.1 | $40.5 | $41.6 | $58.1 | $67.1 | $51.9 | $93.6 | $83.4 |
| EBIT, after tax (w Actual Paid + Disputed Royalties) | [20] [10]-[19] | | | | | | | | | | | | | |
| **Discount Period** | [21] | 0.0 | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 5.5 | 6.5 | 7.5 | 8.5 | 9.5 | 10.5 | 11.5 |
| **Discount Factor** | [22] 1/(1+15.00%)^[21] | 1.00 | 0.93 | 0.81 | 0.71 | 0.61 | 0.53 | 0.46 | 0.40 | 0.35 | 0.30 | 0.27 | 0.23 | 0.20 |
| NPV (w Actual Paid Royalties) | [23] [15]*[22] | | | | | | | | | | | | | |
| NPV (w Actual Paid Royalties + Disputed Royalties) | [24] [20]*[22] | | | | | | | | | | | | | |
| **Sum Undiscounted EBIT, after tax, INCY EU (w Actual Paid Royalties)** | [25] Sum of [15] | | | | | | | | | | | | | |
| **Sum NPV, INCY EU (w Actual Paid Royalties)** | [26] Sum of [23] | | | | | | | | | | | | | |
| **Sum Undiscounted EBIT, after tax, INCY EU (w Actual Paid + Disputed Royalties)** | [27] Sum of [20] | | | | | | | | | | | | | |
| **Sum NPV, INCY EU (w Actual Paid + Disputed Royalties)** | [28] Sum of [24] | | | | | | | | | | | | | |

**Notes and Sources:**

\* See GS0003808.XLS, tab "JAK2 MPD DCF." When using GS0003808.XLS, change cell A1 on tab "JAK MPD Cases" in the drop down box to Nereus Final, which will update information on tab "JAK2 MPD DCF." Then change cell B2 in "JAK2 MPD DCF" from 1 to 0

[1]  Novartis' royalty payments to Incyte from Novartis royalty reports from Q4 2012 through 2021.

[2]  Incyte Corporation's 10-Ks for the years ending 2009, 2012, 2014, 2016, 2018, 2021

[3]  Incyte Corporation's 10-Ks for the years ending 2009, 2012, 2014, 2016, 2018, 2021

[4]  Actual Incyte to Novartis reverse royalty payments from produced royalty reports.

[5]  Difference between estimated Incyte to Novartis reverse royalty payments based on actual Incyte net sales and the Actual Incyte to Novartis reverse roaylty payments.

[8]  GS0003808.XLS, tab "JAK2 MPD DCF," row 112.

[11]  GS0003808.XLS, tab "JAK2 MPD DCF," row 114. 2009 value directly from GS0003808. 2010-2021  If prior year EBIT is <0, use prior year Taxable EBIT. Otherwise, $0.

[12]  GS0003808.XLS, tab "JAK2 MPD DCF," row 115.

[13]  GS0003808.XLS, tab "JAK2 MPD DCF," row 116.

[14]  GS0003808.XLS, tab "JAK2 MPD DCF," rows 98, 117. If Taxable EBIT is <0, 0.

[15]  GS0003808.XLS, tab "JAK2 MPD DCF," row 118.

[16]  GS0003808.XLS, tab "JAK2 MPD DCF," row 114. 2009 value directly from GS0003808. 2010-2021  If prior year EBIT is <0, use prior year Taxable EBIT. Otherwise, $0.

[17]  GS0003808.XLS, tab "JAK2 MPD DCF," row 116.

[18]  GS0003808.XLS, tab "JAK2 MPD DCF," row 116.

[19]  GS0003808.XLS, tab "JAK2 MPD DCF," rows 98, 117. If Taxable EBIT is <0, 0.

[20]  GS0003808.XLS, tab "JAK2 MPD DCF," row 118.

[21]  GS0003808.XLS, tab "JAK2 MPD DCF," row 61. Discounted to 2009.

[22]  Assumption of GS0003808.XLS, rows 99, 120.

**Notes and Sources:**
* See GS0003808.XLS, tab "cMET DCF." When using GS0003808.XLS, change cell A1 on tab "cMET Cases" in the drop down box to Nereus Final, which will update information on tab "cMET DCF."
[1]   Tabrecta Product Royalty Revenues from Incyte Corporation's 10-Ks for the year ending 2021.
[2]   Tabrecta Milestone Revenues from Incyte Corporation's 10-Ks for the year ending 2021.
[4]   GS0003808.XLS, tab "cMET CDF," row 40.
[6]   GS0003808.XLS, tab "cMET CDF," row 45.
[7]   GS0003808.XLS, tab "cMET CDF," row 46.
[8]   GS0003808.XLS, tab "cMET CDF," row 47.
[9]   GS0003808.XLS, tab "cMET CDF," rows 48, 51. If Taxable EBIT is <0, 0.
[10]  GS0003808.XLS, tab "cMET CDF," row 49.
[11]  GS0003808.XLS, tab "cMET CDF," row 54. Discounted to 2009.
[12]  Assumption of GS0003808.XLS, tab "cMET CDF," rows 52, 55.

## Comparing Novartis' Estimated Value from Deal and
## Incyte's Estimated Value from Deal Based on Dr. Rao's Tab 9 Methodology

| ($ millions) | | Net Cash Flow | eNPV |
|---|---|---|---|
| **Dr. Rao's "Novartis's Estimated Value from Deal" from Tab 9** | | | |
| JAK | [1] | | |
| c-MET | [2] | | |
| **Total Deal Value** | [3]=[1]+[2] | | |
| | | | |
| | | | |
| **"Estimated Value from Deal" for Incyte** | | | |
| **(Based on Dr. Rao's Methodology)** | | | |
| JAK | [4] | | |
| c-MET | [5] | | |
| **Total Deal Value** | [6]=[4]+[5] | | |

**Notes and Sources:**

[1] Rao Report, Tab 9A.

[2] Rao Report, Tab 9A.

[4] Net Cash Flow: Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions: JAK MPD US to INCYTE, 2009-2021. Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions: JAK MPD EU to INCYTE, 2009-2021.; eNPV: Incyte's Estimated JAK and C-MET Value from Deal Based on Dr. Rao's Methodology from Tab 9: Comparison of Incyte's Expected Value and Estimated Actual Value Based on Incyte's 2009 Assumptions - Combined [5] and [6].

[5] Net Cash Flow: Incyte's Estimated Profit & Loss Statement Based on 2009 Assumptions: C-MET, 2009-2021.; eNPV: Incyte's Estimated JAK and C-MET Value from Deal Based on Dr. Rao's Methodology from Tab 9: Comparison of Incyte's Expected Value and Estimated Actual Value Based on Incyte's 2009 Assumptions - [8].