# EXHIBIT  3

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  -------------------------------------------X
   NOVARTIS PHARMA AG,
4
                        Plaintiff,
5
                        Case No.
6          Vs.          1:20-cv-00400-GHW

7  INCYTE CORPORATION,

8                        Defendant.

9  -------------------------------------------X

10

11

12

13    VIDEOTAPED DEPOSITION OF LINDA PULLAN, Ph.D.

14            ***HIGHLY CONFIDENTIAL***

15              One Vanderbilt Avenue

16              New York, New York 10017

17                June 3, 2022

18

19

20

21

22  Reported by:

23  Anita M. Trombetta, RMR, CRR

24

25  JOB NO. 211041

1

2

3

4                    June 3, 2022

5                    9:37 a.m.

6

7

8        Highly Confidential Videotaped

9   Deposition of LINDA PULLAN, Ph.D., held at

10   the offices of Greenberg Traurig, One

11   Vanderbilt Avenue, New York, New York 10017

12   before Anita M. Trombetta, an RMR, CRR, and

13   a Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2   A P P E A R A N C E S:
 3   GREENBERG TRAURIG
 4         Attorneys for Plaintiffs
 5         One Vanderbilt Avenue
 6         New York, New York 10017
 7   BY:  SYLVIA SIMSON, ESQ.
 8         MICHAEL MIRDAMADI, ESQ.
 9         HAL SHAFTEL, ESQ.
10
11   QUINN EMANUEL URQUHART & SULLIVAN
12         Attorneys for Defendants
13         51 Madison Avenue
14         New York, New York 10010
15   BY:  ERIC STOPS, ESQ
16         DANIEL MACH, ESQ.
17         SOPHIA QASIR, ESQ.
18         ANDREW CHALSON, ESQ. (Via Zoom)
19         LUKE PHILLIPS, ESQ. (Via Zoom)
20         F. DOMINIC CERRITO, ESQ. (Via Zoom)
21   ALSO PRESENT:
22   James Curbow, Law Clerk
23   Larry Moskowitz, Legal Video Specialist
24   Anna King (via Zoom)
25   Mohan Rao (via Zoom)
```

1   L. Pullan, Ph.D. - Highly Confidential

2       THE VIDEOGRAPHER:  Good morning.  We

3   are on the record.  This is the start of

4   media labeled No. 1, of the video-recorded

5   deposition of Linda Pullan, Ph.D., in the

6   matter Novartis Pharma AG versus Incyte

7   Corporation.

8       This deposition is being held at

9   Greenberg Traurig, One Vanderbilt Avenue,

10  New York, New York.  Today's date is

11  June 3, 2022, and the time is 9:38 a.m.

12      My name is Larry Moskowitz and I am

13  the legal video specialist from TSG

14  Reporting Inc., headquartered at 228 East

15  45th Street, New York, New York.

16      The court reporter is Anita

17  Trombetta, also in association with TSG

18  Reporting.

19      Will counsel please introduce

20  yourselves for the record.

21      MR. STOPS:  Sure.  This is Eric

22  Stops from Quinn Emanuel.  With me is

23  Sophia Qasir and Daniel Mach, all for the

24  defendant Incyte.

25      MS. SIMSON:  Sylvia Simson from

1       L. Pullan, Ph.D. - Highly Confidential

2       Greenberg Traurig on behalf of Novartis

3       Pharma AG.  I'll be defending the witness

4       today.  With me is my colleague Michael

5       Mirdamadi, Hal Shaftel, and our law clerk

6       James Curbow will be observing today.

7            I also believe there are some folks

8       on the Zoom on behalf of Incyte if you want

9       to introduce them.

10           MR. STOPS:  I believe Andy Chalson

11      is on the Zoom, also from Quinn Emanuel.

12           THE VIDEOGRAPHER:  Will the reporter

13      please administer the oath.

14  L I N D A   P U L L A N,  P h D

15      called as a witness, having been duly sworn

16      by a Notary Public, was examined and

17      testified as follows:

18  EXAMINATION BY

19  MR. STOPS:

20      Q.    Good morning, again, Dr. Pullan.

21      A.    Good morning.

22      Q.    Are you personally represented by

23  counsel today?

24      A.    No.

25      Q.    Did you meet with counsel in

1        L. Pullan, Ph.D. - Highly Confidential

2    preparation for your deposition?

3        A.    Yes, I met with counsel.

4        Q.    Who did you meet with in preparation

5    for your deposition?

6        A.    The folks here.

7        Q.    How many days?

8        A.    Two before this.

9        Q.    And about how long each day?

10       A.    About seven or eight hours.

11       Q.    Each day?

12       A.    Yes.

13       Q.    And you're appearing here today on

14   behalf of Novartis, correct?

15       A.    Novartis's firm hired me.  I am

16   appearing here on behalf of my own opinions,

17   but Novartis did hire me.  Yes.

18       Q.    Okay.  And you're being paid for

19   your time by Novartis?

20       A.    Correct.

21       Q.    How many times have you served as an

22   expert in a litigation or arbitration before

23   this?

24       A.    Once.

25       Q.    And how many times have you been

1          L. Pullan, Ph.D. - Highly Confidential

2     deposed before this?

3          A.     Once.

4          Q.     And in that arbitration, you offered

5     testimony at the arbitration as well, correct?

6          A.     Correct.

7          Q.     And it was a single arbitration

8     before this?

9          A.     Correct.

10         Q.     And you're familiar with the

11    collaboration and license agreement between

12    Incyte Corporation and Novartis International

13    Pharmaceuticals signed on November 24, 2009,

14    correct?

15         A.     I have read the agreement.

16         Q.     Just -- I'm going to mark the

17    agreement as Pullan as Pullan Exhibit 1001.  I

18    believe we're doing this sequentially from our

19    last set.

20              (Pullan Exhibit 1001, Collaboration

21         and License Agreement Dated November 24,

22         2009, marked for identification.)

23         Q.     And this is the agreement that you

24    understand to be the focus of the dispute

25    between the parties, correct?

1      L. Pullan, Ph.D. - Highly Confidential

2      A.    Yes.

3      Q.    For today, is it okay if I refer to

4   it as the 2009 agreement?

5      A.    I'm okay with that.

6      Q.    So you don't need to open that yet,

7   I just want to mark that one just to establish

8   what it was, and that's the focus of today's

9   discussion.

10           After your Ph.D., your first

11   position was in drug discovery at Monsanto

12   Healthcare, right?

13      A.    Yes, that's correct.

14      Q.    And you were actually employee

15   something like 16 at Monsanto; is that right?

16      A.    Monsanto Healthcare.

17      Q.    Monsanto Healthcare?

18      A.    Right.

19      Q.    Which is a division of the larger

20   Monsanto --

21      A.    It was at that time.  Monsanto

22   acquired Searle pharmaceuticals which was

23   61,000 employees.  So we grew up to about

24   200-and-something, and we acquired a 60,000

25   employee firm, and then that was acquired by

1        L. Pullan, Ph.D. - Highly Confidential

2    Pfizer, which I don't know how many employees

3    they had, 110 or some X-number of thousands.

4        Q.    Got it.  So at Monsanto Healthcare

5    you were involved in the discovery of new

6    molecules; is that right?

7        A.    Yes.

8              MS. SIMSON:  Objection to form.

9    BY MR. STOPS:

10       Q.    What therapeutic class were you

11   focused on?

12       A.    Primarily --

13             MS. SIMSON:  Objection to form.

14       Vague.

15             You can answer the question, doctor.

16       A.    Primarily central nervous system

17   diseases.

18       Q.    Did any of the CNS products that you

19   were working on become marketed drugs while you

20   were at Monsanto?

21       A.    Not at Monsanto Healthcare, but at

22   AstraZeneca, yes.

23       Q.    So from the Monsanto Healthcare,

24   none of the CNS products --

25       A.    Some of the CNS --

1       L. Pullan, Ph.D. - Highly Confidential

2       Q.      Just wait until I finish, please.

3       A.      Sorry.

4       Q.      Thank you.

5               MS. SIMSON:  I don't think --

6       Q.      So my question was:  Did any of

7    these CNS products that you were working on at

8    Monsanto Healthcare become marketed

9    pharmaceuticals?

10      A.      Some of the CNS products at Monsanto

11   Healthcare entered clinical trials.

12      Q.      Okay.

13      A.      None of them completed the clinical

14   trials.

15      Q.      Okay.  Do you know what phase

16   clinical trials the compounds made it to?

17      A.      Some of the compounds made it to

18   phase 1, some of the compounds made it to

19   phase 2.  Most -- most drugs failed at phase 2,

20   the efficacy and sufficient safety to compete

21   in the marketplace.

22      Q.      Do you know how many new molecular

23   entities you worked on at Monsanto Healthcare?

24      A.      I cannot remember at this time.

25      Q.      Would you agree that most drug

1          L. Pullan, Ph.D. - Highly Confidential

2     candidates in drug discovery and development

3     fail?

4          A.    Yes, most candidates fail.

5          Q.    About what percentage of new

6     molecules actually become marketed drugs?

7          A.    It varies by therapeutic area and,

8     of course, by stage.  If you're talking about

9     the -- the compounds as they enter phase 1 and

10    how many get approval, it's about 10 percent,

11    again, varying by stage, varying over history,

12    but it's about 10 percent of those compounds

13    that enter clinical stage, make it to approval.

14         Q.    And what about compounds from lab

15    bench, preclinical, to approval?

16         A.    There are statistics on the

17    probability of success and it, again, varies

18    by -- by type of molecule, by therapeutic area,

19    by -- when you start the measurement, but it's

20    a smaller number than 10 percent.

21         Q.    Would you have a sense of how many

22    molecules go from lab bench into clinicals?

23              MS. SIMSON:  Objection to form.

24    Asked and answered.

25         A.    I mean, from lab bench is a pretty

1        L. Pullan, Ph.D. - Highly Confidential

2    vague concept.  Many -- many things get worked

3    on at academia for decades, right, and then

4    many molecules are synthesized.  I once -- I

5    once led at the Monsanto annual meeting a

6    demonstration game where we had -- it was

7    fun -- where we had passed out cards to all the

8    people who attended the annual stockholders

9    meeting, and we had them turn over their cards

10   and, in essence, said the stage of the molecule

11   and we had them stand up or sit down when they,

12   quote, failed in development.  And it's a

13   pretty dramatic illustration of the challenges

14   of drug discovery, but it really does depend on

15   the details, what you mean by that -- is it a

16   hit, is it a lead, is it a drug candidate.  And

17   therefore it's difficult to answer from lab

18   bench.

19        Q.    Without parsing it in that way, it's

20   a small fraction, correct?

21             MS. SIMSON:  Objection to form.

22        Asked and answered.

23        A.    It is a small fraction.

24        Q.    And you had said about 10 percent

25   make it from phase 1 to approval.

1          L. Pullan, Ph.D. - Highly Confidential

2              Do you know what the percentages

3     going from -- from each phase -- so I'll ask a

4     more specific question.

5              Do you know how many molecules

6     advance from phase 1 to phase 2?

7              MS. SIMSON:  Objection to form.  I'm

8          not sure that that accurately characterizes

9          her prior testimony.  And so I'll object to

10         the extent it mischaracterizes her prior

11         testimony.

12             You can answer if you can,

13         Dr. Pullan.

14     A.    There are published statistics on

15     these.  I did refer to them in my report, and

16     I -- I hesitate to give you a precise number

17     because I don't remember exactly what the

18     numbers are.

19     Q.    Understood.  And when you were at

20     Monsanto Healthcare, were you exclusively

21     working on CNS drug candidates?

22     A.    I believe I also participated on

23     some of the projects, but my primary activities

24     were CNS drug discovery.

25     Q.    Any particular CNS disease or

1        L. Pullan, Ph.D. - Highly Confidential

2   condition that you were targeting?

3        A.    A number of -- one of the compounds

4   was an antidepressant, one was an Alzheimer's

5   candidate, one was stroke, multiple different

6   diseases.

7        Q.    You didn't pick the easy diseases to

8   go after?

9        A.    No CNS diseases are easy diseases to

10  go after.

11       Q.    You were also involved in drug

12  discovery at Zeneca, which came after, right?

13       A.    Correct.

14       Q.    And when you were at Zeneca you were

15  on the negotiation team that related to the

16  genomic database that was eventually licensed

17  to Incyte; is that right?

18       A.    Yes, I was on the negotiation team

19  for the Incyte genomics deal, yes.  A long time

20  ago.

21       Q.    Do you recall what year that was?

22       A.    Not really, somewhere in the '90s.

23       Q.    And you were at the Zeneca location

24  in Wilmington, Delaware, right?

25       A.    That is correct.

1        L. Pullan, Ph.D. - Highly Confidential

2        Q.    What was the genomics database, if

3    you recall?

4              MS. SIMSON:  I'm just going to note

5         the form objection.  I'm assuming that you

6         are referring to the genomics database at

7         Zeneca, but, Dr. Pullan, to the extent you

8         need clarification on the question.

9        A.    What we negotiated a deal for at

10   AstraZeneca, was what was at the time a

11   state-of-the-art database of association of

12   genes with functioning disease.  By today's

13   standards it was very primitive and by today's

14   standards what anybody can access on the web is

15   better than what we paid for, but that was the

16   best at the time.  And it was an a useful tool

17   for researchers in drug discovery to make an

18   association between a molecular target and the

19   disease.

20       Q.    And you started Pullan consulting

21   after Kosan Bioscience was sold to BMS, right?

22       A.    Correct.

23       Q.    And that was about 16 years ago?

24       A.    That was about 16 years ago, March,

25   April.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    Now,  in your report, I believe it's

3    your rebuttal report, you mentioned an Innovent

4    agreement, do you recall that?

5          A.    I recall the Innovent agreement.

6          Q.    At one point were you Innovent's

7    vice president of business development?

8          A.    As a consultant I was titled vice

9    president.  I was the only business development

10   person, initially, and then a number of people

11   who were hired, employees at Innovent, reported

12   to me, but I was a consultant with the title

13   vice president, yes.

14         Q.    So what years were you holding that

15   title?  What years --

16         A.    I don't really remember.  The

17   company was founded in January of 2012.

18   Fidelity Investments asked me to work with

19   them.  I met them at JP Morgan, and I began

20   working with them shortly thereafter, but I

21   don't really remember when the title became

22   associated with the task.

23         Q.    So they were a client of Pullan

24   Consulting, but you also held the title of vice

25   president of business development?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.     Correct, because they wanted me to

3    have it.

4        Q.     You were not a formal employee of

5    Innovent; is that right?

6        A.     Correct, I was a paid as a

7    consultant.

8        Q.     Okay.  Is Innovent still a client of

9    Pullan Consulting?

10        A.     I believe we have let that contract

11    lapse.  They are friends and Innovent offered,

12    repeatedly -- requested that I join the company

13    as an employee, but I declined.

14        Q.     And what was your involvement in the

15    Innovent agreement with Incyte?

16        A.     I have no involvement in the

17    Innovent agreement with Incyte.

18        Q.     Okay.  You were not involved in the

19    negotiation of that agreement?

20        A.     Correct, none.  When I refer to the

21    Innovent agreements, I'm speaking of earlier

22    than that.

23        Q.     Okay.  That agreement -- the

24    Innovent agreement with Incyte that you

25    reference in your rebuttal report was

1      L. Pullan, Ph.D. - Highly Confidential

2   negotiated after you stopped being vice

3   president of development there?

4      A.    No.  You asked me about an

5   Innovent-Incyte agreement.  The Innovent-Incyte

6   agreement, which is referenced in Rao's report

7   and which I covered in my rebuttal -- touched

8   on in my rebuttal, is not the agreement that I

9   referenced in my report.

10          The agreement on my résumé and the         09:53

11  agreement that I negotiated as lead negotiator,

12  one of the agreements I negotiated as lead

13  negotiator was the Innovent-Eli Lilly deal.

14      Q.    Let me try to clarify that, because

15  I think I confused myself.

16          In your rebuttal report, you

17  reference an agreement between Innovent and

18  Incyte, right?

19      A.    Because it was listed in the Rao

20  report, right.

21      Q.    Yes.  Yes.

22          Did you have any involvement in that

23  agreement between Innovent and Incyte?

24      A.    I had no involvement in the

25  agreement between Innovent and Incyte.

1     L. Pullan, Ph.D. - Highly Confidential

2     Q.    Were you acting as vice president of

3 business development at Innovent when Innovent

4 entered the agreement with Incyte?

5     A.    No, I was not vice president of

6 Innovent at that time.

7     Q.    Did you introduce Innovent to

8 Incyte?

9     A.    I did not make that introduction.

10    Q.    When were you first contacted by

11 counsel regarding serving as an expert in this

12 case?

13         MS. SIMSON:  You can answer the

14         question as to time, Dr. Pullan, but I just

15         want to make sure that you understand that

16         our communications and discussions are

17         privileged and I would instruct you not to

18         answer with respect to the content of our

19         discussions.

20         THE WITNESS:    Thank you.

21    A.    A couple of months ago.

22    Q.    Do you recall any more specifically?

23    A.    I do not recall.

24    Q.    Do you know if it was in 2022?

25    A.    Yes, it was in 2022.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    And for the purposes of your expert

3     reports, what did you understand the dispute to

4     be between the parties?

5               MS. SIMSON:  Dr. Pullan, I'm just

6          going to note again that, please don't

7          divulge the content of any communications

8          you may have had with counsel or with

9          Novartis, but you can go ahead and answer

10         the question as to your general

11         understanding.

12         A.    Right.  The parties are disputing

13    the interpretation of when royalties are paid

14    by Incyte to Novartis and the duration and

15    step-down of those royalties.

16         Q.    And do you understand the resolution

17    of that dispute turns on the proper

18    interpretation of Section 8.3(c)(i) of the

19    agreement?  And by "I," it's Roman i in

20    parentheses.

21              MS. SIMSON:  Objection to form.

22         A.    The interpretation depends on that

23    section and related sections, and I believe on

24    the logic of the industry and the standard

25    practices of the industry.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    When you say "logic of the industry

3     and standard practices of the industry," you

4     mean as they relate to the interpretation of

5     that section?

6               MS. SIMSON:  Objection to form.

7          A.    I -- I'm not sure I really

8     understand what distinction you're making

9     there.  What I meant was I know why companies

10    do deals, how they do deals, and therefore,

11    when I read a contract, I bring that judgment

12    to bear.

13         Q.    Okay.  You offered two expert

14    reports in this matter, correct?

15         A.    That is correct, a first and a

16    rebuttal.  Yes.

17         Q.    And those two reports contain all of

18    the opinions you intend to offer in this

19    matter, correct?

20         A.    I stand by those reports.

21         Q.    You don't have any new opinions

22    since -- in this matter since those reports,

23    correct?

24         A.    I have no new opinions.

25         Q.    And I believe yesterday we received

1       L. Pullan, Ph.D. - Highly Confidential

2    an email saying that you had identified an

3    error in your rebuttal report that needed to be

4    corrected?

5           MS. SIMSON:  Objection to form.

6           Mischaracterizes the correction.  It was an

7           error in an exhibit to the rebuttal report,

8           not in the rebuttal report itself.

9    BY MR. STOPS:

10       Q.    Leaving aside that correction, are

11   there any other corrections that you want to

12   make to either of your reports?

13       A.    I do not believe there is any

14   difficulty with any of the other reports.

15       Q.    And you've reviewed Mr. Lankau's

16   opening and rebuttal reports, correct?

17       A.    I reviewed Mr. Lankau's reports.

18       Q.    And you reviewed Dr. Rao's opening

19   and rebuttal reports, correct?

20       A.    I reviewed Dr. Rao's reports.

21       Q.    Have you reviewed -- is it Dr. --

22   the report of Mr. Tedesco?  Have you reviewed

23   his opening rebuttal reports?

24       A.    I have reviewed Mr. Tedesco's

25   reports.

1        L. Pullan, Ph.D. - Highly Confidential

2        Q.    In generating your opinions for this

3    case, how did you decide what documents to

4    consider?

5             MS. SIMSON:  Objection to form.  I

6             would also instruct you, Dr. Pullan, in

7             answering that question, not to divulge the

8             content of any communications you may have

9             had with counsel, but you can otherwise

10            answer the question as a general matter.

11       A.    As a general matter, it feels to me

12    I read everything conceivable.  It's a heck of

13    a lot of paperwork.

14       Q.    How did you select that paper?

15            MS. SIMSON:  Same objection and

16            instruction, Dr. Pullan.

17       A.    They were the documents relevant to

18    this case.

19       Q.    They were provided to you by

20    counsel, correct?

21            MS. SIMSON:  Objection to form.

22            Mischaracterizes the materials

23            considerably.

24       A.    Some documents were provided by

25    counsel and some were provided by me.

1        L. Pullan, Ph.D. - Highly Confidential

2        Q.    What documents were provided by you?

3        A.    The things that are listed in the

4  report that are distinct to my personal

5  history, experience.

6        Q.    The things that weren't Bates

7  numbered, is that an accurate way to portray

8  it?

9             MS. SIMSON:  Objection to form.

10       A.    I'm not sure I really know --

11       Q.    Sure.

12       A.    -- what's Bates numbered and what is

13  not.

14       Q.    Okay.  And out of the materials that

15  you considered, how did you decide what

16  materials to rely on in your report?

17             MS. SIMSON:  Objection to form.  And

18        same instruction with respect to privilege,

19        Dr. Pullan.

20       A.    So clearly the most important

21  document is the thing that was signed.  I --

22  beyond that, I read and considered everything

23  and applied the many years of experience and

24  the knowledge gained from decades of doing

25  deals.  That's how I considered things.

1      L. Pullan, Ph.D. - Highly Confidential

2      Q.    Why is the 2009 agreement the most

3  important document?

4      A.    Because it is what the party agreed

5  to.

6      Q.    Did you ask counsel to send you

7  documents?

8           MS. SIMSON:  Objection to form.  And

9      again, Dr. Pullan, same instruction with

10      respect to divulging the content of our

11      communications.

12      A.    I honestly don't remember how things

13  came or what I asked for versus what I was

14  provided.  And I don't think it matters.

15      Q.    Okay.  You say in your reports that

16  the cMET portion of the deal is not relevant to

17  the litigation, correct?

18      A.    The cMET is not in dispute.

19      Q.    That was going to be my next

20  question.  Is the reason that you found the

21  cMET portion of the agreement to be of little

22  relevance is because the dispute concerns the

23  JAK-licensed products not the cMET products?

24           MS. SIMSON:  Objection to form.

25      A.    That is correct.

1       L. Pullan, Ph.D. - Highly Confidential

2       Q.    Now, the cMET royalty term is based

3   upon the same Section 8.3(c) as the JAK royalty

4   term, right?

5       A.    Yes.

6             MS. SIMSON:  Objection to form.

7   BY MR. STOPS:

8       Q.    So the same interpretation of

9   Section 8.3(c) will apply to all of the

10  royalties, correct?

11            MS. SIMSON:  Objection to form.

12        Objection to the extent it's asking for a

13        legal conclusion or legal opinion.

14            You can answer the question, if you

15        can Dr. Pullan.

16      A.    There is a single provision on

17  royalty term in the agreement.  It applies to

18  royalties within the agreement.

19      Q.    And that includes both cMET and JAK

20  royalties, correct?

21            MS. SIMSON:  Same objections with

22        respect to asking for a legal conclusion or

23        legal opinion, and asked and answered.

24            You can answer if you can,

25        Dr. Pullan.

1          L. Pullan, Ph.D. - Highly Confidential

2          A.     The royalty term applies to cMET,

3     JAK molecules, Novartis's JAK molecules and to

4     the reverse -- what's being termed the reverse

5     royalty.

6          Q.     In your opinion, who is the proper

7     person to interpret the meaning of terms in a

8     pharmaceutical agreement?

9               MS. SIMSON:  Objection to form.

10               Objection to the extent it's asking for a

11               legal opinion or a legal conclusion.

12               You can answer the question,

13               Dr. Pullan.

14          A.     Multiple people can -- can

15     interpret.  I think those who have the most

16     experience in the shaping of deals have the

17     most solid grounds for interpreting the normal

18     behavior in a license and the expectations that

19     would have been at the time, but clearly the

20     folks who did the deal contribute to that

21     interpretation, and I read all those

22     depositions, and clearly a lawyer and a judge

23     make a legal call on what the language says.

24          Q.     You said that the people with "the

25     most experience in shaping of deals have the

1      L. Pullan, Ph.D. - Highly Confidential

2  most solid grounds for interpreting the normal

3  behavior in a license and the expectations."

4  Let me give a go at that in a different way in

5  a minute.

6            MR. STOPS:  Let me mark your expert

7       reports as exhibits.

8            (Pullan Exhibit 1002, Pullan Opening

9       Expert Report, marked for identification.)

10  BY MR. STOPS:

11      Q.    I'm handing you a document I have

12  marked as Pullan 1002.

13      A.    Thank you.

14            MS. SIMSON:  Thank you.

15      Q.    Pullan 1002 is your opening expert

16  report in this matter; is that right?

17      A.    Correct.

18      Q.    And if you just take a quick moment

19  to verify that that is a full copy of your

20  opening expert report.

21      A.    It appears to be so.

22            (Pullan Exhibit 1003, Pullan

23       Rebuttal Report, marked for

24       identification.)

25  BY MR. STOPS:

1      L. Pullan, Ph.D. - Highly Confidential

2      Q.    And handing you the next document

3    which was marked as Pullan 1003.

4          Pullan 1003 is your rebuttal report

5    in this matter, correct?

6      A.    That is correct.

7      Q.    And I'll represent for the record

8    that the correction that was sent over

9    yesterday is not in this version.

10     A.    As so noted.

11         MS. SIMSON:  Eric, do you need a

12      copy of that to mark as Pullan 1004?

13         MR. STOPS:  I have it.  This is just

14      how this one was printed.

15         MS. SIMSON:  Got it.  Thank you.

16   BY MR. STOPS:

17     Q.    In a license agreement it's typical

18   to use defined terms, right?

19         MS. SIMSON:  Objection to form.

20     A.    Defined terms are a common part of

21   license agreements.

22     Q.    Why do parties define terms in

23   license agreements?

24         MS. SIMSON:  Objection to form.

25      Objection to the extent it's asking for a

1      L. Pullan, Ph.D. - Highly Confidential

2      legal opinion.

3            You can answer.

4      A.    Parties define terms to define

5  terms.

6      Q.    Just for fun?

7            MS. SIMSON:  Objection to form.

8      A.    That's not what I said.  They're

9  defining terms.

10     Q.    What does it mean for a term to be

11 defined?

12     A.    It means to provide a definition.  I

13 don't know what you're driving at.  I feel it's

14 a nonsense question and I provided you a

15 sensible, if not what you wanted, answer.

16     Q.    When reading an agreement, do you

17 give meaning to all the words in the agreement,

18 right?

19           MS. SIMSON:  Objection to form,

20     objection to the extent you're asking for a

21     legal opinion or legal conclusion.

22           You can answer, Dr. Pullan, if you

23     can.

24     A.    When one reads an agreement, you --

25 I typically start with the license grant and

1          L. Pullan, Ph.D. - Highly Confidential

2    reach backwards for the definitions that

3    pertain, read the structure, but bringing to it

4    knowing how these things are created and what

5    the parties are trying to accomplish.  So one

6    works with the interpretation of the industry

7    as well as what is written on the paper.

8          Q.    So you start with the words and then

9    bring industry experience to bear on it, is

10   that what you're saying?

11          MS. SIMSON:  Objection to form.

12       Mischaracterizes testimony.

13          A.    I think it is that one reads the

14   words and brings industry experience to them.

15   Again, I feel like this is dancing on the head

16   of a pin.

17          Q.    What do you mean by that?

18          A.    It -- it's kind of obvious, right?

19          Q.    I agree.

20          So when interpreting a license

21   agreement, you don't ignore words in the

22   agreement, right?

23          MS. SIMSON:  Objection to form.

24       Objection to the extent you're asking for a

25       legal opinion or legal conclusion.

1          L. Pullan, Ph.D. - Highly Confidential

2          A.    I'm -- I may skim over some words as

3    they're not as important as other words.  I

4    certainly am not ignoring concepts.

5          Q.    Maybe this goes to my question about

6    definitions, but parties can agree to words use

7    words in ways that are different from their

8    customary meanings, right?

9               MS. SIMSON:  Objection to form.

10         Objection to the extent you're asking for a

11         legal conclusion or a legal opinion.

12              You can answer the question if you

13         can, Doctor.

14         A.    Well, parties generally -- parties

15   in a pharmaceutical licensing agreement

16   generally use words in a way that have evolved

17   over a long period of time and are industry

18   standard.  They may not be the same as casual

19   English, but they are interpretable by those

20   who have experience with deals.

21         Q.    Terms can be defined in agreements

22   to have meanings that are not common English,

23   correct?

24              MS. SIMSON:  Objection to form.

25         A.    I believe I said that they may not

1          L. Pullan, Ph.D. - Highly Confidential

2     be casual, informal English, but they are not a

3     foreign language either.  They are a language

4     of the industry.

5          Q.     Are you saying that defined terms

6     have established industry meanings?

7               MS. SIMSON:  Objection to form.

8          Objection to the extent you're

9          mischaracterizing her testimony.

10          A.     I am saying that we use many terms

11     in many agreements, and we come to -- to know

12     how to interpret those based on many

13     experiences of those, but every agreement is --

14     every deal is unique and stands on what is

15     agreed.

16          Q.     When you say every deal is unique,

17     what do you mean by that?

18          A.     Every deal is unique.

19          Q.     Parties can choose to use words in

20     an agreement in ways that are different than

21     industry standard, correct?

22               MS. SIMSON:  Objection to form.

23          Objection to the extent you're asking for a

24          legal opinion or legal conclusion.

25          A.     I just said that every deal is

1          L. Pullan, Ph.D. - Highly Confidential

2    unique, but the general practice, especially

3    among companies with deal experience is to

4    understand the normal course of business and

5    use terms in a manner that is largely

6    consistent with industry practice.  If we

7    defined patents as oranges, it would be stupid.

8    We define things in a way that is practical,

9    sensible, driving toward a -- a common

10   understanding based on the common

11   pharmaceutical industry framework.

12        Q.    Parties could define patents as

13   oranges, right?

14        A.    That would be utterly stupid.  I've

15   never seen it done.

16        Q.    But it could be done?

17        A.    That's a nonsense statement.  I made

18   it as a nonsense statement.  It should be taken

19   as a nonsense statement.  It is a nonsense

20   statement.  It would not be done.

21        Q.    Parties could define oranges to mean

22   patents?

23             MS. SIMSON:  Objection to form.

24        A.    Ridiculous.

25        Q.    The words -- the words used in a

1          L. Pullan, Ph.D. - Highly Confidential

2    definition --

3          A.    Are aiming at a practical solution

4    to build a consensus to achieve a deal to work

5    together.  They are not mere throwaways.

6          Q.    The words -- words are not

7    throwaways; the words have meaning, correct?

8               MS. SIMSON:  Objection to form.

9          Objection to the extent you're asking for a

10         legal opinion or legal conclusion.

11         A.    Words have meanings.

12         Q.    And why are the same words defined

13   differently in different agreements then?

14              MS. SIMSON:  Objection to form.

15         Objection to the extent you're asking for a

16         legal conclusion or legal opinion, also

17         object to the extent you're asking for her

18         to speculate with respect to other deals.

19         A.    I think different people draft

20   somewhat differently, but actually, what is

21   remarkably true is how often they are largely

22   the same, because it is industry standard, it

23   is practical, it serves a purpose.  It's

24   actually more -- more impressive that they are

25   largely the same across thousands of deals than

1      L. Pullan, Ph.D. - Highly Confidential

2   trying to make a mole -- mountain out of a

3   molehill.

4      Q.    You would agree that differences

5   between definitions across different agreements

6   can convey different meanings, correct?

7           MS. SIMSON:  Objection to form,

8       objection to the extent you're asking for a

9       legal opinion or legal conclusion.

10     A.    Differences can convey differences.

11  Again, I think you're making mountains out of

12  molehills.

13          What is common is much more -- much

14  more to the point most of the time, so.

15     Q.    What do you mean by most of the

16  time?

17     A.    Most of the time.

18     Q.    Some of the times it's not?

19     A.    Every deal is unique, we've said

20  that, but there is industry standard and custom

21  and there is practical working toward an

22  agreement, a collaboration.

23     Q.    But you would agree that differences

24  between definitions across different agreements

25  can convey different meanings?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3          Objection to the extent you're asking for a

4          legal conclusion or legal opinion.

5          A.    And I have answered that question

6     before.

7          Q.    You didn't actually answer the

8     question.  The question is that, despite the

9     fact that your opinion is that terms are used

10    similarly across agreements, even with respect

11    to the same term there can be differences in

12    meanings across different agreements?

13              MS. SIMSON:  Objection to form.

14         Objection to the extent you're asking for a

15         legal conclusion or legal opinion.

16         A.    I think you're dancing on the head

17    of a pin.  There can be differences between

18    agreements.  Every agreement is unique, but one

19    brings industry perspective to any agreement.

20         Q.    And those differences can matter,

21    right?

22              MS. SIMSON:  Objection to form.

23         Objection to the extent you're asking for a

24         legal conclusion or legal opinion.

25         A.    Every agreement is unique.  And

1        L. Pullan, Ph.D. - Highly Confidential

2    they -- -- they reflect what is needed in that

3    agreement.

4        Q.    In your rebuttal report, you

5    criticized portions of Mr. Lankau's report as

6    being a highly legalistic contract

7    interpretation.

8            Do you recall that?

9        A.    Yes, I do recall that.

10        Q.    If one were to say that license

11    patent rights encompassed all patent rights,

12    irrespective of which party to the agreement

13    owned the applicable patents, would that be a

14    legal conclusion?

15            MS. SIMSON:  Objection to form,

16        objection to the extent you're calling for

17        a legal opinion or a legal conclusion.

18            You can answer the question if you

19        can.

20        A.    I believe that a business

21    development professional can interpret a

22    contract as reflecting a business arrangement

23    and can understand those business arrangements.

24        Q.    So why were you criticizing

25    Mr. Lankau's report then?

1       L. Pullan, Ph.D. - Highly Confidential

2       A.      Because it's wrong.

3       Q.      Well, you have -- you have

4  disagreements with his -- with the -- his

5  substantive opinions, but you also criticize

6  his report, generally, as being a highly

7  legalistic contract interpretation.

8               So I'm just trying to understand

9  what's the basis for that criticism of his

10 report?

11              MS. SIMSON:  Objection to form.

12      A.      It feels and reads as if the purpose

13 is to find a wiggle room, a legalistic argument

14 to make what is, what is not.  It is an effort

15 to apply a dissection for no meaningful

16 purpose.  It is not a reflection of the way

17 agreements are structured, to create a

18 partnership, a relationship.  It is a backward

19 look of a -- an artificial system.  It does not

20 reflect what the parties intended when they

21 started the agreement.

22      Q.      So let's unpack that.  What do you

23 mean by it's a dissection.

24      A.      The --

25      Q.      I'm sorry, what did you say?

1         L. Pullan, Ph.D. - Highly Confidential

2              MS. SIMSON:  Hold on one moment.

3              THE WITNESS:  Yes.

4              MS. SIMSON:  I don't believe she

5         used -- oh, wait, she did, I'm sorry, there

6         was a correction made on the transcript.  I

7         apologize, Eric.  Go ahead.

8    BY MR. STOPS:

9         Q.   So I'll just ask again so we're

10   clear.

11              You said that his -- sorry.  That

12   Mr. Lankau's opinions were a dissection.

13              What did you mean by that?

14        A.   Taking out of context, not applying

15   the business purposes to the thinking.

16        Q.   You said his opinions were -- his

17   analysis was backwards.

18              What did you mean by that?

19        A.   They did not start from the premise

20   of a relationship.  It started from trying to

21   dissect, torture the words to find a path out.

22        Q.   So he shouldn't have started with

23   the words of the agreement?

24              MS. SIMSON:  Objection to form.

25        Mischaracterizes the testimony.

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    I did not say he should not start

3    with the words.  I said he is not benefitting

4    from the context and perspective that those who

5    negotiate and create the deals bring to the

6    deals.

7        Q.    Because you should start with the

8    words in the agreement, right?

9            MS. SIMSON:  Objection to form.

10    Asked and answered.

11        A.    I think we have -- you're playing

12    the same silly game.  You're trying to trap me

13    into saying something stupid, and I'm trying to

14    give you the benefit of my experience, and one

15    starts with the words, but you don't read them

16    as a first grader would read them.  You read

17    them as if somebody brings sense and thought to

18    them.  And so I stand by my report and my

19    criticism of Mr. Lankau's report.

20        Q.    How would a first grader read words?

21            MS. SIMSON:  Objection to form.

22        A.    A first grader would read words very

23    simply and not bringing context and experience.

24        Q.    A first grader would read the plain

25    meaning of the words, right?

1          L. Pullan, Ph.D. - Highly Confidential

2          A.    A first --

3               MS. SIMSON:  Objection to form.

4          Objection to the extent asking for a legal

5          opinion or a legal conclusion.

6          A.    A first grader would not know the

7     meanings of the words, particularly in an

8     agreement.  Ask your first grader to read

9     these.  It would be nonsense.

10         Q.    You also -- let me try to get the

11    quote right.  You also said that Mr. Lankau's

12    analysis was an artificial system.

13              What did you mean by that?

14              MS. SIMSON:  Objection to form.

15         Mischaracterizes the testimony.  She didn't

16         say the report was an artificial system.

17         Her words were a backward look of an

18         artificial system.

19              MR. STOPS:  I also didn't say the

20         report was an artificial system.

21    BY MR. STOPS:

22         Q.    My question was:  You said that

23    Mr. Lankau's analysis was an artificial system.

24              What did you mean by that?

25         A.    It is a backward look attempting to

1      L. Pullan, Ph.D. - Highly Confidential

2   extract perspective without considering the

3   context and the industry experience and the

4   purpose.

5           THE WITNESS:  Could I take a bio

6       break?

7           THE VIDEOGRAPHER:  We are going off

8       the record.  The time is 10:31 a.m.

9           (Recess.)

10          THE VIDEOGRAPHER:  We are back on

11      the record.  The time is 10:49 a.m.

12  BY MR. STOPS:

13      Q.    In interpreting an agreement, how

14  does one know whether words are being used in a

15  way that's based on custom and practice or

16  based on something that's special to an

17  agreement?

18          MS. SIMSON:  Objection to form.

19      Objection to the extent asking for a legal

20      opinion or legal conclusion.

21          You can answer the question.

22      A.    So one always brings one's

23  experience in industry to bear.  One looks for

24  distinctions that reflect the purpose of the

25  parties and the aim of the -- of the

1      L. Pullan, Ph.D. - Highly Confidential

2   relationship.

3      Q.    How much experience does someone

4   need to understand the words of a

5   pharmaceutical license agreement?

6          MS. SIMSON:  Objection to form.

7      A.    Depends on which words.  It does

8   take a considerable amount of time, and one's

9   confidence and ability to understand a

10  contract, or even a term sheet, grows with

11  experience.  Years.

12     Q.    So let's -- I guess, for the issues

13  of this case, how much experience does someone

14  need to understand the words at issue?

15         MS. SIMSON:  Objection to form.

16         Objection to the extent asking for a legal

17         conclusion or a legal opinion.

18     A.    I can't give you a specific number

19  of years or -- and the years, you know, you can

20  have years and you do -- people do -- take

21  transfer officers, for instance, do exactly the

22  same kind of agreement over and over again.

23  That would not benefit as much as of years of

24  doing diverse types of agreements.

25             And it's not merely doing the

1      L. Pullan, Ph.D. - Highly Confidential
2   agreements.  It's reading them.  It's working
3   from term sheets to full agreements.  All of
4   that brings insight and enhances one's ability
5   to interpret a contract.
6      Q.    In your opinion, did any of the
7   people at Incyte in 2009 have that experience?
8         MS. SIMSON:  Objection to form.
9      A.    I'm not knowledgeable enough to know
10  what the people at Incyte had in terms of
11  experience.  I can't answer that question.
12     Q.    Well, I think we've established that
13  it's your opinion that a first grader couldn't
14  interpret the words of the agreement.
15     A.    That is correct.
16     Q.    How about someone with a high school
17  education?
18     A.    Probably not.
19     Q.    College education?
20        MS. SIMSON:  Objection to form.
21     A.    At some point, the formal
22  certificate is not the important part.  One
23  learns from the job, not -- as far as I know,
24  there are no college-level degrees in business
25  development.  So college degree is somewhat

1          L. Pullan, Ph.D. - Highly Confidential

2     irrelevant.

3          Q.     So it's -- it's years of experience

4     in doing and interpreting pharmaceutical

5     license agreements is the requisite level?

6               MS. SIMSON:  Objection to form.

7          Objection to the extent asking for a legal

8          conclusion or legal opinion.

9               Your answer?

10         A.     Correct.

11         Q.     So for the licensee in a

12    pharmaceutical license agreement, what's the

13    source of its value?

14              MS. SIMSON:  Objection to form.

15         Vague.

16         A.     It depends, right?  You're asking

17    an extremely broad, vague question.  What is

18    the source of its value?  It depends.

19         Q.     In what ways does the licensee in a

20    pharmaceutical licensing agreement obtain

21    value?

22              MS. SIMSON:  Objection to form.

23         Vague.

24         A.     What are they licensing.  That

25    drives what drives value.  And what roles are

 1         L. Pullan, Ph.D. - Highly Confidential

 2    the two parties playing and what are they

 3    contributing.  That's a pretty open-ended,

 4    how-in-the-world-do-you-make-any-sensible-

 5    answer question.

 6         Q.    Well, I'm just trying to understand

 7    how these work if there is some kind of

 8    industry standards here.  So maybe I'll

 9    start -- make it a little bit more specific.  I

10    said the licensee, so I guess I'm trying to

11    focus on someone who is licensing a product

12    here.

13              So for the licensee in a license

14    agreement for a product, what's their source of

15    value?

16              MS. SIMSON:  Objection to form.

17         Vague.

18         A.    It still is pretty vague, because,

19    after all, I could license a product, a

20    preclinical, and partner it out before I

21    commercialize it.  I could license it at

22    phase 2 and it fails.  I could license it at

23    phase 3.  I could license it when it's on the

24    market.  I could license it with composition

25    matter IP.  I could license it without

1      L. Pullan, Ph.D. - Highly Confidential

2   composition matter IP.  I could license it with

3   the other party running clinical trials.  I

4   could license it for a territory.  I could

5   license it for a specific field.  There's so

6   many variations of -- you've got -- you've got

7   to ask a better question than that.

8      Q.   Well, no one is licensing a product

9   for it to fail, right?

10          MS. SIMSON:  Objection to form.

11     A.   I didn't say the purpose was to have

12   it fail, but the benefit could be zero or loss

13   of money.

14     Q.   That's always the case, right?

15          MS. SIMSON:  Objection to form.

16     A.   Not always the case.  No.

17          After all, if I license it on the

18   market, it's already got sales.  So no, it

19   would not always be the case.

20     Q.   So there any product that's being

21   marketed before it is a marketed product always

22   has a chance to fail?

23          MS. SIMSON:  Objection to form.

24     A.   But -- correct.  Any product before

25   it is proved has a chance of failure.  And even

1      L. Pullan, Ph.D. - Highly Confidential

2  after it's approved, it has a chance of not

3  being a commercial success.  And even after

4  it's a commercial success it has a chance to

5  lose its market exclusivity and no longer be a

6  commercial success.

7      Q.   So it's always risky for the

8  licensee, is that what you're saying?

9          MS. SIMSON:  Objection to form.

10     A.   There is inherent risk on both

11  sides.  It is risky to the licensor as well.

12  The parties interrelationship attempting to

13  mutually benefit and both sides take risks.

14  The selection of a partner is critical because

15  of that.  Yes.

16     Q.   So leaving aside the scenario where

17  the licensee sublicenses or otherwise disposes

18  of the asset in the process, the source of

19  value for the licensee is always from sales of

20  the product, right?

21         MS. SIMSON:  Objection to form.

22     A.   That's actually not necessarily true

23  either.

24     Q.   Okay.

25     A.   They could have a manufacturing

1        L. Pullan, Ph.D. - Highly Confidential

2   role.

3        Q.    That would be a manufacturing

4   agreement though, not a licensing agreement,

5   right?

6            MS. SIMSON:  Objection.

7        A.    Well, there are licenses in a

8   manufacturing agreement.  So it is licensing

9   agreement.  The purpose of which is a

10  manufacturing role.

11       Q.    Right, but we are talking about a

12  situation where the licensee is licensing a

13  product.

14       A.    And that is a license of a product

15  for the purpose of manufacturing.  There are

16  licenses of a product for the purposes of

17  research.  What you're trying to say, perhaps,

18  is licensing a product for the purpose of

19  commercialization.

20       Q.    Okay.

21       A.    And what was your question?

22       Q.    So in a scenario where the licensee

23  in a licensing agreement is licensing it for

24  the purposes of collaboration, what is the

25  source of the licensee's value?

 1          L. Pullan, Ph.D. - Highly Confidential

 2               MS. SIMSON:  Objection to form.

 3     A.     Collaboration.  I -- you changed the

 4     question.  You said collaboration.  In a

 5     collaboration --

 6     Q.     Maybe -- I'm sorry.  Then I

 7     misspoke.  I will rephrase.

 8               So assuming that we're referring to

 9     a licensee -- oh, I said collaboration instead

10     of commercialization.  I apologize.

11               For a licensee who is licensing a

12     product for the purposes of commercialization,

13     what is the source of the licensee's value in

14     the licensing agreement?

15               MS. SIMSON:  Objection to form.

16     A.     So thank you for the reminder that

17     what we are actually talking about is a

18     collaboration, a part of which is for the

19     purpose of commercialization.  So there are

20     multiple potential sources of value.

21     Q.     What's the primary source of value?

22               MS. SIMSON:  Objection to form.

23     A.     It depends on the individual deal.

24     It could be data, it could be sales, it could

25     be royalties on sales.  In a territorial split,

1      L. Pullan, Ph.D. - Highly Confidential

2   it depends on the size of the territory, the

3   markets, the specifics.

4      Q.   Typically, in a licensing agreement

5   for the purposes of commercializing a product,

6   the licensee pays a royalty to the licensor for

7   the right to sell the license product, correct?

8           MS. SIMSON:  Objection to form.

9      A.   Typically, but not always.

10     Q.   There's always exceptions, right?

11          MS. SIMSON:  Objection to form.

12     A.   There are always exceptions.  Every

13  deal is unique.

14     Q.   Under the 2009 agreement between

15  Incyte and Novartis, Novartis obtained the

16  exclusive right to sell JAK-licensed products

17  in every country except for the United States

18  and its territories, right?

19          MS. SIMSON:  Objection to form.

20     A.   That is correct.

21     Q.   And Novartis's JAK licensed product

22  is known as Jakavi, J-A-K-A-V-I, correct?

23     A.   That is correct.

24     Q.   How many countries does Novartis

25  sell Jakavi in?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3     A.     I don't know.

4     Q.     Under the 2009 agreement, Novartis

5   obtained the exclusive right to sell cMET,

6   C-MET, licensed products in every country in

7   the world, right?

8     A.     That is correct.

9               MS. SIMSON:  Objection to form.

10    Q.     And Novartis's cMET licensed product

11  is Tabrecta, T-A-B-R-E-C-T-A, correct?

12    A.     I believe so.

13    Q.     How many countries does Novartis

14  sell Tabrecta in?

15    A.     I don't know.  I can't even tell you

16  how many countries there are in the world.

17    Q.     Currently, what are the aggregate

18  net sales of Jakavi and Tabrecta?

19               MS. SIMSON:  Objection to form.

20          Asked and answered.  Actually, withdrawn.

21          Objection to form.  Vague.  I'm also going

22          to just put a standing objection on the

23          record with respect to questions about

24          Tabrecta, given our stipulation.

25               MR. STOPS:  I'm sorry, what

1  L. Pullan, Ph.D. - Highly Confidential

2  stipulation?

3       MS. SIMSON:  Our stipulation about

4  Tabrecta not being relevant to the case.

5       MR. STOPS:  There's no such

6  stipulation.

7       MS. SIMSON:  There is such

8  stipulation.  I'm happy to mark it as an

9  exhibit if you'd like.  I'm just putting a

10 standing objection on the record, Eric.  If

11 you don't agree with me --

12      (Multiple speakers.)

13      MR. STOPS:  Fine.  I just want to

14 make it clear that there is no such

15 stipulation.  We don't agree there is such

16 stipulation.

17      MS. SIMSON:  And such a stipulation

18 has been signed by both sides.  That's our

19 position.

20      THE WITNESS:  And I don't know the

21 answer anyway.

22      MR. MACH:  Sorry to bother you.  Do

23 we need to pull up the stipulation?

24      MS. SIMSON:  I was just putting a

25 standing objection on the record.

1          L. Pullan, Ph.D. - Highly Confidential

2                MR. MACH:  If there --

3                (Multiple speakers.)

4                MS. SIMSON:  I have not instructed

5          the witness not to answer.  I was putting a

6          standing objection on the record.

7                MR. MACH:  I'm just trying to help.

8                MR. STOPS:  And that's fine.

9   BY MR. STOPS:

10         Q.    And how much profit has Novartis

11   forecasted that it will make for the life of

12   Jakavi and Tabrecta?

13                MS. SIMSON:  Objection to form.

14         Calls for speculation.

15         A.    And I don't know.

16         Q.    You reviewed the deposition

17   testimony of Brian Goldfus, correct?

18         A.    Yes.

19         Q.    All of it?

20         A.    I believe so.

21         Q.    You're aware that Brian Goldfus

22   testified that the value of the royalty from

23   Incyte to Novartis was in the realm of --

24   projected to be in the realm of one percent of

25   the overall profits of the deal, correct?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3     A.    I don't --

4               MS. SIMSON:  Objection to the extent

5     it mischaracterizes Brian Goldfus's testimony.

6     A.    I don't specifically remember that.

7     And I -- I find the argument that the size of

8     the number in dispute has relevance to the

9     dispute not -- not sensible.

10    Q.    So you agree that the -- the value,

11    the projected values of the various royalty

12    streams are irrelevant to resolving the

13    dispute?

14              MS. SIMSON:  Objection to form.

15         Mischaracterizes Dr. Pullan's testimony

16         and her opinions.

17    A.    There is an agreement, and whether

18    they turned out to be as projected, whether

19    they turned out to be bigger or smaller is

20    irrelevant.  The parties share in the success.

21    Q.    Are you saying that projections are

22    relevant but only at the time of the agreement?

23              MS. SIMSON:  Objection to form.

24         Mischaracterizes testimony.

25    A.    Relevant to what?

1      L. Pullan, Ph.D. - Highly Confidential

2      Q.    Resolving the dispute here.

3            MS. SIMSON:  Same objections.

4      A.    I think that's too broad a question

5  and I'm not sure I really know what you're

6  trying to ask.

7      Q.    I'm actually just trying to

8  understand what you had said a few answers ago.

9  So give me one second.

10            You had said something about the --

11  the value of the number in dispute -- sorry?

12            You said that the argument that the

13  value of the number in dispute has relevance to

14  the dispute was not sensible.

15            MS. SIMSON:  Objection to form, and

16        to the extent it mischaracterizes her

17        testimony.

18      A.    If I say I owe you X percent of

19  sales, whether the sales of big or small is

20  irrelevant.  I owe you X percent of sales.

21      Q.    Okay.  So you're saying the --

22      A.    Unless the parties specifically

23  stipulated that there was such a term, and

24  there is not.

25      Q.    Okay.  So you're saying in this --

1        L. Pullan, Ph.D. - Highly Confidential

2   for this dispute, how things actually worked

3   out aren't relevant to -- resolving the issue?

4          MS. SIMSON:  Objection to form and

5          objection to the extent asking for a legal

6          conclusion or opinion.

7        A.    That the size of the sales are not

8   relevant to determining the dispute.

9        Q.    So in your opinion, it makes no

10  difference if Incyte is making a lot of money

11  or if Novartis is making a lot of money or if

12  both parties are making no money on the

13  agreement for actually resolving the contract

14  dispute at issue, correct?

15          MS. SIMSON:  Objection to form.

16          Mischaracterizes testimony, as well as her

17          opinions in her report.

18        A.    I do stand by my report and I do

19  believe that the dispute should not be on the

20  basis of whether the projections were correct

21  or which side is making how much money.  Both

22  parties have wonderfully succeeded and

23  that's -- the drug has succeeded and that is a

24  tribute to the collaboration.  It is the result

25  of the collaboration, and that's great.  It

1        L. Pullan, Ph.D. - Highly Confidential

2   doesn't change what is written in the contract

3   or what is agreed.

4        Q.    Maybe there's another way to ask the

5   question, I think you'll agree with this.  The

6   interpretation of a contract would be the same

7   if we were doing it in 2009 or today; is that

8   right?

9             MS. SIMSON:  Objection to form.

10        Objection to the extent you're asking for a

11        legal conclusion or legal opinion.

12        A.    In 2009, I don't believe there was

13   any dispute.  So I think it does matter.

14        Q.    Well, if you were hired to answer

15   the question of -- --

16        A.    What is this agreement about.

17        Q.    -- what does this mean, right after

18   the agreement was signed or today, there -- the

19   analysis would be the same?

20             MS. SIMSON:  Objection to form.

21        Vague.  Incomplete hypothetical.

22        A.    It is a hypothetical.  And I did

23   consider all the materials post signing as well

24   as presigning, and I read all the reports to

25   think hard about my opinion.

1          L. Pullan, Ph.D. - Highly Confidential

2          However, I believe that my opinion

3     when I very first read the contract is exactly

4     where I ended up after a great deal of thought.

5     So I do believe the clauses and the structure

6     of the deal are clear, were clear.

7          Q.    Are you done?

8          A.    Yes.

9          Q.    So when the agreement was signed in

10    November of 2009, as well as today, the clauses

11    and structure of the deal were clear, correct?

12          MS. SIMSON:  Objection to form, to

13          the extent you're asking for a legal

14          conclusion or legal opinion.

15          A.    I believe an experienced business

16    development professional would find them clear.

17          Q.    So it would be irrelevant to your

18    opinion if Brian Goldfus testified that the

19    expected value of the reverse royalty was in

20    the realm of one percent of the overall profits

21    of the deal, correct?

22          MS. SIMSON:  Objection to form.

23          Objection to the extent it

24          mischaracterizes1 Brian Goldfus's

25          testimony.

1          L. Pullan, Ph.D. - Highly Confidential

2      A.    If Brian Goldfus said that, it would

3   be irrelevant.

4      Q.    Okay.  You know what a patent is,

5   right?

6      A.    Yes.

7      Q.    Are you a named inventor on any

8   United States patents?

9      A.    I am not a named inventor on any

10   U.S. patents.

11      Q.    You're familiar with the FDA

12   publication known as the Orange Book, correct?

13          MS. SIMSON:  Objection to form.

14      A.    In a broad sense.

15      Q.    I'm not defining orange to mean

16   patents here.

17      A.    Yes.

18      Q.    Though it is relevant?

19      A.    That's a good point.  Yeah.

20          (An off-the-record discussion was

21      held at this time.)

22   BY MR. STOPS:

23      Q.    You said you were generally familiar

24   with the concept of the Orange Book, right?

25      A.    Concept of --

```
 1        L. Pullan, Ph.D. - Highly Confidential

 2        Q.     Of the FDA's Orange Book?

 3        A.     Yes.

 4        Q.     And how would you access the FDA's

 5   Orange Book?

 6        A.     On the web.

 7        Q.     Do you know why it's called the

 8   Orange Book?

 9        A.     I have no idea.

10        Q.     Orange cover, it was printed.

11               The Orange Book lists patents that

12   relate to specific FDA-approved drug products,

13   right?

14        A.     That is correct.

15        Q.     And different -- many different

16   types of patents can be listed in the Orange

17   Book, correct?

18        A.     That is correct.

19        Q.     And you're familiar with the term

20   "compound patents," correct?

21        A.     Actually, that is not the way most

22   of us talk about it.  Most of us talk about

23   composition of matter patents.  Composition of

24   matter.  But I am familiar enough that people

25   substitute the word "compound" sometimes.
```

1         L. Pullan, Ph.D. - Highly Confidential

2         Q.    Composition of matter normally

3    claims the molecular entity itself, correct?

4         A.    That is correct.

5         Q.    If I claimed a -- a salt form of a

6    molecular entity, would you consider that also

7    to be a composition of matter patent?

8              MS. SIMSON:  Objection to form.

9         Also objection to the extent asking for a

10        patent legal opinion.

11   BY MR. STOPS:

12        Q.    I'm actually just trying to get

13   terminology straight with you right now.

14             Does a salt patent fall under the

15   umbrella of composition of matter patent in

16   your -- in the way that you use the term?

17             MS. SIMSON:  Same objections.

18        A.    In the original composition of

19   matter patent, there are salts often claimed.

20   One could patent an additional salt and that

21   would not be the composition of matter patent.

22        Q.    Okay.  Okay.  I could call that a

23   salt patent?

24        A.    Yes.

25        Q.    Okay.  And I think we've just been

 1          L. Pullan, Ph.D. - Highly Confidential

 2     in a circle, but salt patents claim salt forms

 3     of active ingredients in a pharmaceutical

 4     product?

 5               MS. SIMSON:  Objection to form.

 6          A.    Correct.

 7          Q.    So for example, for -- well, let me

 8     take a step back.

 9               I think we -- I think I established

10     that Novartis sells a product called Jakavi,

11     J-A-K-A-V-I.  Incyte sells the same active

12     ingredient as Jakafi, J-A-K-A-F-I?

13               MS. SIMSON:  Objection to form.

14          Foundation.

15          A.    That is my understanding.  Yes.

16          Q.    And the active ingredient in both

17     products is the molecule ruxolitinib, correct?

18     And that's spelled R-u-x-o-l-i-t-i-n-i-b?

19               MS. SIMSON:  Believe it or not,

20          Eric, she got it right on the transcript

21          the first time.  Go Anita!

22               MR. STOPS:  Excellent.

23               THE WITNESS:  I would call it rux,

24          but just to keep things -- the molecule is

25          the same.

1          L. Pullan, Ph.D. - Highly Confidential

2    BY MR. STOPS:

3          Q.    And Jakavi and Jakafi are the same

4    formulation also, correct?

5                MS. SIMSON:  Objection to form.

6          A.    I believe that is correct.

7          Q.    So in the two products Jakavi and

8    Jakafi, ruxolitinib is in the phosphate salt

9    form, right?

10                MS. SIMSON:  Objection to form.

11          A.    I don't know.

12          Q.    Another type of patent that can be

13    listed in the -- oh, sorry.  And salt patents

14    can be listed in the FDA's Orange Book,

15    correct?

16          A.    I believe so.

17          Q.    Another type of patent that can be

18    listed in the Orange Book is a polymorph

19    patent, correct?

20                MS. SIMSON:  Objection to form.

21          Foundation.

22                MR. STOPS:  Polymorph.

23                MS. SIMSON:  Foundation as well.

24                Go ahead.

25          A.    I believe so.

1          L. Pullan, Ph.D. - Highly Confidential

2     Q.     Patents on a drug's formulation can

3   also be listed in the FDA's Orange Book,

4   correct?

5          MS. SIMSON:  Objection to form.

6     A.     I believe so.

7          MS. SIMSON:  Foundation.

8   BY MR. STOPS:

9     Q.     And a formulation is generally the

10  way the active ingredient is put into the

11  dosage for the patient, correct?

12          MS. SIMSON:  Objection to form.

13          Foundation.  Also objecting to the extent

14          asking for a --

15          MR. STOPS:  Expert opinion?

16          MS. SIMSON:  No.  A legal opinion.

17     A.     I do think that I might object to

18  your characterization because a dosage can also

19  be a patent, right, a scheduling dose, and that

20  is not the same thing as a formulation.

21     Q.     A -- the way the active ingredient

22  is put into a -- a tablet or capsule would be a

23  form -- could be a formulation patent, correct?

24          MS. SIMSON:  Objection to form.

25     A.     The -- the way it's put into a

 1        L. Pullan, Ph.D. - Highly Confidential

 2   tablet or capsule.

 3        Q.   Sure --

 4        A.   I think you're --

 5        Q.   No?

 6        A.   -- slicing --

 7        Q.   How would you define a formulation

 8   patent?

 9        A.   I would define it as the description

10   of the other ingredients that end up in the

11   dose.  The nonactive ingredients.  The

12   excipients.

13        Q.   Formulation patents can be listed in

14   the Orange Book, correct?

15        A.   I believe so.

16        Q.   And I think you just you mentioned

17   another type, dosing regime patents can also be

18   listed in the Orange Book, correct?

19        A.   Yes.

20        Q.   And there's many different types of

21   formulation patents that can be listed in the

22   Orange Book like extended release, delayed

23   release, immediate release types of

24   formulations, correct?

25             MS. SIMSON:  Objection to form.

```
1          L. Pullan, Ph.D. - Highly Confidential

2     A.    I have seen those sorts of things.

3     Q.    And methods-of-use patents can also

4  be listed in the Orange Book, correct?

5          MS. SIMSON:  Objection to form.

6     A.    I believe so, yes.

7     Q.    And an example of a method-of-use

8  patent would be a patent that claimed an

9  approved indication for a drug, correct?

10         MS. SIMSON:  Objection to form.

11         Foundation.

12    A.    That is an example, yes.

13    Q.    Short circuit this a little bit.

14         There is a lot of types of patents

15 that can be listed in the Orange Book, right?

16         MS. SIMSON:  Objection to form.

17    A.    I believe there are a lot of types

18 of patents, yes.

19    Q.    Some patents can be granted to a

20 drug company before a drug is approved by the

21 FDA, right?

22    A.    Some types of patents are granted to

23 pharmaceutical companies before FDA approval.

24    Q.    And patents can also be applied for

25 and granted after a drug is approved, correct?
```

1              L. Pullan, Ph.D. - Highly Confidential

2         A.    Normally, the companies do not want

3    the majority of patents to be sought or granted

4    after approval because they want the value of

5    those patents in excluding competition and,

6    therefore, the most important patents are

7    normally sought long before approval.

8         Q.    The patents that go out the furthest

9    are often sought and approved after a product

10   is --

11        A.    By definition --

12              MS. SIMSON:  Objection to form.

13        Vague.  And objection to the extent you're

14        asking for a legal opinion.

15        A.    The patents that are filed for last

16   certainly last the longest because there is a

17   patent life.  Therefore, your question is sort

18   of saying the most recent patents are the last

19   to expire.  Yeah.

20        Q.    My question was that -- and you're

21   getting to this point I was trying to make,

22   patents that are filed later can be the most

23   valuable patents --

24        A.    No, that is not what I said.

25        Q.    That was my question.  My question

1          L. Pullan, Ph.D. - Highly Confidential

2    is:  Patents that are filed later can be the

3    most important because they last the longest,

4    correct?

5              MS. SIMSON:  Objection to form.  And

6         objection to the extent asking for a legal

7         opinion.

8              You can answer.  Go ahead.

9    A.    I think in the industry, it is

10   generally believed that a formulation patent, a

11   alternative salt form, an extended release, all

12   those things are less important than a

13   composition of matter patent, because another

14   formulation can have essentially the same

15   characteristics.  The value of the composition

16   of matter patent is that it precludes a party

17   who is not part of the agreement, not part of

18   the licensing agreement, from being able to use

19   the same molecule, and that is much more

20   valuable, much more protection than is a -- a

21   formulation of which there may well be many

22   nearly equivalent formulations.  So the last

23   patent need not be the most valuable; generally

24   is not the most valuable.

25   Q.    The last -- the last to expire -- --

1          L. Pullan, Ph.D. - Highly Confidential

2     A.    Is not the most valuable.

3     Q.    -- can be the most valuable?

4          MS. SIMSON:  Objection to form.

5     A.    Generally --

6          MS. SIMSON:  Vague.

7     A.    Is generally not the most valuable.

8     Q.    That's not my question.

9          My question was:  Patents that are

10    filed later can be the most valuable because

11    they last the longest, correct?

12         MS. SIMSON:  Objection to form.

13    A.    It is conceivable.

14    Q.    I think in -- what you were saying

15    is that there are sometimes infringement issues

16    with patents other than composition of matters

17    patents, correct?

18         MS. SIMSON:  Objection to form.

19    Mischaracterizes testimony.

20    A.    I think I would leave the

21    definitions of infringement to other people.

22    Q.    Okay.  Then how about a different

23    way.  Regardless of the type of patent, the

24    last-to-expire patent that precludes generic

25    competition is the most valuable, right?

1          L. Pullan, Ph.D. - Highly Confidential

2                MS. SIMSON:  Objection to form.

3          Objection to the extent you're asking for a

4          legal opinion.

5          A.    I do think we're getting into some

6     pretty narrow and specific things.  I can

7     imagine circumstances where the barrier to that

8     generic entry is weak, and therefore the last

9     patent is not the most valuable.

10         Q.    I'm positing that the patent

11    prevents generic competition.  So I might --

12    the basis of my question is that in the

13    hypothetical, the patent prevents generic

14    competition.  So my question was simply:  The

15    last-to-expire patent that protects the product

16    from generic competition is always the most

17    valuable, correct?

18                MS. SIMSON:  Objection to form.

19         Incomplete hypothetical.

20         A.    It is indeed a hypothetical.  I

21    would argue it is generally not the case that

22    the last patent is the most valuable patent.

23    Your hypothetical is not generally the case.

24    So I'm telling you, in general, the truth is,

25    the industry perspective is, that the last

1      L. Pullan, Ph.D. - Highly Confidential

2   patent is not generally a good barrier to

3   competition.

4      Q.     Okay.

5      A.     And therefore is not the most

6   valuable.  And companies work very, very hard

7   to establish a strong position prior to

8   approval and -- and so it depends.

9      Q.     No.  I think my question is very

10  simple regardless of what type of patent it is.

11  The last-to-expire patent that prevents generic

12  competition is necessarily the most valuable,

13  right?

14         MS. SIMSON:  Objection to form.

15      Asked and answered.

16      A.     If -- if it prevents generic

17  competition effectively, it is valuable.

18      Q.     And for many drugs, composition of

19  matter patents expire before the drug is

20  commercially viable, correct?

21         MS. SIMSON:  Objection to form.

22      A.     I don't know how many.  I would

23  argue that is probably not correct, but I don't

24  have statistics at hand.  I don't have

25  statistics at hand and I don't think that

1          L. Pullan, Ph.D. - Highly Confidential

2    makes -- I don't think that is consistent with

3    the facts, but I don't have the data to rebut.

4          Q.    Okay.  A lot of marketed molecules

5    are old, right?

6               MS. SIMSON:  Objection to form.

7          Vague.

8          A.    A lot of marketed molecules are old.

9          Q.    Old molecules won't have composition

10   of matter patents, right?

11              MS. SIMSON:  Objection to form.

12         A.    Old molecules without composition of

13   matter patents often are cheap.

14         Q.    Sorry.  Let's go with

15   nongenericized.  There's a lot of

16   nongenericized old molecules on the market,

17   correct?

18              MS. SIMSON:  Objection to form.

19         A.    What's old?

20         Q.    Let's make it over 20 years?

21              MS. SIMSON:  Same objection.  Also

22         vague.

23         A.    There aren't that many.  Certainly

24   not with substantial sales.  There are a few.

25         Q.    I gave an example, an example with

1      L. Pullan, Ph.D. - Highly Confidential

2  pomalidomide.

3      A.    I don't remember which pomalidomide

4  is.  It's a familiar word but I don't know that

5  one.

6      Q.    Invented in the '60s.

7      A.    That's certainly not the normal

8  pattern.  The average life cycle of a drug is

9  up for about five years and then rolling over

10  and declining and much, much smaller.  There

11  are exceptions.

12      Q.    So normally -- in your opinion, drug

13  companies would not pursue approval of a drug

14  without a composition of matter patent?

15          MS. SIMSON:  Objection to form.

16      A.    Companies pursue a drug before

17  composition of matter patents are granted.

18  Many deals are done before composition of

19  matter patents are granted.

20      Q.    Actually, I was asking the other

21  way.  If a -- if a composition of matter patent

22  had expired already.  So for a drug where a

23  composition of matter patent had already

24  expired, drug companies would not pursue

25  approval of such a drug, correct?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3     A.    It depends.

4     Q.    Why would drug companies pursue

5     approval of a drug, in your opinion, when the

6     composition of matter patent has already

7     expired?

8               MS. SIMSON:  Objection to form.

9          Incomplete hypothetical.

10    A.    Speculating, one can imagine a case

11    where a molecule whose composition of matter IP

12    has expired has -- pretty doggone rare, but it

13    has a single source of manufacturing a

14    single -- a highly difficult -- Taxol comes to

15    mind.  Taxol is an old generic molecule whose

16    protection was based on its extremely difficult

17    production.  That's an extremely rare example.

18    Q.    Taxol is albumen-based production?

19              MS. SIMSON:  Objection.

20    A.    No, not albumen.  Taxol before

21    albumen was part -- you're thinking --

22    Q.    Abraxane?

23    A.    Abraxane, right.

24              And now Taxol, the original and

25    Abraxane, do not have effective barriers to

1          L. Pullan, Ph.D. - Highly Confidential

2     competition by manufacturing, because people

3     have figured out alternative methods of

4     manufacturing.

5               So there was a period of time when

6     Taxol had effective protection due to its

7     manufacturing patents.  That disappeared and

8     that is the criticism of protection by

9     manufacturing patents, similar to the criticism

10    of where there is one formulation, there is

11    another formulation.  The one thing that is not

12    readily substitutable is the composition of

13    matter.

14         Q.    Are you sure about that for

15    Abraxane?

16               MS. SIMSON:  Objection to form.

17         A.    Sure about what?

18         Q.    That it's now easy to manufacture?

19         A.    Compared -- compared -- I will not

20    assert I know everything about Abraxane's

21    manufacturing.  Compared to its historic past,

22    I will assert it is much easier to manufacture.

23    I'm not asserting that Abraxane is a cinch to

24    manufacture.  I -- I don't have that knowledge.

25         Q.    How about methods of use patent?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3     Vague.  With respect to what?

4          A.    Yes, what would you like to know

5     about methods to use patent?

6          Q.    Are those effective against

7     preventing competition in your mind?

8               MS. SIMSON:  Objection to form.

9          A.    Generally not.

10         Q.    How about a dosing regime patents?

11              MS. SIMSON:  Same objection.

12         A.    Generally not.  There can be

13    exceptions, but generally not, for the same

14    sorts of arguments as for formulation patents.

15    Where there is one dose and schedule, somebody

16    can figure out another dose and schedule,

17    generally.

18         Q.    Now, you say generally for all these

19    statements.

20              Do you agree that all of these types

21    of patents other than composition of matter

22    patents can be extremely valuable, correct?

23              MS. SIMSON:  Objection to form.

24         A.    In certain circumstances other types

25    of patents can be valuable.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    And all the types of patents listed

3    in the Orange Book can prevent generic

4    competition?

5          A.    In certain --

6                MS. SIMSON:  Objection to form.

7          A.    In certain circumstances.  Not all

8    circumstances.

9          Q.    Even after a composition of matter

10   patent issues, parties involved in the

11   development have incentives to obtain

12   additional patents because they can, under

13   certain circumstances, provide value, correct?

14               MS. SIMSON:  Objection to form.

15         A.    Broadly speaking, yes, parties seek

16   additional patents in hopes they provide value.

17   But a patent can only be obtained when there is

18   something novel, original, not anticipated by

19   those skilled in the art, nonobvious.

20         Q.    Patentable subject matter often

21   comes out of development of a pharmaceutical

22   product, correct?

23               MS. SIMSON:  Objection to form.

24         A.    Research and development.

25         Q.    Okay.  Patentable subject matter

1        L. Pullan, Ph.D. - Highly Confidential

2   often comes out of the research and development

3   of a pharmaceutical product, correct?

4           MS. SIMSON:  Objection to form.

5        Asked and answered.

6        A.    I believe so.

7        Q.    And Incyte did obtain additional

8   patents after the agreement was executed,

9   correct?

10          MS. SIMSON:  Objection to form.

11       Vague.

12       A.    I believe they did obtain additional

13  patents.

14       Q.    And you agree that Novartis could

15  have obtained an additional patent to cover

16  Jakafi in the United States, correct?

17          MS. SIMSON:  Objection to form.

18       A.    I do not know.  I don't -- I did not

19  investigate what additional patentable subject

20  matter was novel and nonobvious and available

21  to Novartis.

22       Q.    So you do not agree that Novartis

23  could have obtained additional patents covering

24  Jakafi in the United States?

25          MS. SIMSON:  Objection to form.

1          L. Pullan, Ph.D. - Highly Confidential

2          Mischaracterizes testimony and her

3          opinions.

4          A.    I said I do not know if they could

5    have.

6          Q.    In your rebuttal expert report, you

7    stated, "It is true that Novartis could have

8    obtained an additional patent covering Jakafi

9    in the United States."

10          MS. SIMSON:  Objection to form.

11          Also does not repeat -- or does not cover

12          the entirety of the sentence in -- in that

13          report, and I also object to the extent it

14          takes that sentence out of context.

15          A.    Can you point me to the specific

16    page, please?

17          Q.    Page 13, second paragraph.  Rebuttal

18    report.  I'm sorry.

19          A.    Yeah.

20          Q.    And my question was just:  You agree

21    that it is true that Novartis could have

22    obtained an additional patent covering Jakafi

23    in the United States, correct?

24          A.    Perhaps.

25          MS. SIMSON:  I'm going to object to

1        L. Pullan, Ph.D. - Highly Confidential

2        the extent -- sorry, I'm going to object

3        because it omits the seconds half of the

4        statement in the sentence.

5              MR. STOPS: My question is -- I'll

6        withdraw the question.

7  BY MR. STOPS:

8        Q.    My question is just:  You agree that

9  it is true that Novartis could have obtained an

10 additional patent covering Jakafi in the United

11 States, correct?

12             MS. SIMSON:  Objection to form.

13       A.    I am not making a judgment that it

14 was possible for them to obtain a patent.

15 That's might have.  It is plausible, but I did

16 not make a judgment as to whether there was

17 patentable subject matter available to

18 Novartis.

19       Q.    Understood.

20       A.    And, indeed, it did not need to in

21 order to get paid the reverse royalties.

22       Q.    Novartis did not obtain any

23 additional patents covering Jakafi in the

24 United States, correct?

25             MS. SIMSON:  Objection to the form.

1      L. Pullan, Ph.D. - Highly Confidential

2      Object to the extent cover -- asks for a

3      legal opinion.

4      A.    I believe that is correct.

5      Q.    And Incyte did -- did subsequently

6  develop additional patent protection on an

7  extended release formulation of ruxolitinib,

8  correct?

9            MS. SIMSON:  Objection to form.

10     A.    I don't really know.

11     Q.    Novartis could have obtained a

12 patent protection on an extended release

13 formulation of ruxolitinib?

14           MS. SIMSON:  Objection to form.

15     A.    Again, I cannot judge what

16 patentable information was available to

17 Novartis, what was unobvious, and -- and I

18 cannot assert that it was patentable material

19 for Novartis.

20     Q.    Sure.  If Incyte could have obtained

21 a patent covering extended release formulation

22 of ruxolitinib, Novartis could have too, right?

23           MS. SIMSON:  Objection to form.

24     A.    I don't necessarily think that's

25 true.  After all, you have to be the inventors.

1        L. Pullan, Ph.D. - Highly Confidential

2   So if Incyte invented it, then Novartis

3   couldn't obtain the patent.

4        Q.    Ah, I was addressing your question

5   of whether such type of patentable subject

6   matter could exist, not the inventorship.

7             MS. SIMSON:  Objection.  That's not

8        what you asked.

9   BY MR. STOPS:

10       Q.    So my question was just:  If there

11  was patentable subject matter on an extended

12  release formulation of ruxolitinib, Novartis

13  could have obtained such a patent, correct?

14            MS. SIMSON:  Objection to form.

15       Calls for speculation.

16       A.    It's an extremely hypothetical

17  situation.  And I think it's reaching.

18       Q.    Incyte --

19       A.    It's not my judgment as to what is

20  patentable by whom.

21       Q.    Well, Incyte subsequently obtained

22  additional patent protection claiming a new

23  method of manufacturing ruxolitinib, correct?

24            MS. SIMSON:  Objection to form.

25       Foundation.

1      L. Pullan, Ph.D. - Highly Confidential

2      A.    I did not study what the patents

3  they obtained were for.

4      Q.    Isn't it relevant to your opinion on

5  whether Novartis could have obtained additional

6  patent protection?

7           MS. SIMSON:  Objection to form.

8      Argumentative.

9      A.    I was not making a judgment about

10  the feasibility of Novartis obtaining a patent.

11      Q.    Okay.  You're not offering any

12  opinion on the feasibility of Novartis

13  obtaining additional patent protection on

14  Jakafi in the United States, correct?

15           MS. SIMSON:  Objection to form.

16      A.    Yes, that is correct.

17      Q.    After Jakafi was first approved,

18  Incyte obtained a patent claiming the use of

19  Jakafi to treat GVHD, correct?

20           MS. SIMSON:  Objection to form.

21      Foundation.

22      A.    I don't know when they obtained

23  patents on GVHD.

24      Q.    GVHD is graft versus host disease,

25  correct?

1          L. Pullan, Ph.D. - Highly Confidential

2      A.      That is the definition of GVHD, yes.

3      Q.      Novartis could have obtained

4   additional United States patents claiming new

5   uses of Jakafi, correct?

6          MS. SIMSON:  Objection to form.

7      A.      Same argument.  I am not making a

8   judgment of what was feasible to patent.

9      Q.      Companies developing pharmaceutical

10  products often apply for and receive patents

11  after drugs are approved, correct?

12         MS. SIMSON:  Objection to form.

13     A.      I think we previously discussed that

14  they often received them before and sometimes

15  they receive them afterwards.

16     Q.      And any patents that Novartis did

17  obtain that claim that -- sorry.

18         Any patents that Novartis did obtain

19  that have claims relating to Jakafi in the

20  United States would be licensed to Incyte under

21  the 2009 agreement, correct?

22         MS. SIMSON:  Objection.  I'm going

23         to object to form, just because of the

24         vagueness and breadth of the question.

25     A.      There were --

1        L. Pullan, Ph.D. - Highly Confidential

2              MS. SIMSON:  Withdrawn.  I'm just

3        going to say that I think there might be a

4        word or two missing on the transcript from

5        the court reporter.  So I don't know, Eric,

6        if you want to ask the question again,

7        maybe I won't have an objection.

8        A.    Could you repeat the question?  I'm

9   sorry, it sort of floated away.

10  BY MR. STOPS:

11       Q.    Absolutely.  Any patents that

12  Novartis did obtain that have claims relating

13  to Jakafi in the United States would be

14  licensed to Incyte under the 2009 agreement,

15  correct?

16             MS. SIMSON:  Objection to form, and

17       to the extent you're asking for a legal

18       opinion.

19       A.    But I believe the agreement does

20  have cross licensing in the partnership, but

21  there is an IP committee that would have made a

22  decision as to whether Novartis could indeed

23  file those claims.

24       Q.    That's not my question.  So I think

25  your answer is yes.  I'm just --

1    L. Pullan, Ph.D. - Highly Confidential

2         MS. SIMSON:  Objection.

3  BY MR. STOPS:

4    Q.    I'm happy to ask it again.  I'm not

5  sure I got a yes or a no out of that answer.

6    A.    You did not get a yes or a no.  You

7  got an answer.

8    Q.    Well, the question I don't -- is

9  pretty straightforward.  If Novartis obtained a

10 patent with claims relating to Jakafi in the

11 United States, that patent would be licensed to

12 Incyte under the 2009 agreement, correct?

13   A.    I believe that is correct.

14   Q.    If Novartis had obtained patents on

15 ruxolitinib outside of the United States, those

16 patents would have benefitted Novartis,

17 correct?

18        MS. SIMSON:  Objection to form.

19   A.    It depends on -- on what they

20 claimed, how strong they were.  They might have

21 benefitted Novartis.

22   Q.    Sure.  You'd agree that if Novartis

23 obtained that patent protection outside the

24 United States on ruxolitinib, those patents

25 potentially would have benefitted Novartis,

1      L. Pullan, Ph.D. - Highly Confidential

2  correct?

3      A.    And would --

4            MS. SIMSON:  Objection to form.

5      A.    And would have benefitted Incyte by

6  virtue of the royalties paid on sales.

7      Q.    Patents are good for everyone,

8  right?

9            MS. SIMSON:  Objection to form.

10     A.    Broadly speaking, patents are good.

11     Q.    You would agree that regardless of

12 which party's interpretation of Section 8.3(c)

13 of the 2009 agreement is correct, both parties

14 are still incentivized to obtain additional

15 patent protection, correct?

16           MS. SIMSON:  Objection to form.  And

17      calls for speculation.

18     A.    It is -- it is a hypothetical.  I

19 think both parties want to protect the product

20 and both parties benefit from both parties'

21 sales and success.

22     Q.    And regardless of which

23 interpretation of Section 8.3(c) is correct,

24 both parties are incentivized to obtain

25 additional patents, if possible, correct?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3      A.     Regardless --

4               MS. SIMSON:  Calls for speculation.

5      A.     Regardless of the agreement in most

6   particulars, both parties want the products to

7   be protected.

8      Q.     So even leaving the agreement aside,

9   both parties are incentivized to obtain

10  additional patents, correct?

11              MS. SIMSON:  Objection to form.

12      Mischaracterizes the testimony.

13      A.     I think I have answered that.

14  Pharmaceutical industry likes patents.

15      Q.     So both parties would be

16  incentivized to obtain additional patents,

17  correct?

18              MS. SIMSON:  Objection to form.

19      Mischaracterizes testimony.  Asked and

20      answered multiple times.

21      A.     I think I've answered that.

22      Q.     And the answer is yes, correct?

23              MS. SIMSON:  Objection to form.

24      A.     The answer is what I answered.

25      Q.     Both parties are incentivized to

1      L. Pullan, Ph.D. - Highly Confidential

2    obtain additional patents, correct?

3           MS. SIMSON:  Objection to form.

4       Asked and answered.  You're now badgering

5       the witness.

6       A.    I think I have answered the

7    question.

8       Q.    What was your answer?

9           MS. SIMSON:  She's already given an

10      answer multiple times, Counsel.

11          MR. STOPS:  If I want to spend my

12      time asking the question again, I can.

13          THE WITNESS:  Okay.

14          MS. SIMSON:  I will give the same

15      objection every time, which is asked and

16      answered.  And she will say she has

17      answered the question.

18   BY MR. STOPS:

19      Q.    Both parties are --

20          MR. STOPS:  You're instructing the

21   witness on how to answer.  That's completely

22   improper.

23          MS. SIMSON:  I have not instructed

24      her not to answer the question.

25          MR. STOPS:  You just instructed her

1          L. Pullan, Ph.D. - Highly Confidential

2          how to answer.  That's improper.

3                  MS. SIMSON:  I have not instructed

4          her how to answer.  You can go ahead and

5          ask your question, Counsel.

6                  MR. STOPS:  And she will say -- you

7          told her exactly what she said --

8                  MS. SIMSON:  She just said she that

9          answered the question, Counsel.

10   BY MR. STOPS:

11        Q.    Both parties to the 2009 agreement

12   are incentivized to obtain additional patent

13   protection, if possible, correct?

14                MS. SIMSON:  Objection to form.

15          Asked and answered.

16        A.    I believe I have indeed answered

17   this the way I wanted to answer it previously.

18        Q.    Please.

19        A.    I did.

20        Q.    And what's your answer?

21        A.    We can read it back if you like.

22        Q.    I'm asking you to answer it.

23                MS. SIMSON:  Counsel, she's already

24          answered the question.  Now you're

25          badgering her.

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    I said the pharmaceutical industry

3    likes patents.  Everybody benefits from the

4    sales and success of the drug.

5        Q.    You're aware that Novartis did file

6    several United States patent applications

7    concerning ruxolitinib, correct?

8            MS. SIMSON:  Objection to form and

9        foundation.

10       A.    I'm not sure I am aware of that.

11       Q.    Would that be relevant to your

12   opinions?

13           MS. SIMSON:  Objection to form.

14       A.    Broadly speaking; not particularly.

15       Q.    Why did you qualify that with

16   broadly speaking?

17       A.    Because your question is so broad

18   that I don't know what it's driving at.

19       Q.    I'm just -- if Novartis had obtained

20   several United States patent applications

21   concerning ruxolitinib, would that be relevant

22   to your opinions in this matter?

23           MS. SIMSON:  Objection to form.

24       A.    My opinion in this matter is that

25   Novartis did not need to obtain patents, and

1          L. Pullan, Ph.D. - Highly Confidential

2     therefore that opinion does not change.

3          Q.     Okay.  Are you aware that Novartis

4     has at least six currently pending applications

5     before the United States Patent and Trademark

6     Office that concern ruxolitinib?

7               MS. SIMSON:  Objection to form and

8          foundation.

9          A.     I am not aware of the specifics.

10         Q.     Novartis did not view obtaining

11    patents concerning ruxolitinib as a practical

12    impossibility, did it?

13              MS. SIMSON:

14         A.     As a what?

15              MS. SIMSON:  Objection to form.

16         Q.     Practical improbability.

17              MS. SIMSON:  Objection to form.

18         A.     I have no idea what Novartis thought

19    about patentability of rux.

20         Q.     Where royalties are paid in

21    pharmaceutical licensing contracts, generally

22    they are paid by the licensee to the licensor

23    as compensation for being granted the right to

24    sell -- sorry, granted the right to use the IP,

25    correct?

1          L. Pullan, Ph.D. - Highly Confidential

2                 MS. SIMSON:  Objection to form.

3          A.    No.  Patent -- royalties are paid

4     for many different things.  Patents are but one

5     factor.  Royalties are paid for contributions,

6     just as are other deal terms.  Money in a deal

7     flows for contribution, pays for contributions.

8     Those contributions can be many different

9     forms.

10         Q.    I was reading from expert report.

11         A.    Show me where you were reading from

12    my expert report.

13         Q.    Opening report, Page 11.  Second

14    full paragraph, second sentence.

15         A.    The --

16         Q.    Could you read the sentence, your

17    second sentence of your -- of that paragraph

18    into the record, please?

19         A.    "Where royalties are paid in

20    pharmaceutical licensing contracts, generally

21    they are paid by the licensee to the licensor

22    as compensation for being granted the right to

23    use the IP."

24         Q.    Thank you.

25         A.    Generally, but not always.

1      L. Pullan, Ph.D. - Highly Confidential

2      Q.    Okay.  Thank you.

3      A.    They are also paid for other

4   contributions.  As are all financial terms in a

5   deal.

6           (Pullan Exhibit 1004, July 9, 2009,

7      Term Sheet, marked for identification.)

8   BY MR. STOPS:

9      Q.    I'm handing you a document marked as

10  Pullan Exhibit 1004.

11          MS. SIMSON:  Dr. Pullan -- well,

12      actually, maybe this is a question for you,

13      Eric.  How long do you plan to go on this

14      because we've been going over an hour?

15          MR. STOPS:  At the witness's --

16      convenience.

17          THE WITNESS:  It would be lovely to

18      take a break.  Thank you.

19          MR. MACH:  Is this going to be lunch

20      break?

21          MS. SIMSON:  No, just a short break.

22      Mean, we can take the lunch break, but I

23      don't think we have to.

24          MR. STOPS:  Again, your discretion,

25      Doctor.

1          L. Pullan, Ph.D. - Highly Confidential

2               THE WITNESS:  I'm not hungry yet,

3          but I could use a --

4               MS. SIMSON:  Why don't we take a

5          ten-minute break and come back.

6               THE VIDEOGRAPHER:  We are going off

7          the record.  The time is 11:57 a.m.

8               (Recess.)

9               THE VIDEOGRAPHER:  We are back on

10         the record.  The time is 12:15 p.m.

11    BY MR. STOPS:

12         Q.    Okay.  Dr. Pullan, I handed you,

13    right before the break, Pullan Exhibit 1004,

14    correct?

15         A.    Yes.

16         Q.    And do you recognize Exhibit 1004?

17         A.    Yes.

18         Q.    It is a July 9, 2009, term sheet,

19    correct?

20         A.    Correct.

21         Q.    And it's okay if I call this the

22    July 9 term sheet, right?

23         A.    Yes.

24               MS. SIMSON:  I'm just going to note

25         for the record since there's no cover email

1          L. Pullan, Ph.D. - Highly Confidential

2          associated with this, it's not clear what

3          the date of this particular document is.

4          It says it at the top, but I'm not sure

5          what version this is.

6                    THE WITNESS:  Nor am I.

7                    MS. SIMSON:  Usually the version

8          circulated between the parties, Mr. Stops,

9          had a covering on them, like a red line and

10         a final.  So I just wanted to note that.

11                   MR. STOPS:  Okay.  My understanding

12         is this is the only July 9, so I'm not

13         intending to do any games with this

14         document.  So let's proceed on this one.

15    BY MR. STOPS:

16         Q.    On the -- and you have seen the

17    July 9 term sheet?

18         A.    I have seen the July 9 term sheet.

19    I don't have in mind the -- the status of this

20    relative to other term sheets, but...

21         Q.    And my understanding is this is the

22    last term sheet.

23                   MS. SIMSON:  I have no objection to

24         Mr. Stops' characterization of the last

25         term sheet being exchanged between the

1          L. Pullan, Ph.D. - Highly Confidential

2          parties dated July 9.  I just don't know

3          about this particular document, if it's in

4          its completed form of the document family.

5          That's my only objection.

6                    MR. STOPS:  Okay.

7    BY MR. STOPS:

8          Q.    On the first page of the July 9 term

9    sheet, you see a definition for license IP.

10         A.    Yes, I do see that.

11         Q.    And the term sheet definition of

12   license IP mentions Incyte in the first

13   sentence -- the first line of the definition.

14                   Do you see that?

15         A.    I'm sorry.

16         Q.    In the definition of license IP in

17   the July 9 term sheet, do you see the mention

18   of Incyte in the first line?

19         A.    Yes.

20         Q.    The July 9 term sheet definition of

21   licensed IP does not use the word Novartis,

22   correct?

23                   MS. SIMSON:  Objection to form.

24         A.    It has as the second part of that

25   definition:  Or that is acquired or developed

1           L. Pullan, Ph.D. - Highly Confidential

2      during the term.

3           Q.    We're going to get to that in one

4      second.  I just wanted to -- just -- just to

5      establish, it doesn't explicitly say the word

6      Novartis in that definition, correct?

7           A.    But that second phrase could indeed

8      imply Novartis.

9           Q.    So the -- you agree there is no

10     explicit mention of Novartis in the definition

11     of a licensed IP, correct?

12               (Multiple speakers.)

13               MS. SIMSON:  Objection to form.

14          A.    The word Novartis does not appear.

15          Q.    Your position is that the second

16     clause of the definition encompasses Novartis,

17     correct?

18               MS. SIMSON:  Objection to form, only

19          in that it's unclear which definition

20          you're referencing.

21               MR. STOPS:  Sure.  I'll clarify.

22     BY MR. STOPS:

23          Q.    Your position is that the second

24     clause of the licensed IP definition

25     encompasses Novartis, correct?

1          L. Pullan, Ph.D. - Highly Confidential

2      A.      Novartis could acquire or develop or

3  Incyte could acquire or develop additional

4  patents and that would be encompassed in the

5  definition of licensed IP.

6      Q.      Okay.  If the parties had wanted to

7  explicitly include Novartis, they would have

8  done that, right?

9          MS. SIMSON:  Objection to form.

10     Calls for speculation.

11     A.      At the time when this term sheet was

12 agreed upon, Novartis had no IP that covered

13 rux and such -- as such, there was no need to

14 include Novartis in the first phrase, and both

15 parties are included in the second phrase.  So

16 they didn't need to make explicit the word

17 Novartis in the first phrase because it would

18 make no sense.

19     Q.      Novartis didn't have any patents

20 when the deal was signed on November 24, 2009,

21 either, right?

22         MS. SIMSON:  Objection to form.

23     Vague.

24     A.      Any patents on rux.  There were

25 patents that were relevant to the agreement.

1        L. Pullan, Ph.D. - Highly Confidential

2                MS. SIMSON:  You said any patents --

3        A.    Period.

4                MS. SIMSON:  -- period.

5        A.    There certainly were Novartis

6    patents that were relevant to this agreement.

7    Novartis had its own JAK inhibitor, etc.

8        Q.    Did Novartis have its own JAK

9    inhibitor when this term sheet was signed?

10               MS. SIMSON:  Objection to form.

11       A.    I don't know.

12       Q.    So did it have any relevant

13   patents --

14       A.    Not --

15       Q.    -- to the term sheet when the July 9

16   term sheet was exchanged?

17               MS. SIMSON:  Objection to form.

18   BY MR. STOPS:

19       Q.    Maybe I said that wrong.  Give me

20   one second.

21               On July 9, 2009, did Novartis have

22   any relevant patents?

23               MS. SIMSON:  Objection to form.

24       A.    Relevant to what?

25       Q.    Relevant to the potential agreement

1        L. Pullan, Ph.D. - Highly Confidential

2    between the parties?

3             MS. SIMSON:  Objection.

4        A.    Perhaps.  I don't know.

5        Q.    Then why weren't they included?

6        A.    They were.

7        Q.    No, they weren't.  You just told me

8    they weren't.

9        A.    Not included on the first phrase.

10       Q.    Right.  Why weren't they included

11   there?

12       A.    I assume it is because it was judged

13   they did not have, at the time, the patent

14   controlled.

15       Q.    So then why was it on the final

16   agreement on November 24, 2009?

17            MS. SIMSON:  Objection to form.

18       Foundation.

19       A.    I would like to see exactly how it

20   is included, because I think that's the

21   specifics.  I think that in this collaboration,

22   both parties could have, might have obtained

23   patents that were relevant, and therefore

24   licensed patents became a definition that

25   encompassed both parties.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.     Right.  We're talking first about

3    what patents existed at the time, right, that's

4    the first clause, right?

5          A.     Right.

6          Q.     Now, your position is that Novartis

7    did not have any relevant patents --

8          A.     I am not asserting that.

9          Q.     Sorry.

10         A.     I don't know with specificity that

11   that is a correct statement.  And this is a

12   multi-part agreement.

13         Q.     I believe --

14         A.     Actually, July 9, if I remember

15   right, this doesn't -- correct me if I'm wrong,

16   but when did Novartis bring in the additional

17   JAK molecules?

18         Q.     I'm just asking, and you said --

19         A.     And I'm asking whether this term

20   sheet encompasses the additional JAK molecules.

21   Any compounds currently being developed by

22   Novartis or its affiliates as a JAK inhibitor.

23         Q.     So I guess, let me ask -- see if

24   you've answered your own question here.

25                Are you asking whether a potential

1      L. Pullan, Ph.D. - Highly Confidential

2   Novartis JAK molecule was contemplated under

3   the July 9 term sheet?

4      A.    I was asking that question.

5      Q.    And what's the answer to that

6   question?

7      A.    It does imply that Novartis

8   encompassed any compounds currently being

9   developed by Novartis or its affiliates.

10      Q.    So Novartis -- under your logic,

11   current Novartis patents should have been

12   included in licensed IP, correct?

13            MS. SIMSON:  Objection to form.

14   And --

15      A.    This does say "know-how" in licensed

16   IP definition.

17      Q.    So under your logic, if your -- if

18   your reasoning was correct, Novartis patents

19   and know-how, current patents and know-how,

20   should have also been included in the licensed

21   IP definition in the July 9 term sheet,

22   correct?

23            MS. SIMSON:  Objection to form.

24   Also mischaracterizes her testimony.

25      A.    There are licensed grants that we

1        L. Pullan, Ph.D. - Highly Confidential

2   should look at to see that they were indeed

3   licenses.  Let's go back to licensed IP.

4        So a term sheet is necessarily

5   incomplete and this does not seem to discuss

6   the license, for instance, to do research and

7   development.  It's only -- the license is

8   defined as:  Incyte shall grant to Novartis for

9   collaborative research and development.  It

10  does not have, which the final agreement does,

11  that Novartis grants to Incyte the right to do

12  activities, indeed to do activities in each

13  other's territories with the exception of

14  selling.

15       Q.   So you're saying there are

16  substantial changes from the term sheet to the

17  final agreement, right?

18            MS. SIMSON:  That mischaracterizes

19       her testimony.  So I'll object on that

20       basis.

21       A.   I'm -- I am saying there are

22  changes.  I think the parties understood that

23  there would be additional language that would

24  be the frame.  There are, in this agreement,

25  the discussion of -- of some of the who does

1      L. Pullan, Ph.D. - Highly Confidential

2   what, Incyte to develop responsibilities,

3   Novartis development responsibilities, that

4   imply a license to do those activities.

5      Q.   I think we are getting far afield

6   from the question that I had -- I had asked.

7           It was simply:  The first sentence

8   of licensed IP does not include any existing

9   patent or know-how owned or controlled by

10  Novartis, correct?

11     A.   The word Novartis --

12          MS. SIMSON:  Objection to form.

13     A.   -- does not appear in the first half

14  of the sentence.

15     Q.   And you don't -- you are not taking

16  the position that it should be read into it,

17  correct?

18          MS. SIMSON:  Objection to form.

19     A.   I am not taking a position on

20  putting words that aren't there in, but I am

21  believing that the parties intended, and the

22  parties went on and put Novartis IP in

23  positions in the final agreement.  IP,

24  including know-how and patents.

25     Q.   So just focusing on the first half

1          L. Pullan, Ph.D. - Highly Confidential

2     of the sentence in licensed IP concerning the

3     currently existing patents and know-how, so

4     leaving aside the second clause that deals with

5     later developed or acquired.  Okay?  Are you

6     with me so far?

7               MS. SIMSON:  Objection to form.

8          Q.    You agree that the first portion of

9     the sentence neither explicitly mentions

10    Novartis nor should be read to include Novartis

11    patents or know-how, correct?

12              MS. SIMSON:  Objection to form and

13              objection to the -- to the extent it's

14              asking for a legal conclusion or opinion.

15         A.    And the ultimate decider of what the

16    parties agreed is the execution copy, not the

17    term sheet.

18         Q.    No.  I'm not asking to interpret the

19    execution agreement right now.  I'm just trying

20    to understand what you consider to be within

21    the scope of the first clause of the sentence

22    of the licensed IP definition in the July 9

23    term sheet.

24              So my question is:  Do you agree

25    that the first portion of the licensed IP

1          L. Pullan, Ph.D. - Highly Confidential

2     definition, in the July 9 term sheet,

3     concerning the currently existing patents and

4     know-how, does not explicitly nor implicitly

5     encompass Novartis patents and know-how?

6               MS. SIMSON:  Objection to form.

7          A.    The precise sentence here does not

8     include Novartis.  The agreement implies that

9     Novartis is indeed granting rights to Incyte as

10    Incyte is granting rights, in that they are

11    both granting each other roles and

12    responsibilities in co-development.

13         Q.    You were talking about the 2009

14    final agreement --

15         A.    No, right here.

16         Q.    Oh, I'm sorry.  Then please show me.

17    I didn't understand that.

18         A.    I'm saying that each party says they

19    have development roles and responsibilities.

20    And Novartis development responsibilities

21    Incyte, Novartis responsibilities, implicit in

22    that structure, is that they must have the

23    right to do those things with the molecule.

24         Q.    So that's in the license grant?

25         A.    No, it's in--

1       L. Pullan, Ph.D. - Highly Confidential

2       Q.    Let's look at the license grant,

3    which explicitly --  so license grant -- 'hold

4    on.  I'll withdraw that.

5            MS. SIMSON:  Actually, Mr. Stops,

6        Mr. Stops, you cut off the witness.  She

7        was not done with her answer.  And you cut

8        her off.  Please let her finish her answer.

9        She said, "No, it's," and then you cut her

10       off.

11           MR. STOPS:  Oh, I withdrew that

12       question.   That was the --

13           MS. SIMSON:  You didn't withdraw the

14       question at the time.

15   BY MR. STOPS:

16       Q.    Actually, I'm going to clarify.  You

17   can make that same answer.  I just want to make

18   sure my question was more specific.

19           So the licenses granted or proposed

20   to be granted under the July 9 term sheet are

21   set forth on Page 2 of the July 9 term sheet

22   under the word "license," correct?

23       A.    That is a proposed license.

24       Q.    And the license here is a license

25   from Incyte to Novartis, correct?

1          L. Pullan, Ph.D. - Highly Confidential

2          A.     Yes, but implicit in the development

3    roles is that there are licenses flowing in

4    both directions permitting the parties to do

5    their collaboration in their respective

6    territories.

7          Q.     Okay.  So there is an invisible

8    license grant that I'm not seeing here?

9               MS. SIMSON:  Objection to form.

10          Mischaracterizes her testimony, and

11          argumentative.

12          A.     The parties go on to make that

13   license grant explicit in the final agreement.

14          Q.     So the final agreement is changed to

15   have a licensed grant from Novartis to Incyte;

16   is that right?

17               MS. SIMSON:  Objection to form.

18          Mischaracterizes testimony.

19          A.     The license agreement is definitely

20   fatter than the term sheet.  There is a lot of

21   stuff in here that is not in here, right?

22          Q.     Okay.  So let's just work on

23   licensed IP for a minute.  We'll progress

24   through this.  The second clause -- sorry, so

25   just -- just so we're clear on the first

1        L. Pullan, Ph.D. - Highly Confidential

2    clause.

3            The first clause is:  "Any patent or

4    proprietary know-how owned or controlled by

5    Incyte as of the effective date," right?

6        A.    That is what it says.

7        Q.    And is it your position that the

8    licensed IP definition in the July 9 term sheet

9    also includes any patent or proprietary

10   know-how owned or controlled by Novartis or its

11   affiliates as of the effective date?

12           MS. SIMSON:  Objection to form.

13       Also object to the extent you're asking for

14       a legal conclusion or opinion.

15       A.    I am not implying the words say that

16   Novartis is granting a license.  They don't say

17   that --

18       Q.    Okay.

19       A.    -- in the first half.  I am saying

20   that in practical terms, we know that in order

21   to practice the things the rest of the term

22   sheet says, that such licenses must go in both

23   directions.  No collaboration would be struck

24   that prohibited the -- for instance, Incyte

25   from doing things because of -- doing things

1        L. Pullan, Ph.D. - Highly Confidential

2    that would benefit both parties because of IP

3    held by the other party, right?

4            The parties are collaborating.  Both

5    parties benefit from the success of the drug.

6    In particular in this case, but broadly, both

7    parties benefit from the success in each

8    other's territories.  And because of that, it

9    is -- it is necessary that each party not block

10   the success of the drug.

11       Q.   Aren't --

12       A.   And permit the activities of the

13   development responsibilities.

14       Q.   Aren't there a lot of activities

15   that -- just because an activity could

16   potentially benefit both parties, it doesn't

17   mean that the parties are allowed to do it

18   under the agreement, does it?

19            MS. SIMSON:  Objection to form.

20       Mischaracterizes the testimony.

21       A.   I certainly never said just because

22   they would benefit, but in this big fat

23   agreement, are licenses granted from both sides

24   in order to execute the collaboration.

25       Q.   Would you agree that no final

1      L. Pullan, Ph.D. - Highly Confidential

2  agreement could be reached that prohibited

3  Incyte from doing things that would benefit

4  both parties?

5            MS. SIMSON:  Objection to form.

6  Vague.

7      A.    Doing things.  It's hard for me to

8  imagine all the variations that things might be

9  and, therefore, it is a little hard to answer

10  that question.

11      Q.    Those were your words, Doctor.

12      A.    My -- those indeed probably were my

13  words, but what was intended is those things

14  that are described in the roles and

15  responsibilities and the collaboration between

16  the parties.  So I was referring to the

17  specifics, not to all things as I interpreted

18  your question.

19      Q.    So you're saying, I guess, going --

20  still trying to understand your position on

21  licensed IP.

22            You're saying that there is a

23  necessary implicit inclusion in licensed IP in

24  the July 9 term sheet of any patent or

25  proprietary know-how owned or controlled by

1      L. Pullan, Ph.D. - Highly Confidential

2   Novartis or its affiliates as of the effective

3   date?

4           MS. SIMSON:  Objection to form, and

5       to the extent it mischaracterizes the prior

6       testimony.

7       A.    I'm saying there is an implicit

8   structure which ends up being reflected in the

9   final agreement that does indeed -- the

10  implicit structure results in exchange of IP

11  between the two parties in the final agreement;

12  not in the term sheet.

13      Q.    Okay.  I think I get it.  But it's

14  not based on the words of the licensed IP

15  definition?

16          MS. SIMSON:  Objection to form.

17      A.    It is not based on the first phrase

18  of the licensed IP definition.

19      Q.    Right.  Okay.  Okay.  Understood.

20          So the actual words of the licensed

21  IP definition:  Any patents or proprietary

22  know-how controlled -- sorry -- any patents or

23  proprietary know-how owned or controlled by

24  Incyte or its affiliates as of the effective

25  date, those words only concern Incyte, right?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3     A.     The word "Novartis" is not in those

4     words.

5     Q.     Now let's move on to the second

6     portion of the licensed IP definition, which

7     is, "or that is acquired or developed during

8     the term that is necessary or useful for

9     research, developing, making, using, selling,

10    offering for sale, importing of licensed

11    products."

12               Do you see that?

13    A.     Yes.

14               So you interpret the second portion

15    of the sentence to include Novartis based on

16    the passive voice and the lack of an

17    explicit -- the identified actor in the second

18    line, correct?

19               MS. SIMSON:  Objection to form.

20    A.     Broadly speaking, I think that is

21    correct.

22    Q.     Okay.  And to be -- so we're very

23    clear on it, where it says, "or that is

24    acquired or developed," those words do not have

25    an explicit actor, correct?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    Those words do not have an explicit

3    actor.

4        Q.    So you read that to include Incyte

5    or Novartis?

6        A.    As parties to the agreement.

7        Q.    Now, you've reviewed the July 27

8    draft agreement, correct?

9        A.    I'm sure I have.

10       Q.    It was the first draft agreement

11   exchanged between the parties.

12       A.    Okay.

13       Q.    Let me mark that.

14            MS. SIMSON:  I'm just going to

15        object to that characterization.  It was

16        the first draft sent by Incyte to Novartis.

17            MR. STOPS:  Just for clarification,

18        are you aware of any other draft agreements

19        that were exchanged before the July 27

20        draft?

21            MS. SIMSON:  I was just making clear

22        that it wasn't an exchange on the same day.

23            THE WITNESS:  It was one draft.

24            MS. SIMSON:  It was just one draft.

25            (Pullan Exhibit 1005, First Draft

1        L. Pullan, Ph.D. - Highly Confidential

2        Agreement dated July 27, 2009, marked for

3        identification.)

4    BY MR. STOPS:

5        Q.    Dr. Pullan, I'm handing you what is

6    marked as Pullan Exhibit 1005.

7        A.    Thank you.

8        Q.    Exhibit 1005 is an Incyte draft, if

9    you look at the top-right corner dated July 27,

10   2009, correct?

11       A.    Correct.

12       Q.    And --

13            MS. SIMSON:  Sorry, one second.

14   BY MR. STOPS:

15       Q.    You reviewed this document before,

16   correct?

17            MS. SIMSON:  I'm just going to make

18       the same objection I did before that

19       there's no cover email associated with

20       this, so it's -- it's not -- I can't tell

21       whether or not this is the draft that was

22       indeed sent to Novartis on this day or it

23       just has this stamp on the top-right

24       corner.  I don't have the full document

25       family here.

1        L. Pullan, Ph.D. - Highly Confidential

2             MR. STOPS:  Okay.

3    BY MR. STOPS:

4        Q.    If you would turn to Page 5 of the

5    Exhibit 1005.

6        A.    Yes.

7        Q.    You see at 1.34 a definition

8    entitled:  Incyte IP?

9        A.    Yes.

10       Q.    And Incyte IP means Incyte know-how

11   and Incyte patent rights, right?

12       A.    Yes.

13       Q.    It's not your opinion that Incyte IP

14   includes any Novartis know-how or Novartis

15   patent rights, correct?

16       A.    That is correct.

17            MS. SIMSON:  Objection to form.

18   BY MR. STOPS:

19       Q.    Just making sure.

20            The next definition under is:

21   Incyte know-how at 1.35.

22            Do you see that?

23       A.    Yes, sir.

24       Q.    And Incyte know-how means:

25   "Know-how controlled by Incyte or its

1          L. Pullan, Ph.D. - Highly Confidential

2    affiliates as of the effective date or that is

3    acquired or developed during the term that's

4    necessary or useful to develop a commercialized

5    licensed product."

6               Do you see that?

7    A.    Yes, I do.

8    Q.    And Incyte patent rights, at 1.36,

9    means:  "Those patent rights controlled by

10   Incyte or its affiliates as of the effective

11   date or that are acquired or developed during

12   the term that are necessary or useful to

13   develop or commercialize."  And then it

14   provides a longer definition of cMET licensed

15   compounds and JAK licensed compounds --

16               MS. SIMSON:  Slow down, Eric.  I'm

17         having trouble understanding you.

18               MR. STOPS:  Too much coffee already.

19   BY MR. STOPS:

20   Q.    CMET licensed compounds and JAK

21   licensed compounds.

22               Do you see that?

23               MS. SIMSON:  I am just going to

24   object.  I think it's cMET patent licensed and

25   JAK patent licensed.

1          L. Pullan, Ph.D. - Highly Confidential

2               THE WITNESS:  Both.

3               MS. SIMSON:  Are you talking about

4          the underlying terms?

5     BY MR. STOPS:

6          Q.    So the "A" -- the -- right after the

7     "A," the cMET licensed compounds, and B, JAK

8     licensed compounds.  Then there is more to

9     it -- there's more in there, but it's generally

10    the compounds.

11               Do you see that?

12         A.    Yes, I see that.

13         Q.    Both the Incyte know-how and Incyte

14    patent rights definitions which are part of the

15    Incyte IP use the same structure as licensed IP

16    in the July 9 term sheet, correct?

17               MS. SIMSON:  Objection to form.

18          Also object to the extent asking for a

19          legal opinion or a legal conclusion.

20         A.    There is a distinction in that the

21    terms start with the word Incyte.  The licensed

22    IP in the term sheet did not start with the

23    word Incyte.  It did not say Incyte licensed

24    IP.  It said licensed IP.

25               So there is a difference, but the

1        L. Pullan, Ph.D. - Highly Confidential

2    phrases are in both of these, as the phrases

3    are in the Novartis.

4        Q.    Yes.  So both the know-how -- Incyte

5    know-how and Incyte patent rights include the

6    second clause:  Or that is acquired or

7    developed during the term.  Right?

8        A.    Actually slightly wrong, one says:

9    That is, and the other one says:  That are.

10       Q.    Okay.  Do you read anything into the

11   difference between those?

12       A.    No.

13       Q.    Is the lack of an explicit actor and

14   the use of the passive voice in Incyte know-how

15   and Incyte patent rights indicating that those

16   terms include both Incyte and Novartis as the

17   actor?

18            MS. SIMSON:  Objection to form.

19       Passive voice or future voice?

20            MR. STOPS:  It's not past.  It's

21       passive.

22            MS. SIMSON:  Oh, I heard past.

23       Sorry, I apologize.

24       A.    Again, I'm not issuing a legal

25   opinion, but I think it would be read that

1          L. Pullan, Ph.D. - Highly Confidential

2     because there's the word Incyte first in the

3     defined term, that one would imply the

4     possessive Incyte patent rights to include

5     Incyte, and not Novartis.

6          Q.    So your position is that the

7     distinction between licensed IP in the term

8     sheets and Incyte IP in the July 27 draft

9     agreement is in the name of the defined term,

10    licensed IP versus Incyte IP; is that right?

11             MS. SIMSON:  Objection to form.

12        Mischaracterizes her testimony.

13        A.    And the concept of the -- the point

14    of these -- the fact that licensed IP is now

15    broken into Novartis IP and Incyte IP.

16        Q.    You agree it uses the same structure

17    of the -- that is acquired or developed during

18    the term, correct?

19             MS. SIMSON:  Objection to form.

20        Vague by "it."

21        A.    I believe I have answered that I can

22    read the words that are acquired in both forms.

23        Q.    And they're the same, right?

24             MS. SIMSON:  Objection to form.

25        A.    Except for is and are.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    Okay.  In the July 9 term sheet on

3    the front page, the products being licensed are

4    Incyte's cMET program and Incyte's JAK program,

5    correct?

6               MS. SIMSON:  Objection to form.  I'm

7          not quite sure where you are.

8               MR. STOPS:  Maybe I'm saying this

9          wrong.

10   BY MR. STOPS:

11         Q.    If you look at the -- I'm looking at

12   the licensed products.  It's the third box down

13   on the July 9 term sheet.

14              MS. SIMSON:  Sorry, Mr. Stops, are

15         you in the recitals?  You said license.

16         That's why I got confused.

17              MR. STOPS:  Still talking about the

18         July 9 term sheet, like I said.  In the

19         third box down states:  Licensed products.

20              Are we all on the same page?

21              MS. SIMSON:  I'm with you.

22   BY MR. STOPS:

23         Q.    The products that are being licensed

24   are the Incyte cMET program and the JAK --

25   Incyte JAK program.

1          L. Pullan, Ph.D. - Highly Confidential

2               Do you see that?

3     A.     Yes.

4     Q.     The licensed products in this

5     definition are Incyte products, correct?

6               MS. SIMSON:  Objection to form.

7     A.     They appear to be Incyte products,

8     yes.

9     Q.     Why does it say licensed products

10    then?

11              MS. SIMSON:  Objection to form.

12              Calls for speculation.  Also object to the

13              extent asking for a legal opinion or a

14              legal conclusion.

15    A.     This is a term sheet; this is the

16    full agreement.  There are -- I write term

17    sheets all the time.  These are categories as

18    well as predecessors to the defined terms of

19    the final agreement.  The parties utilize words

20    in a way that reflect a mutual understanding

21    and are completed in the final agreement.

22    Q.     So you're saying licensed IP because

23    you use the word "license" should have actually

24    said Incyte IP in the term sheet?

25              MS. SIMSON:  Objection to form --

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    That is not what I said.

3             MS. SIMSON:  -- mischaracterizes

4        testimony.

5   BY MR. STOPS:

6        Q.    Now, still on the term sheet, your

7   position is that licensed IP was a streamline

8   to exclude know-how during the contract

9   drafting stage, right?

10            MS. SIMSON:  Objection to form.

11       Mischaracterizes her testimony and

12       opinions.

13       A.    So the exclusion of know-how was

14  necessary for the royalty term because

15  otherwise the royalty term would have no finite

16  end --

17       Q.    So in -- sorry.  I cut you off.

18       A.    -- as know-how has no finite end.

19       Q.    So under the July 9 term sheet, the

20  royalty term does not have a finite end,

21  correct?

22            MS. SIMSON:  Objection to form.  And

23       mischaracterizes the document.

24            MR. STOPS:  I'll restate that.

25  BY MR. STOPS:

1      L. Pullan, Ph.D. - Highly Confidential

2      Q.    I thought what you just said was

3  that under the July 9 term sheet it's your

4  opinion that the royalty term does not have a

5  finite end?

6           MS. SIMSON:  Mischaracterizes her

7           testimony.  I'll object on that basis.

8      A.    That is not what I said.

9      Q.    Let me read back what you said.

10 Maybe we can make this clear.  You said, "So

11 you said the exclusion of know-how was

12 necessary for the royalty term because

13 otherwise the royalty term would have no finite

14 end."

15          MS. SIMSON:  And I just want to note

16          for the record, you cut her off, and then

17          she said know-how has no finite end.

18          MR. STOPS:  Oh, okay.

19          MS. SIMSON:  So you read it back,

20          Counsel.  Do you have a question?

21 BY MR. STOPS:

22     Q.    My question then is so under the

23 July 9 term sheet, it is your opinion that the

24 royalty term does not have a finite end because

25 know-how doesn't have a finite end; is that

 1          L. Pullan, Ph.D. - Highly Confidential

 2     right?

 3               MS. SIMSON:  That mischaracterizes

 4          her opinions, and I'll object on that

 5          basis.

 6          A.    That is not what I said.  I said the

 7     purpose of splitting out know-how from licensed

 8     IP that ends up in the final agreement, the

 9     purpose is to make it clear that there is a

10     finite end, but one could also argue that the

11     last-to-expire valid claim refers to patents.

12     And therefore there is a finite end.  But still

13     I think the purpose was the clarification that

14     what we're talking about is patents.

15          Q.    If you look underneath the royalty

16     term, there is a definition of valid claim,

17     isn't there?

18          A.    Yes.

19               MS. SIMSON:  Counsel, just to make

20          sure we're looking at the same thing, are

21          you still under the term sheet or the --

22          Q.    Under the term sheet under the

23     royalty term, there is a definition of valid

24     claim, correct?

25          A.    Yes.

 1          L. Pullan, Ph.D. - Highly Confidential

 2          Q.     And that definition of valid claim

 3   is limited to patents, correct?  Claims of

 4   patents, correct.

 5          A.     That is what it says.  Patent and

 6   patent applications.

 7          Q.     Yes.  So in the royalty term, in the

 8   July 9 term sheet where it says, "valid claim

 9   within licensed IP," there is no ambiguity

10   there because it only includes patents by

11   virtue of the words "valid claim," correct?

12              MS. SIMSON:  Objection to form.

13          Object to the extent you're calling for a

14          legal conclusion or legal opinion.

15          A.     I would argue that it is probably

16   not something that people would misinterpret,

17   but that the enhancement of clarity was to say

18   valid claim within the licensed patents.

19          Q.     But you are not arguing that there

20   is any lack of clarity of valid claim within

21   licensed IP as including -- potentially

22   including know-how, correct?

23              MS. SIMSON:  Objection to form.

24          A.     Can you --

25              MS. SIMSON:  Yeah.

```
1        L. Pullan, Ph.D. - Highly Confidential
2        A.    -- rephrase that question because I
3   sort of lost it.
4        Q.    Sure.  In the royalty term
5   provision in the July 9 term sheet, no one
6   would think that the phrase "valid claim"
7   within licensed IP is referring to know-how,
8   correct.
9             MS. SIMSON:  Objection to form.
10       A.    Probably we would not claim that a
11  valid claim referred to know-how.
12       Q.    So the phrase "valid claim within a
13  licensed IP" only refers to patents and patent
14  applications, correct?
15            MS. SIMSON:  Objection to form.
16       A.    It seems to refer to patents and
17  patent applications.
18       Q.    So now still with the term sheet but
19  now the -- I'll start that again.
20            MS. SIMSON:  Sorry, Mr. Stops.  I
21       didn't hear what you said.
22            MR. STOPS:  I said I'll start that
23       again.  I'm sorry.
24  BY MR. STOPS:
25       Q.    So I understand your position
```

1          L. Pullan, Ph.D. - Highly Confidential

2     correctly, it's your opinion that licensed IP

3     in the July 9 term sheet has the same meaning

4     as licensed patent rights in the 2009 final

5     agreement, correct?

6          A.    The same --

7                MS. SIMSON:  Objection to form.

8          A.    -- intention.

9          Q.    What's the difference between -- I

10    said same meaning; you said same intention.

11    I'm just trying to understand what the

12    difference is there.

13         A.    I'm not a lawyer.  So I'm not trying

14    to parse every word.  I'm trying to get at the

15    essence of the agreement.

16         Q.    Do they mean something different?

17               MS. SIMSON:  Objection to form.

18    Asked and answered.

19    BY MR. STOPS:

20         Q.    I mean, that's what this whole case

21    is about, right?

22               MS. SIMSON:  Objection to form.

23         A.    This case is about what the parties

24    agreed to.  It is not a dance of words.  It is

25    what the parties agreed to, and that is shaped

1      L. Pullan, Ph.D. - Highly Confidential

2  by the intended relationship and the roles and

3  responsibilities of the parties and the

4  collaboration.

5      Q.    It's what the parties agreed to as

6  reflected in the words of the agreement, right?

7           MS. SIMSON:  Objection to form.

8      Argumentative.

9      A.    The attempt is, indeed, to capture

10  the intentions in the words.

11      Q.    Do parties ever get it wrong?

12           MS. SIMSON:  Objection to form.

13      Vague.

14  BY MR. STOPS:

15      Q.    Do parties ever fail to properly

16  capture their intent in the words of a final

17  agreement?

18           MS. SIMSON:  Objection to form.

19  BY MR. STOPS:

20      Q.    You've been involved in a lot of

21  agreements over the years.

22           Do parties ever get it wrong and

23  fail to accurately capture their intent in the

24  words of the agreement?

25           MS. SIMSON:  Objection to form.

1          L. Pullan, Ph.D. - Highly Confidential

2          Argumentative.  Object to the extent you're

3          asking for a legal opinion or legal

4          conclusion.

5                Dr. Pullan, you can answer that if

6          you can.

7      A.     Parties may sign agreements that

8  fail to be clear or fail to capture items which

9  are necessary to explain how to work together,

10 yes.

11     Q.     Is your opinion that parties can

12 have different understandings of the words of

13 agreements at the time the agreement was

14 signed?

15              MS. SIMSON:  Objection to form.

16          Mischaracterizes her opinions and her

17          testimony.  And object to the extent you're

18          asking for a legal opinion or legal

19          conclusion.

20     A.     Parties are a conglomeration of

21 human beings, and we're all fallible.  So I

22 would suspect that there could be nuances of

23 variation across different people within a

24 party and across parties.

25     Q.     So you would agree that parties

1        L. Pullan, Ph.D. - Highly Confidential

2   sometimes agree to things that they didn't

3   intend to, correct?

4            MS. SIMSON:  Objection to form.

5        Mischaracterizes her testimony.

6        A.    I think your other question was

7   better.  Do parties always have the same

8   understanding?  I think that's the discrepancy

9   that does sometimes occur.  Or there's

10  incomplete pieces, incomplete definition of the

11  agreement.

12       Q.    So a party could agree to something

13  that they hadn't intended to, correct?

14       A.    You just asked me that.

15           MS. SIMSON:  Objection to form.

16       A.    I said your other phrasing was much

17  superior.

18       Q.    Have you ever been involved in an

19  agreement where a client agreed to something

20  that it had not intended to?

21           MS. SIMSON:  Objection to form.

22       Vague.

23           I'm also going to instruct

24       Dr. Pullan that to the extent that question

25       is going to have her violate

1          L. Pullan, Ph.D. - Highly Confidential

2          confidentiality obligations or privilege

3          that she may have to some other party that

4          is not a party to this lawsuit, I would

5          instruct her not to answer.  If you're

6          going to, you know, waive privilege, I

7          don't want you to do that with respect to

8          another party and certainly not for

9          Novartis either, but I want you to be very

10         careful when you answer that question with

11         respect to confidentiality and privilege

12         obligations you may owe to others.

13              And in case it's not clear, we would

14         like this transcript marked highly

15         confidential.

16     A.    I'm -- I'm cognizant of

17  confidentiality and I appreciate that and do

18  not want to violate my client's

19  confidentiality, but can I think of an example

20  that meets your question, and off the top of my

21  head, I cannot think of an example.

22     Q.    Okay.  So you said that interpreting

23  an agreement is not a dance of words.

24          What did you mean by that?

25          MS. SIMSON:  Objection to form.

1          L. Pullan, Ph.D. - Highly Confidential

2          A.     I probably should not use casual

3     expressions and I apologize for that.  But what

4     I mean is that as the parties work together to

5     structure the agreement, it is not about

6     scoring points with words, it's not about

7     beating the other side up.

8               The idea of coming to an agreement

9     is to create a structure that enables the

10    parties to work successfully with each other,

11    such that, again, both can share the success

12    that comes with a successful drug.

13              The ideal agreement is one that you

14    come to agreement and you put it in the drawer

15    and you never look at it again because you work

16    well together, you both know the purposes of

17    what you're doing.  That's what the words are

18    supposed to enable you to do.  It is not the

19    point to create words on a piece of paper.  It

20    is the point to create a relationship that

21    works.

22         Q.     Each party, in negotiating an

23    agreement, is acting in their own

24    self-interest, right?

25              MS. SIMSON:  Objection to form.

1      L. Pullan, Ph.D. - Highly Confidential

2      Objection to the extent you're asking for a

3      legal conclusion or legal opinion.

4      A.    I'm -- I am trained as a biochemist.

5  I believe all organisms act in their own

6  interest down to the single cell that swims

7  to -- toward food and -- I think that's a

8  general statement of life.

9      Q.    So at least up until the execution

10  of an agreement, the parties to the agreement

11  are adversaries, correct?

12          MS. SIMSON:  Objection to form.

13  BY MR. STOPS:

14      Q.    And hire expensive lawyers, right?

15          MS. SIMSON:  Same objection.

16      A.    There is no doubt they hire

17  expensive lawyers.  All lawyers are expensive.

18      Q.    Seriously, the part -- up until --

19  at least up until the point of signing of an

20  agreement, the parties are -- or are, as you

21  said, work in their own self-interests, but

22  they're adversaries, right?

23          MS. SIMSON:  Objection to form.

24      A.    They are working in their own

25  self-interest, but they are working to become

```
 1        L. Pullan, Ph.D. - Highly Confidential

 2   partners.  They are not trying to score points.

 3   They are trying to create an agreement that

 4   works for them and, necessarily, in these long

 5   relationships, that -- a sure recipe for

 6   failure is to create a totally win-win on your

 7   side, lose on the other side agreement, because

 8   we're talking about a relationship that lasts

 9   ten-plus years, right?  You are not trying to

10   score little brownie points by saying, Oh, I

11   got one over on them.

12             In fact, I have an example, which I

13   cannot name the company, but one time ████
```

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

█████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

████████████████████████████████

██████████████████████████████████████ We

```
25   are not adversaries, we are working to try to
```

1    L. Pullan, Ph.D. - Highly Confidential

2    become partners, and as such, we do not want to

3    screw the other side over.

4        Q.    Both parties are maximizing their

5    return in the agreement, correct?

6            MS. SIMSON:  Objection to form.

7        A.    Well --

8            MS. SIMSON:  And objection to the

9        extent you're asking for a legal opinion

10       and legal conclusion.

11       A.    Both sides attempt to maximize

12   return through a successful relationship.

13       Q.    So we were talking about whether

14   licensed IP in July 9 term sheet and licensed

15   patent rights in the final agreement had the

16   same meaning, and I think your answer was that

17   they had the same intent;  is that accurate?

18           MS. SIMSON:  Objection to form, and

19       object to the extent it mischaracterizes

20       prior testimony.  I -- I also think your

21       question there is vague.

22       A.    Would you like to read me back my

23   answer and I'll -- what the question --

24       Q.    Well, I asked you if licensed IP in

25   the July 9 term sheet and licensed patent

1         L. Pullan, Ph.D. - Highly Confidential

2    rights in the final 2009 agreement had the same

3    meaning, and you -- you said that -- you

4    changed it and said they the same intent; is

5    that correct?

6         A.    Correct.

7         MS. SIMSON:  Objection to form.

8         A.    Because I am not attempting to

9    attribute to myself a legal interpretation.

10        Q.    Okay.  Can you articulate any

11   difference in the meanings between licensed IP

12   definition in the July 9 term sheet and the

13   licensed patent rights definition in the 2009

14   final agreement?

15        MS. SIMSON:  Objection to form and

16        to the extent it you're asking for a legal

17        opinion.

18        A.    I'm sorry, my brain is wandering a

19   little.  I think I need a cookie break.

20        MR. STOPS:  Shall we break for

21   lunch?

22        THE WITNESS:  Yes, that would make

23        sense.

24        MS. SIMSON:  Do you want to withdraw

25        the question?

1        L. Pullan, Ph.D. - Highly Confidential

2              MR. STOPS:  I guess I did have a

3        question pending there.

4    BY MR. STOPS:

5        Q.    Can you answer that question and

6    then we'll -- we'll break?

7        A.    Can you say it one more time.  I'm

8    sorry.  I just sort of reached this point my

9    brain started going --

10             MS. SIMSON:  It's past 1:00.  You're

11       probably hungry.

12   BY MR. STOPS:

13       Q.    So the question was just, can you

14   articulate any difference in the meanings of

15   licensed IP in the July 9 term sheet and

16   licensed patent rights in the final -- final

17   agreement?

18             MS. SIMSON:  Objection to form.

19       Object to the extent you're asking for a

20       legal opinion or legal conclusion.  Also I

21       think the question is vague.

22       A.    So if you are asking me do I think

23   they serve the same intent, I think that is

24   true.

25       Q.    Okay.  I wasn't asking you that.

1      L. Pullan, Ph.D. - Highly Confidential

2      A.   And --

3      Q.   I was asking if you can articulate

4  any difference in the meanings between them?

5          MS. SIMSON:  Same objections.

6      A.   I think I cannot articulate any

7  important difference.  I'm not trying to be a

8  lawyer.

9          MR. STOPS:  Okay.  Let's break.

10         THE VIDEOGRAPHER:  The time is

11     1:13 p.m.  We're going off the record.

12         (Luncheon recess.)

13         THE VIDEOGRAPHER:  We are back on

14     the record.  The time is 2:13 p.m.

15  BY MR. STOPS:

16      Q.   Dr. Pullan, I'm handing you a

17  document marked as Exhibit 1006.

18         (Pullan Exhibit 1006,

19     Incyte-Innovent Agreement, marked for

20     identification.)

21  BY MR. STOPS:

22      Q.   I believe this is the Incyte

23  Innovent agreement that you referred to in your

24  rebuttal report that was in Dr. Rao's opening

25  report; is that correct?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.     That is correct.

3        Q.     And so let's go to the royalty

4    provisions in this.  It's Page 36, Section 7.3.

5               And you reviewed this agreement,

6    correct?

7        A.     Yes, I did review this agreement.

8        Q.     So in Section 7.3.1 it's titled:

9    Generally.  This sets forth the existence of

10   royalties from Innovent to Incyte; is that

11   correct?

12       A.     Let me --

13       Q.     Yes.

14       A.     Yes, that appears to be correct.

15       Q.     And as far as I'm reading it, this

16   seems to be one-way royalties, Innovent to

17   Incyte?

18             MS. SIMSON:  And, Dr. Pullan, in

19        order to answer that question if you need

20        to take another look at the agreement, feel

21        free to do so.

22             THE WITNESS:  Right.

23       A.     As I remember there is combination

24   products, joint IP, things like that.  So there

25   are royalties potentially in both directions,

1        L. Pullan, Ph.D. - Highly Confidential

2  as I remember.

3        Q.    Contingent royalties --

4              (Multiple speakers.)

5        A.    Contingent --

6              MS. SIMSON:  Objection to form.

7        Q.    That's fine.  It doesn't matter for

8  the next question.  The Section 7.3.2 on

9  Page 37 of Exhibit 1006, there is a section

10 entitled:  Royalty terms.

11             Do you see that?

12       A.    Yes.

13       Q.    And the royalty terms sets forth the

14 term of the royalties, right?

15             And one of the potential end

16 conditions of the royalty term is Section A:

17 Expiration of a valid claim covering such

18 licensed products in such region.

19             Do you see that?

20       A.    I see that.

21       Q.    So this doesn't -- in this it

22 doesn't specify any parties' patent rights

23 here.

24             The term is just valid claim,

25 correct?

 1          L. Pullan, Ph.D. - Highly Confidential

 2               MS. SIMSON:  Objection to form.

 3        A.    The --

 4               MS. SIMSON:  And object to the

 5          extent you're asking for a legal opinion or

 6          legal conclusion.

 7        A.    It does say, "expiration of a valid

 8     claim covering such licensed product."

 9        Q.    And valid claim is capitalized

10     indicating that it's a defined term, right?

11        A.    Correct.

12        Q.    So the definition section is at the

13     end of this one?

14        A.    Oh.

15        Q.    So let's, I guess, flip to the

16     definition section, if you would.  I guess,

17     first just if you look at Page 67 -- tell me

18     when you reach there.

19        A.    I'm at 67.

20        Q.    And you see there is a definition

21     that defines "INCY patent"?

22        A.    Yes.

23        Q.    You understand that to be Incyte

24     patents, correct?

25        A.    Correct.

1        L. Pullan, Ph.D. - Highly Confidential

2        Q.    And on the next page, 68, there is

3     an "INNO patent" definition?

4        A.    Yes.

5        Q.    Which, I believe, corresponds to

6     Innovent patents, correct?

7        A.    I believe that to be true.

8        Q.    Then the operative term in that

9     royalty provision is valid claim, and that

10    appears on Page 73?

11       A.    Okay.

12       Q.    And take a look at this and you

13    don't have to read it out loud.  I do not -- I

14    do not see any specification of either parties

15    or any parties' patents by definition in this

16    section, like in other words, I don't see it

17    specifying Incyte patents or Innovent patents?

18       A.    In this --

19             MS. SIMSON:  Objection to form.

20    BY MR. STOPS:

21       Q.    Correct.  In the definition of valid

22    claim.  I just want you to confirm that.

23       A.    Confirmed.

24       Q.    So with respect to the royalty term

25    provision, that depends upon -- on expiration

1        L. Pullan, Ph.D. - Highly Confidential

2    of a valid claim covering such licensed product

3    in such region, whose patents does it depend on

4    in your opinion?

5             MS. SIMSON:  Objection to form.

6         Objection to the extent you're asking for a

7         legal conclusion or a legal opinion.

8        A.    So as I remember, there is the

9    potential for a licensed product to be a

10   combination product, which means, it could be

11   either parties' patents.

12       Q.    Okay.  So does it matter which

13   product that we're referring to under the

14   agreement, which way -- sorry.

15            Does which product is being sold

16   change which parties' patents are relevant to

17   that termination provision?

18            MS. SIMSON:  Objection to form.

19        Objection to the extent you're asking for a

20        legal conclusion or a legal opinion.

21       A.    So it matters whose patents cover

22   the product only to the extent that that's

23   where the patents come from.  The royalty term

24   is not dependent in this agreement on whose

25   patents are being applied.

1         L. Pullan, Ph.D. - Highly Confidential

2         Q.    So, hypothetically, assume both

3    parties had patents that covered the product,

4    the royalty term would go out until the last of

5    either parties?

6              MS. SIMSON:  Objection to form.

7         Objection to the extent you're asking for a

8         legal conclusion or a legal opinion.  And

9         incomplete hypothetical.

10        A.    As a hypothetical, it seems that

11   the -- if there were patents from both parties,

12   it would go until the last valid claim of those

13   patents.

14        Q.    Okay.  And that's because the valid

15   claim definition doesn't specify a party?

16             MS. SIMSON:  Objection to form.

17        Objection to the extent you're asking for a

18        legal conclusion or a legal opinion.

19        A.    Thank you.

20             That, and the royalty term

21   definition also doesn't say that it is a valid

22   claim of a particular parties.

23        Q.    Right.  So you would have a

24   different opinion if it said a valid claim of

25   Incyte's patents?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    Correct.

3        Q.    So the -- the final agreement

4    between Incyte and Novartis, the -- the final

5    agreement between Incyte and Novartis, the 2009

6    agreement, could have worded things like the

7    Innovent agreement?

8              MS. SIMSON:  Objection to form.

9         Calls for speculation.  Object to the

10        extent you're asking for a legal conclusion

11        or a legal opinion.

12        A.    Could have, would have, should have,

13    maybe, who knows, but what matters is what they

14    didn't say, and what the parties intended.

15             MS. SIMSON:  I don't think she was

16        done with her answer.

17        Q.    I'm sorry.

18        A.    I think the parties' intent was for

19    a collaboration and for the -- the benefit to

20    flow to both parties based on both parties'

21    contributions.

22        Q.    Now, you just interpreted the

23    Innovent agreement based on the words of the

24    agreement itself?

25             MS. SIMSON:  Objection to form.

1        L. Pullan, Ph.D. - Highly Confidential

2        Objection to the extent calling for a legal

3        conclusion or legal opinion.

4        A.    I brought to the agreement my

5   knowledge of how agreements are generally

6   structured.  These things can be hard to read

7   if you don't bring that context, right?  You

8   need to understand what a combination product

9   is, and that it could represent IP from either

10  party.  There are lots of words,  and it's much

11  easier to read the words and get what they mean

12  if you're bringing knowledge and perspective to

13  the words.

14       Q.    In the Innovent agreement, do you

15  know if the parties intended that the royalties

16  would only be paid as long as Incyte had

17  patents?

18            MS. SIMSON:  Objection to form.

19       Call for speculation.  Object to the extent

20       you're asking for a legal conclusion or

21       legal opinion.

22       A.    I believe the parties agreed that

23  there would be royalties as long as there were

24  patents covering the product; patents, period.

25       Q.    And you're basing that on the words

1        L. Pullan, Ph.D. - Highly Confidential

2    of the agreement?

3            MS. SIMSON:  Objection to form.

4        Asked and answered.

5        A.    The words of the agreement and the

6    knowledge that there was a complex relationship

7    with the parties bringing multiple molecules,

8    multiple contributions, and mutually

9    benefitting.

10       Q.    And you're reading that into the

11   agreement, right?

12           MS. SIMSON:  Objection to form.

13       A.    I'm not reading it into the

14   agreement.

15       Q.    I'm sorry.  That's based on your

16   reading of the agreement?

17           MS. SIMSON:  Same objection.  And

18       asked and answered.

19       A.    It is in the agreement.

20       Q.    And you don't know if the parties

21   intended something different in actuality,

22   right?

23           MS. SIMSON:  Objection to form.  And

24       object to the extent you're calling for a

25       legal conclusion or legal opinion.

1       L. Pullan, Ph.D. - Highly Confidential

2       A.    I have no reason to suspect they

3   intended something other than what resulted in

4   the agreement.  I have no access to their term

5   sheet history, the internal documentation.

6   This is the only piece of evidence I have.

7       Q.    And yet you're able to interpret the

8   agreement, right?

9             MS. SIMSON:  Objection to form.

10      A.    With difficulty.  It's hard work.

11      Q.    So let's go to the 2009

12  Incyte-Novartis agreement.

13            MS. SIMSON:  Can you identify which

14      exhibit that is for the witness?

15      Q.    1001, please.  And you can put the

16  other documents to the side if you want to get

17  them out of your way.  My next set of questions

18  is on the agreement itself.

19            So if you would turn to the royalty

20  section of Exhibit 1001 that is on page --

21  starts on Page 56.

22      A.    Yes.

23      Q.    And you see there is a Section 8.3

24  entitled:  Royalties?

25      A.    Yes.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    I guess I'll start at the top.

3     Section 8.3(a) are Novartis royalties to

4     Incyte, right?

5          A.    That is correct.

6          Q.    And 8.3(a)(i), Roman -- lower case

7     Roman i, is cMET license products, right?

8          A.    That is correct.

9          Q.    And Section 8.3(a)(i) is a royalty

10    from Novartis to Incyte based on sales of

11    cMET-licensed products, correct?

12         A.    That is correct.

13         Q.    The royalty payments under

14    Section 8.3(a)(i) start on the first commercial

15    sale of each cMET licensed product, correct?

16              MS. SIMSON:  Objection to form.

17         Objection to the extent you're asking for a

18         legal conclusion or legal opinion.

19         A.    I concur.

20         Q.    And the royalty payments under

21    Section 8.3(a)(i) end based on the royalty term

22    provisions of Section 8.3(c), correct?

23         A.    I believe that is correct.

24         Q.    The Novartis territory for cMET

25    products is the entire world, correct?

1      L. Pullan, Ph.D. - Highly Confidential

2      A.    Correct.

3      Q.    And just for completeness, that is

4  set forth in Section 1.82 on Page 12, correct?

5      A.    I'll get there.  Just a second.

6  Yes.

7      Q.    So flipping back to the royalty --

8  royalty provisions.  The next Section 8.3(a)(i)

9  is the royalty from Novartis to Incyte based on

10 sales of JAK-licensed products, correct?

11     A.    Yes.

12     Q.    And the royalty payments under

13 Section 8.3(a)(i) also start on the first

14 commercial sale of each JAK-licensed product,

15 correct?

16     A.    On the net sales.

17     Q.    Sorry.  The start date for the

18 royalties under 8.3(a)(i) is the first

19 commercial sale, correct?

20     A.    I don't actually see the words first

21 commercial sale.

22     Q.    I think you have to read that in

23 conjunction with the royalty term of 8.3(c).

24     A.    Right.  Yes, from the date of the

25 first commercial sale, yes.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.     So the royalties under 8.3(a)(i)

3     start on the first commercial sale of each

4     JAK-licensed product, correct?

5          A.     Yes.

6          Q.     And the royalty payments under

7     8.3(a)(i) end based on the royalty term

8     provisions of 8.3(c), correct?

9          A.     Correct.

10          Q.     The Novartis territory for

11     JAK-licensed products is the entire world

12     except for the United States and its

13     territories, right?

14               MS. SIMSON:  Objection to form.

15          A.     The entire world other than the

16     Incyte territory.

17          Q.     Which -- okay.  And if we look at

18     section --

19          A.     1.48.

20          Q.     Thank you -- 1.48, the Incyte

21     territory is the United States of America, its

22     territories, and possessions, correct?

23          A.     Correct.

24          Q.     So under Section 1.82, which is the

25     Novartis territory, why isn't the Novartis

1        L. Pullan, Ph.D. - Highly Confidential

2    territory for JAK-licensed products the entire

3    world under the agreement?

4            MS. SIMSON:  Objection to form.

5        Calls for speculation.  Also object to the

6        extent you're asking for a legal conclusion

7        or legal opinions.

8        A.    Presumably, because the parties

9    agreed it was not the entire world.

10       Q.    Sure.  1.82 specifies that

11   Novartis's territory for JAK-licensed products

12   is the entire world except for the Incyte

13   territory, correct?

14       A.    That is what it says.

15       Q.    Why don't we read Section 1.82 as

16   simultaneously the entire world and the entire

17   world other than the Incyte territory?

18           MS. SIMSON:  Objection to form.

19       A.    I'm at a loss to answer that

20   question.

21       Q.    Grammatically speaking, it says in

22   it at one point, "the entire world and the

23   entire world other than the Incyte territory."

24       A.    I see.  There is a semicolon.  There

25   is an A and a B and there is a reference to

1        L. Pullan, Ph.D. - Highly Confidential

2   cMET and JAK-licensed products.  So there is a

3   distinction between the two parties as

4   illustrated by a number of points.

5        Q.    So Section 1.82 is directional,

6   correct?

7             MS. SIMSON:  Objection to form.

8        Object to the extent you're asking for a

9        legal conclusion or a legal opinion.

10       A.    And I don't even know what it means

11  to say directional.

12       Q.    When you're talking about cMET

13  license products, you look to the entire world.

14            When you talk about JAK-licensed

15  products you look to the entire world other

16  than the Incyte territory, right?

17            MS. SIMSON:  Objection to form.

18       A.    Those are the words, but I don't

19  know what directional means.

20            MS. SIMSON:  Same objection.

21  BY MR. STOPS:

22       Q.    How would you define the structure

23  of Section 1.82?

24            MS. SIMSON:  Objection to form.

25       Object to the extent asking for a legal

1          L. Pullan, Ph.D. - Highly Confidential

2          conclusion or a legal opinion.

3          A.    I think I would say it -- it means

4    Novartis territory for cMET is worldwide;

5    Novartis territory for JAK is worldwide minus

6    the U.S.

7          Q.    Would you consider this to be a --

8    you would agree that this is a two-part

9    definition?

10          MS. SIMSON:  Objection to form.

11          Objection to the extent you're asking for a

12          legal conclusion or legal opinion.

13          A.    There is an A and a B.

14          Q.    So this -- the Section 1.82 has a --

15    has two parts, one part for cMET-licensed

16    products and the other part for JAK-licensed

17    products, correct?

18          MS. SIMSON:  Same objections.

19          A.    Answered.

20          Q.    It's a different question.

21          A.    Not much.

22          Q.    So the Section 1.82 for Novartis

23    territory has one part for Novartis's territory

24    for cMET-licensed products and one part for

25    Novartis's territory for JAK-licensed products

1      L. Pullan, Ph.D. - Highly Confidential

2    correct?

3          MS. SIMSON:  Objection to form.

4       Objection to the extent you're asking for a

5       legal conclusion or legal opinion.  Also

6       asked and answered.

7    A.     There are two parts.

8    Q.     And that you consider this to be a

9    conditional definition because it depends on

10   what the starting condition is, right?

11         MS. SIMSON:  Objection to form.

12   A.     I don't know.

13         MS. SIMSON:  Objection to the extent

14   you're asking for a legal conclusion or legal

15   opinion.

16   BY MR. STOPS:

17   Q.     In the condition of Novartis's

18   territory for cMET-licensed products, you look

19   to the entire world.

20         For the condition of the Novartis's

21   territory for JAK-licensed products you look to

22   the entire world other than the Incyte

23   territory, correct?

24         MS. SIMSON:  Objection to form.

25       Objection to the extent asking for a legal

1        L. Pullan, Ph.D. - Highly Confidential

2        conclusion or legal opinion.  Also asked

3        and answered.

4        A.    I don't see that that's conditional

5    in my use of the word conditional.  So I'm not

6    sure what, what you're driving at.

7        Q.    If you're looking to figure out what

8    Novartis's territory is for cMET-licensed

9    products, you look in Section A or B?

10       A.    Where it says cMET, I looked in

11   Section A.

12       Q.    If you're looking for Novartis's

13   territory with respect to JAK-licensed

14   products?

15       A.    I look where it says JAK-licensed

16   products.

17       Q.    So going back to the royalty

18   provisions in 8.3, Section 8.3(b) is Incyte

19   royalties to Novartis, right?

20       A.    Yes.

21       Q.    Section 8.3(b)(i) is the royalty

22   from Incyte to Novartis based on sales of a JAK

23   product in the United States, correct?

24       A.    That is correct.

25       Q.    And the royalty payments under

1          L. Pullan, Ph.D. - Highly Confidential

2     Section 8.3(b)(i) do not start on the first

3     commercial sale of the U.S. JAK product,

4     correct?

5               MS. SIMSON:  Objection to form.

6          Objection to the extent you're asking for a

7          legal conclusion or legal opinion.

8          A.    On what basis do you make that

9     point?

10         Q.    Oh, Section 8.3(b)(i), royalty start

11    only if Novartis --

12               (Multiple speakers.)

13         Q.    Section 8.3(b)(i) royalty start only

14    if Novartis obtains reimbursement and pricing

15    approval for the first indication of a

16    JAK-licensed product in at least three of the

17    EU major market countries, correct?

18         A.    That is what it says.  And it says

19    that because they wanted not to be paying out

20    when they weren't receiving.  The parties

21    wanted to align their payments and it was in

22    Incyte's interest to delay paying out when they

23    were likely to have approval first and did have

24    approval first in the U.S.

25         Q.    Okay.  So you agree that the royalty

1          L. Pullan, Ph.D. - Highly Confidential

2    payments under Section 8.3(b)(i) do not start

3    on the first commercial sale of JAK products by

4    Incyte, correct?

5              MS. SIMSON:  Objection to form.

6         A.    Because that's what it says, yes.

7         Q.    Okay.  And reimbursement and pricing

8    approval is not the same as approval by a

9    European country regulatory agency to sell a

10   JAK-licensed product, correct?

11             MS. SIMSON:  Objection to form.

12        A.    Pharmaceutical companies do not sell

13   until they have pricing approval in -- in most

14   countries of Europe.  So the two are conjoined.

15   And the first commercial sale occurs after both

16   events.  The United States does not have, so

17   far, pricing agreement.

18        Q.    There is no necessary linkage

19   between reimbursement and pricing approval?

20   They are -- sorry.  They are two separate

21   things.  Approval to sell a drug and

22   reimbursement and pricing approval are two

23   separated things, correct?

24             MS. SIMSON:  Objection to form.

25        A.    They're pretty linked, meaning if

1      L. Pullan, Ph.D. - Highly Confidential

2   you don't have a price, you can't sell.

3      Q.    You can't get -- you can't get

4   reimbursement?

5      A.    You can't get reimbursed.

6      Q.    You can sell; you can't get

7   reimbursement?

8      A.    You can't get much in the way of

9   sales when it's governmental healthcare because

10   that's who is paying for the vast majority of

11   sales.

12      Q.    Some sales take place outside of the

13   reimbursement scheme, correct?

14           MS. SIMSON:  Objection to form.

15      A.    Some sales take place by private

16   payers outside government-supported healthcare,

17   but the majority of sales take place, in

18   Europe, in government-supported healthcare.

19      Q.    If Novartis had never obtained --

20   let's look at this, say, more forward looking.

21           If Novartis never obtained

22   reimbursement and pricing approval for the

23   first indication of a JAK-licensed product in

24   at least three major European market countries,

25   the Section 8.3(b)(i) royalty would never

1       L. Pullan, Ph.D. - Highly Confidential

2   begin, correct?

3           MS. SIMSON:  Objection to form.

4       A.    That's not what happened, but it is

5   not beyond the realm of possibility.

6       Q.    You don't cite any other agreements

7   that require reimbursement and pricing approval

8   in three-out-of-five major European countries

9   as a trigger for royalty payments, correct?

10          MS. SIMSON:  Objection to form

11      European.

12      A.    I didn't try to cite any other

13  agreements.  Without a doubt, I could find some

14  more clauses in other agreements.

15      Q.    My question is just:  You didn't

16  cite any in your report, correct?

17          MS. SIMSON:  Objection to form.

18      Asked and answered, argumentative.

19      A.    That is correct.

20      Q.    And the parties actually had to

21  amend the 2009 agreement in 2014 to remove the

22  requirement that Novartis obtain approval in

23  three-out-of-five major market European

24  countries, correct?

25          MS. SIMSON:  Objection to form.

1        L. Pullan, Ph.D. - Highly Confidential

2        A.      Parties --

3                MS. SIMSON:  Objection to the

4        characterization of that amendment to the

5        agreement.

6        A.      The parties chose to amend the

7    agreement, not had to amend it.

8        Q.      The parties agreed to amend the

9    agreement, correct?

10       A.      The parties amended the agreement.

11       Q.      And at the point of the amendment,

12   Novartis had not obtained approval in -- strike

13   that.

14               The parties had -- at the time of

15   that amendment, Novartis had not received

16   reimbursement and pricing approval in three of

17   five major market European countries, correct?

18               MS. SIMSON:  Objection to form.

19       Foundation.

20       A.      If you show me the amendment, I

21   believe there were trades for such amendment,

22   meaning the parties negotiated and each side

23   gave something.

24       Q.      Right.  Had Novartis obtained

25   approval in three of five major European

1          L. Pullan, Ph.D. - Highly Confidential

2    countries, they wouldn't have had to enter into

3    agreement -- an amendment to the agreement with

4    respect to that clause, correct?

5          MS. SIMSON:  Objection to form.

6          Objection to the extent you're asking for a

7          legal conclusion or a legal opinion.

8    A.    Had Incyte not wanted something in

9    exchange, they wouldn't have had to enter the

10   agreement either.  This was a mutually

11   negotiated amendment.  It was not merely

12   Novartis.

13   Q.    I'm not suggesting it was charity or

14   a handout.  My point is just that had Novartis

15   already achieved reimbursement and pricing

16   approval in three of five major market European

17   countries, it wouldn't have had to enter the

18   amendment on that point, correct?

19         MS. SIMSON:  Same objections.  And

20         also asked and answered.

21   A.    As to that tiny piece, if they had

22   already done it, there would be no point in

23   asking to remove it.  But that's not all that

24   amendment was about.

25   Q.    The Section 8.3(b)(i) royalties,

1        L. Pullan, Ph.D. - Highly Confidential

2   like all the royalties under the 2009 agreement

3   are based on net sales of the product, correct?

4        A.    Yes.

5        Q.    And if there are no sales, there's

6   no royalty, right?

7             MS. SIMSON:  Objection to form.

8        Objection to the extent you're asking for a

9        legal conclusion or legal opinion.

10       A.    If royalties are on sales, there

11  have to be sales for there to be royalties.

12       Q.    Royalty payments under

13  Section 8.3(b)(i) end based on the royalty term

14  provisions of 8.3(c), correct?

15       A.    Correct.

16       Q.    8.3(b)(ii) is -- sets forth a

17  royalty from Incyte to Novartis based on sales

18  of JAK products in topical -- sorry -- yes,

19  topical formulations and ophthalmic

20  indications, correct?

21            MS. SIMSON:  Objection to form.

22       Mischaracterizes 8.3(b)(ii).  Also omits

23       the language that's:  Covered by Novartis

24       improvements, and other language in that

25       provision.

1       L. Pullan, Ph.D. - Highly Confidential

2       A.    It does indeed say:  Covered by

3    Novartis improvements for the topical

4    formulation outside the JAK field, and a

5    non-oral formulation for ophthalmic

6    indications.

7       Q.    And the royalty payments under

8    Section 8.3(b)(ii) do not start on the first

9    commercial sale of topical or ophthalmic --

10   ophthalmically indicated products, correct?

11          MS. SIMSON:  Objection to form.

12       Mischaracterizes the document.

13      A.    If the royalties are on sales, they

14   start when there are sales.

15      Q.    The triggering event for the

16   existence of sales is the Novartis

17   improvements, as you mentioned, correct?

18          MS. SIMSON:  Objection to form.

19       And -- and objection to the extent you're

20       asking for a legal conclusion or legal

21       opinion.

22      A.    It is a necessary condition that

23   they be covered by Novartis improvements, but

24   they still start when there are sales.

25      Q.    Well, they start when there are

1          L. Pullan, Ph.D. - Highly Confidential

2     sales and Novartis improvements, right?  Two

3     conditions.

4               MS. SIMSON:  Objection to form.

5          A.    They start when there are sales, but

6     it is necessary that there be covered by

7     Novartis improvements.

8          Q.    If there were sales and no Novartis

9     improvement, are there royalties?

10         A.    I never said that.

11              MS. SIMSON:  Objection to the form.

12         Asked and answered.

13    BY MR. STOPS:

14         Q.    Well, let's make sure we are clear.

15              If there are sales, but no Novartis

16    improvements, are there royalties under

17    Section 8.3(b)(ii)?

18              MS. SIMSON:  Objection to form.

19         A.    You asked about start.

20         Q.    Right.

21         A.    They start when there are sales, but

22    there would not exist at all if there were not

23    covered by Novartis improvements .

24         Q.    If there are Novartis improvements,

25    but no sales, are there royalties?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    No.

3        Q.    So both sales and Novartis

4   improvements are necessary for there to be

5   royalties, right?

6             MS. SIMSON:  Objection to form.

7        Argumentative.  Asked and answered.

8        A.    I indeed answered that.  You asked

9   specifically when they start and they start on

10  sales, that's what you asked, is when they

11  start.

12       Q.    There could be sales, but no

13  royalties, right?

14       A.    That's true, I said that.

15       Q.    Okay.  Same thing with the previous

16  Section 8.3(b)(i).

17            There needs to be sales and approval

18  in three of five EU countries, right?

19            MS. SIMSON:  Objection to form.

20       Also ignores Amendment No. 3 to the

21       agreement.

22  BY MR. STOPS:

23       Q.    Under the agreement as executed in

24  2009, there needs to be both sales and approval

25  in three EU countries for royalties to exist

1        L. Pullan, Ph.D. - Highly Confidential

2    under 8.3(b)(i), correct?

3            MS. SIMSON:  Objection to form.

4        Ignores Amendment No. 3 of the agreement.

5        A.    Ignoring the amendment, that would

6    be a correct statement.

7        Q.    Okay.  So sales under 8.3(b)(i)

8    don't start until there are both sales and

9    approval in three to five EU countries, right?

10           MS. SIMSON:  Same objections.  And

11       asked and answered.

12       A.    I'd say I answered that, yes.

13       Q.    And royalty payments under

14   8.3(b)(ii) and based on the royalty term

15   provisions in Section 8.3(c), correct?

16       A.    Yes.  There is a single royalty term

17   provision for all royalties under the

18   agreement.

19       Q.    So --

20           MS. SIMSON:  Counsel, if you're

21       going to pull another exhibit, would you

22       mind letting us know what it is.

23           MR. STOPS:  That's fine.  I'm just

24       making sure I have the right document.

25       I'll tell you momentarily.

1      L. Pullan, Ph.D. - Highly Confidential

2  BY MR. STOPS:

3      Q.    Okay.  So on Page 12 of your

4  rebuttal report you state in the middle of the

5  first large bulleted section:  "If the receipt

6  of a royalty for a particular time frame was

7  conditioned on undertaking an additional step,

8  like Novartis obtaining a patent, that would be

9  clearly reflected.  There is no such

10 contingency reflected in Section 8.3(b)(i) or

11 Section 8.3(c)."

12           Now, that's incorrect, right?

13           MS. SIMSON:  Objection to form.

14     A.    I do not believe what I've said here

15 is incorrect.  There is no such contingency

16 like expressly tied to Novartis improvements.

17     Q.    Well, under the agreement as signed

18 on November 24, 2009, Novartis was required to

19 obtain reimbursement and pricing approval in at

20 least three of the EU major market countries,

21 correct?

22     A.    There is --

23           MS. SIMSON:  Objection to form.

24     A.    There is no contingency parallel to

25 if covered by Novartis improvements.

1       L. Pullan, Ph.D. - Highly Confidential

2       Q.    There is a contingency that Novartis

3  needs to obtain pricing and reimbursement

4  approval in at least three EU major market

5  countries?

6       A.    But that's not the --

7             MS. SIMSON:  Objection to form.

8       Ignores Amendment No. 3 to the agreement.

9       Asked and answered.  Argumentative.

10      A.    There is no parallel contingency to

11 that which is described in little ii.

12      Q.    Why is that not a contingency in

13 section --

14      A.    I didn't say it wasn't a

15 contingency.  I said there was no such parallel

16 contingency.

17      Q.    Then I am very confused about your

18 testimony.  Could you explain?

19      A.    Good, because I've been confused

20 about your questions a lot, so it's about time.

21 Turn about's fair play.

22      Q.    Would you explain for me?

23      A.    This says with respect to the one

24 percent royalty, it is expressly tied to

25 Novartis improvements.  The general royalty

1          L. Pullan, Ph.D. - Highly Confidential

2     from Incyte to Novartis is not expressly tied

3     to Novartis obtaining a patent.  It is not tied

4     expressly to Novartis improvements.

5          Q.    No, it's tied to reimbursement of

6     pricing approval in three of five European

7     countries --

8          A.    I acknowledge that.

9               MS. SIMSON:  Objection.

10    BY MR. STOPS:

11         Q.    -- in the agreement that's signed in

12    2009, correct?

13               MS. SIMSON:  Objection to form.

14         Asked and answered.  Mischaracterizes her

15         testimony.

16         A.    My statement that there is no such

17    contingency refers back to Novartis

18    improvements.  There is no contingency stated

19    in this paragraph that refers back to Novartis

20    improvements.

21         Q.    You --

22         A.    Such.

23         Q.    You agreed that it was conditioned

24    on undertaking an additional step, correct?

25               MS. SIMSON:  Objection to form.

1          L. Pullan, Ph.D. - Highly Confidential

2          Ignores Amendment No. 3 to the agreement,

3          and also object to the extent you're asking

4          for a legal conclusion or legal opinion.

5          A.    Not giving you a legal conclusion

6    and recognizing the amendment, there is a

7    contingency, but it is not parallel to the

8    structure of little ii.

9          Q.    Because it's not tied to Novartis

10   improvements, correct?

11         A.    Or Novartis patents.

12         Q.    You're familiar with Section 8.3(c)

13   of the 2009 agreement, correct?

14         A.    Reasonably familiar.

15         Q.    I take it that was sarcasm.

16         A.    No.  I have a full-time job.  I

17   worked hard on this, but I am not a lawyer, and

18   I don't spend a hundred percent of every day

19   working on this particular agreement.  I

20   worked -- during this period, I signed a major

21   agreement; during this period I've been working

22   on, eh, six, seven different agreements

23   simultaneously.  I can get confused, I can

24   forget things because this is not my full-time

25   job.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    Section 8.3(c) concerns both royalty

3    term and certain conditions under which

4    royalties reduce to 50 percent?

5                MS. SIMSON:  Objection to form.

6          A.    The provisions do discuss both

7    duration and a step-down.

8          Q.    In Section 8.3(c), the royalty term

9    portion is the first half of the section ending

10   in the term -- in the underlying words "royalty

11   term," correct?

12               MS. SIMSON:  Dr. Pullan, if you need

13         take a look to at what he's talking about

14         since it's a large paragraph, take your

15         time.

16         A.    That is correct.

17         Q.    And the second half of

18   Section 8.3(c) concerns the conditions where

19   royalties reduce to 50 percent, correct?

20         A.    Of the applicable rate.

21         Q.    And really this is just so I don't

22   have to -- I don't have to ask all the

23   questions twice about both the royalty term and

24   the 50 percent portion of it, but you agree

25   that the analysis of the disputed royalty term

1       L. Pullan, Ph.D. - Highly Confidential

2  portion is the same as the analysis of the

3  dispute with respect to the step-down portion,

4  correct?

5           MS. SIMSON:  Objection to form.

6       Objection to the extent you're asking for a

7       legal conclusion or a legal opinion.

8       A.    I'm not sure what the analysis

9  means, so.

10      Q.    You didn't do a separate analysis in

11 your expert reports of the royalty term versus

12 the conditions under which the term -- the

13 applicable royalty rates would reduce to

14 50 percent, right?

15          MS. SIMSON:  Objection to form.

16      Objection to the extent he's attempting to

17      mischaracterize either of her expert

18      reports, and objection to the extent you're

19      asking for a legal conclusion or a legal

20      opinion.

21      A.    Are they in different reports, no.

22 Did I think about each of them, yes.

23      Q.    Let's try a different way.  You

24 understand that the dispute between the parties

25 relates to Section 8.3(c)(i) of the royalty

```
 1        L. Pullan, Ph.D. - Highly Confidential
 2   term, which reads:  "The last to expire of any
 3   valid claim of license patent rights covering
 4   such licensed product in such country,"
 5   correct?
 6            MS. SIMSON:  Objection to form.
 7        Mischaracterizes Novartis's complaint in
 8        this action, and objection to the extent
 9        you're asking Dr. Pullan for a legal
10        opinion or a legal conclusion.
11        A.    I believe that would be better said
12   that there is dispute about the moneys owed
13   both in duration and in timing of step-down.
14        Q.    Okay.  In the second portion of
15   8.3(c) dealing with the 50 percent reduction,
16   do you see the language that reads:  "In a
17   specific country, the licensed product is
18   neither covered by a valid claim of licensed
19   patent rights"?
20        A.    Where are we?
21            MS. SIMSON:  Objection.
22        A.    I'm sorry.
23        Q.    In the second half of 8.3(c) that
24   deals with the 50 percent reduction, there is
25   a --
```

1       L. Pullan, Ph.D. - Highly Confidential

2       A.      Okay.

3       Q.      -- portion that reads:  "In a

4    specific country, the licensed product is

5    neither covered by a valid claim of license

6    patent rights."

7               MS. SIMSON:  Objection.  That

8          characterization omits a second half in the

9          bracket which then reads:  "Nor such

10         licensed product is subject" --

11              MR. STOPS:  That's fine, Counsel.

12         You can ask whatever you want on redirect.

13              MS. SIMSON:  No.  I'm just -- my

14         objection is that you left out the second

15         half of the --

16              MR. STOPS:  You can say --

17              MS. SIMSON:  -- sentence.

18              MR. STOPS:  You can say objection to

19         form or something along those lines.

20   BY MR. STOPS:

21      Q.      But go ahead, Dr. Pullan, can you

22   answer?

23      A.      I see the language that says:  "It's

24   neither covered by a valid claim nor regulatory

25   exclusivity."

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    Do you -- for the purposes of -- for

3     the purposes of your report, is your analysis

4     of Section 8.3(c)(i), which states:  "The last

5     to expire of any valid claim of licensed patent

6     rights covering such licensed product in such

7     country," the same as your analysis of the

8     phrase in the second portion of 8.3(c), which

9     states:  "In a specific country, the licensed

10    product is neither covered by a valid claim of

11    licensed patent rights."

12          MS. SIMSON:  Same objection, and

13          object to the extent you're asking for a

14          legal conclusion and legal opinion.

15          A.    To the extent that you're ignoring

16    the second half of that phrase, it's different.

17    To the extent that many of the words are the

18    same, the words are -- indeed many of them the

19    same.

20          Q.    Is it your opinion that the words:

21    "A valid claim of licensed patent rights" in

22    the step-down portion of 8.3(c), has a

23    different meaning than the words:  "Any valid

24    claim of licensed patent rights," in

25    Section 8.3(c)(i)?

1        L. Pullan, Ph.D. - Highly Confidential

2            MS. SIMSON:  Objection to form.

3        Objection to the extent -- withdrawn.

4        Objection to form.  Objection to the extent

5        you're asking for a legal conclusion or

6        legal opinion.

7        A.    I am not asserting the words are

8   different in those two phrases.

9        Q.    So your analysis of those two

10   phrases is the same, correct?

11           MS. SIMSON:  Objection to form.

12       Objection to the extent you're asking for a

13       legal --

14       A.    My analysis is what I've written.

15   You can characterize it how you wish, but

16   I'm -- I think it's, again, slicing and dicing,

17   and I stand by what I've written.

18       Q.    With respect to Incyte's royalty

19   payments to Novartis under Section 8.3(b)(i),

20   the licensed product is Jakafi, correct?

21           MS. SIMSON:  Objection to the extent

22       you're asking for a legal opinion or a

23       legal conclusion.

24       A.    The product upon which net sales are

25   paid is Jakafi.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.      Maybe if I said it -- said it

3     differently.  With respect to Incyte's royalty

4     payments to Novartis under Section 8.3(b)(i),

5     the licensed product at issue is Jakafi,

6     correct?

7                MS. SIMSON:  Objection to the extent

8          you're asking for a legal conclusion or

9          legal opinion.

10         A.      I would interpret it as Jakafi.

11         Q.      Because there could theoretically in

12    the future be other licensed products under

13    that section, correct?

14               MS. SIMSON:  Objection to form.

15         A.      Indeed there could.

16         Q.      Such as an extended or other

17    modified release version of ruxolitinib for

18    example, correct?

19               MS. SIMSON:  Objection to form.

20         Objection to the extent asking for a legal

21         conclusion or a legal opinion.

22         A.      Or a Novartis JAK product.

23         Q.      If it was a Novartis JAK product,

24    who would be paying royalties under

25    Section 8.3(b)(i)?

1          L. Pullan, Ph.D. - Highly Confidential

2          A.     If Incyte had the right to sell the

3     Novartis JAK product, Incyte would be paying

4     royalties to Novartis.

5          Q.     My question was:  If it was a

6     Novartis JAK product, who would be paying

7     royalties under Section 8.3(b)(i)?

8               MS. SIMSON:  Objection to form.

9          A.     I have forgotten all the provisions

10    of the terms that bring in the Novartis JAK

11    product into this arrangement.

12         Q.     If one of the other Incyte molecules

13    specified in the schedules to the agreement was

14    marketed, that could also be under

15    Section 8.3(b)(i), correct?

16         A.     I believe that is correct.

17              MS. SIMSON:  Objection to form.

18    BY MR. STOPS:

19         Q.     And with respect to Incyte's royalty

20    payments to Novartis under Section 8.3(b)(i),

21    the country is the United States and its

22    territories, correct?

23         A.     Incyte territory is the United

24    States and its territories.

25         Q.     You understand that there is no

1          L. Pullan, Ph.D. - Highly Confidential

2    current dispute regarding Section 8.3(c)(iii),

3    the expiration of regulatory exclusivity for

4    such product in such country, correct?

5             MS. SIMSON:  Objection to form.

6          Objection to the extent you're

7          mischaracterizing Novartis's complaint in

8          this action.

9      A.    I understand that is not the subject

10   to which I am supposed to be addressing myself.

11     Q.    We don't have to talk about that

12   today, right?

13     A.    That's good.

14            MS. SIMSON:  Objection to form.

15   BY MR. STOPS:

16     Q.    Section 8.3(c)(ii) reads:  "Ten

17   years following the date of first commercial

18   sale in such country," correct?

19     A.    Correct.

20     Q.    Section 8.3(c)(ii) sets a minimum

21   amount of time that the royalties will be paid

22   for all of the potential royalty streams in the

23   2009 agreement, correct?

24            MS. SIMSON:  Objection to form.

25            THE WITNESS:  And not to legal

1      L. Pullan, Ph.D. - Highly Confidential

2      opinion?

3           MR. STOPS:   You're not allowed to

4      object.

5           MS. SIMSON:  I will say I will

6      object to the extent you're asking for a

7      legal conclusion or a legal opinion.

8      A.    Not offering a legal opinion, but

9  offering a business development perspective,

10  the clause, just as the first clause of last --

11  expired valid claim, the clause of ten years or

12  some variations of that are very standard

13  language.

14      Q.    And the -- the clause here:  "Ten

15  years following the date of first commercial

16  sale in such country" is the minimum amount of

17  time that the royalties will be paid for each

18  of the royalty streams set forth in the 2009

19  agreement, correct?

20           MS. SIMSON:  Objection to form.

21      A.    There is a single definition

22  applying to each of the royalty streams in this

23  agreement.

24      Q.    And each stream will last a minimum

25  of ten years, correct?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3          Asked and answered.

4          A.    Each stream will last a minimum of

5     ten years for first commercial sale on a

6     country-by-country, product-by-product basis.

7          Q.    So for the over a hundred countries

8     or so that Novartis sells ruxolitinib in, it

9     will pay a royalty to Incyte for a minimum of

10    ten years, correct?

11              MS. SIMSON:  Objection to form.

12         Objection to the extent you're asking for a

13         legal conclusion or a legal opinion.

14         A.    And I don't know how many countries

15    Novartis sells in.

16         Q.    Assuming it's over a hundred, for

17    all -- I'll take that statement out.  For all

18    the countries that Novartis sells ruxolitinib

19    in, it will pay a royalty for a minimum of ten

20    years to Incyte based on net sales of the

21    product in that country, right?

22              MS. SIMSON:  Objection to form.

23         Objection to the extent asking for a legal

24         conclusion or legal opinion.

25         A.    And the same applies in all the

1          L. Pullan, Ph.D. - Highly Confidential

2     directions, all the royalties.  They are paid

3     for ten years from first commercial sale.

4          Q.    And Novartis will pay Incyte

5     royalties on net sales of a ruxolitinib product

6     even in countries with no regulatory

7     exclusivity and no patent protection, correct?

8               MS. SIMSON:  Objection to form.

9          Objection to the extent you're asking for a

10         legal conclusion or legal opinion.

11         A.    It says the latter of any of these

12    circumstances.  It says "the longer of."

13    Sorry.  Same concept.

14         Q.    So even if there is no patent

15    protection and no regulatory exclusivity,

16    royalties still exist for ten years?

17              MS. SIMSON:  Objection to form.

18         Asked and answered.

19         A.    Yes.

20         Q.    And on a country-by-country,

21    product-by-product basis, royalties can be

22    extended if -- let me try a different way.

23              MS. SIMSON:  Are you withdrawing

24         that?

25              MR. STOPS:  Yeah, I'll withdraw that

1      L. Pullan, Ph.D. - Highly Confidential

2      question.

3  BY MR. STOPS:

4      Q.    Novartis's royalties to Incyte on a

5  product-by-product, country-by-country basis

6  can be extended if Incyte obtains patent

7  protection on Jakavi in the relevant country,

8  correct?

9           MS. SIMSON:  Objection to form.

10      Object to the extent you're asking for a

11      legal conclusion or legal opinion.

12      A.    The extent [sic] can be extended if

13  there are patents covering such product in the

14  particular country.

15      Q.    I think I either misheard or -- I'll

16  just read it back and you tell me if it's

17  transcribed wrong.  It came out as:  The extent

18  can be extended if there are patents covering

19  such product in the particular country?

20      A.    I don't think that's what I said,

21  but...

22      Q.    Did you mean to say the royalty can

23  be extended?

24      A.    The duration can be extended if

25  there are patents in that country.

1          L. Pullan, Ph.D. - Highly Confidential

2               THE WITNESS:  I can't imagine how

3     hard this job is.

4          Q.    In your opinion, at the time the

5     agreement was executed in 2009, did Incyte and

6     Novartis know that Incyte's royalties to

7     Novartis would continue beyond ten years?

8               MS. SIMSON:  Objection to form.

9          A.    Ten years from what?

10         Q.    Well, ten years from the first

11    commercial sale.  Wouldn't necessarily start on

12    that date, as we discussed, but ten years from

13    that as a measuring point?

14         A.    So there was uncertainty as to

15    whether it would get approved.

16         Q.    Okay.

17         A.    There was uncertainty as to when it

18    would get approved.  There was uncertainty as

19    to when the last patent to claim to expire

20    would be.

21              The parties -- both parties

22    modelled, talked about, estimated loss of

23    exclusivity for more than ten years of sales.

24         Q.    So is it your opinion that as of the

25    execution of the 2009 agreement, Incyte and

1        L. Pullan, Ph.D. - Highly Confidential

2     Novartis knew that royalties would continue,

3     assuming there is approval and assuming that

4     Incyte's patents were not invalidated, but it's

5     your opinion that as of the execution of the

6     agreement in 2009, the parties knew that the

7     royalty from Incyte to Novartis would continue

8     beyond ten years to the expiration of the

9     Incyte's patents?

10             MS. SIMSON:  Objection to form.

11        A.    I think "knew" is too strong a word.

12    Believed, expected, yes.

13        Q.    So if the parties expected the

14    royalty to continue until the expiration of

15    Incyte's patents, which would be beyond ten

16    years, there wasn't any reason to include the

17    ten-year provision in Section 8.3(c)(ii),

18    right?

19        A.    They did not know.  The provision

20    such as ten years is extremely common because

21    they cannot assume that patents are not

22    challenged and invalidated.  They cannot assume

23    claims are granted.  Country by country, they

24    cannot even assume there is a patent, right, so

25    no, that's not at all true.

1        L. Pullan, Ph.D. - Highly Confidential

2            The provisions of multiple

3    parameters in patent -- in royalty durations

4    are extremely common.  The forms of these are

5    practically universal.  Not universal; there

6    are always exceptions.  But this form of

7    last-to-expire claim, ten years from first

8    commercial sale, and regulatory exclusivity are

9    in the vast majority of deals, precisely

10    because it matters on a country-to-country

11    basis.

12            MS. SIMSON:  Eric, I think we've

13        been going well over an hour.  If we can

14        take a short break.

15            THE WITNESS:  That would be great.

16        Thank you.

17            MR. STOPS:  Okay.

18            THE VIDEOGRAPHER:  We are going off

19        the record.  The time is 3:17 p.m.

20            (Recess.)

21            THE VIDEOGRAPHER:  We are back on

22        the record.  The time is 3:44 p.m.

23    BY MR. STOPS:

24        Q.    Dr. Pullan, do you still have the

25    2009 agreement in front of you.

1          L. Pullan, Ph.D. - Highly Confidential

2          A.     Yes.

3          Q.     And that's Exhibit 1001, for the

4     record?

5          A.     Yes.

6          Q.     So we're still in section 8.3(c).

7     In Section 8.3(c)(i), it uses the phrase

8     "licensed patent rights," right?

9          A.     Yes.

10         Q.     Why does the section use the defined

11    phrase "licensed patent rights" instead of just

12    identifying the specific patent rights owned by

13    the parties in Section 8.3(c)?

14              MS. SIMSON:  Objection to form.

15         Objection to the extent you're asking for a

16         legal opinion or legal conclusion.

17         A.     I do believe lawyers write things

18    differently, but in this particular case, I

19    believe the point here is that the same

20    provisions cover the Incyte patents, Novartis

21    patents, joint patents, patents that aren't yet

22    filed, and therefore, a single lump worked to

23    serve the purpose.

24         Q.     The -- instead of licensed patent

25    rights, Section 8.3(c)(i) could have just said

1          L. Pullan, Ph.D. - Highly Confidential

2     Incyte patent rights, Novartis patent rights,

3     and patent rights in joint IP, right?

4               MS. SIMSON:  Objection to form.

5          Also objection to the extent you're asking

6          for a legal conclusion or legal opinion.

7          A.    And patent rights in joint IP, is

8     that the same as joint patent rights?

9          Q.    So I don't think joint patent rights

10    is a defined term.  So instead of -- instead of

11    it saying joint patent rights, in other

12    sections I believe it says patent rights and

13    joint IP.  So I was trying not to make up a

14    term there.

15         A.    I see.

16         Q.    So my question is just -- so instead

17    of licensed patent rights in Section 8.3(c)(i),

18    in your opinion, it would have been the same to

19    write Incyte patent rights, Novartis patent

20    rights, and patent rights in joint IP, correct?

21              MS. SIMSON:  Objection to form.

22         Object to the extent it mischaracterizes

23         her opinions in her report.

24         A.    I do believe the parties intended

25    the duration of the royalties to be the

1          L. Pullan, Ph.D. - Highly Confidential

2     last-to-expire claim of any patent, including

3     an Incyte patent, a Novartis patent, or however

4     you phrase a joint patent.

5          Q.     We can call it joint patents.  I

6     think we know -- understand what you mean

7     there.  Okay.

8               So instead of licensed patent

9     rights, it could have said Incyte patent

10    rights, Novartis patent rights, and joint

11    patent rights, right?

12              MS. SIMSON:  Objection to form.

13         Object to the extent you're asking for a

14         legal conclusion or legal opinion.

15         A.     And I suppose one could argue, if

16    you really want to be argumentative, that it

17    could have said almost anything.  This is what

18    they did agree to.

19         Q.     I prefaced that poorly then.

20    Without changing the meaning of the

21    Section 8.3(c)(i), instead of licensed patent

22    rights, it could have said Incyte patent

23    rights, Novartis patent rights, or joint patent

24    rights?

25         A.     Again --

1          L. Pullan, Ph.D. - Highly Confidential

2              MS. SIMSON:  Same objections.

3      A.      -- not as a lawyer.  I would argue

4  that that would be equivalent, but there may be

5  lawyerly purposes for the specific choices of

6  words, but the concept is that the parties work

7  together, pool their patents, and the patent

8  duration is based on loss of patent

9  exclusivity, ten years, or regulatory

10  exclusivity.

11      Q.    So I think your answer is you don't

12  have an opinion on this, but just checking.

13              Do you have an opinion on why the

14  drafters of the 2009 agreement use the term

15  licensed patent rights instead of simply

16  specifying Incyte patent rights, Novartis

17  patent rights, and joint patent rights?

18              MS. SIMSON:  Objection to form.

19          Calls for speculation.  Also object to

20          extent you're asking for a legal conclusion

21          or legal opinion.

22      A.    I think this was a nice clean

23  description, but I, again, am not offering a

24  legal opinion.

25      Q.    You're not offering a nonlegal

1        L. Pullan, Ph.D. - Highly Confidential

2   opinion on why they didn't draft it -- in

3   alternative ways, correct?

4            MS. SIMSON:  Objection to form.

5        A.    Hypotheticals are tough to answer

6   and what they could have, would have, should

7   have.  This is what they did.

8        Q.    So licensed patent rights itself is

9   defined in the agreement at Section 1.67, which

10  is on Page 10.

11       A.    Yes.

12       Q.    Okay.  Do you know how many times in

13  the agreement that the defined term licensed

14  patent rights is used?

15           MS. SIMSON:  Objection to form.

16       A.    I have read that it is asserting,

17  but I have not actually counted, once.

18       Q.    You've read that it is used once,

19  but you haven't actually counted; is that what

20  you --

21       A.    Correct.

22       Q.    Okay.

23       A.    Royalty term is also only used once.

24       Q.    True.

25       A.    The defined, the description of it,

1          L. Pullan, Ph.D. - Highly Confidential

2    the term may be used more than once, but it is

3    in one place for all three streams.

4          Q.    Ah, I understand what you're saying.

5                The words -- the phrase, rather,

6    "with respect to," is commonly used in

7    licensing collaboration agreements, correct?

8                MS. SIMSON:  Objection to form.

9          Foundation.

10         A.    I would agree that I have seen "with

11   respect to" in licensing agreements.

12         Q.    Do you know how many times the

13   phrase "with respect to" appears in the 2009

14   agreement, Exhibit 1001?

15               MS. SIMSON:  Objection to form.

16   BY MR. STOPS:

17         Q.    Do you have -- are you offering an

18   opinion about what the words "with respect to"

19   mean in your report?

20               MS. SIMSON:  Objection to form and

21         objection to the extent you're asking for a

22         legal conclusion, legal opinion.

23               Anita, the screen has just frozen

24         for a minute.  If you mind giving me --

25               You can go ahead and answer the

1       L. Pullan, Ph.D. - Highly Confidential

2       question.

3       A.      I have seen the language "with

4   respect to" used in agreements, and I have read

5   the agreements as -- as a business

6   professional, and I do not find any merit in an

7   argument that it somehow divides the patent

8   rights by who's selling or where the patents

9   came from.  I do not see a distinction of any

10  meaningful import by the addition "with respect

11  to" other than sort of saying in the ordinary

12  course of language what it says.

13      Q.      I hadn't gotten there yet.  I was

14  just asking in general, in drafting,

15  interpreting agreements, do the words, "with

16  respect to," have meaning?

17              MS. SIMSON:  Objection to form.  And

18          objection to the extent calling for a legal

19          conclusion or legal opinion.

20      A.      They have meaning as pointers, but

21  they don't have any ability to -- to slice and

22  dice and change the concept of the parties

23  agree to work together, each give each other

24  whatever patents are necessary or useful, and

25  pay each other royalties, and those royalties

1       L. Pullan, Ph.D. - Highly Confidential

2   last as long as there is a valid claim, or ten

3   years, or regulatory exclusivity, the latter

4   longer of.  Go ahead.

5       Q.    So jumping ahead, I'm still --

6   leaving aside this -- if we had never looked at

7   the 2009 agreement between Incyte and Novartis,

8   in drafting other agreements, have you ever

9   used the phrase "with respect to "?

10      A.    I'm sure I have.

11      Q.    And when you've done that, what has

12  it meant?

13            MS. SIMSON:  Objection to form.

14      A.    "With respect to," referring to, as

15  noted here.

16      Q.    So now to the actual definition of

17  licensed patent rights, when it says in the

18  first clause, "licensed patent rights means

19  with respect to the patent rights licensed to

20  Novartis hereunder, the Incyte patent rights,"

21  in that phrase, what do you understand "with

22  respect to," to mean?

23      A.    Talking about the patent rights

24  licensed to Novartis, they are the Incyte

25  patent rights.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    So when we're talking about the

3     patent rights licensed to Novartis hereunder,

4     we mean the Incyte patent rights?

5          A.    Yes.

6          Q.    So under what circumstances are we

7     talking about the patent rights licensed to

8     Novartis?

9               MS. SIMSON:   Objection to form.

10         Vague.

11         A.    Under the circumstances of this

12    agreement.

13         Q.    So when we're talking about a

14    product that Novartis sells, when we're

15    interested in examining a product that Novartis

16    sells, we're talking about the patent rights

17    that are licensed to Novartis, right?

18              MS. SIMSON:   Objection to form.

19         A.    That's not what this says.  This

20    says when we're talking about patent rights

21    licensed to Novartis, we're talking about the

22    Incyte patent rights.  It doesn't say, with

23    respect to who's selling the drug, the patent

24    rights.  It doesn't say that.

25         Q.    So when we're talking about what

1          L. Pullan, Ph.D. - Highly Confidential

2    licensed patent rights are licensed to

3    Novartis, we're talking about the Incyte patent

4    rights?

5              MS. SIMSON:  Objection to form.

6         A.    When we're talking about what

7    patents are licensed to Novartis, we are

8    talking about the Incyte patent rights.  Incyte

9    patent rights.

10        Q.    So with respect to Novartis,

11   licensed patent rights means the Incyte patent

12   rights?

13        A.    With respect to the patent rights

14   licensed to Novartis, those are the Incyte

15   patent rights.

16        Q.    And the term is licensed patent

17   rights.  So the patents -- licensed patent

18   rights, the patents that are licensed to

19   Novartis, I'm still trying to figure out what

20   licensed patent rights means with respect to

21   what's licensed to Novartis, that it means the

22   Incyte patent rights --

23             MS. SIMSON:  Objection to form.

24   BY MR. STOPS:

25        Q.    -- right?

1      L. Pullan, Ph.D. - Highly Confidential

2      A.    No.

3      MS. SIMSON:  And objection to the

4      extent it's asking for a legal opinion or

5      legal conclusion.

6      Go ahead, Dr. Pullan.

7      A.    As noted in my report, as noted

8  based on many years of experience, the parties

9  pool the patents to protect the product.  The

10  royalty duration is defined by the existence of

11  a patent under this whole clause, the entire

12  whole clause, such that, no matter whose patent

13  it is, it is for the duration of the last valid

14  claim under this entire paragraph 1.67.

15      Q.    You were saying before -- it

16  confused me because it didn't seem consistent

17  with the way that you phrased things in other

18  places.  The word "licensed patent rights," if

19  it was not capitalized, you say -- sorry.

20  Let's start a different way.

21      Licensed patent rights in your

22  opinion, in the context of the 2009 agreement,

23  means the same as or has the same intent as

24  licensed IP in the July 9 term sheet, right?

25      MS. SIMSON:  Objection to form.

1        L. Pullan, Ph.D. - Highly Confidential

2        Mischaracterizes testimony.  Object to the

3        extent calls for a legal conclusion or a

4        legal opinion, and object to your

5        characterization of her being inconsistent.

6             You can go ahead, Dr. Pullan.

7    A.    Thank you.

8             It's entirely possible I'm not as

9    clear as I would like to be and don't remember

10   every detail of what I have said, but I believe

11   I am entirely consistent in arguing that, read

12   in a straightforward way, the duration of the

13   royalties is any valid claim in the licensed

14   patent rights, and the licensed patent rights

15   includes Incyte patent rights and Novartis

16   patent rights.

17   Q.    So --

18   A.    And I skipped joint IP.  Sorry.

19   Q.    In your opinion, licensed patent

20   rights is not conditional; is that right?

21            MS. SIMSON:  Objection to form.  And

22       object to the extent you're asking for a

23       legal opinion or legal conclusion.

24   A.    So they could be conditional on

25   something.  The patents are invalid; there are

1          L. Pullan, Ph.D. - Highly Confidential

2    no patents, right.

3          Q.    Not, not that way.

4                So licensed patent rights in the

5    context of the 2009 agreement always means the

6    same thing, no matter what royalty stream

7    you're looking at, right?  That's your opinion?

8          A.    Yes.

9                MS. SIMSON:  Objection to form.

10         A.    There is a single clause governing

11   all three royalty streams.

12         Q.    Just like Novartis territory?

13               MS. SIMSON:  Objection to form.

14         Vague.

15         A.    Novartis territory doesn't -- I see

16   what you're trying to do, but Novartis

17   territory is clearly distinct because there is

18   a worldwide rights under cMET.

19         Q.    Because you read Novartis territory

20   as conditional?

21               MS. SIMSON:  Objection to form.

22         A.    I find that --

23               MS. SIMSON:  Mischaracterizes prior

24         testimony.

25         A.    I find that conditional thing a

1        L. Pullan, Ph.D. - Highly Confidential

2    useless word because all things are

3    conditional.  You know, if we're not alive, we

4    wouldn't be having this conversation.  That's a

5    condition.  That's a conditional.  So -- I

6    don't get it.

7        Q.    It's like a logical game.  If you --

8    if it depends on the starting condition, you

9    get a different output.  So if you start -- for

10   license for Novartis territory, if you're

11   looking at cMET, you then use the one term

12   Novartis territory and you get one answer.  If

13   you're looking at JAK and you use Novartis

14   territory, you get a different answer, right?

15       A.    Right.

16            MS. SIMSON:  Objection.

17       Q.    Now, licensed patent rights, you

18   think it doesn't matter what the starting

19   condition is if it's 8.3(a)(i) royalties,

20   8.3(a)(ii), 8.3(b)(i), 8.3(b)(ii), you get the

21   licensed patent right, and you get the same

22   answer no matter what.  It's always Incyte

23   patent rights, Novartis patent rights, and

24   joint patent rights, right?

25            MS. SIMSON:  Objection to form.  And

1      L. Pullan, Ph.D. - Highly Confidential

2      object to the extent called for a legal

3      opinion or a legal conclusion.

4      A.    I believe you have a logic error in

5  that the starting point of royalty term is

6  8.3(c).  It is not all those other pieces.  So

7  the starting point is the royalty term includes

8  licensed patent rights.

9      Q.    Licensed patent rights is -- sorry.

10  The royalty term is broken up on a

11  product-by-product, country-by-country basis.

12      A.    But there is one starting point,

13  8.3(c).

14      Q.    It's actually -- it's actually many

15  more than just the four royalty streams because

16  there's many different products and many

17  different countries.

18      A.    Which is all covered in 8.3(c).

19      Q.    Right.

20      A.    On a licensed product by licensed

21  product -- I'm sorry.  On a licensed product by

22  licensed product and country-by-country basis.

23  It's all right here.

24      Q.    So these are all different starting

25  points.  There are lots of licensed products,

1        L. Pullan, Ph.D. - Highly Confidential

2   right?

3           MS. SIMSON:  Objection to form.

4        Argumentative.  Now you're badgering the

5        witness, Counsel.

6   BY MR. STOPS:

7        Q.    Do you agree there are multiple

8   licensed products?

9        A.    Yes.

10       Q.    There are multiple countries?

11       A.    Yes.

12       Q.    So each combination of licensed

13  product and country has a different royalty

14  stream?

15           MS. SIMSON:  Objection to form.  And

16       also incomplete hypothetical.

17       A.    And everything is dealt with right

18  here.  You don't need to go elsewhere to say

19  that there are multiple products and multiple

20  countries.  This is the starting point to think

21  about the royalty term, and it uses licensed

22  patent rights covering such licensed product in

23  such country.  It doesn't say because it came

24  from somebody else.  It doesn't say because

25  it's being sold by somebody else.  It says on a

1          L. Pullan, Ph.D. - Highly Confidential

2    licensed product by licensed product basis --

3    sorry, I added the word basis -- and

4    country-by-country basis, the last to expire of

5    any valid claim of licensed patent rights

6    covering such licensed products.

7              You don't need to go reach somewhere

8    else.  It's right there.

9        Q.    Don't you have to know whether it

10   covers the licensed product?

11             MS. SIMSON:  Objection to form.  And

12        objection to the extent it asks for a legal

13        conclusion.

14   BY MR. STOPS:

15       Q.    Let me try a different way.  Let me

16   try a different way then.

17             MS. SIMSON:  Are you withdrawing

18        that question then?

19             MR. STOPS:  I'm asking a question.

20   BY MR. STOPS:

21       Q.    So there are JAK -- there are patent

22   rights that relate to ruxolitinib, correct?

23       A.    Yes.

24       Q.    There are patent rights that relate

25   to capmatinib, the cMET licensed product.

1        L. Pullan, Ph.D. - Highly Confidential

2        A.      Tabrecta, whatever it is.

3        Q.      That's the brand name.  Tabrecta.

4    The brand is T-A-B-R-E-C-T-A and the word I

5    said was capmatinib.  C-A-P --

6             MS. SIMSON:  M-A-T.

7             MR. STOPS:  -- I-N-I-B.  Capmatinib.

8             MS. SIMSON:  No objection to that

9        spelling.

10             MR. STOPS: Didn't want to do that

11        again.

12        A.      The only part I can ever remember is

13    the last part because that stands for an

14    inhibitor.

15        Q.      Okay.  Sorry.  There are patent

16    rights that are in the JAK area and patent

17    rights that are in the cMET area, right?

18             MS. SIMSON:  Objection to form.

19        A.      Area?  There are patent rights that

20    cover JAK molecules, products; and patent

21    rights that cover MET, cMET compounds or

22    patents -- compounds or products.  I'm sorry.

23        Q.      Does licensed patent rights mean

24    something different depending on if we're

25    looking at a JAK-licensed product or a

1       L. Pullan, Ph.D. - Highly Confidential

2    cMET-licensed product?

3           MS. SIMSON:  Objection to form, and

4       to the extent you're asking for a legal

5       conclusion or legal opinion.

6       A.    Licensed?  Ask me the question

7    again, please.

8       Q.    Does licensed patent rights mean

9    different things if we're looking at

10   JAK-licensed products or cMET-licensed

11   products?

12          MS. SIMSON:  Objection to form, and

13      to the extent you're asking for a legal

14      conclusion or legal opinion.

15      A.    In a definition basis, it means the

16   same thing, the lump of patents.

17          In a practical term, it is the

18   patents covering the product.  So there will be

19   different patents that cover different

20   products.  But the -- you do not need to break

21   it apart to have this paragraph make sense and

22   be interpretable.

23      Q.    Right.  My point is much, much

24   simpler.  Your -- depending on the starting

25   condition, JAK-licensed product or

1      L. Pullan, Ph.D. - Highly Confidential

2    cMET-licensed product, then we get to the

3    defined term, licensed patent rights, you get

4    something different out, even under your

5    interpretation, right?

6            MS. SIMSON:  Objection to form.  To

7        the extent you're asking for a legal

8        opinion or legal conclusion, I'll object on

9        that basis as well.

10     A.    And "get something different," you

11   pay royalties on a product that is covered by a

12   patent.  That patent could come from either

13   party.  Clearly, a patent that covers a cMET

14   inhibitor that doesn't cover a JAK inhibitor --

15   there could be one that covers both -- but

16   clearly one that does not cover a JAK inhibitor

17   would not trigger a royalty.  But that doesn't

18   change what the language says.

19     Q.    So licensed patent rights means

20   the -- means patent rights relating to JAK

21   products even with respect to the

22   commercialization of cMET products?

23     A.    No.

24            MS. SIMSON:  Objection to form.

25        Mischaracterizes her testimony.

1          L. Pullan, Ph.D. - Highly Confidential

2      A.    I just said, clearly it's patents

3  that cover the product.  So it would not

4  capture patents that don't cover the product.

5  But any patents that cover the product would be

6  captured.

7      Q.    Okay.  So let's go up to 1.67

8  license patent rights on Page 10 of the

9  agreement.  The first words of the second

10 sentence are:  "In each case."

11          Do you see that?

12     A.    Yes.

13     Q.    The words "in each case," have

14 meaning, right?

15          MS. SIMSON:  Objection to form, and

16     to the extent you're asking for a legal

17     conclusion or opinion.

18     A.    I'm not denying the words have

19 meaning, but I also think you don't need to

20 divide this definition, the definition applies

21 as it is written in 8.3(c).

22     Q.    Well, then, what are the cases?

23          MS. SIMSON:  Objection to form.

24     Vague.  And to the extent asking for a

25     legal conclusion or opinion.

1      L. Pullan, Ph.D. - Highly Confidential

2      A.     I think "in each case" refers to the

3   joint IP included in the Incyte patent rights

4   and the Novartis patent rights.  The sentence.

5      Q.     So in the case of patent rights

6   licensed to Novartis, you read it to mean

7   Incyte patent rights and patent rights forming

8   part of the joint IP, correct?

9           MS. SIMSON:  Objection to form, and

10          to the extent asking for a legal conclusion

11          or opinion.

12     A.     And I don't -- I think you're

13   compounding the two things.  You said in a case

14   of patents licensed to Novartis.  I'm reading

15   joint IP.

16     Q.     Right.

17     A.     No.  I read this sentence and it

18   says, "Patent rights forming joint IP shall be

19   included in Incyte patent rights and Novartis

20   patent rights."

21          I don't see a division that you're

22   trying to reach for.

23     Q.     Well, I thought I was actually

24   rephrasing what you said.

25          So it says "each case," right?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    Right.

3        Q.    So "each" means more than one?

4              MS. SIMSON:  Objection to form.

5    BY MR. STOPS:

6        Q.    So I read this as having two cases.

7              MS. SIMSON:  Objection to form.

8        And --

9    BY MR. STOPS:

10       Q.    I wasn't -- so I read this as having

11   two cases.

12             Is that consistent with how you read

13   the -- the words "in each case" in

14   Section 1.67?

15             MS. SIMSON:  Objection to the form,

16       and to the extent asking for a legal

17       opinion or legal conclusion.

18       A.    Incyte patent rights and Novartis

19   patent rights are part of joint IP and patent

20   rights.

21       Q.    I'm sorry.  So what are the cases,

22   in your reading of this?

23             MS. SIMSON:  Objection to form.

24       Same objections with respect to asking for

25       a legal conclusion or legal opinion.

1          L. Pullan, Ph.D. - Highly Confidential

2     A.     The sentence refers to the -- the

3   parts, but the parts are all included in

4   licensed patent rights.  And joint IPs shall be

5   included in the case of Incyte patent rights

6   and in the case of Novartis patent rights.

7     Q.     So if it's all lumped together why

8   does it need two cases?

9          MS. SIMSON:  Objection to form.

10         Mischaracterizes testimony.

11    A.     And --

12         MS. SIMSON:  And object to the

13         extent asking for a legal conclusion or

14         legal opinion.

15    A.     I cannot judge why someone wrote it

16  exactly as how they wrote it, and that is not

17  my role.  I can tell you that an experienced

18  person reading this would see no reason to come

19  to the conclusion that the licensed patent

20  rights as used in 8.3(c) does not mean the

21  patent rights that cover the product, whichever

22  party they come from in such country.

23    Q.     So the defined term is Licensed

24  Patent Rights, all capital first letters,

25  right?

1      L. Pullan, Ph.D. - Highly Confidential

2      A.    Yes, sir.

3      Q.    What significance, if any, do you

4    give to the choice of words:  "Licensed,

5    patent, and rights" here rather than orange --

6            MS. SIMSON:  Objection to form.

7    BY MR. STOPS:

8      Q.    -- for example?

9            MS. SIMSON:  And to the extent

10           asking for a legal opinion or legal

11           conclusion.

12     A.    I asked for that by playing with you

13    earlier, but I'm not going to parse the

14    individual words.

15     Q.    No, no, I'm actually not -- I'm not

16    asking you to.  I'm just asking you if had this

17    said orange or something else, if it had other

18    words here instead of licensed patent rights as

19    a defined term, would that change the meaning,

20    in your opinion?

21           MS. SIMSON:  Objection to form, and

22           to the extent asking for a legal opinion or

23           legal conclusion.

24     A.    I do think that's a legal

25    conclusion.  I think it would certainly make

1        L. Pullan, Ph.D. - Highly Confidential

2    interpretation more difficult because we

3    certainly approach contracts using the standard

4    vocabulary that we develop over hundreds of

5    contracts, and this is very standard

6    vocabulary, and orange would not be standard

7    vocabulary and would not be helpful.

8        Q.    Is a way to look at it that, since

9    the words licensed patent rights are, in your

10   opinion, words that are somewhat commonly used,

11   the reader comes to the definition with a

12   general understanding of what they're going to

13   mean?

14            MS. SIMSON:  Objection to form to

15        the extent asking for a legal conclusion or

16        legal opinion.  And also mischaracterizes

17        her testimony.

18        A.    I think it is certainly true that by

19   using standard forms, that unless one finds an

20   explicit deviation from those standard forms, a

21   noted exception, that it is most likely

22   interpretable as consistent with standard

23   business practices.  Jargon arises in an

24   industry of a profession because it is useful,

25   and we all have our jargon.

1        L. Pullan, Ph.D. - Highly Confidential

2        Q.    So if you see a term that is

3    consistent with industry practice, you would --

4    general understanding of what you're going to

5    get, but if you saw something like orange, it

6    wouldn't be helpful?

7        A.    It would not be helpful.

8            MS. SIMSON:  Objection to form.

9        A.    But it's also true that if I saw the

10   standard words and the definition was very

11   nonstandard, that I also would take note.

12   Either the use of a nonstandard word as a

13   defined term or a very nonstandard definition

14   would cause an alert to pay attention to the

15   exception, or if there's something explicitly

16   stated, we would pay attention to that explicit

17   statement.

18       Q.    Now, this definition "with respect

19   to the patent rights licensed to Novartis

20   hereunder, the Incyte patent rights, and with

21   respect to the patent rights licensed to Incyte

22   hereunder, the Novartis patent rights, in each

23   case the patent rights forming part of the

24   joint IP shall be included as applicable in the

25   Incyte patent rights and Novartis patent

1      L. Pullan, Ph.D. - Highly Confidential

2   rights," leaving aside the party names, of

3   course, is this standard form?

4         MS. SIMSON:  Objection to form, and

5      to the extent asking for a legal conclusion

6      or legal opinion.

7      A.    It certainly reads as a form that I

8   have seen in other agreements.  It is not

9   precisely the same form as in some other

10  agreements, but it doesn't jump out as

11  something oddball, nonstandard.

12     Q.    So it doesn't say oranges?

13     A.    It doesn't say orange.

14     Q.    So -- okay, so let's go back.  Would

15  you turn to Section 7.3 of the agreement.  That

16  is, I believe, titled:  Third-party

17  infringement.

18        MS. SIMSON:  Do you have a page

19     number, Mr. Stops?

20        MR. STOPS:  I will.  It is Page 48

21     of the agreement.

22        MS. SIMSON:  Thank you.

23  BY MR. STOPS:

24     Q.    The first Subsection 7.3(a) is

25  notice provisions, correct?

1          L. Pullan, Ph.D. - Highly Confidential

2      A.    Yes.

3      Q.    And in the first sentence, it

4   relates to notice of infringement of joint IP,

5   Incyte IP, or any Novartis IP.

6          Do you see that?

7      A.    Yes.

8      Q.    Had the parties wanted to pool

9   patent rights, they could have used similar

10  language to the language of Section 7.3(a),

11  correct?

12         MS. SIMSON:  Objection to form, and

13      to the extent asking for a legal conclusion

14      or legal opinion.

15     A.    And it's a hypothetical.  And they

16  could have said, any joint IP, any Incyte IP,

17  or any Novartis IP.  They didn't.  The word

18  "any" doesn't appear in exact parallel form.

19  There are stylistic differences.  People do not

20  write everything exactly the same way

21  throughout a contract, and different lawyers

22  contribute different pieces of contracts and

23  write differently.

24     Q.    Sure.  My question was just,

25  licensed patent rights -- I'm sorry, instead of

1         L. Pullan, Ph.D. - Highly Confidential

2    licensed patent rights in Section 8.3(c)(i),

3    the parties could have just used this same form

4    and written it:  Joint patents, Incyte patents,

5    or any Novartis patents, right?

6              MS. SIMSON:  Objection to form to

7         the extent asking for legal conclusion or

8         legal opinion.  Also incomplete

9         hypothetical.

10        A.    It is a hypothetical.  It is my

11   opinion that that would be a largely equivalent

12   form.

13        Q.    So --

14             MS. SIMSON:  Sorry.  Did she say she

15        needed to fix something?

16             (Multiple speakers.)

17   BY MR. STOPS:

18        Q.    At the time the 2009 agreement was

19   executed, there was no product named Jakafi,

20   correct?

21        A.    Correct.

22             MS. SIMSON:  Objection to form.

23        Q.    And there was no product named

24   Jakavi, right?

25        A.    Right.  Because Novartis owned both

1        L. Pullan, Ph.D. - Highly Confidential

2    those brand names and gave them to Incyte.  One

3    of its many contributions to Incyte was both

4    brand names.  And they're good brand names by

5    the way.  The world knows those drug names.

6    Much better than many of the other ones, right?

7    Easy to remember.

8        Q.    Incyte -- ruxolitinib was the first

9    approved Janus-kinase inhibitor, correct?

10            MS. SIMSON:  Objection to form.

11       A.    Yes, as far as I know.  I could be

12   wrong on that, to be honest.  I don't -- I

13   believe so.

14       Q.    Janus kinase is what's abbreviated

15   JAK?

16       A.    JAK.  Right.

17       Q.    There were no products being sold at

18   all under the agreement when it was executed in

19   2009, right?

20       A.    That's correct.  Incyte had no

21   commercial infrastructure.  And nothing had

22   been approved.

23       Q.    There were several possible JAK

24   compounds that could have been sold under the

25   2009 agreement, correct?

1        L. Pullan, Ph.D. - Highly Confidential

2             MS. SIMSON:  Objection to form.  And

3        incomplete hypothetical.

4        A.    There are potential alternative

5   compounds to rux that could have been under

6   this agreement as the first product sold.

7   There still could be additional products sold

8   under this agreement.

9        Q.    So would a -- a JAK inhibitor other

10  than ruxolitinib could have been sold by either

11  party under the agreement, correct?

12            MS. SIMSON:  Objection to form.

13       A.    Yes.

14       Q.    And several other Incyte JAK

15  inhibitors are identified in the agreement as

16  potential compounds, correct?

17            MS. SIMSON:  Objection to form.

18       A.    There are INCB numbers.

19       Q.    I think we mentioned this -- I think

20  we went over this before, but under the

21  Section 8.3(b)(i) royalty from Incyte to

22  Novartis, the only currently relevant JAK

23  product is Jakafi, right?

24            MS. SIMSON:  Objection to form.

25       A.    I have no firsthand knowledge that

1          L. Pullan, Ph.D. - Highly Confidential

2     that is true, but I believe that to be true.

3          Q.     And the relevant Incyte territory is

4     the United States and its territories, right?

5          A.     Yes.

6          Q.     So in Section 8.3(c)(i) --

7               MS. SIMSON:   Counsel, you're

8          flipping now back to Page 57.  I just saw

9          you.

10               MR. STOPS:   We were on it with

11          8.3(b)(i).

12     BY MR. STOPS:

13          Q.     So in Section 8.3(c)(i), with

14     respect to Incyte's royalty to Novartis under

15     8.3(b)(i), where it reads:  "Such licensed

16     product in such country, the relevant Incyte

17     royalties to Novartis will be based on sales of

18     the product Jakafi made in the United States,"

19     correct?

20               MS. SIMSON:   Objection to form, and

21          to the extent calling for a legal

22          conclusion or legal opinion.

23          A.     So such country, that's -- that I

24     got kind of lost.  Are you saying such country

25     as in B or in C?

1        L. Pullan, Ph.D. - Highly Confidential

2        Q.    So I'm just trying to make sure

3    we're talking about the same thing.  I'm

4    talking about the royalties being paid pursuant

5    to 8.3(b)(i) from Incyte to Novartis,

6    currently, or that were already subject of this

7    dispute between the parties.

8              And with respect to those royalties,

9    when we go look at 8.3(c)(i), where it says:

10   "Covering such licensed product in such

11   country, such licensed product is Jakafi and

12   such country is the United States," correct?

13             MS. SIMSON:  Objection to form and

14        to the extent calling for a legal

15        conclusion or legal opinion.

16        A.    I concur.

17        Q.    So from your reports, I understand

18   that it's your position that the parties should

19   have been -- rather, I understand it's your

20   position that the parties should have more

21   clearly spelled out that Novartis's royalties

22   to Incyte based on sales -- let me start that

23   again.  I think that was a little confusing.

24             So you -- you generally understand

25   Incyte's positions in this case, that the

1          L. Pullan, Ph.D. - Highly Confidential

2     royalties have -- that the ten years have

3     passed and the royalties have stopped, right?

4          MS. SIMSON:  Objection to form.  And

5          Novartis obviously disputes that position.

6     A.     I do not understand the basis for

7     those opinions.  I understand that is what they

8     are claiming.

9     Q.     Do you not understand the basis or

10    did you not agree with the basis?

11         MS. SIMSON:  Same objection.

12    A.     I think both are true.  I cannot

13    understand how they can possibly get to such a

14    conclusion and therefore I disagree with their

15    conclusion.

16    Q.     Okay.  Had --

17         MS. SIMSON:  Just for the record,

18         there is a glass of water spilled and we

19         are okay.

20    BY MR. STOPS:

21    Q.     So had the parties wanted to

22    effectuate Incyte's interpretation of

23    Section 8.3(c)(i), okay, it's your opinion that

24    they should have more clearly spelled out that

25    Incyte's royalties to Novartis on sales of

1     L. Pullan, Ph.D. - Highly Confidential

2    Jakafi in the United States do not depend on

3    any patents that Incyte obtains, correct?

4         MS. SIMSON:  Objection to form.

5         Mischaracterizes her opinions and her

6         testimony.

7     A.    I think it is true that I would

8    state that if the parties had agreed that

9    Novartis was required to get a patent, it would

10   have been discussed, it would have appeared in

11   the term sheets, it would have been on the

12   issues list, it would have been in the

13   agreement in an explicit manner.  None of the

14   above is true.

15    Q.    Now, you don't provide any proposed

16   language in your report to accomplish that

17   proposed clarification, right?

18         MS. SIMSON:  Objection to form, and

19         to the extent calls for a legal conclusion

20         or a legal opinion.

21    A.    The language that I would propose

22   would be the practical language of a business

23   development person and the final contract would

24   reflect a legal -- a lawyer's write-up.

25    Q.    Okay.

1          L. Pullan, Ph.D. - Highly Confidential

2          A.     And therefore I do not propose the

3     specific language.  I always tell my clients

4     that we get a lawyer when we get down to

5     precise language.  We BD people focus on making

6     the arrangement work, the collaboration work.

7     We focus on who does what, who pays what, and

8     how long they get paid.

9               Those are the sort of fundamental

10    things, not all the fundamental things, but the

11    majority of fundamental things that are

12    pre-agreed in a term sheet.  And then the

13    precise form of the language that captures

14    those in the fullest form is written by

15    lawyers.

16         Q.     So the lawyers effectuate the intent

17    of the BD people; is that what you're saying?

18               MS. SIMSON:  Objection to form.

19         Mischaracterizes testimony.

20         A.     The lawyers are to reflect the

21    agreed-upon structure and relationship as

22    defined by the term sheets, with input from

23    lawyers, but the -- the drivers of the

24    structure are typically business development

25    professionals.

1         L. Pullan, Ph.D. - Highly Confidential

2         Q.    So wait, then what's the lawyer

3    role?

4         A.    To capture and make complete the

5    language that reflects the structure, and to

6    add things like the assignment clauses and

7    things that we don't normally put in term

8    sheets.

9         Q.    So you don't draft the language of

10   the agreements?

11             MS. SIMSON:  Objection to form.

12        A.    I do not draft the final language of

13   agreements, correct.

14        Q.    And you didn't propose any draft

15   language in your reports in this matter that

16   would have effectuated Incyte's position in

17   this case, correct?

18             MS. SIMSON:  Objection to form.

19        A.    It was not my purpose --

20        Q.    Sure.

21        A.    -- to amend the agreement.

22        Q.    No.  But you didn't say anywhere in

23   your report, if Incyte wanted to say what it

24   says it says, it should have drafted it this

25   way, right?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3          Mischaracterizes her opinions.

4          A.    I said in my report if the parties

5     had agreed to a particular stipulation, it --

6     particularly when it goes beyond the norm, it

7     would be reflected in explicit language.  I did

8     not write, myself, that explicit language.  I

9     didn't think it was necessary.  That is, it's

10    pretty obvious that it's not there.

11         Q.    Well, Incyte's position is that it

12    is explicitly there, right?

13              MS. SIMSON:  Object.

14    BY MR. STOPS:

15         Q.    Look you don't have to agree with

16    it, but you understand that's Incyte's

17    position, correct?

18              MS. SIMSON:  Objection to form.

19         Argumentative.

20         A.    I think it is not explicitly there.

21         Q.    Right.  You understand that it's

22    Incyte's position that it is explicitly there?

23              MS. SIMSON:  Objection to form.

24         Argumentative.

25         A.    I understand Incyte disputes the

1      L. Pullan, Ph.D. - Highly Confidential

2  obvious interpretation that certainly I and

3  others are likely to reach by reading this

4  thing.

5      Q.    Well, not everybody reaches that

6  conclusion, right?

7          MS. SIMSON:  Objection to form.

8      Argumentative.

9      A.    I agree Incyte has a different

10 perspective.  I do not see any explicit

11 language that supports the contention that

12 Novartis has to go get a patent.  I do not see

13 it in the contract, I do not see it in the

14 discussions, I do not see it in the Incyte

15 presentations, I don't see it in the Novartis

16 presentations.  It does not exist.

17     Q.    What do you mean Novartis has to get

18 a patent?  Who says Novartis has to get a

19 patent?

20         MS. SIMSON:  Objection to form.

21     A.    Or not get paid.

22     Q.    But they do get paid.

23         MS. SIMSON:  Objection to form.

24     Mischaracterizes the record.

25 BY MR. STOPS:

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.     Hold on.  Just so we have it clear,

3     Novartis does get paid, right?

4                 MS. SIMSON:  Objection to form --

5          A.     Incyte --

6                 MS. SIMSON:  I just want to state

7          for the record, Incyte has taken the

8          position that they are no longer paying

9          Novartis.  So I'm going to object to your

10         question on that basis.

11         A.     Incyte has said they're not paying

12    Novartis.

13         Q.     Right.

14         A.     They stepped down and are not

15    paying.

16         Q.     But Novartis got paid for ten years,

17    right?

18                MS. SIMSON:  Objection to form.

19         Mischaracterizes the record.

20         A.     And that is not the last to expire

21    of any valid claim.

22         Q.     No.  So just so we're clear, no one

23    has ever said that Novartis had to get a

24    patent.

25                They got the benefit of what they

1          L. Pullan, Ph.D. - Highly Confidential

2    bargained for, right?

3            MS. SIMSON:  Objection to form.

4          Mischaracterizes the record and

5          Dr. Pullan's opinions and testimony.

6            (Multiple speakers.)

7          A.    This is what they bargained for --

8            MS. SIMSON:  And Dr. Pullan's

9          opinions and testimony.

10   BY MR. STOPS:

11         Q.    When you said -- when you say this

12   is what you bargained for, you pointed to

13   Section 8.3(c) of the agreement?

14         A.    And it includes the last to expire

15   of any valid claim of a patent covering the

16   product in the country.

17         Q.    That's not what it says, though,

18   right?

19           MS. SIMSON:  Objection to form.

20         Argumentative.

21   BY MR. STOPS:

22         Q.    The actual words are:  "The last to

23   expire of any valid claim of capitalized, Term,

24   Licensed, capitalized P Patent, capitalized R

25   Rights, capitalized C Covering such licensed

1     L. Pullan, Ph.D. - Highly Confidential

2  product in such country, right?

3     A.    You left out the capital L and the

4  capital P.

5     Q.    Sure, I did.  But the actual words,

6  words matter, right?

7          MS. SIMSON:  Objection to form.

8     Argumentative.

9     A.    And we have been through the fact

10 that I believe the correct interpretation of

11 licensed patent rights covering such licensed

12 product is a patent covering such product in

13 such country.  And so I do not see a

14 discrepancy in my position, in my report in the

15 language.

16    Q.    Right, but the way we got here was

17 you had said that Novartis must get a patent.

18 There is no requirement under the agreement,

19 under anyone's interpretation, that Novartis

20 has to get a patent, right?

21         MS. SIMSON:  Objection to form.

22    Mischaracterizes the record.  And

23    mischaracterizes her testimony.

24    A.    I was saying that Incyte's disputed

25 position argues that in the absence of Novartis

1     L. Pullan, Ph.D. - Highly Confidential

2     getting a patent, they are not going to get

3     paid, and that is a requirement to get the

4     patent in order to get paid beyond the ten

5     years, and that is what it is all about.

6         Q.     If Incyte obtained a patent today

7     that extended the term of the generic-free term

8     of the products out to 2040 --

9         A.     Right.

10        Q.     -- that would be to the benefit of

11    both parties, right?

12             MS. SIMSON:  Objection to form.  And

13             vague as to location.

14        A.     I would argue it would be to the

15    benefit of both parties.  The collaboration is

16    to the benefit of both parties.

17        Q.     Did anyone say that Incyte needed to

18    get a patent that goes up to 2040?

19             MS. SIMSON:  Objection to form.

20        A.     If Incyte had not already had a

21    patent, then someone would need to go get a

22    patent to prevent the generic entry and keep

23    the royalties going.  Incyte already had a

24    patent at the start of this discussion.

25        Q.     Getting additional patent protection

1          L. Pullan, Ph.D. - Highly Confidential

2    would be to both parties' benefit, right?

3              MS. SIMSON:  Objection to form.

4          A.    Yes.

5          Q.    But there's no requirement to get

6    additional patents, correct?

7              MS. SIMSON:  Objection to form.

8          Vague.  Object to the extent you're asking

9          for a legal conclusion or legal opinion.

10         A.    I think you're trying to say that

11   I'm making a blatant statement that there is a

12   requirement, I'm saying there is a requirement.

13   You're positing that there is a requirement.  I

14   am objecting to the position that there is a

15   requirement for the royalties to be paid.

16             You're distorting my position by

17   posing it as an absolute requirement, and

18   neither side had an absolute requirement, but

19   the royalties are dependent on the existence of

20   any patent, in contrast to Incyte's position

21   that in the absence of a Novartis patent, they

22   stop.

23         Q.    What's a blocking patent?

24             MS. SIMSON:  Objection to form.

25         Foundation.

1          L. Pullan, Ph.D. - Highly Confidential

2     A.    I'm not a patent attorney.  So I

3  would defer to somebody who is to make a good

4  definition of a blocking patent.

5     Q.    Well, you would agree that Incyte's

6  own patents cannot block its sales of Jakafi in

7  the United States, correct?

8          MS. SIMSON:  Objection to form, and

9          to the extent you're asking for a legal

10         conclusion or legal opinion, I would object

11         on that basis.

12    A.    Incyte has the right, absent this

13  agreement, to exclude others.  Under this

14  agreement, Novartis and Incyte are partners,

15  and they have the right to exclude others.

16    Q.    So let's break that up for a second.

17  Outside the agreement, we're in agreement that

18  Incyte's own patents cannot block its sales of

19  Jakafi in the United States, correct?

20         MS. SIMSON:  Objection to form.

21    A.    I think that statement is correct.

22  Independent of the agreement.

23    Q.    Sure.

24    A.    As a hypothetical, all that

25  business, yes.

1          L. Pullan, Ph.D. - Highly Confidential

2     Q.    So in the context of the agreement,

3  are you saying that Incyte's patents block its

4  sales of Jakafi in the United States?

5          MS. SIMSON:  Objection to form.

6     Mischaracterizes her testimony.

7     A.    I never said that.

8     Q.    I misunderstood then.  Okay.  You

9  said, then -- let me ask you affirmatively

10 then.

11          In the context of the agreement,

12 Incyte's own patents cannot block its sales of

13 Jakafi in the United States, correct?

14          MS. SIMSON:  Objection to form, and

15     to the extent asking for a legal opinion.

16     Or legal conclusion.

17    A.    Incyte has patents that cover the

18 product, and under this agreement they are

19 permitted to sell under those patents.

20    Q.    Permitted by who?

21          MS. SIMSON:  Objection to form.

22    A.    By the fact they have a patent.

23    Q.    Do they need a patent to sell it?

24    A.    No.

25          MS. SIMSON:  Objection to form.

1      L. Pullan, Ph.D. - Highly Confidential

2   BY MR. STOPS:

3      Q.    So its own patents don't block its

4   sales of Jakafi in any context, right?

5          MS. SIMSON:  Objection to form, and

6      to the extent asking for a legal conclusion

7      or legal opinion.

8      A.    I think you are correct that I'm not

9   saying that its own patents blocked it from

10  selling.  I've never said that.

11     Q.    And, similarly, a hypothetical

12  Novartis-owned patents -- a hypothetical

13  Novartis-owned patent would not be able to

14  block Novartis's sales of Jakavi, right?

15         MS. SIMSON:  Objection to form.

16     A.    Actually, you know, there are

17  circumstances in which in either case that

18  could be true.  If they granted an exclusive

19  license to somebody else, they would have given

20  up the rights to sell under their own patents.

21     Q.    Right.  That's -- I can understand

22  the hypothetical.  That's why I specified

23  Jakavi where Novartis has the right to sell.

24  So in the context here a Novartis-owned patent

25  would not be able to block Novartis's sales of

 1       L. Pullan, Ph.D. - Highly Confidential

 2   Jakavi, right?

 3           MS. SIMSON:  Objection to form, to

 4       the extent asking for a legal conclusion or

 5       legal opinion.

 6       A.     And the same form applies to Incyte.

 7   That is, if Incyte had given somebody else an

 8   exclusive right in the United States, they

 9   would be precluded from selling in the United

10   States because they would have given the rights

11   to somebody else.

12       Q.     But they didn't, right?

13       A.     Right.  And your questions were the

14   same sort of hypothetical.  In the

15   hypothetical, this that and the other.  So I'm

16   just clarifying that there are circumstances

17   that it could have applied, but what we're

18   focused on is in indeed this agreement.

19       Q.     And under this agreement, Incyte's

20   own patents don't block its sales of Jakafi?

21           MS. SIMSON:  Objection to form.

22       A.     You have said that repeatedly.

23           MS. SIMSON:  Eric, we've been going

24       a little over an hour.  If we can take a

25       short break.

1      L. Pullan, Ph.D. - Highly Confidential

2           MR. STOPS:  Doctor,  do you need a

3      break?

4           THE WITNESS:  I think it's lovely to

5      have a short break.

6           MR. STOPS:  Can we keep this under

7      20 minutes?

8           MS. SIMSON:  I think we can keep it

9      to ten.

10           MR. STOPS:  Please.

11           THE WITNESS:  Thank you.

12           THE VIDEOGRAPHER:  Microphone.

13           We are going off the record.  The

14      time is 4:49 p.m.

15           (Recess.)

16           THE VIDEOGRAPHER:  We are back on

17      the record.  The time is 5:04 p.m.

18  BY MR. STOPS:

19      Q.   Dr. Pullan, what prevents generic

20  competition for a pharmaceutical product?  I

21  know it's a broad question, but generally

22  speaking.

23           MS. SIMSON:  Objection to form.

24      A.   Generic products are broadly

25  excluded by a valid patent.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.     You'd agree that license -- licenses

3     to patents are typically the biggest driver of

4     deal value, right?

5          A.     No.

6                 MS. SIMSON:  Objection to form.

7          Q.     You don't agree with that?

8          A.     I say they are a piece of value, a

9     very significant piece, but if you look in my

10    rebuttal report, I believe I state that if they

11    were the only portion or the majority portion,

12    that we would pay the same thing for a

13    preclinical compound as a Phase 3 compound, and

14    the difference is data.

15         Q.     Would you open your opening report,

16    please.

17         A.     Yes.

18         Q.     That's Exhibit 1002.  Page 6, second

19    full paragraph.  I'll read you the last

20    sentence.  It says:  "Patents are generally

21    viewed as the largest value driver."

22                Do you see that?

23         A.     I do see that.  That was a mistake.

24    I should have said are generally viewed as one

25    of the largest value drivers.

1      L. Pullan, Ph.D. - Highly Confidential

2      Q.    The commercial life of a product

3  ends when there is generic competition, right?

4      A.    No, the high value of commercial

5  life of a product decline.

6            UNIDENTIFIED VOICE:  Some of cases

7  don't require --

8            MR. STOPS:  Is that coming out of

9  the Zoom?  Can we go off the record for a

10 second?

11           MS. SIMSON:  Yeah, let's go off the

12      record just for a moment.

13           (Multiple speakers.)

14           MR. STOPS:  -- whoever is saying

15      this.

16           THE VIDEOGRAPHER:  We are going off

17      the record.  The time is 5:06 p.m.

18           (Recess.)

19           THE VIDEOGRAPHER:  We are back on

20      the record.  The time is 5:07 p.m.

21 BY MR. STOPS:

22      Q.    And what do you mean by the high

23 value commercial life of a product?

24      A.    So for small molecules, as opposed

25 to biologics, the entry of a generic in recent

1        L. Pullan, Ph.D. - Highly Confidential

2    years has meant a very rapid decline of both

3    the sales price and sales volume sold by the

4    seller who is there before the generic.

5        Q.    Don't branding companies tend to

6    increase their price initially when there's

7    generic competition?

8            MS. SIMSON:  Objection to form.

9        A.    I think they often increase their

10   price in anticipation of the loss.  I do not

11   believe they increase their price after the

12   loss or certainly not substantial -- prices

13   drop.

14       Q.    So there are a group, maybe small

15   group of patients who will pay for a brand

16   product regardless, right?

17           MS. SIMSON:  Objection to form.

18       A.    There are sometimes a small group of

19   people who will pay for a branded product.

20   Increasingly, their insurance will not cover

21   that purchase price.  The insurance will push,

22   even in the United States, extremely so

23   elsewhere, will push for the cheaper generic

24   product.

25       Q.    But isn't the incentive to increase

1          L. Pullan, Ph.D. - Highly Confidential

2     the price since the volume is going down and

3     there is -- I think there was a small group of

4     what they would call inelastic purchasers?

5               MS. SIMSON:  Objection to form.

6          A.    Price is a pretty complicated

7     decision, and I should not weigh in on price

8     because I have never set the price of a single

9     drug.  There are curves that are worked on to

10    try to figure out the optimal price.  The point

11    for generic entry is that most of the value is

12    lost.

13         Q.    And generic -- generic entry takes

14    place when there is a loss of exclusivity for

15    the product, correct?

16              MS. SIMSON:  Objection to form.

17         A.    Generic entry need not take place at

18    the time when there is loss of exclusivity, but

19    does often take place when there is a loss of

20    exclusivity.

21         Q.    In the context of commercialization

22    of a pharmaceutical product, know-how doesn't

23    delay the entry of generic competition,

24    correct?

25              MS. SIMSON:  Objection to form.

1          L. Pullan, Ph.D. - Highly Confidential

2      A.      There are regulatory recognitions of

3   data exclusivity, which is a form of know-how,

4   which can indeed delay generic entry.  That is,

5   the FDA and other bodies can offer exclusivity

6   based on the data.

7      Q.      Right.  That would fall under

8   regulatory exclusivity, correct?

9      A.      That is correct.

10      Q.      So leaving aside exclusivities,

11   patent exclusivities, regulatory exclusivities,

12   know-how itself doesn't extend the commercial

13   life of a product, correct?

14          MS. SIMSON:  Objection to form.

15      A.      Generally not.  There, again, can be

16   exceptions if there is a trade secret, which is

17   essential to being able to practically practice

18   that product manufacturer or -- that's probably

19   the most likely, but correct.

20      Q.      Exceptions would be hard-to-make,

21   hard-to-formulate price?

22      A.      Correct.

23      Q.      And know-how is most significant at

24   the beginning of an agreement when the asset is

25   being transferred, right?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3     A.     There is know-how transfer at the

4  beginning of most agreements.  Know-how

5  continues to be developed under the

6  collaboration and therefore the most important

7  know-how may come late in an agreement rather

8  than at the time of signing an agreement.  The

9  most important know-how for the value of the

10  product, the label, the success of the drug

11  need not come at the beginning of an agreement.

12     Q.     Would you agree that the know-how is

13  most significant at the beginning when the

14  asset's being transferred?

15               MS. SIMSON:  Objection to form.

16     A.     No, I just said no.  I said may or

17  may not, often is not.  If I do a deal --

18     Q.     You still have -- I'm sorry.  Go

19  ahead.

20     A.     At preclinical and during the

21  collaboration, I figure out the best patient

22  population for which this drug will be

23  successful.  That may be the most valuable

24  thing.  The difference between two very similar

25  drugs, Keytruda and Opdivo, which are huge

1        L. Pullan, Ph.D. - Highly Confidential

2    successes, is largely the distinction in the

3    clinical development programs the two companies

4    ran, such that the demonstration of efficacy in

5    certain tumor types, certain patient

6    populations was developed late in life up to

7    and after approval, and that has enabled

8    Keytruda to have much higher sales than Opdivo.

9    So valuable know-how can occur throughout the

10   life of the product.

11       Q.    Under your right hand is your

12   opening report, Pullan Exhibit 1002, second

13   full paragraph, Page 6, middle of the

14   paragraph.  I'll read you from it:  "Know-how

15   is most significant at the beginning when the

16   asset is being transferred."

17            Do you see that?

18       A.    Yes.

19       Q.    Did I read that correctly?

20       A.    Yes.

21       Q.    Do you agree that in the context

22   of -- sorry.  Do you agree that only rarely is

23   know-how a significant barrier to market

24   competition?

25       A.    When I was writing this I was

1      L. Pullan, Ph.D. - Highly Confidential

2    thinking of the know-how that is in the

3    licensed IP.  This was talking about the

4    know-how brought into the agreement, and if --

5    if you think in those terms or if you think in

6    extremely broad terms of all know-how, then

7    this statement is correct.

8            However, the data that is generated,

9    the know-how of how best to use the drug is of

10   substantial value and is often developed later

11   than the start of the agreement.

12      Q.    Under the agreement -- the 2009

13   agreement between Incyte and Novartis, that

14   second category, know-how that is later

15   developed, that's jointly owned by the parties,

16   correct?

17      A.    I believe that's correct.

18      Q.    Okay.  We can go back to that in a

19   minute, but you'd agree that financial

20   investments don't prevent generic competition

21   directly, correct?

22            MS. SIMSON:  Objection to form.

23      A.    The -- dollars, per se, are not a

24   barrier to, but wise investment generates data

25   that can indeed be a barrier to competition.

1      L. Pullan, Ph.D. - Highly Confidential

2   Smart marketing can also be a barrier to

3   competition.

4      Q.    In terms of preventing switches to

5   generic alternatives?

6      A.    Yes.  Physician loyalty, custom and

7   practice by physicians of how they are

8   comfortable with a medicine, yes.

9      Q.    Okay.  You also discussed the

10  meaning of the term "covering" with a capital C

11  in your reports, correct?

12     A.    Yes.

13     Q.    And you offer the opinion that

14  covering has a commonplace definition, correct?

15          MS. SIMSON:  Objection to form.  And

16      also mischaracterizes the scope of his

17      opinion.

18     A.    Covering is defined similarly in

19  many, many agreements.

20     Q.    And is that what you mean by

21  commonplace, defined similarly in many

22  agreements?

23          MS. SIMSON:  Objection to form.

24     A.    I think so.

25     Q.    Now, the definition that you offer

1          L. Pullan, Ph.D. - Highly Confidential

2     in your report for covering as a commonplace

3     definition, that isn't based on the words of

4     the 2009 agreement, correct?

5               MS. SIMSON:  Objection to form, and

6          to the extent --

7          A.    Can you point me to where you're

8     talking about?

9          Q.    Yes.  It is your opening report at

10    Page 9, and I believe it's at the bottom of the

11    page.  Yes, spanning on to Page 10.  Sorry.

12              Would you look at the agreement at

13    Section 1.23 on Page 6, the definition of

14    cover, covering, or covered?

15         A.    Okay.

16         Q.    Actually, before we get to that, you

17    can leave that in front of you, I'll have a

18    question for you on that in a second, but you

19    understand what a patent assignment is,

20    correct?

21              MS. SIMSON:  Objection to form.

22         A.    Yes.

23         Q.    The -- sorry.  A patent inventor can

24    assign his or her rights in a patent to a

25    person or company, correct?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    Correct.

3        Q.    So a person or company can own a

4    patent, correct?

5        A.    Yes.

6        Q.    And the owner of a patent can't

7    infringe the patent, right?

8             MS. SIMSON:  Objection to form.

9        A.    Unless they license it exclusively

10    to someone else or assign it, yeah.

11        Q.    If they assigned it, they wouldn't

12    own it anymore, right?

13        A.    Right.

14        Q.    The -- with respect to the royalty

15    paid by Incyte under 8.3(b)(i), I think we've

16    established that the relevant product is the

17    drug Jakafi, as the parties currently sell

18    products, correct?

19        A.    We've talked about that as pertinent

20    to the royalty that Incyte pays Novartis.

21        Q.    And the word "person" is also

22    defined in the agreement, right?  And that's

23    Section 1.88.  And a person means any natural

24    person, general or limited partnership,

25    corporation, limited liability company, limited

1          L. Pullan, Ph.D. - Highly Confidential

2    liability partnership, firm, association, or

3    organization, or other legal entity, correct?

4          A.    That is what it says.

5          Q.    Am I person under the agreement?

6          A.    You are a person as referred to --

7          Q.    In the definition?

8          A.    -- in the definition.  You are not a

9    party to the agreement.   Would that we were,

10   yes.

11         Q.    And you are a person pursuant to the

12   definition in the agreement, correct?

13         A.    I am --

14               MS. SIMSON:  Objection to form.

15         A.    -- a person.

16         Q.    Novartis is a person, pursuant to

17   the definition in the agreement?

18         A.    Yes.

19         Q.    And Incyte is a person pursuant to

20   the definition in the agreement.

21               And selling a product under the

22   agreement constitutes commercialization,

23   correct?

24               MS. SIMSON:  Objection to form, and

25         to the extent seeking legal opinion.

1          L. Pullan, Ph.D. - Highly Confidential

2          A.    I believe commercialization may be

3     defined more broadly as selling, including

4     marketing, for instance.

5          Q.    Yes, I was just confirming that it

6     includes selling, but we can look at the

7     definition.  It's 1.19 on Page 5 of the 2009

8     agreement.

9               And that includes selling, right?

10         A.    Yes.

11         Q.    So Incyte doesn't have a license to

12    the Incyte patent rights that claim

13    ruxolitinib, correct?

14              MS. SIMSON:  Objection to form, and

15         to the extent seeking a legal opinion or

16         legal conclusion.

17         A.    Incyte has a license under the

18    agreement to practice certain activities under

19    the Incyte patents, as well as under the

20    Novartis patents.

21         Q.    Incyte doesn't have a license to the

22    Incyte patents, does it?

23         A.    It has --

24              MS. SIMSON:  Objection to form.

25         A.    -- a license under the agreement to

1          L. Pullan, Ph.D. - Highly Confidential

2     do activities.

3          Q.    My question was:  Incyte doesn't

4     have a license under the Incyte patent rights,

5     correct?

6               MS. SIMSON:  Objection to form.

7     BY MR. STOPS:

8          Q.    And tell me where you are in the

9     agreement.

10         A.    I'm under license grant.

11              MS. SIMSON:  Just for the record,

12         Dr. Pullan, you're on Page 18 of the

13         agreement?

14              THE WITNESS:  Yes.

15              MS. SIMSON:  And Section 2.1 or 2.2.

16              THE WITNESS:  2.1(b).

17         A.    And then Incyte has permission to

18    develop an alternative compound that could

19    indeed come from Novartis.

20         Q.    Sorry where are you looking?

21         A.    "Potential JAK backups."

22         Q.    Will you tell me a page and a

23    section?

24         A.    Page 36.

25         Q.    Page 36, section?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    4.5.

3        Q.    Okay.  So is that a license from

4    Incyte under the Incyte patent rights?

5        A.    It is an expectation that under the

6    Incyte patent rights or the Novartis patent

7    rights either party may develop a JAK2

8    inhibitor.

9        Q.    That doesn't say anything about a

10   license from Incyte to Incyte to all the Incyte

11   patent rights, correct?

12       A.    Correct.

13             MS. SIMSON:  Objection to form.

14   BY MR. STOPS:

15       Q.    So as far as you're aware, Incyte

16   does not have a license to the Incyte patent

17   rights that claim ruxolitinib, correct?

18             MS. SIMSON:  Objection to form, and

19        to the extent seeking a legal opinion or a

20        legal conclusion.

21       A.    The primary license grant does not

22   specify a license to Incyte under the Incyte

23   patents.  Incyte, under this agreement, is

24   granted rights to do certain activities --

25   rights and obligations to do certain

1      L. Pullan, Ph.D. - Highly Confidential

2   activities.  And the agreement permits those

3   under the umbrella of the patents that are in

4   the agreement.  That is, the patents cannot be

5   used to block the activities which are ascribed

6   to the two parties in the agreement.

7      Q.    So are you talking about things

8   outside of patent rights --

9           MS. SIMSON:  Objection to form.

10  BY MR. STOPS:

11     Q.    -- like know-how, for example?

12     A.    Know-how and the other parties'

13  patents.

14     Q.    Right.  And make sure I

15  understood -- you said Incyte, under this

16  agreement, is granted rights due to certain

17  activities.

18          My question was just:  Incyte

19  doesn't have a license under the Incyte patent

20  rights, so just the Incyte patent rights, that

21  claim ruxolitinib or Jakafi, correct?

22          MS. SIMSON:  Objection to form, and

23      to the extent seeking a legal opinion or a

24      legal conclusion.

25     A.    I think I concur, but I think the

1        L. Pullan, Ph.D. - Highly Confidential

2   agreement talks of a broader relationship than

3   just the patents.

4        Q.    Okay.  And Incyte doesn't need a

5   license to the Incyte patent rights to sell

6   Jakafi, right?

7        A.    In the territories where it is not

8   licensed, those rights to Novartis.

9        Q.    That's -- Jakafi only exists in the

10  United States and its territories, right?

11            MS. SIMSON:  Objection to form.

12       A.    One could imagine the brand name

13  could if you get into hypotheticals, yes.

14       Q.    Sure.  Right.  So Incyte doesn't

15  need a license to the Incyte patent rights to

16  sell Jakafi in the United States, right?

17            MS. SIMSON:  Objection to form.

18       A.    I think I answered that already.

19       Q.    Yes.

20       A.    Yes.

21       Q.    Incyte's -- there aren't any

22  Novartis patent rights that claim ruxolitinib

23  or Jakafi, right?

24            MS. SIMSON:  Objection to form, and

25        object to the extent seeking a legal

1          L. Pullan, Ph.D. - Highly Confidential

2          opinion or legal conclusion.

3          A.     And I am not in a position to know

4     there isn't a broad claim in one of their other

5     JAK patents that may overdominate rux.  I don't

6     know.

7          Q.     If Novartis had such a claim, do you

8     think they would have raised it by now?

9          MS. SIMSON:  Objection to form.

10          Argumentative.

11          A.     I don't know.  When it arrives, I

12     don't know.

13          Q.     Novartis does not have a license to

14     sell ruxolitinib in the United States, correct?

15          MS. SIMSON:  Objection to form.

16          A.     That is correct.

17          Q.     And Novartis doesn't sell

18     ruxolitinib in the United States, correct?

19          A.     That is correct.

20          Q.     Now, in the definition of cover on

21     Page 6, Section 1.23 of the 2009 agreement,

22     there is no mention of the patent owner,

23     correct?  It just refers to licenses, correct?

24          MS. SIMSON:  Objection to form, and

25          object to the extent seeking legal opinion

1          L. Pullan, Ph.D. - Highly Confidential

2          or legal conclusion.

3          A.    But for a license.

4          Q.    And it doesn't refer to ownership,

5    correct?

6          A.    Correct.

7                MS. SIMSON:  Objection to form.

8    BY MR. STOPS:

9          Q.    And the parties could have drafted

10   cover, covering, and covered differently to

11   include ownership, correct?

12               MS. SIMSON:  Objection to form.

13         A.    Parties could have drafted the form

14   differently, yes.

15         Q.    And you've reviewed the 2019

16   agreement between Incyte and Novartis, correct?

17         A.    I have reviewed the 2019 agreement.

18               MS. SIMSON:  Just, did you say 2009

19         or 2019?

20               MR. STOPS:  '19, and on second

21         thought.

22               MS. SIMSON:  I just wanted to make

23         sure that wasn't a misstatement.

24               MR. STOPS:  Yes.

25               (Pullan Exhibit 1007, 2019 Agreement

1      L. Pullan, Ph.D. - Highly Confidential

2      between Incyte and Novartis, marked for

3      identification.)

4      Q.    I'm handing you what's marked as

5  Exhibit 1007.

6      A.    Yes.

7      Q.    And this is the 2019 agreement

8  between Incyte and Novartis, correct?

9      A.    Yes.

10          MS. SIMSON:  I'm just going to note

11     for the record that this agreement is

12     between Novartis International

13     Pharmaceutical Limited, not Novartis Pharma

14     AG, which is just a different name than the

15     current plaintiff in this action.

16          MR. STOPS:  And just before I

17     forget, I think you may have done this

18     already, let's mark this transcript highly

19     confidential.

20          MS. SIMSON:  We've already done

21     that, and I have no objection to that.

22          MR. STOPS:  Great.  I just realized

23     we now put in a couple of confidential

24     agreements.

25  BY MR. STOPS:

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.     Now, unfortunately, this one does

3    not have specific section numbers for

4    definitions, but there is a definition section

5    at Section 1.1, that include a number of

6    definitions.

7          A.     Correct.

8          Q.     And cover is set forth on Page 3 in

9    the definitions section.

10         A.     Yes.

11         Q.     The version or the definition of

12   cover, covered, or covering in the 2019

13   Incyte-Novartis agreement, which is Novartis

14   Exhibit 1007, specifically calls out ownership,

15   correct?

16              MS. SIMSON:   Objection to form, and

17         to the extent asking for a legal opinion or

18         a legal conclusion.

19         A.     In the absence of ownership or a

20   license.

21         Q.     So had the definition of covered

22   from the 2019 agreement, Exhibit 1007, been

23   used instead of the definition of covering in

24   the 2009 agreement, would Incyte's sales of

25   Jakafi in the United States have been covered?

1        L. Pullan, Ph.D. - Highly Confidential

2            MS. SIMSON:  Objection to form.

3        Objection to the extent seeking a legal

4        opinion or a legal conclusion.  Also

5        incomplete hypothetical.

6        A.    I think it could have been covered.

7    I think it would have been covered.

8        Q.    Okay.  Now, in -- I think we

9    established this earlier.  Novartis sells

10   Tabrecta, which is the cMET inhibitor, pursuant

11   to a license under the 2009 agreement, correct?

12           MS. SIMSON:  Objection to form, and

13       reiterate my prior objection with respect

14       to the Tabrecta.

15   BY MR. STOPS:

16       Q.    Novartis pays a royalty to Incyte on

17   sales of Tabrecta, correct?

18       A.    Yes.

19       Q.    And the royalty term for Tabrecta is

20   also governed by Section 8.3(c) of the

21   agreement, right?

22           MS. SIMSON:  Same objections.

23       A.    Yes.

24       Q.    You aren't offering any opinions

25   regarding the relevance of Tabrecta royalties

1          L. Pullan, Ph.D. - Highly Confidential

2     in this litigation, correct?

3          A.     That is definitely correct.

4          Q.     But you're aware that Novartis did

5     obtain a -- an Orange Book listed patent for

6     Tabrecta, correct?

7               MS. SIMSON:  Objection to form, and

8          reiterate my objections with respect to the

9          relevance of Tabrecta in this lawsuit.

10         A.     And I did not study the Novartis

11    patents on Tabrecta, as I did not see them as

12    relevant to the questions at hand.

13         Q.     Did Novartis generate or accumulate

14    any Novartis know-how during the course of the

15    2009 agreement?

16              MS. SIMSON:  Objection to form.

17         A.     During --

18              MS. SIMSON:  Vague with respect to

19         what you mean by the course of the 2009

20         agreement.

21         A.     Right.  During the course of the

22    collaboration?

23         Q.     I misspoke.  Yes.

24         A.     Okay.  I'm sure Novartis created a

25    vast array of know-how during the

1      L. Pullan, Ph.D. - Highly Confidential

2   collaboration.

3      Q.   Was any of the know-how that was

4   created or generated by Novartis, did it

5   constitute Novartis know-how or joint IP?

6          MS. SIMSON:  Objection to form.

7          Calls for speculation.  Object to the

8          extent seeking a legal opinion or a legal

9          conclusion.

10  BY MR. STOPS:

11     Q.   Let's take a look at the agreement.

12  I think the relevant section for this is

13  actually going to be Section 7.1(b).

14         MS. SIMSON:  Counsel, just for the

15         record, you're looking at Exhibit 1001,

16         right?

17         MR. STOPS:  Correct.  Page 46,

18         Section 7.1(b).

19         MS. SIMSON:  Thank you.

20     Q.   Now,  the -- the second clause:

21  "All inventions or discoveries made or

22  information created jointly by each party or

23  affiliates, employees, independent contractors

24  in the course of conducting such" -- sorry --

25  "conducting activities under this agreement,

1      L. Pullan, Ph.D. - Highly Confidential

2   together with all intellectual property rights

3   therein, shall be jointly owned by the parties

4   and are joint IP."

5            Do you see that?

6      A.    I do, but I also see above where it

7   says:  "All inventions made" --

8      Q.    -- independently?

9      A.    -- "independently are not joint IP,

10  but shall be owned by each party."

11     Q.    Do you know which -- what know-how

12  under the agreement is joint versus individual?

13           MS. SIMSON:  Objection to form.

14     A.    No, but I can imagine there are

15  both.  In fact, there would be independent

16  activities and there would be joint activities.

17     Q.    Okay.

18     A.    And either could lead to IP or

19  inventions.

20     Q.    Okay.  And I think we discussed

21  earlier that each licensing deal is unique,

22  correct?

23     A.    I have said that.

24     Q.    If -- well, I guess if licensing

25  agreements were all the same, Pullan Consulting

1        L. Pullan, Ph.D. - Highly Confidential

2   wouldn't have any business, right?

3        A.    I'd be out of work, yes.  Yes.

4        Q.    And companies hire you because

5   pharmaceutical agreements are bespoke and have

6   to be negotiated individually, right?

7             MS. SIMSON:  Objection to form.

8        A.    They are definitely generally

9   negotiated individually.  There are licenses

10  that are cookie cutters.  They tend to be by

11  more service providers who provide the same

12  service under multiple licensing agreements,

13  but the majority of things, certainly, I work

14  on and the majority of agreements are each

15  individually negotiated.

16       Q.    You've been involved in research and

17  development agreements, correct?

18       A.    I've been involved in research and

19  development agreements.

20       Q.    Would you consider the agreement

21  between Incyte and Novartis, the 2009

22  agreement, Exhibit 1001, to be a research and

23  development agreement?

24            MS. SIMSON:  Objection to form, and

25       to the extent asking for a legal conclusion

1      L. Pullan, Ph.D. - Highly Confidential

2      or legal opinion.

3      A.    The primary activities under this

4  agreement are development and commercialization

5  that, as I remember, there is the right to do

6  research, so one could characterize it that

7  way.  It is principally a co-development

8  collaboration with territorial rights for

9  commercialization.

10      Q.    I think we got to this concept a

11  little bit before.  Is there a difference --

12  well, what do you consider to be the difference

13  between the end of -- of market exclusivity and

14  just a general loss of exclusivity for a

15  product, or are those synonymous terms?

16            MS. SIMSON:  Objection to form.

17      A.    They are largely synonymous terms.

18      Q.    Now, the commercial life of a

19  product, however, can go on beyond the loss of

20  exclusivity, correct?

21      A.    We discussed this --

22            MS. SIMSON:  Objection to form.

23      A.    There can be sales after a generic

24  enters.

25      Q.    In leaving aside the 2009 agreement,

  
1          L. Pullan, Ph.D. - Highly Confidential

2    in general, do -- does the licensee pay

3    royalties until the end of exclusivity or until

4    the end of a commercial life of a product?

5              MS. SIMSON:  Objection to form.

6          Incomplete hypothetical, and to the --

7          object to the extent seeking legal opinion

8          or legal conclusion.

9          A.    There are licenses that last as long

10   as there are sales.  This is not one.  The

11   pattern in the 2009 agreement of duration of

12   royalties is the most common pattern,

13   consisting of last valid claim covering the

14   product, a number of years from first

15   commercial sales, and ten years is by far the

16   most common term, and regulatory exclusivity.

17   With regulatory exclusivity being less common

18   than the other two, but also highly common.

19         Q.    Okay.  So in your opinion, some

20   agreements go to a specific loss of exclusivity

21   and some agreements can go out to the end of

22   the commercial life of a product;  is that

23   accurate?

24             MS. SIMSON:  Objection to form.

25         A.    And some --

1       L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  And mischaracterizes

3       her testimony.

4       A.    And some agreements can have a fixed

5   term, some agreements have no royalties, some

6   agreements are quite different from other

7   agreements.

8       Q.    Okay.

9       A.    We're paying attention to this

10  agreement.

11      Q.    Okay.  There's lots of different

12  ways to generate the end of a royalty term?

13              MS. SIMSON:  Objection to form.

14      A.    The majority of cases have a form

15  almost identical to what is in the 2009

16  agreement.

17      Q.    Why don't all agreements simply go

18  out to the end of the commercial life of a

19  product?

20              MS. SIMSON:  Objection to form.

21      A.    The -- it is on a

22  product-by-product and country-by-country basis

23  typically, right, the paying of royalties.  And

24  one can easily imagine that there could be one

25  prescription in a country, and you would have

1          L. Pullan, Ph.D. - Highly Confidential

2     to file an audit report and pay a royalty.

3     It's a tremendous burden and there might be no

4     economic value of that one prescription, i.e.,

5     no profit, it costs you more to sell the darn

6     stuff than you collect.  Therefore, it is not

7     economically sensible in many cases, to have

8     a --

9          Q.    Infinite.

10         A.    -- infinite royalty.

11         Q.    Okay.  So in the -- in the 2009

12    agreement, Section 8.3(c), do you -- in your

13    opinion, what date does Incyte's royalty

14    payments to Novartis pursuant to

15    Section 8.3(b)(i) end?

16              MS. SIMSON:  Objection.

17         A.    The latter.

18              MS. SIMSON:  Sorry.

19              THE WITNESS:  Thank you.

20              MS. SIMSON:  Objection to form, and

21         to the extent seeking a legal opinion or

22         legal conclusion.  Go ahead.

23         A.    The latter of the last-to-expire

24    patent claim covering the product in the

25    country.  At the time the parties were

1    L. Pullan, Ph.D. - Highly Confidential

2    negotiating, Incyte had the composition of

3    matter patent, and that patent was discussed as

4    having an expiration date of -- it varied a

5    little bit in the discussions, but, generally,

6    2027.  If there are additional patents, it can

7    go longer.

8            (Pullan Exhibit 1008, Agreement

9        Between Incyte and Eli Lilly,marked for

10       identification.)

11   BY MR. STOPS:

12       Q.    I'm handing you what's marked as

13   Exhibit Pullan 100 -- Exhibit Pullan 1008.

14   Exhibit 1008 is an agreement between Incyte and

15   Eli Lilly, correct?

16       A.    That is what it says.

17       Q.    Have you reviewed this exhibit?

18       A.    Lightly, yes.

19       Q.    If you look at the date of this

20   agreement, it was executed -- and this is

21   Page 1 of the -- of Exhibit 1008.

22            At the top it says it was entered

23   into as of the 18th day of December 2009.

24            Do you see that?

25       A.    Yes.

1       L. Pullan, Ph.D. - Highly Confidential

2       Q.    That's a few weeks after the

3    execution of the agreement between Incyte and

4    Novartis, correct?

5       A.    Yes.

6       Q.    And if you go to Section 7.3,

7    Royalties, on Page 41 of the agreement,

8    Section 7.3(a) specifies royalties from Eli

9    Lilly to Incyte.

10             Do you see that?

11      A.    Yes.

12      Q.    The royalty term appears at

13   Section 7.3(b) of the agreement.

14      A.    Yes.

15      Q.    Okay.  And Section 7.3(b) royalty

16   term is structured similarly to the royalty

17   term provision in the 2009 Incyte-Novartis

18   agreement at Section 8.3(c), correct?

19             MS. SIMSON:  Objection to form.

20      A.    There is --

21             MS. SIMSON:  And objection to the

22        extent it calls for a legal opinion or

23        legal conclusion.

24      A.    There is an important distinction.

25   There is, instead of the term, "licensed patent

1       L. Pullan, Ph.D. - Highly Confidential

2  rights," there is the term "Incyte patent

3  rights."  But the three tiers of duration are

4  comparable.

5       Q.   Does Lilly pay royalties under this

6  agreement on any Eli Lilly patent rights?

7       A.   I don't remember if there are

8  provisions of joint and -- and such -- I don't

9  remember if there's provisions on joint

10 ownership of patent rights and combination

11 products and other such things that could

12 result in Lilly paying on things where Lilly

13 owns IP.

14          MS. SIMSON:  Dr. Pullan, you can

15       take a look at the agreement if you need

16       to.

17          THE WITNESS:  It would take me a

18       while.

19          MS. SIMSON:   You're entitled to.

20 BY MR. STOPS:

21      Q.   Does it matter?

22          MS. SIMSON:  Objection to form.

23      A.   Does it matter to Lilly?  Does it

24 matter to Incyte?

25      Q.   No.  Does it matter to the

1      L. Pullan, Ph.D. - Highly Confidential

2  interpretation of the agreement?

3          MS. SIMSON:  Objection to form.

4      A.    The agreement --

5          MS. SIMSON:  And objection to the

6          extent it calls for legal opinion or legal

7          conclusion of this Lilly agreement.

8      A.    Does what matter?  The legal

9  agreement matters, and if there are definitions

10  that say there are joint products and such,

11  there may indeed be provisions that say there's

12  an obligation to pay under joint IP.

13     Q.    So --

14     A.    I can't remember all of these

15  agreements.

16     Q.    No.  So I wasn't sure if you were

17  going to say it mattered or not.  Let's take a

18  look at Page 6 of the 2009 Eli Lilly agreement,

19  Exhibit 1008.  There is a definition 1.33

20  Incyte patent rights?

21     A.    Yes.

22     Q.    The definition reads:  "All patent

23  rights that are, A, controlled by Incyte or any

24  of its affiliates as of the effective date or

25  during the term, and, B(i), covers a licensed

1          L. Pullan, Ph.D. - Highly Confidential

2    compound or licensed product, a composition

3    containing a licensed compound, a formulation

4    containing a licensed product" -- and continues

5    on to say -- "or necessary to commercialize"

6    language.

7              Do you see that?

8      A.    Yes.

9      Q.    In your reading of this, Section B,

10   which is written in the passive voice without

11   an explicit actor, does that cover Eli Lilly

12   activities?

13             MS. SIMSON:  Objection to form.

14        Objection to the extent asking for her to

15        have a legal opinion or legal conclusion

16        with respect to this definition.

17     A.    Tell me what section you're

18   referring to that has a passive voice now.

19   Where are we in this agreement?

20     Q.    When you say "this agreement" which

21   one you're asking?

22     A.    The one you are asking the question

23   about.

24     Q.    The Eli Lilly, Page 6, Section --

25     A.    No, you're asking about the passive

1        L. Pullan, Ph.D. - Highly Confidential

2    form; is that what you're talking about?

3        Q.    Sorry.  I'll rephrase that.

4            Page 6, Section 1.33 of the Eli

5    Lilly agreement, Section B of that definition

6    says:  "Covers a licensed compound."  There is

7    no explicit actor in Section B.

8            So my question for you is:  Does

9    that mean, in your opinion, that it includes

10   Eli Lilly patent rights?

11           MS. SIMSON:    Objection to form.

12           Calls for speculation -- object to the

13           extent asking her to give a legal opinion

14           or legal conclusion with respect to this

15           definition.

16       A.    This differs from what's in the 2009

17   Novartis agreement in a number of ways.  Among

18   them is it isn't licensed patent rights.  It's

19   Incyte patent rights.  If in the 2009

20   agreement, the parties had wanted to write

21   Incyte patent rights, they could have written

22   Incyte patent writes.

23           This agreement, they did write

24   Incyte patent rights.  I believe it's also

25   different in that or otherwise necessary versus

1      L. Pullan, Ph.D. - Highly Confidential

2  necessary and useful, if I remember correctly,

3  in the other agreement.

4      Q.    So the lack of an explicit actor and

5  the use of passive voice doesn't --

6      A.    What are you referring to as passive

7  voice?  What --

8      Q.    Oh, so -- it is -- it doesn't have

9  an actor.

10     A.    We're saying the same thing twice?

11          MS. SIMSON:  Objection to form.

12 BY MR. STOPS:

13     Q.    By using the passive voice, it

14 doesn't have an actor.

15          MS. SIMSON:  Objection to form.  You

16     can answer that if you can.

17     A.    After you asked me the last time I

18 went away and thought about my mother teaching

19 English, and the covers, etc., is not a passive

20 voice.  That's an active verb.  So as I

21 understand the words "passive voice" as used in

22 grammar, I don't see a passive voice.

23     Q.    It doesn't include a -- you are

24 correct.  In this -- in Section 1.33, there is

25 no passive voice.  It does not have an explicit

1        L. Pullan, Ph.D. - Highly Confidential

2    actor.

3        A.    Two different concepts.

4              MS. SIMSON:  Objection to form.

5    BY MR. STOPS:

6        Q.    Yes.  In the July 9 term sheet, the

7    language is:  "Or that is acquired," which we

8    can -- it's a grammatical distinction.

9              MS. SIMSON:  And just for the

10         record, I think the witness has taken out

11         the term sheet.

12              Is that correct, Dr. Pullan?

13              THE WITNESS:  Yes.

14    BY MR. STOPS:

15        Q.    Since -- so since you have --

16        A.    Owned and control is an active

17    voice.  Is acquired --

18        Q.    Or developed is passive.

19              MS. SIMSON:  Objection to form.

20        A.    Actually --

21              MS. SIMSON:  Or to the

22         characterization.  And object to that

23         characterization, is what I said.

24        A.    I'm not sure whether that is

25    technically a passive voice or not.  If you

1          L. Pullan, Ph.D. - Highly Confidential
2     said acquires or acquired, it would seem
3     active.  And I don't know what the point of all
4     that is, regardless.
5          Q.    Let's stick with the -- the lack of
6     an actor.  In the July 9 term sheet that you
7     have in your hands, you read:  "Or that is
8     acquired or developed" to include either party
9     because there is no specified actor.
10         A.    Correct.
11         Q.    I was just asking if in the Eli
12    Lilly agreement, Exhibit 1008, do you similarly
13    read Part B of the definition 1.33, where it
14    says:  "Covers a licensed compound" to include
15    both Incyte and Eli Lilly because that
16    similarly does not include an explicit actor?
17              MS. SIMSON:  Objection to form.
18         Objection to you asking her for a legal
19         opinion or legal conclusion with respect to
20         this Eli Lilly agreement.
21         A.    I would argue that if I were reading
22    only Section B, I would assume it's included
23    the IP in the partnership.  The distinction is
24    that this is Incyte patent rights.
25              In the other agreement, wherever it

```
 1        L. Pullan, Ph.D. - Highly Confidential
 2   is in this pile of paper, that is not described
 3   as Incyte patent rights.  It is described as
 4   licensed patent rights, and if you go to the
 5   definition of licensed patent rights, it says:
 6   Means patents.  Again, it does not say:  Means
 7   Incyte patents.
 8        Q.    Wait.  So I'm not sure if you just
 9   mixed -- we were talking about the July 9 term
10   sheet.
11        A.    And I was talking about the
12   agreement.
13        Q.    And you were talking about the
14   agreement.  So I don't think you've made that
15   similar lack of explicit actor argument about
16   the agreement.
17        A.    Okay.
18             MS. SIMSON:  I don't think that's
19        what she was saying.  So I'm going to
20        object to the extent you're
21        mischaracterizing her testimony.
22   BY MR. STOPS:
23        Q.    Then I don't know what we were
24   talking about then.
25        A.    That's probably a universal feeling.
```

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    You take the position that the

3    royalty paid by Incyte to Novartis is a

4    "clawback" from the royalty paid by Novartis to

5    Incyte, right?

6              MS. SIMSON:  Objection to the

7          characterization of her opinion.  Objection

8          to form.

9          A.    The phrase "clawback" was used by

10   Goldman Sachs working for Incyte.  I interpret

11   the clawback as taking back.  The phrase

12   "clawback" is used in other circumstances of

13   taking back moneys.  And so I do interpret it

14   that way, but I didn't apply that; Goldman

15   Sachs and, presumably, Incyte applied that.

16         Q.    The word "clawback" doesn't appear

17   in the final 2009 agreement, correct?

18             MS. SIMSON:  Objection to form.

19         Argumentative.

20         A.    The word "clawback" does not appear

21   in the final agreement.  It appears in the

22   Incyte materials leading up to the agreement.

23         Q.    It also doesn't appear in any term

24   sheet, right?

25             MS. SIMSON:  Objection to form.

1          L. Pullan, Ph.D. - Highly Confidential

2          Argumentative.

3          A.    I do not believe it appears in any

4     term sheet.

5          Q.    And the documents you're referring

6     to are internal documents that never went to

7     Novartis, correct?

8               MS. SIMSON:  Objection to form.

9          A.    There may have been the use of

10    "clawback" in some exchanges between the

11    parties.  I cannot positively assert that there

12    are not.

13         Q.    You agree that the parties could

14    have simply negotiated a lower royalty rate

15    from Novartis to Incyte and accomplished the

16    same thing, right?

17              MS. SIMSON:  Objection to form.

18         A.    Actually --

19              MS. SIMSON:  Mischaracterizes the

20              record, and I also will object to the

21              extent you're asking for a legal opinion

22              and a legal conclusion.

23         A.    I do not agree, because part of what

24    Novartis clearly talked about and appears in

25    the definition is an alignment of incentives,

1        L. Pullan, Ph.D. - Highly Confidential

2    and that means the parties thought it was in

3    their best interest for Novartis to care about

4    the success of the U.S. sales.  And that led,

5    at least in part contributed, to the creation

6    of a payment to Novartis on U.S. sales.  And

7    that incentivized and resulted in -- in the

8    collaboration, many contributions from

9    Novartis -- that benefitted the U.S. sales and

10   benefitted both Incyte and Novartis.

11        Q.    So if it was simply a clawback --

12   sorry.  Are you arguing that it's not simply a

13   clawback because there's a lot more to it

14   because if it was just a clawback, it could

15   have been accomplished by a reduction in the

16   royalty rates Novartis --

17        A.    It was.

18              MS. SIMSON:  Objection to form.

19              MR. STOPS:  I wasn't finished with

20        my question?

21              MS. SIMSON:  Sorry, I apologize.

22              Were you done, Mr. Stops?

23        A.    I'm sorry, finish your question,

24   please.

25        Q.    So if it was simply a clawback, that

1      L. Pullan, Ph.D. - Highly Confidential

2   result could have been accomplished through a

3   lower royalty rate, correct?

4            MS. SIMSON:  Objection to form.

5         Mischaracterizes her testimony and her

6         opinions.

7      A.    The concept of clawback is one

8   characterization of what was included.  The --

9   I would argue the more important consideration

10  is that this was a partnership where the

11  parties wanted to share in the risk and share

12  in the reward and wanted to create a

13  partnership that helped Incyte in the U.S. and

14  paid Incyte for Novartis's success outside the

15  U.S.  And that reverse -- what is called in

16  this agreement a reverse royalty, was

17  structured to accomplish those benefits to both

18  Incyte and Novartis.  And was important to

19  Novartis and was argued about in -- in the

20  early term sheets, taken in and out, the

21  numbers were changed, it was considered part of

22  the walkaway.  It was an important term to

23  Novartis.

24            It was accepted by Incyte.  It

25  aligned the interests of the parties to expand

1        L. Pullan, Ph.D. - Highly Confidential

2    the U.S. sales to encourage things like

3    providing the brand name, doing marketing war

4    games, etc., etc., contributions to the U.S.

5    that benefitted both parties.

6        Q.    So are you saying Novartis would not

7    have made contributions to the partnership, if

8    there were no U.S. royalty payments from

9    Incyte?

10        MS. SIMSON:  Objection to form.

11        Mischaracterizes her testimony.

12        A.    I did not say that.  I said it

13    incentivized.  I understand that it was a

14    really good collaboration and both sides felt

15    both sides were working well together and that

16    Novartis worked very hard and contributed many

17    things to Incyte that benefitted Incyte, and

18    Novartis benefitted by marketing the product

19    successfully in Europe, using its commercial

20    capabilities to make the product more

21    successful than either side had forecast.

22        Q.    And what contributions has Novartis

23    made after the ten-year anniversary of the

24    first commercial sale?

25        MS. SIMSON:  Objection to the form,

1        L. Pullan, Ph.D. - Highly Confidential

2        and to the extent you're asking for a legal

3        conclusion or a legal opinion.

4        A.    I -- I -- I don't know exactly the

5    timings of many of the things that were listed

6    as contributions by Novartis.  If you go to

7    the -- the email chain that -- I'm forgetting

8    all the right names.  One name in it is Jim

9    Dailey, where they discuss the commercial

10   contributions, and they go on to say -- Incyte

11   goes on to say.

12       Q.    But that was in 2011, wasn't it?

13             MS. SIMSON:  Objection to form.

14       A.    I don't know.

15       Q.    It --

16             MS. SIMSON:  Dr. Pullan, were you

17       done with your response?

18       Q.    It wasn't after the ten-year

19   anniversary of the first commercial sales of

20   Jakafi in the United States; is that right?

21             MS. SIMSON:  Objection to form.

22       Argumentative.  Also interrupted her last

23       response.

24       A.    E-mail -- I'm sorry.

25       Q.    So my question was, are you aware of

1      L. Pullan, Ph.D. - Highly Confidential

2  any specific contributions that Novartis has

3  made after the ten-year anniversary of the

4  first commercial sale of Jakafi in the United

5  States?

6          MS. SIMSON:  Objection to form.

7      Objection to the extent you're asking for a

8      legal opinion or legal conclusion.

9      A.    The email states categories of

10  contributions.  I have no doubt that some of

11  those categories of contributions continue to

12  this day.  I don't have the specifics of what

13  happened when, but as I understand it, the

14  parties worked well together and there were

15  certainly no complaints about a lack of

16  contribution or a falloff in contribution.  It

17  was a good collaboration and continued.

18          MR. STOPS:  Great.  Let's take a

19      five-minute break.

20          THE WITNESS:  Okay.

21          MS. SIMSON:  Sure.

22          THE VIDEOGRAPHER:  We are going off

23      the record.  The time is 6:11 p.m.

24          (Recess.)

25          THE VIDEOGRAPHER:  We are back on

1    L. Pullan, Ph.D. - Highly Confidential

2    the record.  The time is 6:27 p.m.

3  BY MR. STOPS:

4    Q.    Dr. Pullan, Incyte -- during the

5  negotiation process, Incyte was looking for a

6  partner who could commercialize ruxolitinib

7  outside the United States, correct?

8        MS. SIMSON:  Objection to form.

9    Calls for speculation.

10   A.    I believe that Incyte wanted a

11 partner that could commercialize outside the

12 U.S.

13   Q.    Incyte always intended to

14 commercialize ruxolitinib inside the United

15 States itself; is that correct?

16       MS. SIMSON:  Objection to form.

17   Calls for speculation.

18   A.    I don't know what Incyte always

19 intended.  Incyte expressed that it wanted to

20 commercialize in the U.S. during the

21 negotiations.  What it always wanted, I don't

22 know.

23   Q.    The initial payment from Novartis to

24 Incyte, the license payment was negotiated by

25 the parties, correct?

1          L. Pullan, Ph.D. - Highly Confidential

2          A.    Correct.

3          Q.    And that license payment was for the

4     JAK program and the cMET program, correct?

5               MS. SIMSON:  Objection to form.

6          A.    It included both, but it was largely

7     driven by the JAK program.

8          Q.    The milestone payments were also

9     negotiated by the parties, correct?

10              MS. SIMSON:  Objection to form.

11         A.    Yes, the milestones were negotiated

12    by the parties.

13         Q.    And the royalty payments were also

14    negotiated by the parties, correct?

15         A.    The royalty payments were negotiated

16    by the parties.

17         Q.    Did either party have greater

18    bargaining power during the negotiation

19    process?

20              MS. SIMSON:  Objection to form.

21         Calls for speculation.  Also object to the

22         extent asking for a legal opinion or legal

23         conclusion.

24         A.    I don't know.  Whether one side held

25    a greater power than another power in a

1      L. Pullan, Ph.D. - Highly Confidential

2  negotiation is alternatives.  Both sides had

3  alternatives.  Power in negotiation is

4  financial.  Novartis had more financial.

5  Incyte was in debt, and had viability concerns,

6  which it managed to solve before signing the

7  full agreement, at least delay.

8           One might argue, in a speculative

9  way, that perhaps Novartis had more power, but

10  the terms that Novartis paid were very

11  generous, were the largest upfront of any deal

12  I could identify in 2009.  So both sides did --

13  ultimately did very well.

14      Q.    Okay.  Which revenue stream was more

15  important to Novartis, the revenue from sales

16  of what became Jakavi or the royalty payments

17  from Incyte?

18           MS. SIMSON:  Objection to form.  And

19      calls for speculation as to what was

20      important to Novartis.

21      A.    I think it's clear from the record

22  that Novartis considered what is termed the

23  reverse royalty, the payment on U.S. sales as

24  important.  They fought for it.  They, in the

25  Pharm Committee, ruled that it was a required

1        L. Pullan, Ph.D. - Highly Confidential

2   term.

3            If you're asking which was more

4   likely to happen, one might argue that the

5   royalty on U.S. sales was more likely to happen

6   because the -- Incyte had had discussions with

7   the FDA, and Europe is a more fragmented

8   market.  So there are ways to think about it

9   which would argue the reverse royalty was a

10  sure thing, reverse royalty would not require

11  Novartis to expend resources like sales and

12  marketing.  So it was important to Novartis.

13  The ability to sell the product in Europe upon

14  success was also important to Novartis.

15       Q.    You said it was a -- sorry.  The

16  royalty from Incyte was a "sure thing."

17            As we've discussed today --

18       A.    More sure thing.

19       Q.    Well, as we discussed today, that's

20  absolutely not true because it was contingent

21  upon Novartis attaining the reimbursement

22  pricing approval in three-out-of-five major EU

23  countries, correct?

24            MS. SIMSON:  Objection to form.

25       A.    Negotiated subsequently an

1        L. Pullan, Ph.D. - Highly Confidential

2    amendment, but neither side had a sure thing.

3    If you remember the documents, the probability

4    of success was about 70 percent in the judgment

5    of the parties, and so that means there was a

6    30 percent chance it would not get approved, in

7    both -- both or either country.

8        Q.    So my question was just:  Which of

9    the revenue streams was more important to

10    Novartis?

11        A.    I've answered that.

12            MS. SIMSON:  Objection to form.

13        Asked and answered.

14    BY MR. STOPS:

15        Q.    I think you said they were both

16    important?

17        A.    I said they were both important.

18        Q.    You don't have an opinion on which

19    one was more important to Novartis?

20            MS. SIMSON:  Objection to form.

21        (Multiple speakers.)

22            MS. SIMSON:  Objection to form.

23        Calls for speculation.

24        A.    I do not have complete insight into

25    Novartis's thinking.  I'm judging from the

1        L. Pullan, Ph.D. - Highly Confidential

2    record, and the record shows they certainly

3    worked hard to get that reverse royalty.  They

4    considered it important.  Understandably, they

5    also wanted to sell the product.  So.

6        Q.    So you're not offering a -- value

7    judgment opinion on which was more important?

8            MS. SIMSON:  Objection to form.

9        A.    That is correct.  I've answered that

10   both were important.

11       Q.    And you referenced this, but prior

12   to the execution of the 2009 agreement between

13   Incyte and Novartis, Incyte had finished a

14   large fund raise, correct?

15           MS. SIMSON:  Objection to form.

16       A.    Yes.

17       Q.    And Incyte was also in the process

18   of finalizing a deal with Eli Lilly we also

19   discussed, right?

20           MS. SIMSON:  Objection to form.

21       A.    Which also was uncertain.

22       Q.    Now, we also talked about this a

23   little bit.

24           When Novartis started negotiating

25   with Incyte, it had its own JAK inhibitor

1       L. Pullan, Ph.D. - Highly Confidential

2   program, correct?

3           MS. SIMSON:  Objection to form.

4       Calls for speculation.

5       A.    I believe the JAK program at

6   Novartis existed when it started negotiating

7   with Incyte.

8       Q.    Do you know if that program still

9   exists?

10          MS. SIMSON:  Objection to form.

11      Calls for speculation.

12      A.    I do not know.

13      Q.    You're not aware of any products

14  that have come out of that program?

15      A.    I haven't looked.

16      Q.    They would have been under the

17  agreement with Incyte, correct?

18          MS. SIMSON:  Objection to form.

19      Calls for speculation.

20      A.    As I remember, it could bring into

21  and the parties could discuss the inclusion of

22  said products.

23      Q.    Do you know why Novartis pursued

24  Incyte's JAK program when it had its own JAK

25  program?

1        L. Pullan, Ph.D. - Highly Confidential

2              MS. SIMSON:  Objection to form.

3        Calls for speculation.

4        A.    I can speculate that it's because

5   the rux program from Incyte was more advanced

6   and had attractive data.

7        Q.    And this goes without saying, but

8   Incyte invented the ruxolitinib molecule,

9   correct?

10             MS. SIMSON:  Objection to form.

11       A.    I honestly am not absolutely sure I

12  know that for a fact, but I presume that to be

13  a fact.  They owned the patent.  You know, I

14  didn't think about who was the inventors on the

15  patent.

16       Q.    And Incyte came up with the

17  formulation for ruxolitinib, correct?

18             MS. SIMSON:  Objection to form.

19       Call for speculation.

20       A.    I don't know.

21       Q.    We know Novartis didn't invent

22  ruxolitinib, correct?

23             MS. SIMSON:  Objection to form.

24       Calls for speculation.

25       A.    We know Novartis did not invent rux.

1        L. Pullan, Ph.D. - Highly Confidential

2        Q.    And ruxolitinib is indicated for the

3    treatment of four conditions, correct?

4             MS. SIMSON:  Objection to form.

5        A.    I can only think of three off the

6    top of my head, but polycythemia vera,

7    myeloproliferative disorders, and

8    graft-versus-host disease.  What's the fourth?

9        Q.    Graft versus host is split into

10   acute and chronic.

11       A.    Oh, okay.

12       Q.    And to your knowledge, Novartis did

13   not develop any of the methods of using

14   ruxolitinib, correct?

15            MS. SIMSON:  Objection to form.

16       A.    I object to that.

17            (Multiple speakers.)

18       A.    Sorry.

19       Q.    Please.

20       A.    I object to that.  If you're saying

21   they did not develop the method of use, they

22   ran, helped design, ran clinical trials which

23   developed the method of use.

24            If you're asking did they file a

25   method-of-use patent, that's a different

1        L. Pullan, Ph.D. - Highly Confidential

2    question.  But they did indeed help or

3    substantially help develop the method of use of

4    the drug that ends up in the label that is the

5    path to approval and use.

6        Q.    And they -- sorry.  Go ahead.

7        A.    And Incyte refers to the clinical

8    trial contributions of Novartis as important in

9    the FDA approval in their press releases.

10   Suggesting that, indeed, Incyte contributed to

11   the establishment of the way the products are

12   used and the labels and the approval in the

13   U.S. as well as in Europe and elsewhere.

14       Q.    Novartis didn't come up with any of

15   the methods of using ruxolitinib, right?

16            MS. SIMSON:  Objection to form.

17       A.    Come up with.  I just finished

18   telling you they contributed to, they helped

19   study design.  I don't know whose contribution

20   to study design was larger.  I don't have that

21   much insight.

22       Q.    Incyte had the MF and polycythemia

23   polycythemia vera uses already planned when the

24   deal was signed, right?

25            MS. SIMSON:  Objection to form.

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    They had the intention to achieve

3     those uses.

4        Q.    Okay.  And Incyte approached

5     Novartis and asked them to buy into the

6     graft-versus-host disease indications, correct?

7              MS. SIMSON:  Objection to form.

8     Calls for speculation.

9        A.    I believe Incyte approached Novartis

10    first.

11       Q.    And so the -- the graft versus host

12    indications were developed -- or were

13    originated by Incyte after the parties entered

14    the 2009 agreement, correct?

15             MS. SIMSON:  Objection to form.

16       A.    I'm not sure I really know when they

17    started working on graft versus host.

18       Q.    Did Novartis originate any of the

19    methods of using ruxolitinib?

20             MS. SIMSON:  Objection to form.

21    Calls for speculation.

22       A.    Just as before, the parties

23    collaborated to develop the way the products

24    are used and what appears in the labels.

25             And the label is what we sell,

1          L. Pullan, Ph.D. - Highly Confidential

2     right?  The value of the solid material in a

3     vial is a small proportion of the value of the

4     drug.  The method of use, the practice of use

5     by physicians, by KOLs, is based on the

6     clinical trial results, and the negotiated

7     label with the regulatory authorities.

8          Q.     There wouldn't be any Jakafi or

9     Jakavi without Incyte, right?

10               MS. SIMSON:  Objection to form.

11          A.     I love it, but there wouldn't be any

12    without Novartis as well, because those words

13    were brand names owned by Novartis.  So what we

14    know as Jakavi and Jakafi are Novartis

15    originated brand names -- brand names.

16          Q.     Ruxolitinib would not exist without

17    Incyte, right, the marketed product?

18               MS. SIMSON:  Objection to form.

19          A.     I think rux would not exist without

20    Incyte.  It might not exist without Novartis as

21    well, as a marketed product, which is the

22    question you asked me.

23          Q.     Incyte had submitted the IND for

24    ruxolitinib prior to the 2009 agreement with

25    Novartis, correct?

1      L. Pullan, Ph.D. - Highly Confidential

2      A.     Correct.

3             MS. SIMSON:  Objection to form.

4   BY MR. STOPS:

5      Q.     Novartis did not submit the IND for

6   ruxolitinib, correct?

7      A.     That is correct.

8      Q.     Incyte ran the Phase 1 clinical

9   studies for ruxolitinib correct?

10     A.     Yes.

11     Q.     Novartis did not run the Phase 1

12  clinical studies for ruxolitinib, correct?

13     A.     Novartis ran more expensive larger

14  studies, but did not run the Phase 1.

15     Q.     Incyte ran the Phase 2 clinical

16  studies for ruxolitinib, correct?

17            MS. SIMSON:  Objection to form.

18     A.     I am not sure whether Incyte ran all

19  the Phase 2s.  I do not know the history of the

20  drug.  Often there are Phase 2s following on

21  and could well have been run during the

22  collaboration.

23     Q.     Incyte obtained all the patents that

24  claim ruxolitinib in the United States,

25  correct?

1          L. Pullan, Ph.D. - Highly Confidential

2               MS. SIMSON:  Objection to form.

3     A.     As far as my knowledge goes, that is

4   correct.

5     Q.     So Incyte obtained all the patents

6   that claim ruxolitinib in the entire world,

7   correct?

8               MS. SIMSON:  Objection to form.

9     A.     As we discussed before, by the time

10  you start a Phase 3 program, and as is

11  discussed in the reports, most of the patents

12  will have been filed to protect the molecule.

13  And Incyte came to this collaboration at a

14  Phase 3 start period.

15    Q.     Do you know what percentage of

16  branded drugs without generic competition that

17  are protected only by patents that were

18  obtained after the drug was approved?

19               MS. SIMSON:  Objection to form.

20    Calls for speculation.

21    A.     No, I do not know the percentage.

22  Pretty small, I think, but speculation.

23    Q.     In your opening report, you cite to

24  a median clinical cost of almost 1 billion

25  per -- per drug.

 1      L. Pullan, Ph.D. - Highly Confidential

 2          Do you recall that?

 3          MS. SIMSON:  Mr. Stops, can you

 4      direct us --

 5          MR. STOPS:  Sure.  Page 4.  I think

 6      you said it a few times.  Page 4.  Sorry.

 7      First full paragraph.

 8      A.   Yes.

 9      Q.   And do you know how much Novartis

10  spent up to a ruxolitinib approval?

11      A.   No, I do not.

12          MS. SIMSON:  Objection to form.

13      A.   And this is clinical costs, when one

14  counts the cost failure and the cost of

15  capital.

16      Q.   Right.  So this includes all of the

17  other drugs that Incyte attempted to develop

18  and did not bring to market.

19          It's not just ruxolitinib, correct?

20          MS. SIMSON:  Objection to form.

21      A.   Yeah.

22      Q.   It's the -- it's the expensive costs

23  of research and development programs in the

24  pharmaceutical industry, generally?

25      A.   Yes, this is a general number.

1      L. Pullan, Ph.D. - Highly Confidential

2      Q.    Do you know how much it cost Incyte

3   to bring ruxolitinib to market?

4           MS. SIMSON:  Objection to form.

5      A.    I do not.  And does the agreement

6   care?  No, it doesn't.  The agreement is what

7   the agreement says, meaning what it cost Incyte

8   before the agreement is what it cost Incyte

9   before the agreement.  That has no bearing on

10  what the agreement says about going forward.

11     Q.    Wouldn't the cost be relevant, at

12  the very least, to Incyte's perspective coming

13  to the agreement?

14          MS. SIMSON:  Objection to form.

15     Calls for speculation.

16     A.    Incyte's perspective coming to the

17  agreement is important.  But the costs, per se,

18  have nothing to do with what the terms of the

19  agreement say, or the justification for paying

20  or not paying a term.

21     Q.    Neither did the costs going forward

22  after the agreement, right?

23          MS. SIMSON:  Objection to form.

24     A.    I do not believe, in this particular

25  agreement, there is any cap on costs or on

1          L. Pullan, Ph.D. - Highly Confidential

2     payment of royalties or costs, whereas there

3     are in some of the Incyte agreements.  So in

4     this particular agreement, I do not believe it

5     is relevant what the costs are.

6          Q.    Going forward?

7          A.    Going forward or before.

8          Q.    You still have Page 4 --

9          A.    Yes, sir.

10         Q.    -- in front of you?

11              The very last sentence of that

12    paragraph that we were in just references

13    studying additional disease settings or

14    indications.  And that's a -- studying

15    additional disease settings or indications is a

16    way that parties can obtain additional patent

17    protections on a product, correct?

18              MS. SIMSON:  Objection to form.

19         A.    Conceivably, but what it's driving

20    at -- studying additional settings and

21    indications is driving at obtaining the label

22    and the medical use of the product.  The

23    purpose of additional studies is not to obtain

24    patents.  The purpose of additional studies is

25    to obtain use of the product.

1          L. Pullan, Ph.D. - Highly Confidential

2          Q.    Now, you're -- in your opening

3    report your opinions started on -- the section

4    entitled:  Opinions start on Page 7 of your

5    report.

6          A.    Okay.

7          Q.    Is that correct?

8                Now, you don't provide any citations

9    to anything in the record on Page 7, correct?

10               MS. SIMSON:  Objection to form.

11         A.    There are no footnotes.

12         Q.    Throughout your report -- make sure

13   I'm accurate on this -- I believe there is a

14   single footnote, footnote 7 on Page 9 in the

15   portion of your report starting with the words

16   that, the word "opinions."

17               Is that correct?

18         A.    It looks to me like there's also a

19   footnote 8, if you're just talking footnotes.

20         Q.    Well, I guess my question is pretty

21   simple.

22               Why did you not footnote the

23   reference material that you cited in your

24   report?

25               MS. SIMSON:  Objection to form.

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    The material I cited in the report

3    is based on, eh, almost 40 years of experience

4    and hundreds of negotiations and reading

5    hundreds more contracts.  It is not based on

6    any one document that I would cite.

7        Q.    In early stage deals that you --

8    that you've been involved in, what is the

9    ballpark of -- I think you started -- let's

10   take a step back.

11          For this agreement for ruxolitinib,

12   I think you said the parties had estimated the

13   probability of success was around 70 percent,

14   right?

15          MS. SIMSON:  Objection to form.

16       A.    At one point that was the estimates

17   of the parties, yes.

18       Q.    Is that -- is that in keeping with

19   your experience for products at the -- that are

20   in Phase 3?

21          MS. SIMSON:  Objection to form.

22       A.    I don't remember the absolute number

23   that is the industry average across all

24   therapeutic areas, but it is reasonably close

25   to the general number, if it is not the general

1        L. Pullan, Ph.D. - Highly Confidential

2    number.

3        Q.    Products that are earlier stage and

4    even if we've been to true R&D products would

5    have much lower --

6        A.    R products, you mean.

7        Q.    Say it again?

8        A.    R.  You said R&D.  This is an R&D

9    product.

10       Q.    Oh, I see, research product.  Yeah,

11   so things are very, very early stage would have

12   lower probability of success?

13       A.    Correct.

14       Q.    So when you attempt to calculate

15   values for early stage products, do the values

16   wind up being the -- calculated, like the

17   eNPVs, are they negative?  Lower case E, N-P-V.

18            MS. SIMSON:  Objection to form.

19       A.    The expected net present value for

20   many early stage products are indeed negative.

21       Q.    Why would parties do a deal with a

22   negative eNPV?

23            MS. SIMSON:  Objection to form.

24   Calls for speculation.

25       A.    So parties do a deal when they

1        L. Pullan, Ph.D. - Highly Confidential

2    believe together they can make the drug more

3    successful than the eNPV might suggest.

4        Q.    Can you explain that?

5        A.    So all modelling is expected -- why

6    do you bet on the lottery?  Why does anybody

7    bet on the lottery?

8        Q.    I don't know?

9        A.    I don't know either.  But people bet

10   on the lottery because they hope and believe

11   that they have a chance of success.  It might

12   not be a probability of success, and the eNPV

13   is the most probable estimate.  It is not the

14   only estimate, right?

15       Q.    Yeah.  But if you were -- by sheer

16   math, wouldn't you necessarily recommend

17   against doing any deal with a negative eNPV?

18            MS. SIMSON:  Objection to form.  And

19        also to the extent that that question

20        exposes confidentiality or privilege

21        concerns, I'd urge you not to disclose that

22        if that would be an issue.

23       A.    I will not answer it in a way that

24   conflicts with -- it is the case -- actually,

25   many companies who are hugely successful run

1      L. Pullan, Ph.D. - Highly Confidential

2  into great difficulties because they argue

3  themselves out of doing deals.  Roche, after

4  Valium.  Valium was astronomically successful

5  for its time.  Roche, after Valium, did very

6  few deals and virtually no early deals and all

7  of the sudden they look around and they have no

8  pipeline, they have no prospects.  Roche's size

9  shrunk historically.

10          One must do deals.  One most build a

11  pipeline if you're going to have a future.  You

12  try to pick the best opportunities, but you

13  pick opportunities.

14      Q.    Okay.  So eNPV is not the whole

15  story?

16          MS. SIMSON:  Objection to form.

17      A.    No, there are many factors that go

18  into doing a deal.  And the uncertainty, the

19  ability to predict an eNPV increases with time.

20  That is, you know more, right?  The comfort of

21  an estimate at a preclinical research stage is

22  very, very low.  The error bars on those

23  numbers are huge.  The error bars at Phase 3

24  are still pretty doggone significant and people

25  are wrong most of the time, but they're

1          L. Pullan, Ph.D. - Highly Confidential

2     dramatically wrong.

3              It is very, very difficult to

4     predict what a product would do and it is more

5     difficult for an earlier opportunity.

6              The value of eNPVs in even thinking

7     about a deal is much lower for an early

8     opportunity.  Indeed Merck uses a real options

9     technique for evaluating early opportunities.

10         Q.    What's the real options technique?

11    You knew I was going to ask that.

12         A.    Yeah, I did, and I should have

13    thought up my clear explanation.  I think it's

14    a not very helpful technology, but Merck does

15    use this for early opportunities.

16              It says that the volatility in the

17    stock price is a measure of the predictability

18    and optionality of -- of an arrangement.

19         Q.    I'm sorry I asked.

20         A.    And the Black-Scholes calculation,

21    and it's pretty obscure, and it's extremely

22    difficult to stand in front of somebody and

23    then say, The reason I say it's worth X is

24    because of these alpha factors and beta factors

25    and the volatility of the stock and the index

1          L. Pullan, Ph.D. - Highly Confidential

2     compared to the whole.  It becomes so

3     untransparent that, in my opinion, it's not a

4     very useful technique in communicating value.

5     But it is used as an alternative to what they

6     perceive as the insufficiencies of the eNPV for

7     early opportunities.

8               MR. STOPS:  I think I'm done.  Let's

9          go off the record for one minute and we can

10         stay here.  I'll step out.

11              THE VIDEOGRAPHER:  We are going off

12         the record.  The time is 6:57 p.m.

13              (Recess.)

14              THE VIDEOGRAPHER:  We are back on

15         the record.  The time is 7:01 p.m.

16              MR. STOPS:  Doctor, you'll be happy

17         to hear that I have no further questions

18         for you at this time.

19              THE WITNESS:  Very happy.

20              MS. SIMSON:  Why don't we go off the

21         record.  I'll check my notes and see if I

22         have anything.

23              THE VIDEOGRAPHER:  We are going off

24         the record.  The time is 7:01 p.m.

25              (Recess.)

1       L. Pullan, Ph.D. - Highly Confidential

2              THE VIDEOGRAPHER:  We are back on

3       the record.  The time is 7:39 p.m.

4   EXAMINATION BY

5   MS. SIMSON:

6       Q.    Welcome back, Dr. Pullan.  Just a

7   few follow-up questions for you.  Dr. Pullan,

8   do you recall testifying earlier about your

9   many years of experience in negotiating

10  pharmaceutical BD&L deals and bringing that

11  experience to bear in considering the 2009 deal

12  between Novartis and Incyte?

13      A.    Yes, I do.

14            MR. STOPS:  Objection, leading.

15  BY MS. SIMSON:

16      Q.    And when you were discussing the

17  relevance of the years of experience to

18  considering the 2009 agreement, were you

19  referring to the industry custom and practice

20  perspective as opposed to a legal perspective?

21      A.    Absolutely.

22      Q.    Do you recall being asked about

23  whether, generally speaking, parties can ever

24  fail to accurately capture their intent in the

25  words of their agreement?

1       L. Pullan, Ph.D. - Highly Confidential

2       A.    Yes, I do.

3       Q.    And that was earlier today by

4    Mr. Stops, correct?

5       A.    Yes.

6       Q.    And you said --

7             MR. STOPS:  Just like you did

8    before, your counsel, you got to give me a

9    second to object before you answer the

10   question.

11            Go ahead.

12   BY MS. SIMSON:

13      Q.    I think Mr. Stops spoke there before

14   I was done with my last question, so I'll

15   withdraw that and start again.  Okay.

16            And you said that this may be

17   possible.

18            MR. STOPS:  Objection.  Leading.

19   BY MS. SIMSON:

20      Q.    Do you recall testifying to that,

21   Dr. Pullan?

22      A.    I -- I recall testifying to that.  I

23   believe those were my words.

24      Q.    But it is your opinion that it's --

25   in this case the 2009 agreement did capture the

1          L. Pullan, Ph.D. - Highly Confidential

2    intention of the parties?

3               MR. STOPS:  Objection, leading.

4               MS. SIMSON:  I'm not done.  Please

5          let me finish before you make your

6          objection, Mr. Stops.

7    BY MS. SIMSON:

8          Q.    But it's your opinion in this case

9    that the 2009 agreement did capture the

10   intention of the parties with respect to the

11   duration of the reverse royalty.

12              MR. STOPS:  Objection, leading.

13         A.    Yes, that is my opinion.

14         Q.    At the end of today's deposition,

15   and I'm reading from the transcript here, so

16   you testified that:  Incyte refers to the

17   clinical trial contributions of Novartis as

18   important in the FDA approval in their press

19   releases suggesting that indeed, Incyte

20   contributed to the establishment of the way the

21   products are used and the labels and the

22   approval in the U.S., as well as in Europe and

23   elsewhere.

24              Do you remember giving that

25   testimony?

1        L. Pullan, Ph.D. - Highly Confidential

2        A.    I don't remember it exactly that

3    way, but I have no doubt that I misspoke and

4    that should have been Novartis's contribution

5    to the clinical trials as mentioned in the

6    Incyte press release.

7        Q.    Okay.  And that was my question, was

8    whether or not you misspoke and you meant

9    Novartis in lieu of Incyte?

10            MR. STOPS:  Objection, vague?

11       A.    Correct and answered.  Yes.

12       Q.    So --

13       A.    I did indeed intend to highlight the

14   contributions of Novartis.  And so I did -- if

15   the record is correct and I have no doubt it is

16   not -- I do not doubt it is correct.  Therefore

17   I misspoke.

18       Q.    Dr. Pullan, we've spoken about the

19   2009 agreement at length during today's

20   deposition.

21            Did you read that agreement

22   thoroughly in connection with providing your

23   opinions in this case?

24       A.    Yes, many times.

25       Q.    And Dr. Pullan, you were asked by

```
 1          L. Pullan, Ph.D. - Highly Confidential

 2    Mr. Stops about the citations in your opening

 3    report.

 4               Do you remember those questions?

 5         A.    Yes, I do.

 6         Q.    And next to your report, as

 7    Exhibit A, is your materials considered list,

 8    if you want to take a look at that.

 9         A.    In both reports, yes.

10         Q.    And documents discussed in your

11    reports are listed on those exhibits, right?

12         A.    Correct.

13         Q.    And there might be several other

14    citations throughout your reports that are not

15    footnotes.

16               MR. STOPS:  Objection to form,

17    leading.

18         A.    It is correct that the materials

19    listed as documents considered were indeed

20    considered, read, and may not appear in

21    footnotes but should not be assumed to be not

22    considered.

23               MS. SIMSON:  I have no further

24          questions, unless of course Mr. Stops has

25          follow-up, and I may have follow-up.
```

1          L. Pullan, Ph.D. - Highly Confidential

2               MR. STOPS:  One second.  We don't

3          have to go off, I don't think.

4               Okay.  No questions.

5               THE WITNESS:  Thank you.

6               MS. SIMSON:  Nothing further here.

7          So, Dr. Pullan, thank you very much.

8               MR. MACH:  Thanks, everyone.

9               THE VIDEOGRAPHER:  We are going off

10         the record the time is 7:44 p.m.

11              (Time Noted:  7:44 p.m.)

12

13

14                    ---------------------

15                    LINDA PULLAN, PHD

16

17    Subscribed and sworn to before me

18    this      day of                2022.

19

20    ---------------------------------------

21

22

23

24

25

```
 1        L. Pullan, Ph.D. - Highly Confidential

 2          C E R T I F I C A T E

 3

 4   STATE OF NEW YORK     )

 5                         ) ss.:

 6   COUNTY OF KINGS       )

 7            I, ANITA M. TROMBETTA, a Notary

 8      Public within and for the State of New

 9      York, do hereby certify:

10            That LINDA PULLAN, PHD, the witness

11      whose deposition is hereinbefore set forth,

12      was duly sworn by me and that such

13      deposition is a true record of the

14      testimony given by such witness to the best

15      of my ability.

16            I further certify that I am not

17      related to any of the parties to this

18      action by blood or marriage; and that I am

19      in no way interested in the outcome of this

20      matter.

21            IN WITNESS WHEREOF, I have hereunto

22      set my hand this 6th day of June, 2022.

23

24      _____

        ANITA M. TROMBETTA, RMR, CRR

25
```

```
 1         L. Pullan, Ph.D. - Highly Confidential

 2    -------------------I N D E X------------------

 3    WITNESS                 EXAMINATION BY       PAGE

 4     Linda Pullan, Ph.D.   MR. STOPS               5
                             MS. SIMSON            313
 5

 6    -------------------EXHIBITS-------------------

 7
      EXHIBIT NAME        DESCRIPTION              PAGE
 8
       Exhibit 1001    Collaboration and           7
 9                     License Agreement
                       Dated November 24,
10                     2009
       Exhibit 1002    Pullan Opening             28
11                     Expert Report
       Exhibit 1003    Pullan Rebuttal            28
12                     Report
       Exhibit 1004    July 9, 2009, Term         96
13                     Sheet
       Exhibit 1005    First Draft               117
14                     Agreement dated July
                       27, 2009
15     Exhibit 1006    Incyte-Innovent           142
                       Agreement
16     Exhibit 1007    2019 Agreement            260
                       between Incyte and
17                     Novartis
       Exhibit 1008    Agreement Between         272
18                     Incyte and Eli Lilly

19

20

21

22

23

24

25
```

```
 1   NAME OF CASE:

 2   DATE OF DEPOSITION:

 3   NAME OF WITNESS:

 4   Reason Codes:

 5        1.  To clarify the record.

 6        2.  To conform to the facts.

 7        3.  To correct transcription errors.

 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____
```

```
1              L. Pullan, Ph.D. - Highly Confidential

2                    MR. STOPS:  One second.  We don't

3         have to go off, I don't think.

4                    Okay.  No questions.

5                    THE WITNESS:  Thank you.

6                    MS. SIMSON:  Nothing further here.

7         So, Dr. Pullan, thank you very much.

8                    MR. MACH:  Thanks, everyone.

9                    THE VIDEOGRAPHER:  We are going off

10        the record the time is 7:44 p.m.

11                   (Time Noted:  7:44 p.m.)

12

13
                                    Linda Pullan
14                       ---------------------

15                    LINDA PULLAN, PHD

16

17     Subscribed and sworn to before me

18     this    5th   day of   July        2022.

19            Elizabeth Collazo
20     --------------------------------------

21

22              ELIZABETH COLLAZO
                 Notary Public - State of Florida
                 Commission # GG 346702
                 My Comm. Expires Jun 27, 2023
23

24

25
```

NotaryCam DocID:62c45aea2ec6917418b41451

1   NAME OF CASE: *Novartis Pharma AG v. Incyte Corp.*, No. 1:20-cv-00400-GHW-GWG

2   DATE OF DEPOSITION: June 3, 2022

3   NAME OF WITNESS: Linda Pullan, Ph.D.

4   Reason Codes:   *** **Please see attached errata sheet** ***

5           1.  To clarify the record.

6           2.  To conform to the facts.

7           3.  To correct transcription errors.

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24  Subscribed and sworn to before me this 5th Day of July, 2022

25  *Elizabeth Collazo*

ELIZABETH COLLAZO
Notary Public - State of Florida
Commission # GG 346702
My Comm. Expires Jun 27, 2023

*Linda Pullan*
_____

NotaryCam DocID:62c45aea2ec6917418b41451

## Linda Pullan, Ph.D. Deposition Transcript Errata

Deposition taken on June 3, 2022, in *Novartis Pharma AG v. Incyte Corporation*, Case No. 1:20-cv-00400-GHW-GWG, pending in the U.S. District Court for the Southern District of New York

| Page and Line | Change | Reason for Change |
|---|---|---|
| 8:22 | Change "pharmaceuticals" to "Pharmaceuticals" | Transcription error |
| 10:19 | Add "when assessing" after "phase 2" | Clarification |
| 10:20 | Add "if there is" after "and" | Clarification |
| 12:8 | Add apostrophe to "stockholders" | Transcription error |
| 13:23 | Change "of the" to "other" | Transcription error |
| 14:5 | Add "for" after "was" | Transcription error |
| 15:12 | Change "functioning" to "function in" | Transcription error |
| 15:16 | Delete "an" | Transcription error |
| 17:6 | Delete first "a" | Transcription error |
| 17:16 | Change "have" to "had" | Transcription error |
| 18:10 | Change "rÃ©sumÃ©" to "résumé" | Transcription error |
| 19:5 | Add "business development at" after "of" | Clarification |
| 19:25 | Change "Yes, it was in 2022" to "It was in December 2021" | Correction |
| 22:14 | Change "difficulty with any of the other" to "other correction with either of my" | Clarification |
| 23:13 | Change "paperwork" to "paper" | Transcription error |
| 24:5 | Change "history, experience" to "history and experience" | Transcription error |
| 24:23 | Change "the" to "my" | Transcription error |
| 25:4 | Change "party" to "parties" | Transcription error |
| 25:18 | Add "portion" after "cMET" | Transcription error |
| 27:15 | Add "the meaning of terms" after "interpret" | Clarification |
| 27:18 | Change "license and the expectations that" to "licensing deal and what the expectations" | Clarification |
| 27:22 | Change second "and" to "who is" | Clarification |
| 27:23 | Change "make" to "makes" | Clarification |
| 31:3 | Add "and thus the entire agreement" after "structure" | Clarification |
| 31:4 | Change "things" to "agreements" | Clarification |
| 32:16 | Change "have" to "has" | Transcription error |
| 32:17 | Change "are" to "is" | Transcription error |
| 33:13 | Change "of" to "with" | Transcription error |

| Page and Line | Change | Reason for Change |
|---|---|---|
| 35:11 | Change "meanings" to "meaning" | Transcription error |
| 35:21 | Change "they" to "pharmaceutical collaboration and licensing agreements" | Clarification |
| 38:2 | Change the second "they" to "the differences" | Clarification |
| 39:13 | Delete "a" after "find" | Transcription error |
| 40:21 | Change "dissect, torture" to "dissect and torture" | Transcription error |
| 41:5 | Delete "the" after "create" | Transcription error |
| 43:23 | Add "the" after "in" | Transcription error |
| 44:19-20 | Change "years, you know, you can have years and you do - - people do - - take" to "years do not necessarily reflect the scope of knowledge and experience. Tech" | Clarification |
| 44:23 | Delete "of" after the second "as" | Transcription error |
| 45:23 | Delete "not" | Transcription error |
| 46:25 | Change the first "drives" to "is" | Transcription error |
| 47:19-20 | Change "a preclinical" to "at the preclinical stage" | Clarification |
| 48:6 | Delete "of - - you've got" | Clarification |
| 48:25 | Change "proved" to "approved" | Transcription error |
| 49:12 | Change "interrelationship" to "enter a relationship" | Transcription error |
| 49:15 | Delete "Yes." | Clarification |
| 50:8 | Add "a" after "is" | Transcription error |
| 50:9 | Change "agreement. The" to "agreement the" | Transcription error |
| 53:6 | Change "C-MET, licensed products" to "C-MET Licensed Products" | Transcription error |
| 56:8 | Change "in dispute" to "of the forecasted reverse royalty payment amounts at the time somehow" | Clarification |
| 56:9 | Add "is" after "dispute" and before the first "not" | Clarification |
| 56:18 | Change "they" to "the projected values" | Clarification |
| 56:18 | Change "projected," to "projected or" | Transcription error |
| 56:19 | Add "than projected" after "smaller" | Clarification |
| 57:19 | Change "of" to "figures are" | Clarification |
| 57:23 | Add "capping the reverse royalty" after "term" | Clarification |
| 58:7 | Change "are" to "is" | Transcription error |
| 58:23 | Delete "that's - -" | Clarification |
| 66:19 | Change "scheduling" to "schedule and" | Transcription error |

| Page and Line | Change | Reason for Change |
|---|---|---|
| 70:20 | Change "valuable, much more protection than is a - - a" to "valuable and offers much more protection than a patent for a" | Transcription error / clarification |
| 71:16 | Change "matters" to "matter" | Transcription error |
| 74:3 | Add "across the industry and in this case" after "facts" | Clarification |
| 74:3 | Add "it" after "rebut" | Transcription error |
| 75:3 | Change "which" to "what" | Transcription error |
| 75:11 | Add "like with Incyte" after "exceptions" | Clarification |
| 76:13-14 | Change "a single source of manufacturing a single - - a highly difficult - -" to "a single, highly difficult source of manufacturing." | Clarification |
| 83:17 | Change "unobvious" to "nonobvious" | Transcription error |
| 87:19 | Delete "But" | Clarification |
| 90:5 | Change "in most" to "and its" | Clarification |
| 90:14 | Change "Pharmaceutical" to "The pharmaceutical" | Transcription error |
| 95:3 | Change "Patent - - royalties" to "Royalties" | Clarification |
| 95:7 | Change "contribution" to "contributions" | Transcription error |
| 96:3 | Change "They" to "Royalties" | Clarification |
| 98:9 | Change "covering" to "cover email" | Transcription error |
| 105:7 | Change "Novartis" to "it" | Clarification |
| 105:15 | Change "licensed" to "the Licensed" | Transcription error |
| 106:3 | Change "licenses" to "licensed" | Transcription error |
| 106:24 | Add "within" after "be" and add "of the term sheet" after "frame" | Clarification |
| 107:23 | Change "positions" to "definitions" | Clarification |
| 109:7 | Add "first part of this" after "The" | Clarification |
| 109:21 | Change "Incyte, Novartis" to "or Incyte development" | Clarification |
| 111:21 | Change the first "in here" to "in the final agreement" | Clarification |
| 111:21 | Change the second "in here" to "in the final term sheet" | Clarification |
| 111:21 | Change "right?" to "but none of those additions are material financial deal terms." | Clarification |
| 112:25 | Delete "because of - - doing things" | Clarification |
| 113:22 | Change "benefit, but" to "benefit.  But" | Transcription error |
| 113:23 | Delete the comma | Transcription error |
| 115:9 | Change "agreement that does indeed - - the" to "agreement.  That" | Clarification |

| Page and Line | Change | Reason for Change |
|---|---|---|
| 122:2-3 | Change "as the phrases are in the Novartis" to "just as these same phrases are in the Novartis defined terms Novartis Know-How and Novartis Patent Rights" | Clarification |
| 123:13-14 | Delete "the concept of the - - the point of these - -" | Clarification |
| 125:20 | Change "reflect" to "reflects" | Transcription error |
| 138:5 | Delete "that - -" | Clarification |
| 148:22 | Change "parties" to "party" | Transcription error |
| 149:14 | Change "didn't" to "did" | Transcription error |
| 161:19 | Change "they" to "Incyte" | Clarification |
| 162:17 | Change "agreement" to "approval" | Transcription error |
| 169:6 | Change "there" to "they" | Transcription error |
| 169:22 | Change both uses of "there" to "they" | Transcription error |
| 173:11 | Change "little ii" to "8.3(b)(ii)" | Clarification |
| 175:8 | Change "little ii" to "8.3(b)(ii)" | Clarification |
| 178:12 | Add "a" after "is" | Transcription error |
| 185:12 | Change "are" to "is" | Transcription error |
| 186:5 | Change "for" to "from" | Transcription error |
| 188:12 | Change "extent [sic]" to "royalty duration" | Transcription error |
| 189:19 | Change "to claim to expire" to "claim expiration" | Clarification |
| 191:3 | Delete "in patent - -" | Clarification |
| 195:7 | Change "the patent" to "the royalty" | Clarification |
| 195:9 | Change "exclusivity" to "protection" | Clarification |
| 196:16 | Change "it" to "Incyte" | Clarification |
| 196:25 | Add "term" after "defined" | Transcription error |
| 199:3 | Delete "latter" | Clarification |
| 205:5 | Delete "a" | Transcription error |
| 210:15 | Change "In" to "On" | Transcription error |
| 210:17 | Change "a practical term" to "practical terms" | Transcription error |
| 213:12 | Delete "I don't - -" | Clarification |
| 217:24 | Change "of" to "or" | Transcription error |
| 222:13 | Delete "I don't - -" | Clarification |
| 223:6 | Change "as" to "if" and add "was not" after "product" | Clarification |
| 223:7 | Add "other" after "additional" | Clarification |
| 234:14 | Change the comma to "or" | Transcription error |
| 235:3 | Change "that" to "there" | Transcription error |

| Page and Line | Change | Reason for Change |
|---|---|---|
| 236:12 | Add "not" after "is" | Transcription error / clarification |
| 236:18 | Change "requirement, but" to "requirement. But" | Clarification |
| 236:19 | Change "the royalties are" to "the duration of the reverse royalties is" | Clarification |
| 243:4 | Delete "of" | Transcription error |
| 243:5 | Change "decline" to "declines" | Transcription error |
| 244:12 | Change "substantial - - prices" to "substantially. Prices" | Transcription error |
| 244:22 | Change the comma to "and" | Transcription error |
| 244:23 | Delete "will push" | Clarification |
| 246:16 | Add "such as" after "exceptions" | Clarification |
| 246:17-19 | Change "practically practice that product manufacturer or - - that's probably the most likely, but correct" to "manufacture and/or commercialize the product" | Clarification |
| 253:9 | Add "actual" before "agreement" | Clarification |
| 253:9-10 | Delete "Would that we were, yes." | Clarification |
| 258:7 | Change "is" to "has" | Transcription error |
| 258:8 | Delete the comma | Transcription error |
| 259:11 | Change "When" to "Until" | Clarification |
| 269:12 | Change the comma to "- -" | Transcription error |
| 269:15-16 | Change "and ten years is by far the most common term," to "(and ten years is by far the most common term)" | Transcription error |
| 271:8 | Change "a - -" to "an" | Transcription error |
| 274:8-9 | Delete "of joint and - - and such - - I don't remember if there's provisions" | Clarification |
| 277:22 | Change "writes" to "rights" | Transcription error |
| 280:25 | Change "other agreement" to "agreement at issue in this case" | Clarification |
| 283:25 | Change "the definition" to "this royalty provision of the agreement" | Clarification |
| 284:8 | Change the comma to "and" | Transcription error |
| 285:18 | Add "the reverse royalty" after "And" | Clarification |
| 287:5 | Change "timings" to "timing" | Transcription error |
| 287:9 | Change "Dailey" to "Daly" | Transcription error |
| 287:9 | Change "the" to "Novartis'" | Clarification |

| Page and Line | Change | Reason for Change |
|---|---|---|
| 290:25 | Change the second "power" to "party" | Transcription error |
| 291:3 | Change "is" to "may be" | Clarification |
| 291:4 | Change the second "financial" to "finances" | Transcription error |
| 291:9 | Add "financial" after "more" | Clarification |
| 297:22 | Change "ran, helped design, ran" to "ran and helped design" | Clarification |
| 298:10 | Change "Incyte" to "Novartis" | Clarification |
| 298:17 | Change "with." to "with?" | Transcription error |
| 298:18 | Change the first "they" to "Novartis" | Clarification |
| 300:11 | Add "Jakafi" after "any" | Transcription error / clarification |
| 300:15 | Delete "- - brand names" | Transcription error |
| 301:21 | Add "some" after "and" | Clarification |
| 302:11 | Change the first "the" to "my" | Clarification |
| 303:14 | Add "of" before "failure" | Transcription error |
| 305:19-20 | Delete "it's driving at - -" | Clarification |
| 305:20 | Add "is" after "at" | Transcription error |
| 309:24 | Change "- - it is the case - - actually," to "confidentiality. It is the case actually that" | Clarification |
| 310:18 | Change "uncertainty" to "certainty" | Transcription error |
| 310:19 | Add a comma after "eNPV" | Transcription error |
| 310:25 | Add "less" after "they're" | Clarification |
| 311:4 | Change "would" to "will" | Transcription error |