UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

NOVARTIS PHARMA AG,

                      Plaintiff,

            -against-

INCYTE CORPORATION,

                    Defendant.

--------------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/6/2025

1:20-cv-400-GHW

<u>MEMORANDUM OPINION &
ORDER</u>

GREGORY H. WOODS, United States District Judge:

      In 2009, Plaintiff Novartis Pharma AG ("Novartis") and Defendant Incyte Corporation ("Incyte") entered into an agreement to commercialize a drug compound called ruxolitinib (the "Agreement").  The Agreement established separate sales territories where each party would sell the drug.  Section 8.3(c) of the Agreement required each party to pay the other royalties based on sales in their respective domains.

      The parties have disputed the meaning of Section 8.3(c) in this case for the last five years.  In Incyte's view, Section 8.3(c) permitted it to reduce its royalty payments in 2019 and cease its royalty payments in 2021.  In Novartis's view, Section 8.3(c) requires Incyte to pay the full royalty rate until 2028.  The Court has twice held that both parties' interpretations of Section 8.3(c) are reasonable, and accordingly, that Section 8.3(c) is ambiguous.  A trial is scheduled for next month so that a jury can determine which interpretation was intended when the parties executed the Agreement.

      Incyte, however, has moved for judgment on the pleadings.  The motion comes at a very late stage in this case, but its theory is novel.  Incyte argues that there can be no ambiguity in Section 8.3(c) because one of the two reasonable readings of that provision—Novartis's—is unlawful *per se* under a legal rule established by the Supreme Court in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964).

Incyte's reading of Section 8.3(c) must prevail, it argues, because that reading is the only reading that does not violate the *Brulotte* rule.

The Court disagrees.  The *Brulotte* rule is a simple one:  a licensor that negotiates royalty payments "'with the leverage' of a patent" cannot "'project those royalty payments beyond the life of the patent.'"  *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 265 (1979) (quoting *Brulotte*, 379 U.S. at 33).  That is not what would occur under Novartis's reading of Section 8.3(c), because Novartis has no patents in the drug for which it is seeking royalties.  Because *Brulotte* does not apply to Novartis's reading of Section 8.3(c), Incyte's motion is DENIED.

## I.     BACKGROUND

Familiarity with this case is presumed.  The reader is referred to the Court's February 22, 2021 opinion on Incyte's motion to dismiss for a full description of the pleadings and allegations in this case, Dkt. No. 52 ("MTD Ruling"); *see Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim."), and to the Court's July 29, 2024 opinion on the parties' respective motions for summary judgment for a full description of the procedural history of this case through that date, Dkt. No. 443 ("MSJ Ruling").  Before the Court is Incyte's novel theory for judgment on the pleadings based on the Supreme Court's decision in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), first raised on December 26, 2024 after apparently "taking a fresh look at the case after [the Court's] ruling" denying both parties' motions for summary judgment.  Dkt. No. 469; Dkt. No. 475 at 20:2-4.  By the time Incyte first raised this theory, a trial in this case was less than five months away, *see* Dkt. No. 446, and by the time Incyte's motion was filed and fully briefed, trial was less than two months away, *see* Dkt. No. 532.  The Court previewed in a conference regarding Incyte's motion that it expected it would "need to be much more concise in [its] ruling" on Incyte's motion than it has been on motions past.  Dkt. No. 475 at 30:12-13; *see* Fed. R. Civ. P.

12(c) (permitting motions for judgment on the pleadings only if filed "early enough not to delay trial"). A concise summary of this case is provided here.

### A. Facts[1]

On November 24, 2009, Novartis and Incyte entered into the Collaboration and License Agreement that is the subject of this dispute. Dkt. No. 36-1 (the "Agreement");[2] Dkt. No. 1 ¶ 1 ("Compl."). The Agreement provided a comprehensive framework for the relationship between the two parties to permit them to "collaborate with respect to the research, development and commercialization of certain pharmaceutical Compounds on a global scale." Compl. ¶ 14. Before entering into the Agreement, Incyte had several medicinal compounds "in various stages of development" but was unable to "effectively develop and ultimately commercialize those compounds on its own." *Id.* ¶ 1. The Agreement with Novartis allowed Incyte to benefit from Novartis's "global expertise and know-how" in developing and commercializing Incyte's medicinal compounds. *Id.* Incyte also received "hundreds of millions of dollars from Novartis in up-front and milestone payments to fund research and development activities relating to certain [of its] compounds." *Id.*

One of the medicinal compounds that Incyte needed help developing and commercializing was ruxolitinib. *Id.* Ruxolitinib is a kinase inhibitor used to treat rare blood cancers and to support organ transplants. *Id.* ¶¶ 1, 23–24. In addition to its upfront and milestone payments, Novartis "contributed (and continues to contribute), among other things, significant technical and industry expertise and knowledge" to the development of ruxolitinib, as well as use of its "global outreach and scale of organization." *Id.* ¶ 14. The parties' collaboration regarding ruxolitinib was a great success. "Ruxolitinib has been highly successful in treating several medical conditions," *id.* ¶ 3,

---

[1] Unless otherwise noted, the facts are drawn from the complaint and the Agreement and are accepted as true for the purposes of this motion for judgment on the pleadings. *See, e.g.*, *Patel*, 259 F.3d at 126.
[2] The Agreement has since been amended five times. Dkt. Nos. 36-2–36-6.

and since 2017, Incyte's sales of ruxolitinib compounds "have exceeded well over a billion dollars annually," *id.* ¶¶ 3, 34–36.

The parties commercialized the drugs covered in the Agreement, including ruxolitinib, by establishing separate territories for Incyte and Novartis to sell products containing the drugs, *see id.* ¶ 14, and requiring each party to pay royalties to the other "based on defined percentages of annual sales of Licensed Products in its respective territory," *id.* ¶ 2. Incyte's territory is the United States, and Novartis's territory is the rest of the world. *Id.* Incyte sells ruxolitinib in the U.S. as "Jakafi," *id.* ¶ 1, and Novartis sells ruxolitinib outside the U.S. as "Jakavi," *id.* ¶ 14.

The Agreement does not require the parties to pay royalties indefinitely. Royalties terminate on a "country-by-country basis" once the latest of three possible endpoints comes to pass:

> (i) the last to expire of any Valid Claim of Licensed Patent Rights Covering such Licensed Product in such country; (ii) ten (10) years following the date of First Commercial Sale in such country; and (iii) the expiration of Regulatory Exclusivity for such Licensed Product in such country.

Agreement § 8.3(c) ("Section 8.3(c)"). Royalties are also reduced by 50% if royalty payments continue "solely due to clause (ii) . . . or . . . Generic Competition exists." *Id.*

The parties dispute whether the time period in clause (i) of Section 8.3(c) has ended with respect to Incyte's royalty payments to Novartis from its sales of Jakafi. In Incyte's view, clause (i) was never applicable to Jakafi because Novartis has no patents over Jakafi, Dkt. No. 428 at 1 ("Mem."), and the phrase "any Valid Claim of Licensed Patent Rights," as applied to Incyte's royalty payments to Novartis, refers only to Novartis-owned patents, *id.* § 8.3(c)(i); Mem. at 1. Incyte, accordingly, reduced its royalty payments by 50% in 2019 following the end of the time period in clause (iii), Mem. at 16; *see* Agreement § 8.3(c) (permitting reduction in royalties where payments continue "solely due to clause (ii)"), and terminated its royalty payments in 2021 following the end of the time period in clause (ii), *see* MTD Ruling at 10.

Novartis's view, by contrast, is that the period in clause (i) will not end until 2028 because the phrase "any Valid Claim of Licensed Patent Rights" refers to patents owned by either party, Agreement § 8.3(c)(i); MTD Ruling at 7, and while Novartis has no patents covering ruxolitinib, Incyte has patents covering ruxolitinib which last until 2028, MTD Ruling at 7.  Novartis, accordingly, contends that Incyte's reduction and cessation of its royalty payments constituted breaches of the Agreement.  Compl. ¶ 7.

The Court has twice held that both parties' interpretations of Section 8.3(c)(i) are reasonable, and accordingly, that Section 8.3(c)(i) is ambiguous.  MTD Ruling at 24 (denying Incyte's motion to dismiss); MSJ Ruling at 116 (denying both parties' motions for summary judgment).  In doing so, the Court did not address the Supreme Court's opinion in *Brulotte*, as that decision was not raised by either party.  *See generally* MTD Ruling; MSJ Ruling.

### B.  Procedural History

Novartis brought this action on January 15, 2020.  Compl. at 21.  Incyte moved to dismiss Novartis's complaint on April 20, 2020, without mentioning *Brulotte*.  Dkt. No. 32.  The Court denied Incyte's motion on February 18, 2021.  MTD Ruling at 24.

Incyte answered the complaint on March 22, 2021.  Dkt. No. 63.  Incyte's answer did not raise *Brulotte* as an affirmative defense or in any other manner.  *See id.*

The parties filed cross-motions for summary judgment on October 21, 2022.  Dkt. Nos. 175, 176.  Incyte's motion for summary judgment did not mention *Brulotte*.  *See* Dkt. No. 177.  The Court denied both parties' motions on July 29, 2024.  MSJ Ruling at 116.

On August 9, 2024, the Court scheduled a trial on Novartis's claims to begin on May 5, 2025.  Dkt. No. 446.

On December 26, 2024, more than four months after the Court scheduled a trial, Incyte moved for a pre-motion conference to discuss an anticipated motion for judgment on the pleadings

based on *Brulotte*.  Dkt. No. 469.  Incyte's motion came nearly five years after the operative pleading

was filed in this case, Compl. at 21, and less than five months before trial was scheduled to begin,

Dkt. No. 446.

The court scheduled a conference to discuss Incyte's anticipated motion on January 7, 2024.

Dkt. No. 470.  At the conference, an attorney for Incyte noted that he and his firm had recently

been retained as co-counsel, Dkt. No. 475 at 2:15-19, 19:23-24; *see* Dkt. Nos. 465–68, and stated that

the purported "*Brulotte* issue is something [they] noticed when taking a fresh look at the case after

[the Court's] summary judgment ruling finding the provision at issue to be ambiguous," Dkt. No.

475 at 20:1-4.  The Court noted that Incyte's anticipated motion was "late," but did not deny Incyte

leave to file the motion based on Novartis's arguments that the issue was "untimely raised" or

"waived."  *Id.* at 29:15-31:5.  The Court granted Incyte leave to file the motion.  *Id.* at 29:24-30:3.

Incyte filed its motion for judgment on the pleadings on February 3, 2025.  Dkt. No. 480;

Dkt. No. 481 ("Mem."); Dkt. No. 482 ("Bennett Decl.").  Novartis opposed the motion on March 2,

2025.  Dkt. No. 524 ("Opp.").  Incyte replied on March 17, 2025, Dkt. No. 532 ("Reply"), less than

two months before the commencement of trial, Dkt. No. 446.

## II.    LEGAL STANDARDS

### A.    Rule 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but

early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P.

12(c).  "Pleadings" include both the "complaint" and the "answer to [the] complaint."  Fed. R. Civ.

P. 7(a).

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to

that for granting a Rule 12(b)(6) motion for failure to state a claim."  *Lively v. WAFRA Inv. Advisory

Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quotation omitted).  "To survive a Rule 12(c) motion, the

plaintiff's complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)) (alterations omitted). In assessing "whether a complaint's factual allegations plausibly give rise to an entitlement to relief," the Court "draw[s] all reasonable inferences in the plaintiff's favor." *Id.* (internal quotations and alterations omitted).

"On a 12(c) motion, the court considers the complaint, the answer, . . . and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation omitted). The complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Id.* (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

The Agreement and its amendments are integral to the complaint because the complaint "relie[s] heavily upon [their] terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). The Court has considered them in resolving Incyte's motion for judgment on the pleadings. *See L-7 Designs*, 647 F.3d at 422.

## B. Contract Interpretation

The Court has concluded that there are two reasonable interpretations of the phrase "any Valid Claim of Licensed Patent Rights" with respect to Jakafi. Agreement § 8.3(c)(i); MTD Ruling at 24; MSJ Ruling at 116. There is Incyte's interpretation, which is that the phrase covers Novartis-owned U.S. patents covering Jakafi. Mem. at 1. And there is Novartis's interpretation, which is that the phrase covers Novartis-owned and Incyte-owned U.S. patents covering Jakafi. Opp. at 2.

Under New York law, a contract provision is ambiguous if it is "susceptible to more than one reasonable interpretation." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992). However, if one interpretation "would render the contract unenforceable," "the Court must

adopt the [other]." *Brevard v. Credit Suisse*, No. 23-cv-428 (LJL), 2024 WL 36991, at *5 n.2 (S.D.N.Y. Jan. 3, 2024), *appeal dismissed*, No. 24-2421, 2025 WL 832508 (2d Cir. Feb. 21, 2025) (applying New York law); *see also Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 410 (S.D.N.Y. 2016) (declining to adopt reading of ambiguous provision in contract governed by New York law that was "unenforceable on grounds of public policy" (quoting Restatement (Second) of Contracts § 193)).  It is "a general rule of construction" that "ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable." *Walsh v. Schlecht*, 429 U.S. 401, 408 (1977).

Incyte moves for judgment on the pleadings on the theory that its reading of the Agreement is the only reading that is enforceable.  It argues that Novartis's reading of Section 8.3(c)(i) would render the Agreement "unenforceable" under federal patent law.  Mem. at 1 (citing *Brulotte v. Thys Co.*, 379 U.S. 29 (1946)).  Whether Novartis's reading would render the Agreement unenforceable is a question of law that is appropriately decided on a motion for judgment on the pleadings.  *See United Res. Recovery Corp. v. Ramko Venture Mgmt., Inc.*, 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008) (finding contract unenforceable under New York law on a motion to dismiss under Fed. R. Civ. P. 12(c)); *see also In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 141 (2d Cir. 1982) (observing that, under New York law, the question of the enforceability of a contract's liquidated-damages provision "is a question of state law").

## C. *Brulotte*

According to Incyte, Novartis's reading of Section 8.3(c)(i) would violate the rule established in *Brulotte v. Thys Co.*, 379 U.S. 29 (1946).  Mem. at 1.  Incyte has misread *Brulotte* and its progeny. Three Supreme Court cases have defined and clarified the scope of the *Brulotte* rule.

In *Brulotte* itself, the Supreme Court held that it was "unlawful per se" for a patentholder to collect royalties on the use of its patent after the patent has expired.  379 U.S. at 32.  The petitioners

8

had acquired hop-picking machines from a patentholder in exchange for a "flat sum" and a seasonal "license for [their] use." *Id.* at 29. The licenses "listed 12 patents relating to hop-picking machines, but only seven were incorporated into the machines sold to and licensed for use by [the] petitioners." *Id.* at 30. Each of the seven patents "expired on or before 1957," but the licenses issued to the petitioners "continued for terms beyond that date." *Id.*

The Supreme Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." *Id.* at 32. The Court explained that, under federal patent law, patentholders are entitled to a temporary "patent monopoly" over the use of their inventions. *Id.* at 31. But when the patent expires, all rights to the patent "become public property." *Id.* Thus, while "[a] patent empowers the owner to exact royalties as high as he can negotiate with the leverage of [a patent] monopoly," "to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent" in violation of federal patent law. *Id.* at 33. The license agreements, accordingly, were preempted under federal patent law "insofar as [they] allow[ed] royalties to be collected which accrued after the last of the patents incorporated into the machines had expired." *Id.* at 30.

The Supreme Court expanded on *Brulotte* in *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979). In *Aronson*, the Court observed that even "a pending patent application gives the applicant some additional bargaining power for purposes of negotiating a royalty agreement," and that this, too, could be "abuse[d]" in violation of federal patent law. *Id.* at 265. Multiple appellate courts have concluded, based on this observation, that it is possible for a contract to violate *Brulotte* if it provides for royalties that endure after a pending or expressly anticipated patent "fails to issue." *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1021 (9th Cir. 2007); *accord Meehan v. PPG Industries, Inc.*, 802 F.2d 881, 884–85 (7th Cir. 1986); *Boggild v. Kenner Products*, 776 F.2d 1315, 1319–20 (6th Cir. 1985); *Pitney Bowes, Inc. v.*

*Mestre*, 701 F.2d 1365, 1373 (11th Cir. 1983); *Kimble v. Marvel Enterprises Inc.*, 727 F.3d 856, 857 (9th

Cir. 2013), *aff'd sub nom. Kimble v. Marvel Ent., LLC*, 576 U.S. 446 (2015).

The holding in *Aronson* reaffirmed, however, that a royalty that is not "negotiated 'with the

leverage' of a patent" does not run afoul of *Brulotte*. *Aronson*, 440 U.S. at 265 (quoting *Brulotte*, 379

U.S. at 33). "The principle underlying" *Brulotte*, the Court explained, "was simply that the monopoly

granted *under a patent* cannot lawfully be used to 'negotiate with the leverage of that monopoly.'" *Id.*

(quoting *Brulotte*, 379 U.S. at 33) (emphasis in original). And while "a pending patent application

gives the applicant some additional bargaining power for purposes of negotiating a royalty

agreement," "the amount of leverage arising from a patent application depends on how likely the

parties consider it to be that a valid patent will issue." *Id.* at 265. The license agreement before the

*Aronson* Court provided for a 5% royalty on sales of an invention described in a pending patent

application, *id.* at 259, and provided for a perpetual 2.5% royalty rate on sales of the invention if the

patent did not issue after five years, *id.* at 260. The Court held that enforcing the perpetual royalty

rate was "consistent with the principles treated in *Brulotte*," *id.* at 264, because it was "clear that

whatever role the pending application played in the negotiation of the 5% royalty, it played no part

in the contract to pay the [2.5%] royalty indefinitely," *id.* at 265. Because the reduced royalty was

not "negotiated 'with the leverage' of a patent," *Brulotte* did not apply. *Id.* (quoting *Brulotte*, 397 U.S.

at 33).

The Supreme Court most recently reaffirmed *Brulotte* in *Kimble v. Marvel Entertainment, LLC*,

576 U.S. 446 (2015). The Court observed that the "*Brulotte* rule . . . is simplicity itself to apply." *Id.*

at 459. "A court need only ask whether a licensing agreement provides royalties for post-expiration

use of a patent. If not, no problem; if so, no dice." *Id.*

The *Kimble* Court also emphasized the limitations of the *Brulotte* rule. It observed, for

example, that "[u]nder *Brulotte*, royalties may run until the latest-running patent covered in the

parties' agreement expires." *Id.* at 454. It also observed that "post-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent." *Id.* (citing 3 R. Milgrim & E. Bensen, Milgrim on Licensing § 18.07, p. 18-16–18-17 (2013)). A license that bundles a patent with other intellectual property, therefore, will survive under *Brulotte* if its royalty rates decrease after the patent period expires. *See id.* ("[F]or example, . . . a license involving both a patent and a trade secret can set a 5% royalty during the patent period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)."); *see also, e.g., Lavery v. Pursuant Health, Inc.*, 126 F.4th 1170, 1177 (6th Cir. 2025) (noting the "exception" to *Brulotte* "for offering a second rate for non-patented intellectual property—say a lower rate after the patent expires").

One limitation of *Brulotte* is particularly relevant here. As *Kimble* explained, "all the decision bars are royalties for using an invention after it has moved into the public domain." 576 U.S. at 453–54; *accord Brulotte*, 279 U.S. at 30 (reversing judgment enforcing license agreement only "insofar as it allows royalties to be collected which accrued after the last of the patents incorporated into the machines had expired"). Thus, as the Ninth Circuit put it, "*Brulotte* does not render an entire contract void and unenforceable merely because it includes an invalid licensing agreement." *Zila*, 502 F.3d at 1023; *accord Modrey v. American Gage & Machine Co.*, 478 F.2d 470, 474 (2d Cir. 1973) (observing that *Brulotte* "held that only as concerns after accrued royalties is an agreement illegal, and that such later accruing royalties are uncollectable"). "Rather, *Brulotte* renders unenforceable only that portion of a license agreement that demands royalty payments beyond the expiration of the patent for which the royalties are paid." *Zila*, 502 F.3d at 1023 (collecting appellate cases, noting that "this rule is not seriously in dispute"). Royalties payable before a patent's expiration date are enforceable under the *Brulotte* rule, *see Modrey*, 478 F.2d at 474–75 (sustaining action for pre-expiration royalty payment, observing that *Brulotte* did "not affect the appellee's claim to the royalty payment" because that payment was "due long before expiration of the patent"), as are royalties

payable under separate patents, *see C.R. Bard, Inc. v. Atrium Med. Corp.*, 112 F.4th 1182, 1193 (9th Cir. 2024) (enforcing royalty provision on sales of product covered by Canadian patents after expiration of U.S. patents, noting that "*Brulotte* . . . does not prohibit royalties that are, by their terms, royalties for something other than use of the expired U.S. patent"); *Brulotte*, 379 U.S. at 29 & n.2 (ignoring patents not incorporated into licensed machine for purposes of preemption analysis).

## III.    DISCUSSION

Novartis's interpretation of Section 8.3(c)—that it entitles Novartis to Jakafi royalties until 2028—does not run afoul of *Brulotte*. The *Brulotte* rule does not apply to royalty agreements that are not negotiated with the leverage of a patent or anticipated patent. That is clearly the case with respect to Jakafi. Incyte concedes, and the pleadings confirm, that Novartis never had any patents covering Jakafi, and that the prospect of a Novartis patent was never more than a hypothetical.

Incyte's argument that Novartis's reading of Section 8.3(c) would render royalties unenforceable for a separate drug product, "Tabrecta," cannot be considered on this motion under Rule 12(c) because that drug is not mentioned anywhere in the pleadings. And in any event, a *Brulotte* violation with respect to Tabrecta would not invalidate Section 8.3(c)(i) with respect to Jakafi.

Accordingly, there remain two reasonable readings of Section 8.3(c): Incyte's, which is not the subject of this motion, and Novartis's. Section 8.3(c) remains ambiguous. A jury will resolve that ambiguity next month.

### A.    *Brulotte* Does Not Bar Novartis's Interpretation of Section 8.3(c)(i)

*Brulotte* is inapplicable to Novartis's interpretation of Section 8.3(c)(i) because, as pleaded, the royalties Novartis seeks from sales of Jakafi "do[] not rely on a patent." *Aronson*, 440 U.S. at 262. Under Novartis's view of Section 8.3(c)(i), Incyte owes royalties to Novartis until *Incyte's* patents covering Jakafi expire. Opp. at 4. Incyte's patents are the only patents covering Jakafi. Novartis,

the party seeking royalties, has never obtained, or even applied for, a patent covering Jakafi. *See* Compl. ¶¶ 19, 25–26; *see also* Mem. at 16 n.7. Incyte contends, nonetheless, that Novartis negotiated the Jakafi royalties with the leverage of "*potential* patent rights that Novartis may obtain covering Jakafi," Mem. at 16 (emphasis Incyte's), because the Agreement defines the royalty-paying period in Section 8.3(c)(i) to include not only patents "Controlled by Novartis . . . as of the [Agreement's] Effective Date" (of which there are none), but also patents controlled by Novartis in the future, at any point "during the [Agreement's] Term," Agreement § 1.79; Opp. at 15. Because Section 8.3(c)(i) does not provide for a reduction of the Jakafi royalties if Novartis fails to obtain a patent, Incyte argues, Novartis's interpretation of Section 8.3(c)(i) would violate *Brulotte*. Opp. at 16 ("A contract that provides for royalties either when a patent expires or when it fails to issue cannot be upheld unless it provides a discount from the alternative-patent protected rate." (quoting *Zila*, 502 F.3d at 1021)).

The mere potential that a licensor may obtain a relevant patent, without more, falls well outside the scope of the *Brulotte* rule. "Commercial agreements . . . are the domain of state law," and "[s]tate law is not displaced merely because the contract relates to intellectual property which may or may not be patentable." *Aronson*, 440 U.S. at 262. As discussed, "[t]he principle underlying [*Brulotte*] was simply that the monopoly granted *under a patent* cannot lawfully be used to 'negotiate with the leverage of that monopoly.'" *Id.* at 265 (quoting *Brulotte*, 379 U.S. at 33) (emphasis in original). The *Brulotte* rule has been extended to instances where a licensor negotiated with the leverage of an already pending or expressly anticipated patent application, *id.*; *Pitney Bowes*, 701 F.2d at 1370 & n.9 (applying *Brulotte* to license for invention "described in then-pending patent applications"); *Boggild*, 776 F.2d at 1320 (applying *Brulotte* to license agreement that expressly anticipated "successful patent applications" and required licensor "to promptly and diligently prosecute . . . patent applications" for the invention); *Meehan*, 802 F.2d at 886 (applying *Brulotte* where "[t]he parties' anticipation and

expectation of an issued patent appear[ed] throughout the contract"), but it has not been extended to the hypothetical possibility that, at some point in the future, a licensor may apply for and obtain a patent covering the licensed invention. To the contrary, where it is evident from the license agreement "that the parties assigned a substantial likelihood" to the possibility that no patent would issue, *Brulotte*'s *per se* rule does not apply, and there is no requirement that royalty payments step down or terminate. *Aronson*, 440 U.S. at 265 (upholding perpetual royalty despite pending patent application).

By Incyte's own admission, Novartis negotiated the royalty provision in Section 8.3(c)(i) with—at most—whatever leverage the "potential that it may obtain a patent" afforded it in negotiations. Opp. at 16. The Agreement contemplates the *possibility* that Novartis may obtain a patent covering Jakafi in the future. Agreement § 1.79 (defining "Novartis Patent Rights" to include, with certain exceptions, "all Patent Rights that . . . are Controlled by Novartis or its Affiliates as of the Effective Date or during the Term"). There is no indication in the complaint or the Agreement that a Novartis patent application covering Jakafi was "pending" or "expressly anticipated." *Boggild*, 776 F.2d at 1320; *Meehan*, 802 F.2d at 885–86; *see* Compl. ¶¶ 19, 25–26.[3] *Brulotte* does not preempt royalty agreements with such a tenuous relationship to federal patent law. *See Aronson*, 440 U.S. at 262 ("State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable; the states are free to regulate the use of such intellectual property in any manner not inconsistent with federal law.").

The parties' broader agreement, as alleged, confirms that the possibility of a Novartis patent played no role in the parties' negotiations of Jakafi royalties. Even perpetual royalty agreements are "consistent with the principles treated in *Brulotte*" where it is clear that federal patent law "played no part" in the negotiations of those royalties. *Aronson*, 440 U.S. at 264–65. Recall that Incyte,

---

[3] Incyte concedes in its brief that Novartis has never filed an application for a patent that covers Jakafi. Mem. at 16 n.7.

according to the complaint, had already developed ruxolitinib before entering into the Agreement.

Compl. ¶ 1.  It entered into the Agreement with Novartis not because Novartis brought its own

inventions to the table, but because Novartis brought "significant and global expertise" on how to

commercialize ruxolitinib, as well as "hundreds of millions of dollars" in "up-front and milestone

payments." *Id.*  The Agreement, consistent with the parties' respective roles, calls Novartis's

payments to Incyte on its drug sales "royalties"—paid from the licensee to the rightsholder, like in

*Brulotte*, Agreement § 8.3(a), and calls Incyte's payments to Novartis "reverse royalties"—paid from

the rightsholder to the licensee, unlike in *Brulotte*, *id.* § 8.3(b)(i).  *See Brulotte*, 379 U.S. at 29–30; *Royalty*

2, Collins Dictionary, https://dictionary.cambridge.org/us/dictionary/english/royalty (defining a

"royalty" as "a payment made to . . . people who have invented things"); *see also Zila*, 502 F.3d at

1020 (noting that a court's "task is not to expand *Brulotte*'s holding beyond its terms").  As alleged,

Incyte's reverse royalties compensated Novartis for its financial and technical contributions to the

commercialization of ruxolitinib, *e.g.*, *id.* ¶ 14, rather than any patents or anticipated patents, *see id.*

¶¶ 19, 24–26; *Pitney Bowes*, 701 F.2d at 1370 & n.9.  That Incyte would continue to compensate

Novartis for its contributions to Jakafi until Incyte's patents in Jakafi expire, as Novartis contends,

would appear to be a perfectly logical commercial decision,[4] *see generally* MTD Ruling at 23–24, and

one that nothing to do with Novartis's abuse of the "leverage" that comes with a "patent

monopoly," *Brulotte*, 379 U.S. at 33–34.

Because the royalties Novartis seeks from Incyte's Jakafi sales were not "negotiated 'with the

leverage' of a patent," they do not run afoul of *Brulotte*.  *Aronson*, 440 U.S. at 265 (quoting *Brulotte*,

---

[4] This is not to say that Incyte's competing view of the parties' agreement regarding Jakafi royalties would not be equally as reasonable.  As the Court explained in its decision on Incyte's motion to dismiss, both parties have "muster[ed] reasonable economic rationales to support their respective interpretations of the Agreement."  MTD Ruling at 23.  Incyte's view, however, is not challenged on this motion.

379 U.S. at 33).[5]  No legal principle bars Novartis's reading of Section 8.3(c)(i) with respect to Jakafi, and accordingly, there remain two reasonable readings of that provision.  *See generally* MSJ Ruling. Section 8.3(c) remains ambiguous.

### B.  Tabrecta Royalties Would Not Render Novartis's Interpretation of Section 8.3(c) Unenforceable

Incyte also argues that Novartis's interpretation of Section 8.3(c)(i) cannot prevail because it would render royalty payments on an entirely different product, "Tabrecta," unenforceable under *Brulotte.*  This argument fails for at least two reasons.  First, Tabrecta is not mentioned anywhere in the pleadings, and accordingly, it is not properly considered on this motion under Rule 12(c).  And second, in any event, *Brulotte* renders royalties unenforceable only to the extent that they extend past the life of the "patent for which the royalties are paid."  *Zila*, 502 F.3d at 1023.  A *Brulotte* violation with respect to Tabrecta would not void Section 8.3(c)(i) with respect to Jakafi.

### i.  The Parties' Putative Agreement Regarding Tabrecta Cannot Be Considered on this Motion for Judgment on the Pleadings

The Court has not considered Incyte's arguments based on the parties' putative agreement for royalties on sales of a product called Tabrecta, Mem. at 2–5, 10–15, 18, because Tabrecta appears nowhere in the materials properly considered on this motion.  In deciding a motion for judgment on the pleadings, the Court "do[es] not look beyond facts stated on the face of the [pleadings]," "documents appended to the complaint or incorporated in the complaint by reference," documents that are "'integral to the complaint," and "matters of which judicial notice may be taken."  *Goel*, 820 F.3d at 559; *see also Sira*, 380 F.3d at 66; Fed. R. Civ. P. 12(c).  The Court has already explained, and Incyte does not dispute, that the universe of materials that are attached, incorporated, or integral to the complaint consists of the Agreement and its subsequent amendments.  MTD Ruling at 12

---

[5] Because this issue is dispositive, the Court takes no position on Novartis's remaining arguments for denial of Incyte's motion.  Opp. at 9–16, 21–27.

(holding that these materials "are integral to the complaint"); *see* Mem. at 2 n.2, 10 n.4.  Incyte argues

that Tabrecta is included in the factual matter alleged in the complaint and stated in the Agreement,

Mem. at 2 n.2, 4, 10 & n.4, and that enough facts about Tabrecta may be judicially noticed to

support Incyte's argument, *id.* at 10 & n.3.  The Court disagrees.

 Tabrecta is not mentioned in the complaint, the Agreement, or any of its amendments.

Incyte contends that, despite this, Tabrecta is included in the pleadings because the complaint and

the Agreement both reference "Licensed Products," *see, e.g.*, Compl. ¶¶ 1, 2, 15; Agreement § 8.3,

and "'c-MET' products," *see, e.g.*, Agreement §§ 1.47, 1.68, and both of these classes of products

"include . . . Tabrecta," Mem. at 2 n.2, 4 (citing nothing for this contention).  Incyte does not

indicate how the Court is supposed to infer that from the pleadings.  The Court is not a chemist;

and even if it was, it would not be proper to leverage that specialized expertise to judicially notice

obscure, potentially contested scientific facts.  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger

U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (observing that judicial notice may not be taken of facts

that "are not usually common knowledge" and are not "derived from an unimpeachable source");

*Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 387 n.2 (E.D.N.Y. 2013) (refusing to judicially

notice "scientific facts" on a university website because the court could not "ascertain who created

[the] website and how that person obtained the scientific facts contained therein").  The pleadings

do not suggest that Tabrecta is a "c-MET product" or a "Licensed Product," because they do not

mention Tabrecta at all.  Tabrecta is not properly considered on this Rule 12(c) motion based on the

factual matter in the pleadings.  *See Sira*, 380 F.3d 57, 66.[6]

---

[6] Incyte also points the Court to the Court's own opinions in this case at the motion-to-dismiss and summary-judgment
stage, noting that those opinions both referenced the terms "Licensed Products" and "c-MET," and that the Court's
summary-judgment opinion referenced "capmatinib," which Incyte says is "the active ingredient in Tabrecta."  Opp. at
5.  Incyte does not explain why the Court's opinions are relevant to this motion for judgment on the pleadings.  *See, e.g.*,
*Sira*, 380 F.3d at 66 ("A district court must convert a motion for judgment on the pleadings to one for summary
judgment if the motion includes material 'outside the pleadings' and that material is 'not excluded by the court.'"
(quoting Fed. R. Civ. P. 12(d))).  Incyte also does not explain how the Court is supposed to know, based on the materials
that it can consider on this motion, that "capmatinib" is "the active ingredient in Tabrecta."  Opp. at 5.  That purported

The Court also cannot judicially notice the facts necessary for Incyte's argument.  Under the Federal Rules of Evidence, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The court "may take judicial notice on its own," and it "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c).  "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)."  *Int'l Star*, 146 F.3d at 70 (citing Fed. R. Evid. 201(b) advisory committee notes).  "Courts need not take judicial notice of irrelevant facts or documents."  *Colon v. City of New York*, No. 16-cv-4540 (VSB), 2023 WL 6497650, at *2 (S.D.N.Y. Oct. 5, 2023); *accord, e.g.*, *United States v. Byrnes,* 644 F.2d 107, 112 (2d Cir. 1981) (finding district court did not abuse discretion in refusing to take judicial notice of regulations that were irrelevant to case); *United States v. Bleznak,* 153 F.3d 16, 21 n.2 (2d Cir. 1998) (denying as moot a motion to take judicial notice of facts "not relevant to our disposition of this appeal").

Incyte asks the Court to judicially notice FDA records regarding Incyte's and Novartis's patents in Tabrecta, Opp. at 10 n.3, but provides no indication that those "facts [are] relevant to the matters before the Court."  *Anthes v. New York Univ.*, No. 17-cv-2511 (ALC), 2018 WL 1737540, at *4 (S.D.N.Y. Mar. 12, 2018), *aff'd sub nom. Anthes v. Nelson*, 763 F. App'x 57 (2d Cir. 2019).  Even if the Court judicially noticed the patent information about Tabrecta, there is nothing in the pleadings to connect the parties' Tabrecta patents to the Agreement.  *See, e.g.*, *Williams v. New York State Off. of*

---

fact, like Tabrecta in general, was not even presented to the Court on summary judgment.  *See generally* MSJ Ruling. Incyte had years to consider developing an argument based on Tabrecta at summary judgment.  It chose not to do so. Dkt. No. 72 (discovery stipulation agreeing, among other things, to "limit discovery concerning . . . 'TABRECTA,'" and to "exclude c-MET/TABRECTA-specific discovery").  This motion for judgment on the pleadings is not an occasion to second-guess Incyte's decision.  *See Sira*, 380 F.3d at 66.

*Mental Health*, No. 10-cv-1022 (SLT) (JO), 2014 WL 1311405, at *1 (E.D.N.Y. Mar. 31, 2014) ("In

deciding a Rule 12(c) motion, the district court may only consider the facts as presented within the

four corners of the complaint."). Again, the pleadings do not mention Tabrecta. The pleadings do

indicate, as Incyte points out, that there are multiple "Licensed Products" covered by the royalty

provision in Section 8.3(c). *See, e.g.*, Compl. ¶¶ 1, 2 (alleging that each party, under the Agreement,

"pays royalties to the other" with respect to "Licensed Products" containing "certain compounds");

Mem. at 2 n.2. But this is a case about just one of those Licensed Products: ruxolitinib. Compl.

¶ 1. Nothing in the pleadings informs the Court that Tabrecta is an additional Licensed Product, *see*

Mem. at 2 n.2, and accordingly, nothing in the pleadings permits an inference that the Tabrecta

patents are covered under the Agreement.[7]

### ii. *Brulotte* Would Not Bar Royalties Paid on Jakafi Sales Based on a Violation with Respect to Tabrecta

In any event, a *Brulotte* violation with respect to Tabrecta would not invalidate Section

8.3(c)(i) with respect to Jakafi. "*Brulotte* does not render an entire contract void and unenforceable

merely because it includes an invalid licensing agreement." *Zila*, 502 F.3d at 1023. "Rather,

*Brulotte* renders unenforceable only that portion of a license agreement that demands royalty

payments beyond the expiration *of the patent for which the royalties are paid*." *Id.* (emphasis added); *see*

*also C.R. Bard*, 112 F.4th at 1193 (observing that *Brulotte* "does not prohibit royalties that are, by their

terms, royalties for something other than the use of the expired U.S. patent").

That is clear from the facts in *Brulotte*. *Brulotte* addressed license agreements that "listed 12

patents relating to hop-picking machines," including one patent that did not expire until after "the

---

[7] Incyte's failure to raise *Brulotte* in its motion to dismiss or in its answer, Dkt. Nos. 34, 48, 63, and its subsequent stipulation with Novartis to "limit discovery concerning . . . 'c-MET' and 'TABRECTA'" and to "not . . . request c-MET/TABRECTA-specific documents or search terms during discovery in this action," Dkt. No. 72, ensured that any factual connection between Tabrecta and Novartis's claims was not the focus of discovery or the parties' motion practice at the summary-judgment stage, *see generally* SJ Ruling.

expiration of the license agreements." 379 U.S. at 30 n.2. The Court ignored that patent, and four others listed in the license agreement, because they were not "incorporated into the machines . . . licensed for use by [the] petitioners." *Id.* at 30. It measured the license agreements' royalty payments only against the life of the patents incorporated into the licensed machines, and, accordingly, invalidated them only "insofar as [they] allow[ed] royalties to be collected which accrued after the last of the patents incorporated into the machines had expired." *Id.* *Brulotte* did not, as Incyte contends, invalidate a license provision based on any patents implicated in the agreement, no matter their relevance to the licensed product. Opp. at 2. It did just the opposite. *See Brulotte*, 379 U.S. at 30; *see also Kimble*, 576 U.S. at 452 (noting that *Brulotte* "held the [license] agreement unenforceable . . . to the extent it provided for the payment of royalties 'accru[ing] afer the last of the patents incorporated into the machines had expired'" (quoting *Brulotte*, 379 U.S. at 3, 32); *Zila*, 502 F.3d at 1023; *C.R. Bard*, 112 F.4th at 1193.

There is, accordingly, no support for Incyte's argument that a *Brulotte* violation with respect to Tabrecta would void Section 8.3(c) with respect to Jakafi. Opp. at 2–3, 10–15. The purported royalties payable for sales of Tabrecta, *see id.* at 11, could easily be rendered unenforceable under *Brulotte* "without affect[ing] [Novartis's] claim to the [Jakafi] royalty payment[s] here involved," *Modrey*, 478 F.2d at 474. Even if *Brulotte* were relevant to any Tabrecta royalties, therefore, they would not render Novartis's reading of Section 8.3(c)(i)—which relates solely to Jakafi— unenforceable.[8]

---

[8] For the avoidance of doubt, the Court takes no position on the merits of Incyte's argument that *Brulotte* would invalidate any purported Tabrecta royalties. *See* Opp. at 11. The Court was not asked to adjudicate the enforceability of any Tabrecta royalties at any stage of this case, and neither party has properly presented any materials with which to assess that question here.

## IV.    CONCLUSION

For the reasons described above, Defendant's motion for judgment on the pleadings is

DENIED.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 480.

SO ORDERED.

Dated:  April 6, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge