UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
NOVARTIS PHARMA AG,                            :

              Plaintiff,              :

          -against-                :

INCYTE CORPORATION,                            :

             Defendant.             :
------------------------------------------------------X

OPINION & ORDER

20 Civ. 400 (GHW) (GWG)

**GABRIEL W. GORENSTEIN, United States Magistrate Judge:**

      Plaintiff Novartis Pharma AG ("Novartis") brought this case against Incyte Corporation

("Incyte") asserting a claim of breach of contract arising under New York law.  See Complaint,

filed January 15, 2020 (Docket # 1) ("Compl.").  Incyte has now filed a motion to compel

Novartis to produce certain documents that it has withheld as attorney-client privileged.[1]  The

sole basis for the motion to compel is that more than two years ago, Novartis filed a declaration

from its attorney on a now-decided motion for summary judgment that contained statements

putting those documents "at issue" in the litigation and thus that Novartis has impliedly waived

the privilege.  Novartis has opposed the motion and has filed a cross-motion to compel Incyte to

---

     [1]  See Incyte's Memorandum of Law in Support of Its Motion to Compel, filed March 3, 2025 (Docket # 526) ("Incyte Mem."); Incyte's Memorandum of Law in Support of Its Motion to Compel, filed March 4, 2025 (Docket # 527) ("Incyte Mem. Sealed"); Notice of Novartis Pharma AG's Memorandum of Law in Opposition to Incyte's Motion to Compel (ECF. No. 526) and in Support of It's [sic] Counter-Motion, filed March 10, 2025 (Docket # 529); Declaration of Michael LeFevour in Support of Novartis Pharma AG's Opposition to Incyte's Motion to Compel (ECF No. 526) and in Support of It's [sic] Counter-Motion, filed March 10, 2025 (Docket # 530) ("LeFevour Decl."); Novartis Pharma AG's Memorandum of Law in Opposition to Incyte's Motion to Compel (ECF. No. 526) and in Support of It's [sic] Counter-Motion, filed March 10, 2025 (Docket # 531) ("Novartis Opp."); Incyte's Reply Memorandum of Law in Support of Its Motion to Compel and in Opposition to Novartis's Cross-Motion, filed March 17, 2025 (Docket # 533) ("Incyte Reply"); Novartis Pharma AG's Reply in Support of Its Counter-Motion (ECF. No. 529), filed March 21, 2025 (Docket # 535) ("Novartis Reply").

produce similar documents in the event Novartis's position is rejected.  As explained further

below, Incyte's motion to compel is conditionally granted and Novartis's cross-motion is denied.

I.    <u>BACKGROUND</u>

Novartis has sued Incyte for breaching the terms of a November 24, 2009, agreement

between the parties regarding royalty (or, as the parties put it, "reverse-royalty") payments on a

pharmaceutical product (the "Agreement").  See <u>Novartis Pharma AG v. Incyte Corp.</u>, 2024 WL

3610438, at *1-2, *30 (S.D.N.Y. July 29, 2024).  The dispute arose because Incyte invoked a

"stepdown provision" in the Agreement, Section 8.3(c), which permitted it to stop making

royalty payments when certain conditions occurred.  <u>Id.</u> at *1.  The dispute in this case "hinges

on the parties' differing interpretations of Section 8.3(c)" of the Agreement and whether a

particular clause was triggered: specifically, a clause that refers to the expiration of "any Valid

Claim of Licensed Patent Rights Covering such Licensed Product" in the United States.  <u>Id.</u>

On March 29, 2021, Novartis included in its initial disclosures of individuals with

discoverable information an attorney named A. Peter Harwich, who was identified as "outside

counsel to Novartis in connection with the Agreement."  Novartis Pharma AG's Rule 26(a)(1)(A)

Initial Disclosures, dated March 29, 2021, annexed as Ex. 1 to LeFevour Decl. (Docket # 530-1),

at 5.

On June 1, 2021, Incyte disclosed Stephen D. Singer, formerly of Wilmer Cutler

Pickering Hale and Dorr LLP ("WilmerHale"), who had served as "outside counsel for Incyte

and drafted the at-issue Agreement," Novartis Opp. at 15.  See Incyte Corporation's

Supplemental Initial Disclosures to Novartis Pharma AG Pursuant to Fed. R. Civ. P. 26(a), dated

June 1, 2021, annexed as Ex. D to Dispute Regarding Deposition of Scott Larsen, filed March

26, 2025 (Docket # 543) (Docket # 543-4), at 3.

Both Harwich and Singer were on the team that negotiated the terms of the Agreement.

Incyte Mem. at 4; Novartis Opp. at 15.

On April 30, 2021, Incyte

served requests for production of documents on Novartis, requesting, inter alia, "[a]ll Documents and Communications regarding the drafting, negotiation, or approval of the Agreement, including internal approvals of Novartis" and "[a]ll Documents and Communications regarding the Parties' intention in agreeing to the 'Incyte Reverse Royalty Rates' as defined in Section 8.3(b) of the Agreement,"

Incyte Mem. at 2-3 (alterations in original).  Novartis "objected to producing any privileged documents."  Id. at 3.  Novartis's privilege logs identify communications related to Harwich as being protected by attorney-client privilege.  See Novartis Supplemental Redaction Log, filed March 4, 2025, annexed as Ex. 4 to Incyte Mem. Sealed (Docket # 527-2); Novartis Second Supplemental Privilege Log - 2/15/2022, filed March 4, 2025, annexed as Ex. 5 to Incyte Mem. Sealed (Docket # 527-3).

On December 28, 2021, the parties entered into a stipulation providing that a party "may elect not to depose a person identified in Initial Disclosures . . . prior to the deadline for the completion of fact discovery in this Action, while reserving all rights."  Stipulation Regarding Fact Depositions, dated December 28, 2021, annexed as Ex. 7 to Incyte Mem. (Docket # 526-7) ("December 28, 2021, Stipulation"), at 2.  Under the stipulation, if a party elected not to depose a disclosed person, the opposing party could still depose that person "at a later date and prior to trial" if the person was listed as a trial witness and the opposing party requested the deposition within five days of service of the trial witness list.  Id.

On February 22, 2022, Novartis deposed Singer.  See Videotaped Deposition of Steven Singer, dated February 22, 2022, annexed as Ex. 11 to Incyte Mem. (Docket # 526-11) ("Singer

Deposition"). In his deposition, and as described further below, Singer answered a number of questions pertaining to the Agreement.

On April 21, 2022, fact discovery closed. See Amendment to Civil Case Management Plan and Scheduling Order, filed March 10, 2022 (Docket # 112), at 1. On October 21, 2022, Novartis submitted a sworn declaration from Harwich as part of Novartis's briefing in support of its motion for summary judgment. See Declaration of A. Peter Harwich in Support of Plaintiff Novartis Pharma AG's Motion for Summary Judgment, filed October 21, 2022 (Docket # 186) ("Harwich Decl."). In the declaration, Harwich stated that he "served as the lead day-to-day partner on the [Allen & Overy LLP] team representing Novartis on this engagement, and all of the contents of this Declaration are based on [his] personal involvement in this capacity in 2009." Id. ¶ 2. The declaration addressed certain terms of the Agreement that were ultimately embodied in Section 8.3. See generally id. ¶¶ 4, 5, 7, 9-14. As will be described in more detail below, Incyte argues that seven statements in this declaration waived attorney-client privilege. At the time the declaration was filed, however, Incyte took no action to compel production of any documents.

On July 29, 2024, the district court denied Novartis's and Incyte's motions for summary judgment, concluding that "the meaning of Section 8.3(c)(i) of the Agreement is ambiguous, and the available extrinsic evidence is capable of multiple reasonable interpretations." Novartis Pharma AG, 2024 WL 3610438, at *2. In coming to this conclusion, the district court relied on Harwich's declaration and Singer's deposition testimony. See id. at *57-58.

Several months later, in February 2025, Novartis filed its witness list, which named Harwich as a trial witness, stating that he would testify on "[c]ommunications between the parties relating to the Agreement and related non-privileged communications." See Plaintiff

Novartis Pharma AG's Witness List, filed February 4, 2025, annexed as Ex. C to Proposed Joint Pretrial Order, filed February 4, 2025 (Docket # 497) ("Proposed Joint Pretrial Order") (Docket # 497-3), at 2. For its part, Incyte's witness list listed Singer as a trial witness, stating that he would testify "about the negotiations between Incyte and Novartis leading to the Agreement and its amendments, the drafting of the term sheets and long form versions of the Agreement, and the drafting and negotiation practices of WilmerHale." Defendant Incyte Corporation's Witness List, filed February 4, 2025, annexed as Ex. D to Proposed Joint Pretrial Order (Docket # 497-4), at 2.

In response to Novartis's witness list, Incyte wrote a letter to Novartis informing Novartis that by submitting the Harwich declaration (more than two years earlier) in connection with its motion for summary judgment in which Harwich "set out his and Novartis's privileged understandings of the meaning of Section 8.3 of the Agreement," and by listing Harwich as a witness testifying about the Agreement, "Novartis has squarely put counsel's mental impression and legal advice 'at issue' and thereby waived any privilege protections as to those topics." Letter, dated January 24, 2025, annexed as Ex. 10 to Incyte Mem. (Docket # 526-10) ("January 24, 2025, Letter"), at 1. It also stated that it would take the deposition of Harwich. Id. at 2. Incyte then unsuccessfully sought from Novartis documents relating to the negotiation of the Agreement on the ground that statements in Harwich's declaration had waived attorney-client privilege. Incyte Mem. at 5.

On March 3, 2025, Incyte filed the instant motion to compel, arguing that "the Court should order Novartis to produce all documents it has withheld as privileged concerning the negotiation, drafting, and interpretation of the royalty term and related provisions of the Agreement dated on or before November 24, 2009." Incyte Mem. at 2. Novartis opposed the motion and cross-moved to compel, arguing that "if the Court is inclined to find a waiver by

Novartis, such a finding would necessitate a finding that Incyte has likewise waived privilege."
Novartis Opp. at 14.

II.    GOVERNING LAW

Because this Court's subject matter jurisdiction is based upon diversity, see Compl. ¶ 10,
state law provides the rule of decision concerning the claim and scope of attorney-client
privilege, see Fed. R. Evid. 501; Dixon v. 80 Pine St. Corp., 516 F.2d 1278, 1280 (2d Cir. 1975).
In New York, the statutory codification of the privilege is as follows:

> [A]n attorney or his or her employee, or any person who obtains without the
> knowledge of the client evidence of a confidential communication made between
> the attorney or his or her employee and the client in the course of professional
> employment, shall not disclose, or be allowed to disclose such communication,
> nor shall the client be compelled to disclose such communication. . . .

N.Y. C.P.L.R. § 4503(a)(1).  For the privilege to apply, the communication from the attorney to
the client must be made "for the purpose of facilitating the rendition of legal advice or services,
in the course of a professional relationship." Rossi v. Blue Cross & Blue Shield of Greater N.Y.,
73 N.Y.2d 588, 593 (1989); see also United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011).
Here, neither party is disputing that attorney-client privilege applies to the underlying
communications being sought.  Instead, the dispute centers around whether Harwich's
declaration impliedly waived the privilege.  See Incyte Mem. at 5; Novartis Opp. at 5.

Courts "have found waiver by implication when a client testifies concerning portions of
the attorney-client communication, . . . when a client places the attorney-client relationship
directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a
claim or defense."  In re Cnty. of Erie, 546 F.3d 222, 228 (2d Cir. 2008) (quoting Sedco Int'l,

S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982) (alterations in original)).[2]  Thus, waiver by

implication (or "at issue" waiver as it is sometimes called) "does not apply exclusively to

situations where a party explicitly relies — or states that it intends to rely — on attorney-client

communications."  Parneros v. Barnes & Noble, Inc., 332 F.R.D. 482, 501 (S.D.N.Y. 2019).

Rather, "at issue" waiver may occur "even where there is no intention to rely on attorney-client

communications."  McGowan v. JPMorgan Chase Bank, N.A., 2020 WL 1974109, at *6

(S.D.N.Y. Apr. 24, 2020).

> Underlying any determination that a privilege should be forfeited is the notion of
> unfairness.  This notion implicates only "the type of unfairness to the adversary
> that results in litigation circumstances when a party uses an assertion of fact to
> influence the decisionmaker while denying its adversary access to privileged
> material potentially capable of rebutting the assertion."

In re Cnty. of Erie, 546 F.3d at 229 (quoting John Doe Co. v. United States, 350 F.3d 299, 306

(2d Cir. 2003), as amended (Nov. 25, 2003)).  In other words, "fairness considerations arise when

the party attempts to use the privilege both as 'a shield and a sword.'"  In re Grand Jury Proc.,

219 F.3d 175, 182 (2d Cir. 2000).

In a similar vein, the First Department of the Appellate Division of the State of New York

has held that

> "At issue" waiver of privilege occurs where a party affirmatively places the
> subject matter of its own privileged communication at issue in litigation, so that
> invasion of the privilege is required to determine the validity of a claim or defense
> of the party asserting the privilege, and application of the privilege would deprive

---

[2]  While In re Cnty. of Erie was decided under federal privilege law, New York law on
attorney-client privilege is "generally similar to accepted federal doctrine."  Bank of Am., N.A.
v. Terra Nova Ins. Co. Ltd., 211 F. Supp. 2d 493, 495 (S.D.N.Y. 2002) (citation omitted); accord
McGowan v. JPMorgan Chase Bank, N.A., 2020 WL 1974109, at *2 n.3 (S.D.N.Y. Apr. 24,
2020); see also Edebali v. Bankers Standard Ins. Co., 2017 WL 3037408, at *4 n.2 (E.D.N.Y.
July 17, 2017) ("[T]he distinction between New York and federal law on attorney-client privilege
is quite indistinguishable, as the law intersects in all of its facets, and are viewed
interchangeably." (citation omitted)).  Because the law of the two jurisdictions is similar in all
respects discussed in this opinion, we sometimes cite to cases applying federal law.

the adversary of vital information.

Deutsche Bank Tr. Co. of Ams. v. Tri-Links Inv. Tr., 43 A.D.3d 56, 63 (1st Dep't 2007); accord

MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 2012 WL 2568972, at *6 (S.D.N.Y. July 3,

2012). Thus, "at issue" waiver occurs when the truth of the witness's testimony "can only be

assessed by examination of a privileged communication." Chin v. Rogoff & Co., P.C., 2008 WL

2073934, at *6 (S.D.N.Y. May 8, 2008) (citing Bowne of N.Y. City, Inc. v. AmBase Corp., 150

F.R.D. 465, 488 (S.D.N.Y. 1993)).

Under New York law, "the burden of establishing any right to protection is on the party

asserting it; the protection claimed must be narrowly construed; and its application must be

consistent with the purposes underlying the immunity." Spectrum Sys. Int'l Corp. v. Chem.

Bank, 78 N.Y.2d 371, 377 (1991) (citing cases). It is also the burden of the party asserting a

privilege to establish that it has not been waived. See John Blair Commc'ns, Inc. v. Reliance

Cap. Grp., 182 A.D.2d 578, 579 (1st Dep't 1992). Any showing that relies on factual contentions

must be made through "competent evidence" such as "affidavits, deposition testimony or other

admissible evidence." Parneros, 332 F.R.D. at 491; see Bowne of N.Y. City, Inc., 150 F.R.D. at

472. Thus, the burden cannot be met by "mere conclusory or ipse dixit assertions" in unsworn

motion papers authored by attorneys. von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 146

(2d Cir. 1987) (quoting In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965)).

III.    INCYTE'S MOTION TO COMPEL

Incyte's motion to compel raises the following issues: (1) whether Incyte's motion is

timely; (2) whether Harwich's declaration impliedly waived attorney-client privilege; and (3) if

so, the scope of that waiver. See Incyte Mem. at 1-2; Novartis Opp. at 5, 8, 11, 13. We address

these issues in turn.

A.  Whether Incyte's Motion Is Untimely

Novartis argues that Incyte's motion is untimely because it was filed after fact discovery closed on April 21, 2022, and years after Harwich's declaration was filed.  Novartis Opp. at 11-12.  Novartis notes that Incyte "has been aware of Mr. Harwich since the outset of litigation when Novartis included him in its list of initial disclosures."  Id. at 12.

We recognize that "[a] party ordinarily must file a motion to compel before the close of discovery and if it fails to do so, the motion will be deemed untimely."  Owen v. No Parking Today, Inc., 280 F.R.D. 106, 112 (S.D.N.Y. 2011).  But a motion to compel discovery may be filed after the close of discovery if the movant "establish[es] good cause."  Gucci Am., Inc. v. Guess?, Inc., 790 F. Supp. 2d 136, 139 (S.D.N.Y. 2011).  "[A] finding of 'good cause' depends on the diligence of the moving party."  Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000).  Here, the April 2022 discovery deadline could not have established a cutoff for bringing this particular motion to compel because the alleged waiver did not occur until long after the deadline and while the summary judgment briefing was underway.  Thus, it would have been impossible for Incyte to have made the instant motion before the discovery deadline.  As a result, Incyte had good cause to make the motion at some point after the discovery deadline.

That being said, Incyte never explains why it did not make the motion at the first opportunity to do so — when Harwich's declaration was filed in October 2022 — instead of more than two years later.  Incyte's only statement on this point is to assert that the "issue" did not become "ripe" until "January 17, 2025 when Novartis listed Mr. Harwich as a trial witness."  Incyte Reply at 15.  But the issue was already "ripe" in October 2022 when Harwich's declaration was filed and obtaining the documents then might have had utility in the briefing of that motion.

Nonetheless, we find that Incyte has shown "good cause" to file the motion when it did based on several considerations. First, as described above, the motion simply could not have been brought by the only applicable court-ordered deadline: the close of discovery. Second, there was no obvious deadline for the making of the motion. Third, while Incyte could have sought to halt summary judgment briefing to obtain the documents it now seeks, both Novartis and the Court benefited from Incyte's decision to allow summary judgment briefing to proceed without requiring production of the documents it now seeks. Any effort to obtain the documents during summary judgment briefing — for example, by invoking Fed. R. Civ. P. 56(d) — would have required a potential halt to and rebriefing of the summary judgment motion. Instead, Incyte was apparently prepared to accept the outcome of the summary judgment motion without the documents. Fourth, the parties had entered into a stipulation that allowed for the deposition of witnesses who were named in the trial witness lists and who had not previously been deposed. See December 28, 2021, Stipulation. Thus, potential future discovery was contemplated anyway even if it was only in the form of depositions. Finally, we cannot fault Incyte for not seeking to obtain the documents at the summary judgment stage given that, under the stipulation, see id. at 2, Incyte could not have deposed Harwich about the documents until he was listed as a trial witness. Once Harwich was listed as a witness, Incyte promptly moved to obtain the documents. See January 24, 2025, Letter.

For these reasons, we find that Incyte acted with the "diligence" required for the good cause analysis. Parker, 204 F.3d at 340. This conclusion is consistent with the ruling in MBIA Ins. Corp., which found, in similar circumstances, that it was acceptable for a party to wait until after a pre-trial order had been filed to move to compel based on privilege waiver --- even though the alleged waiver had been disclosed during the course of summary judgment briefing. See

2012 WL 2568972, at *9 (noting that "[t]he privilege issue would have been rendered moot had the Court granted [the movant's] motion" for summary judgment).

    B.  Whether Harwich's Declaration Impliedly Waives Privilege

    Incyte argues that "Novartis waived privileged [sic] by submitting Mr. Harwich's declaration, which disclosed privileged information regarding the purported 'understanding' and 'intent' of Novartis and its counsel central to the dispute between the parties."  Incyte Mem. at 5. Incyte points to the following statements contained in Harwich's declaration:

[1.]    "The use of the phrase 'reverse' royalty, including in Section 8.3(b)(i) of the Agreement, reflected Novartis' understanding that the patent holder (Incyte) would be paying a royalty to the non-patent-holder (Novartis)," [Harwich Decl.] ¶ 5 (emphasis added);

[2.]    "As it related to Incyte IP, Novartis did not intend the term 'Licensed Patent Rights' to have a new or different meaning or effect," id. at ¶ 7 (emphasis added);

[3.]    "I understood the guiding principle behind Section 8.3(c) to be two-fold," id. at ¶ 12 (emphasis added);

[4.]    "I understood the principle informing Section 8.3(c)(i) to be if either collaborator had a patent that protected a Licensed Product from competition in the relevant country (i.e., where the sales are taking place), then Section 8.3(c)(i) would apply to calculate the duration of the Royalty Term applicable to sales of that Licensed Product in that country," id. at ¶ 13 (emphasis added);

[5.]    "I understood that if any patent or regulatory exclusivity within the scope of the parties' collaboration provided the party selling a Licensed Product with pricing power and market exclusivity, then the selling party would be required to pay full royalties to the other party at the applicable agreed-upon royalty rates," id. at ¶ 13 (emphasis added);

[6.]    "I understood a 50% reduction in royalties would only apply if that pricing power via market exclusivity were lost and/or the drug were faced with Generic Competition," id. at ¶ 13 (emphasis added);

[7.]    "I did not understand there to be any requirement for Novartis to [obtain U.S. patents] in order to receive any reverse royalty payments," id. at ¶ 14 (emphasis added).

Incyte Mem. at 4-5.  Incyte argues that these statements "necessarily implicate privileged communications with Novartis," and consequently, "Novartis waived privilege in affirmatively offering Mr. Harwich's sworn declaration."  Id. at 9.

For its part, Novartis argues that these statements "are independent of any privileged communications [Harwich] may have had with Novartis." Novartis Opp. at 5. Novartis contends that the statements "are based . . . on Mr. Harwich's discussions with Incyte and its counsel and on the documents exchanged between the parties." Id. at 6. It argues that "[t]his is apparent from the face of the declaration—which clearly stated '[n]othing herein is intended to waive any protection or privilege that may exist, including that which may belong to Novartis'— and will be further supported once Incyte deposes Mr. Harwich." Id. at 5 (alterations in original) (citing Harwich Decl. ¶ 2).

We first address the statements in which Harwich declares his own understanding of various terms in the Agreement (statements 3 through 7 above) and then address the statements in which Harwich states Novartis's understanding and intent in relation to the Agreement (statements 1 and 2 above).

### 1. Harwich Understandings

In statements 3 through 7, Harwich repeatedly declares his understandings of certain contractual terms at the time of the negotiations. Incyte argues that the fact that Harwich testified about his understandings of these terms at the time of the negotiations "necessarily implicate[s] privileged communications with Novartis." Incyte Mem. at 9. But there is nothing in the text of those statements or the surrounding circumstances as described in the declaration to suggest that Harwich's own understandings of those terms relied on any communications with his client. In the course of negotiating an agreement, an attorney will naturally form understandings of the meaning of various key terms that are discussed by the parties without those understandings necessarily having been based on privileged communications. We thus

reject the argument that statements 3 through 7 "implicate privileged communications with

Novartis." Id.

It is of no importance that, as Incyte points out, "Novartis has the burden of proving it did

not waive privilege."  Incyte Reply at 3; see John Blair Commc'ns, Inc., 182 A.D.2d at 579.

First, Novartis has met that burden inasmuch as there is nothing in the statements or their context

that suggests that they rely on privileged communications.  Second, "the party arguing for a

waiver" has an obligation to make "some showing" that "the opposing party relies on . . .

privileged communication[s]." In re Cnty. of Erie, 546 F.3d at 228 (emphasis omitted).  Incyte

has not made this initial showing.

Incyte finds it significant that Harwich's "understandings" are not alleged to have been

communicated to Incyte.  See Incyte Reply at 6 n.1.  While this fact might support an argument

for excluding the evidence as irrelevant under Federal Rule of Evidence 401, the Court sees no

reason why it bears on whether Harwich's understandings relied on privileged communications.

There is simply no reason to believe that Harwich's understandings of the meaning of the

contract terms derived from his communications with his client.

Tellingly, Incyte acknowledges that it plans to have a "number of non-lawyer witnesses

who will 'testify as to their understanding of the contract language.'" Id. at 7.  Incyte thus

implicitly admits that such understanding can be held by a person without there having been

attorney-client discussions on the topic.  An attorney, like Harwich, can similarly form an

understanding of a contract term without any attorney-client discussions on the matter.  Indeed, it

seems far more likely that an attorney would arrive at such an understanding without attorney-

client communications than a non-attorney.  In sum, there is nothing unfair — the touchstone of

the "at issue" waiver doctrine — in denying Incyte's discovery motion seeking communications between Harwich and his client regarding Harwich's own understandings of the contract terms.

    2.  Novartis's Intent and Understanding

In statements 1 and 2, Harwich states not his own understanding but "Novartis' understanding" of a term and states what Novartis "did not intend" with respect to a term. Logic dictates that Harwich could only have known Novartis's intent and understanding through a communication from Novartis.

Novartis seeks to avoid this conclusion by arguing, as to the first statement, see Harwich Decl. ¶ 5, that the "surrounding contextual language" makes clear "that the understanding was based on the plain language of the contract, specifically citing Section 8.3." Novartis Opp. at 7. As to the second statement, see Harwich Decl. ¶ 7, Novartis argues that "Harwich explained in the very next paragraph that this understanding was based on discussions with Incyte's counsel." Novartis Opp. at 7 (citing Harwich Decl. ¶ 8). As to both, Novartis makes the more general argument that "looking at the entirety of Mr. Harwich's declaration and in its full context, it is clear that it is based on the parties' negotiations and inter-party discussions, not privileged communications." Id. Novartis does not explain why the "surrounding contextual language" or Harwich's "discussions with Incyte's counsel," id., provided Harwich with information about Novartis's own intent and understanding.

Having examined the declaration in its entirety, we do not believe that the declaration suggests that the challenged statements were based on the language of the Agreement or discussions with opposing counsel. In any case, as a practical matter, Harwich's understanding of Novartis's intent and understanding could only have come from Novartis — not from the opposing party to the negotiation.

This conclusion is supported by case law. For instance, a case from the Third Department of the Appellate Division held that where a "plaintiff chose to have her attorney testify about their negotiating intent, she impliedly waived the attorney-client privilege." Jones v. Gelles, 167 A.D.2d 636, 639 (3d Dep't 1990). It is also consistent with MBIA Ins. Corp., which held that statements concerning certain witnesses' "intent and interpretation" of contracts resulted in a waiver. 2012 WL 2568972, at *8.

Novartis does not argue that Harwich's references to Novartis were meant to be references to Harwich's own intent and understanding obtained during the negotiations. Nor does Harwich's declaration provide any further clarification as to these statements. While Novartis's brief does make some factual claims about this language — for example, that the statements "are independent of any privileged communications [Harwich] may have had with Novartis," and that the statements "are based not on privileged communications but on Mr. Harwich's discussions with Incyte and its counsel and on the documents exchanged between the parties," see Novartis Opp. at 5-6 — these factual assertions are both conclusory and not supported by any statement from Harwich himself.

Novartis also does not argue that the accuracy of Harwich's portrayal of Novartis's intent and understanding is not a subject in dispute. Thus, it does not argue that any documents that contradict Harwich's representation of Novartis's intent and understanding are irrelevant to any claims in this case.

Novartis argues that there is no waiver because "Novartis is not relying on advice of counsel as part of its claims against Incyte in this case." Id. at 8. According to Novartis, this means that "there are no sword/shield or 'fairness' concerns that are the 'touchstone of the "at issue" waiver doctrine'" — and thus, "[a]ll of Incyte's cases are inapposite." Id. at 9 (citing

15

Parneros, 332 F.R.D. at 501). But "[w]hether fairness requires disclosure . . . [is] decided . . .
on a case-by-case basis . . . depen[ding] on the specific context in which the privilege is
asserted." In re Cnty. of Erie, 546 F.3d at 229 (citation and punctuation omitted). It is not
necessary that there be reliance on "advice of counsel" for the application of the "at issue"
waiver doctrine. Rather, the core consideration of whether the "privilege should be forfeited is
the notion of unfairness" resulting from a party "us[ing] an assertion of fact to influence the
decisionmaker while denying its adversary access to privileged material potentially capable of
rebutting the assertion." Id. (quoting John Doe Co., 350 F.3d at 306). Thus, there may be waiver
even in situations where a party is not relying on "advice of counsel," such as "when a client
testifies concerning portions of the attorney-client communication." Id. at 228.

Finally, Novartis notes that the parties' June 29, 2021, discovery stipulation, see
Stipulation and Order Regarding the Production of Paper Documents and Electronically Stored
Information, filed June 30, 2021 (Docket # 68) ("June 29, 2021, Stipulation"), contains a
provision referring to an "attorney's" existing "ethical responsibilit[y]" to inform the opposing
party if privileged materials "have been produced." Novartis Opp. at 12-13 (citing June 29,
2021, Stipulation § XIII(E) ("Nothing in this Stipulation overrides any attorney's ethical
responsibilities to . . . inform the Disclosing Party that [privileged materials] have been
produced." (alterations in original))). Novartis then argues that

> [i]f Incyte believed that Mr. Harwich's declaration waived privilege, it actually
> had an ethical obligation to notify Novartis under the parties['] agreed-upon
> stipulation. That Incyte did not take such action is only further proof that Incyte
> did not believe the declaration waived any privilege when it received it in 2022.

Id. at 13. This argument is meritless. The stipulation's reference to an attorney's existing
"ethical responsibilities" to inform the opposing party if privileged materials "have been
produced," see June 29, 2021, Stipulation § XIII(E), could only be referring to the ethical rule

that requires an attorney to inform an opposing party that there has been transmission of a "document or electronically stored information" that was "inadvertently sent," See New York Rules of Prof. Conduct r. 4.4(b); Model Code of Prof. Conduct r. 4.4(b) (Am. Bar. Ass'n 2024). Here, Harwich's declaration was not "inadvertently" filed, let alone "sent." Additionally, there is no claim that Harwich's statement was itself a privileged communication. The ethical rule cannot be stretched to require Incyte to have pointed out to Novartis that Novartis had filed an affidavit that would subject it to an argument regarding implied waiver.

      C.  Scope of the Waiver

"When a waiver of attorney-client privilege or work product protection has occurred, the court then must address the scope of the waiver." Pearlstein v. BlackBerry Ltd., 2019 WL 1259382, at *7 (S.D.N.Y. Mar. 19, 2019). "The determination of . . . to what extent waiver has occurred is inherently factual and turns on case-by-case considerations of 'fairness.'" People v. Kozlowski, 11 N.Y.3d 223, 246 (2008) (citing John Doe Co., 350 F.3d at 302); see In re von Bulow, 828 F.2d 94, 101-02 (2d Cir. 1987) (assessing the scope of waiver while referencing notions of fairness). "[I]f the court finds that the privilege was waived, then the waiver should be tailored to remedy the prejudice." In re Grand Jury Proc., 219 F.3d at 188; accord United States Sec. & Exch. Comm'n v. Collector's Coffee Inc., 338 F.R.D. 309, 322 (S.D.N.Y. 2021) ("In such a situation the scope of the waiver should be 'tailored to remedy the prejudice to the' opposing party." (citation omitted)).

      As one court has written,

> Because of the fragility of broad generalizations and sometimes per se rules, in the context of determining fairness, it is more prudent to decide the at issue waiver on a case by case basis, which "depends primarily on the specific context in which the privilege is asserted" or on its own particular facts.

Trudeau v. N.Y. State Consumer Prot. Bd., 237 F.R.D. 325, 341 (N.D.N.Y. 2006) (citations omitted). Courts have also noted that "[t]he widely applied standard for determining the scope of a waiver is that the waiver applies to all other communications relating to the same subject matter." Skyline Steel, LLC v. PilePro, LLC, 2015 WL 4480725, at *2 (S.D.N.Y. July 22, 2015) (quoting In re Seagate Tech., LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007)); Pearlstein, 2019 WL 1259382, at *7 ("When there has been a selective disclosure of attorney-client communications in the litigation, courts typically find the party has waived privilege as to all documents pertaining to the subject disclosed." (citation omitted)).

Incyte argues that because "Harwich purported to speak to Novartis's understanding and intent as a whole," Incyte is "'entitled to all documents that concern' Novartis's 'intent and interpretation of the contracts' pre-dating the Agreement." Incyte Reply at 12. In other words, because Harwich allegedly "purport[s] to speak to the company's intent and collective understanding," Incyte is "entitled to documents that might help Incyte test the veracity of and rebut that assertion, even if those communications do not involve Mr. Harwich." Id.

However, the statements that we have now determined form the basis of the waiver are quite narrow, and do not include any of Harwich's "understandings." The only factual assertions in the declaration that must be tested by means of producing related documents are (1) that Novartis understood "that the patent holder (Incyte) would be paying a royalty to the non-patent-holder (Novartis)," and (2) that "Novartis did not intend the term 'Licensed Patent Rights' to have a new or different meaning or effect," compared to the term "Licensed IP." Harwich Decl. ¶¶ 5, 7. Because the scope of the waiver must be "tailored to remedy the prejudice," In re Grand Jury Proc., 219 F.3d at 188, the required production is limited to information that is "potentially capable of rebutting the assertion[s]" made in the two statements. In re Cnty. of Erie, 546 F.3d at

229 (citing <u>John Doe Co.</u>, 350 F.3d at 306).  Thus, Novartis's waiver, if it is to be enforced (<u>see</u> Section V below), would require Novartis to produce only documents previously withheld as privileged that address these two specific factual contentions.

## IV.   NOVARTIS'S CROSS-MOTION TO COMPEL

Novartis requests that if "this Court" grants "Incyte's motion," it should "find that both parties have waived privilege."  Novartis Opp. at 2.  Novartis argues that if Harwich's testimony waives privilege "then Incyte has also waived privilege given Incyte witnesses have provided similar testimony."  <u>Id.</u> at 14-15.  Specifically, Novartis contends that the deposition testimony of Singer, outside counsel for Incyte during the drafting of the Agreement, and the deposition testimony of Keith Mikkelson and Daniel Maravei, lead negotiators of the Agreement for Incyte, result in a waiver of attorney-client privilege by Incyte.  <u>Id.</u> at 14-17.

As to Singer's testimony, Novartis acknowledges that "Singer testified as to <u>his</u> understanding of the Agreement."  <u>Id.</u> at 15 (emphasis added); <u>see</u> Singer Deposition at 167:16-17 (confirming that Singer was giving his "interpretation of the agreement").  Indeed, it appears that Singer was not even testifying as to his understanding or interpretation at the time of the Agreement, but was instead speaking about his understanding at the time of his deposition.  <u>See</u> Singer Deposition at 167:18-21 ("I don't recall at the time what the purpose might have been. But I can tell you what I think the plain words of the agreement say."); <u>id.</u> at 168:14-18 ("That would be the intent and purpose from my perspective, but that's my analysis now.  If you ask me what I remember from back then, again, I just don't recall exactly.").[3]  Regardless, as already

---

[3]  Novartis notes that Singer agreed with a questioner's statement that "Incyte was adhering thoroughly to the [final] term sheet" when it drafted the original draft of the agreement. Novartis Opp. at 15 (citing Singer Deposition at 119:20-24).  While Novartis argues that this means that "Mr. Singer testified as to Incyte's intent and understanding of the Agreement,"

discussed, there is no basis for concluding that a negotiating attorney's understanding of an agreement is based on client communications. Accordingly, Singer's testimony does not justify any finding of waiver.

The same result is true for the statements of Incyte's "lead negotiators," Mikkelson and Maravei, see Novartis Opp. at 16. Novartis does not explain the roles of these individuals, but it appears they are employees of Incyte and not outside attorneys. See, e.g., Deposition of Daniel Maravei, dated March 3, 2022, annexed as Ex. 3 to LeFevour Decl. (Docket # 530-3), at 313:2 ("I'm not an attorney or contract legal expert."); Deposition of Keith Mikkelson, dated March 17, 2022, annexed as Ex. 250 to Declaration of Eric Stops in Support of Incyte's Opposition to Novartis's Motion for Summary Judgment, filed December 7, 2022 (Docket # 265) (Docket # 265-7), at 11:9-11 (Mikkelson's "current position at Incyte" is "Division vice president, head of business development and licensing"). Additionally, we do not read the cited statements from their respective testimony as making any definitive statements about Incyte's intent. However, even if they had, these individuals could certainly testify as to their (and thus Incyte's) intent without reliance on attorney-client communications. Novartis does not provide any reason why it should be presumed that Maravei and Mikkelson relied on such communications to give their testimony. Thus, Novartis has not made its initial showing "that the opposing party relies on . . . privileged communication." In re Cnty. of Erie, 546 F.3d at 228.

In sum, Incyte did not waive attorney-client privilege as a result of Singer's, Maravei's, or Mikkelson's testimony.

---

Novartis Reply at 4, the context of the questioning makes clear that Singer was simply giving his recollection of the drafting process.

V.    NOVARTIS'S INTENT TO LIMIT HARWICH'S TESTIMONY AT TRIAL

In its opposition brief, Novartis asserts that the motion to compel should not be granted because "Mr. Harwich is not going to testify at trial regarding Novartis's understanding and intent regarding the Agreement."  Novartis Opp. at 11.  In support of this result, Novartis cites to MBIA Ins. Corp., which found a waiver had occurred when witnesses testified on the intent of the corporate parties in the agreement.  2012 WL 2568972, at *7. Yet, notwithstanding the finding of waiver, MBIA Ins. Corp. concluded by noting that "[i]f no such testimony will be proffered, no waiver will be enforced."  Id. at *9 (emphasis added).  Accordingly, MBIA Ins. Corp. reflects that even where statements offered in the course of summary judgment briefing operate as an "at issue" waiver, the waiver would not be enforced (once the summary judgment motion was decided) as long as the testimony that engendered the waiver is not offered at trial.

Although Incyte otherwise heavily relies on MBIA Ins. Corp., Incyte is silent as to this aspect of MBIA Ins. Corp.  Incyte does address the issue generally (without reference to MBIA Ins. Corp.)  in its initial memorandum by arguing that "Novartis cannot now undo its own waiver by limiting Mr. Harwich's testimony at trial."  Incyte Mem. at 10.  To support this argument, Incyte cites Alta Partners, LLC v. Getty Images Holdings, Inc., 2023 WL 5717483, at *1 (S.D.N.Y. Sept. 5, 2023), which states that "[o]nce the privilege is waived, it cannot magically be regained.  Id. at *1.  MBIA Ins. Corp., however, covers a circumstance — an "at issue" waiver, see 2012 WL 2568972, at *5 — that is directly analogous to the present circumstance, while Alta Partners, LLC involved privileged communications that had already been produced and reviewed by adverse counsel, see 2023 WL 5717483, at *1.  We therefore find MBIA Ins. Corp. to be more

21

persuasive on this point.[4]

In any event, as already noted, "[w]hether fairness requires disclosure . . . [is] decided . . . on a case-by-case basis . . . depen[ding] on the specific context in which the privilege is asserted." In re Cnty. of Erie, 546 F.3d at 229 (citation omitted). Here, context strongly favors permitting Novartis to avoid enforcement of any waiver by agreeing to preclude any testimony from Harwich as to Novartis's intent und understanding. The only potential unfairness --- the touchstone of "at issue" waiver --- occurred more than two years ago when the Harwich declaration was first filed as part of the summary judgment motion. Incyte could have remedied that unfairness by invoking Fed. R. Civ. P. 56(d) to demand the production of the underlying privileged documents. At that time, enforcing the "at issue" waiver would have had the practical effect of allowing Incyte to obtain the documents to counter Harwich's statements that relied on privileged communications and to offer them to influence the adjudication of the motion. Instead, Incyte allowed summary judgment briefing to proceed, made arguments that the Harwich declaration favored its position, see Incyte's Opposition to Novartis's Motion for Summary Judgment, filed December 7, 2022 (Docket # 261), at 22 n.10, and awaited the district court's disposition of the summary judgment motion. Now that the summary judgment motion has been decided and denied, the past proffering of the Harwich declaration will have no effect whatsoever on the jury trial.

Waiver can only be "justified by considerations of fairness to the adversary" based on the

___

[4] In Regeneron Pharms., Inc. v. Merus B.V., 144 F. Supp. 3d 530 (S.D.N.Y. 2015), aff'd, 864 F.3d 1343 (Fed. Cir. 2017), the court addressed a waiver issue by ordering preclusion of the testimony that would have resulted in the waiver (as well as other sanctions) instead of reopening discovery. See id. at 594-95. As to the sanctions, the case involved "highly unusual circumstances" not present here. Id. at 595. We thus view it more appropriate to follow the path of MBIA Ins. Corp. --- with its fact pattern far more analogous to the instant case --- by giving Novartis the option of not offering the testimony at issue.

principle that "it would be unfair for a party <u>asserting contentions to an adjudicating authority</u> to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions." <u>John Doe Co.</u>, 350 F.3d at 302 (emphasis added). The doctrine thus does not address past testimony that no longer has any significance to the litigation. Without the statements from Harwich being proffered to an adjudicating authority, the unfairness remains long in the past and Incyte cannot now revive that unfairness. To require production of the documents now — whose purpose would be only to fix an imbalance that occurred during the summary judgment briefing — would amount to a pointless punishment of Novartis. It certainly would not vindicate the purpose of the "at issue" waiver doctrine: to avoid the unfairness that results when a party "uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion." <u>In re Cnty. of Erie</u>, 546 F.3d at 229.

Accordingly, if Novartis agrees to limit Harwich's testimony to eliminate references to Novartis's intent and understanding, no waiver would be enforced here because there would be no "decisionmaker" who would be improperly "influence[d]," <u>id.</u>, by Harwich's testimony, and thus there would be no unfairness in depriving Incyte of the attorney-client communications it seeks.

As we have previously noted in analogous contexts, a court may require a party to disclose "whether it intends to rely on factual assertions or corresponding defenses that would require a waiver of the attorney-client privilege." <u>In re Buspirone Antitrust Litig.</u>, 208 F.R.D. 516, 522 (S.D.N.Y. 2002); <u>accord</u> <u>McGowan</u>, 2020 WL 1974109, at *8. Accordingly, Novartis is directed to file a letter on the ECF system within two business days indicating whether it will exclude testimony from Harwich as to Novartis's intent and understanding with respect to the

Agreement.  If such a letter is filed, the waiver will not be enforced and thus no documents need be produced.

    VI.    <u>CONCLUSION</u>

       For the foregoing reasons, Novartis's motion to compel (Docket # 529) is denied. Incyte's motion to compel (Docket # 526) is granted except that Novartis will not be required to produce any documents if it files a letter on or before April 21, 2025, agreeing to limit Harwich's testimony as set forth in Section V above.   If such a letter is not filed, Novartis shall produce the documents to Incyte on or before April 24, 2025.

SO ORDERED.

Dated:  April 17, 2025
       New York, New York

                                    _____
                                      GABRIEL W. GORENSTEIN
                                   United States Magistrate Judge